No._____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AVNER GREENWALD, individually and on
behalf of all others similarly situated,
*Plaintiff-Respondent*,

v.

RIPPLE LABS INC., *et al.*
*Defendants-Petitioners*,

**On Petition for Permission to Appeal from The United States District Court
for the Northern District of California, No. 4:18-cv-04790-PJH
The Honorable Phyllis J. Hamilton**

**DEFENDANTS-PETITIONERS' PETITION FOR PERMISSION TO
APPEAL FROM ORDER GRANTING MOTION TO REMAND
PURSUANT TO 28 U.S.C. § 1453(c)(1)**

PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

JOHN NEUKOM (SBN 275887)
john.neukom@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone:   (650) 470-4500
Facsimile:    (650) 470-4570

Attorneys for Petitioners Ripple Labs
Inc., et al.

**CORPORATE DISCLOSURE STATEMENT PURSUANT TO F.R.A.P. 26.1**

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners state as follows:

Defendant Ripple Labs Inc. has no parent corporation. SBI Holdings, Inc. is a publicly held corporation that owns 10% or more of the stock of Ripple Labs Inc.

The parent corporation of XRP II, LLC is Ripple Labs Inc. No publicly held corporation owns 10% or more of the membership interests in XRP, II LLC.

DATED: October 25, 2018

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____ */s/ Peter B. Morrison*
Peter B. Morrison
Attorneys for Petitioners

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT PURSUANT TO F.R.A.P. 26.1 ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION AND RELIEF SOUGHT .............................................. 1

STATEMENT OF THE FACTS ................................................................. 7

QUESTIONS PRESENTED ....................................................................... 8

REASONS WHY APPEAL SHOULD BE ALLOWED ........................... 9

    I.    This Court Should Allow This Appeal To Reconsider *Luther* ............... 9

        A.    Subsequent Supreme Court Authority Rejected The Presumption On Which *Luther* Relied ............................. 9

        B.    Courts That Have Considered The Question Presented In *Luther* Have Reached The Opposite Conclusion Resulting In A Circuit Split That This Court Can Now Resolve ............................................................................... 11

        *C.*    *Luther* Did Not Consider That Claims Subject To A Removal Bar Were Removable Under The Plain Language Of CAFA ..................................................... 14

    II.    Alienage Jurisdiction Is Based On Uniquely Federal Concerns That Were Neither Present Nor Considered In *Luther* .......................... 17

CONCLUSION .......................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*17th Street Associates, LLP v. Markel International Insurance Co.*,
   373 F. Supp. 2d 584 (E.D. Va. 2005) ......................................................18, 19

*Blausey v. United States Trustee*,
   552 F.3d 1124 (9th Cir. 2009) ......................................................................16

*Coffey v. Ripple Labs*,
   No. 18-cv-03286-PJH,
   2018 WL 3812076 (N.D. Cal. Aug. 10, 2018) ......................................*passim*

*Coleman v. Estes Express Lines, Inc.*,
   627 F.3d 1096 (9th Cir. 2010), *aff'd*,
   631 F.3d 1010 (9th Cir. 2011) .........................................................5, 9, 11, 18

*Dart Cherokee Basin Operating Co., LLC v. Owens*,
   135 S. Ct. 547 (2014) ......................................................................2, 3, 10, 11

*Duncan v. Walker*,
   533 U.S. 167 (2001) ......................................................................................16

*Eminence Investors, L.L.L.P. v. Bank of New York Mellon*,
   782 F.3d 504 (9th Cir. 2015) .........................................................................14

*Jordan v. Nationstar Mortgage LLC*,
   781 F.3d 1178 (9th Cir. 2015) ..............................................................2, 10, 11

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*,
   536 U.S. 88 (2002) .........................................................................................18

*Katz v. Gerardi*,
   552 F.3d 558 (7th Cir. 2009) ....................................................................*passim*

*Koehler v. Bank of Bermuda (New York) Ltd.*,
   229 F.3d 187 (2d Cir. 2000) ...........................................................................6

*Life of the South Insurance Co. v. Carzell*,
   851 F.3d 1341 (11th Cir. 2017) ......................................................................6

*Luther v. Countrywide Home Loans Servicing LP*,
533 F.3d 1031 (9th Cir. 2008) ...............................................................*passim*

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) ........................................................................10

*New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4*,
581 F. Supp. 2d 581 (S.D.N.Y. 2008) .................................................4, 12, 14

*Passarella v. Ginn Co.*,
637 F. Supp. 2d 352 (D.S.C. 2009) ...........................................................4, 12

*Public Employees' Retirement System of Mississippi v. Morgan Stanley*,
605 F. Supp. 2d 1073 (C.D. Cal. 2009) ..............................................5, 13, 14

*Radzanower v. Touche Rosss & Co.*,
426 U.S. 148 (1976)......................................................................................19

*United States v. Aguon*,
851 F.2d 1158 (9th Cir. 1988), *overruled on other grounds by Evans v. United States*, 504 U.S. 255 (1992) ................................................15

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
792 F.3d 1121 (9th Cir. 2015) ...................................................................3, 4

**STATUTES**

15 U.S.C. § 77v(a) ...........................................................................................1, 8

28 U.S.C. § 1332.......................................................................1, 6, 7, 17, 18

28 U.S.C. § 1441 ................................................................................................15

28 U.S.C. § 1453 ........................................................................................*passim*

Pub. L. No. 109-2, 119 Stat. 4 ................................................................19

U.S. Const., art. III, § 2 ................................................................................18

**OTHER AUTHORITIES**

2 *McLaughlin on Class Actions* § 12:6 (15th ed. 2018) ......................................5, 13

iv

16 *Moore's Federal Practice – Civil: Scope of Removal* § 107.91[b] ...............5, 13

E. Merrick Dodd, Jr., *Amending the Securities Act—The American Bar Ass'n Committee's Proposals*, 45 Yale L.J. 199 (1935)..........................................19

Felix Franfurter, *Distribution of Judicial Power of Federal and State Courts*, 13 Cornell L.Q. 499 (1928) ...........................................................................20

v

## INTRODUCTION AND RELIEF SOUGHT

Petitioners Ripple Labs Inc., XRP II, LLC, Bradley Garlinghouse, Christian Larsen, Ron Will, Antoinette O'Gorman, Eric van Miltenburg, Susan Athey, Zoe Cruz, Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita ("Petitioners") timely removed on August 8, 2018 this putative securities class action to the district court under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d) and 1453(b). On October 15, 2018, the district court remanded the action ("Remand Order"), finding the decision in *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008), controlling. Ex. A. In *Luther*, the court held that Section 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v(a), prohibiting removal trumps the statutory provisions of the later-enacted Class Action Fairness Act of 2005 ("CAFA") affirmatively permitting removal. Pursuant to 28 U.S.C. § 1453(c) and Federal Rule of Appellate Procedure 5, Petitioners seek permission to appeal ("Petition") and, following briefing on the merits, reversal of the Remand Order.

This Court should allow Petitioners to appeal the Remand Order because this case presents an opportunity to resolve a circuit split between the United States Courts of Appeals for the Seventh and Ninth Circuits and to revisit *Luther*, which has been overruled in part and severely criticized by courts and commentators.

The United States Supreme Court has already overruled *Luther*, in part, in

1

*Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547 (2014). The *Luther* decision held that the prohibition on removal found in Section 22(a) of the Securities Act "trumps" the conflicting provisions in CAFA expressly permitting removal. *Luther* reached its decision based, in part, on the general presumption that "removal statutes are strictly construed against removal." *Luther*, 533 F.3d at 1034. However, in the more recent *Dart Cherokee* decision, the Supreme Court rejected that very presumption as applied to CAFA removal, concluding that "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Dart Cherokee*, 135 S. Ct. at 554. The Supreme Court's conclusion is directly at odds with *Luther*'s reliance on the antiremoval presumption. Indeed, the Ninth Circuit has already "recognized that *Dart Cherokee* undermines *Luther*'s reasoning on that point." *Coffey v. Ripple Labs Inc.*, 2018 WL 3812076, at *4 (N.D. Cal. Aug. 10, 2018) (citing *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1183 n.2 (9th Cir. 2015)). This alone warrants reconsideration of *Luther* and review of the Remand Order.

In addition, the Court of Appeals for the Seventh Circuit in *Katz v. Gerardi*, 552 F.3d 558 (7th Cir. 2009), considered the same issue as *Luther*—the removability of Securities Act cases pursuant to CAFA—and reached the opposite conclusion when it held that such actions *are* removable. In so holding, *Katz* expressly rejected *Luther*, creating a circuit split between the Ninth and Seventh

Circuits. In particular, in concluding that Section 22(a) trumped CAFA, *Luther* relied on the maxim "that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Luther*, 533 F.3d at 1034 (citation omitted). The *Luther* court reasoned that under this maxim, the Section 22(a) removal bar was "more specific" than the CAFA authorization of removal because Section 22(a) "applies to the narrow subject of securities cases" whereas CAFA applies to a "generalized spectrum" of "high-dollar class actions involving diverse parties." *Id.* at 1032, 1034.

> *Katz* rightfully rejected this reasoning as flawed:
>
> Section 22(a) covers only securities actions, but it includes all securities actions—single-investor suits as well as class actions, small class actions as well as large multi-state ones. [CAFA], by contrast, covers only large, multi-state class actions. Is the [Securities] Act more specific because it deals only with securities law, or is [CAFA] more specific because it deals only with nationwide class actions? There is no answer to such a question, which means that the canon favoring the specific law over the general one won't solve our problem.

*Katz*, 552 F.3d at 561-62.

As *Katz* made clear, *Luther* failed to consider the statutory text of CAFA, and thus, *Luther*'s holding is at odds with the text of CAFA. *See Katz*, 552 F.3d at 561-63; *see also United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1129 (9th Cir. 2015) (en banc) (overruling decision that was inconsistent with statutory text). While *Luther* concluded that Section 22(a) provides an "express exception to removal" under CAFA, *Luther*, 533 F.3d at

3

1034, CAFA contains no such exception. Instead, CAFA states that "[a] class action may be removed to a district court of the United States in accordance with section 1446," 28 U.S.C. § 1453(b), and enumerates *only* three express exceptions to such removal. *See* 28 U.S.C. § 1453(d)(1)-(3). The exceptions do *not* include Section 22(a) (or any other removal bar), and therefore do not encompass the case before this Court. *See Katz*, 552 F.3d at 561-63 (holding that exceptions listed in CAFA were exclusive). Because *Luther* failed to adhere to the text of CAFA, it was wrongly decided and should be reconsidered. *Id.* at 562 (rejecting *Luther* because it "did not analyze this language or even acknowledge its existence"). The existence of the circuit split between the Ninth and Seventh Circuits further warrants this Court's reconsideration of *Luther* and review of the Remand Order in this case. *See Hartpence*, 792 F.3d at 1127-29 (overruling case rejected by other circuits and abrogated by later Supreme Court authority).

Significantly, since *Luther*, courts that have considered the question of whether removal bars like Section 22(a) trump CAFA have agreed with *Katz* and rejected the specific/general maxim the *Luther* court invoked. *See N. J. Carpenters Vacation Fund v. HarborView Mortg. Loan Tr. 2006-4*, 581 F. Supp. 2d 581, 587-88 (S.D.N.Y. 2008) (addressing Section 22(a)); *Passarella v. Ginn Co.*, 637 F. Supp. 2d 352, 353-55 (D.S.C. 2009) (addressing removal bar in Interstate Land Sales Full Disclosure Act ("ILSA")). Even the author of the district court opinion

affirmed in *Luther*, the Honorable Mariana Pfaelzer, observed in a later case that, "[d]efendants appear to have nonfrivolous arguments for a change in the law due to post-*Luther* developments." *Pub. Emps.' Ret. Sys. of Miss. v. Morgan Stanley*, 605 F. Supp. 2d 1073, 1075 n.1 (C.D. Cal. 2009).

Secondary sources also strongly criticize *Luther*. Professor McLaughlin observed in his treatise that "[t]he conclusion in *Luther* is at odds with [] the intent of Congress in enacting CAFA to expand federal jurisdiction over securities class actions of national import." 2 *McLaughlin on Class Actions* § 12:6 (15th ed. 2018). Additionally, Moore's Federal Practice concluded that "[g]iven the Supreme Court's assertion [in *Dart Cherokee*] that no antiremoval presumption applies to cases removed under CAFA, it is likely that the Seventh Circuit approach [in *Katz*] is correct." 16 *Moore's Federal Practice–Civil* § 107.91[b]. Thus, the Court should grant the Petition, review the Remand Order, and reconsider *Luther*.

The Court should grant the Petition for an additional, independent reason— to address an issue of first impression regarding CAFA's expansion of the alienage jurisdiction of federal courts. *See Coleman v. Estes Express Lines, Inc.*, 627 F.3d 1096, 1100 (9th Cir. 2010) (holding that permission to appeal was appropriate when the appeal raised an "important" or "unsettled" "CAFA-related question"). "[T]he major purpose of alienage jurisdiction is to promote international relations by assuring other countries that litigation involving their nationals will be treated at

5

the national level, and alienage jurisdiction is also intended to allow foreign subjects to avoid real or perceived bias in the state courts . . . ." *Life of the S. Ins. Co. v. Carzell*, 851 F.3d 1341, 1347 (11th Cir. 2017) (alteration in original) (citation omitted). The "importance of these goals has only increased with time as both international relations and global trade have become more complex and our nation has assumed a central role in both." *Koehler v. Bank of Bermuda (N.Y.) Ltd.*, 229 F.3d 187, 193 (2d Cir. 2000) (Sotomayor, J., dissenting).

*Luther* considered only whether Section 22(a) barred removal where the action was removed based on the minimal diversity provisions of CAFA, not its alienage provisions. *See* 28 U.S.C. § 1332(d)(2)(A). Unlike *Luther*, this action was brought by an Israeli citizen on behalf of an international class of thousands who purchased the virtual currency XRP on virtual currency exchanges, and seeks to apply the registration requirements of the Securities Act to a virtual currency for the first time. Because the putative class in this case includes foreign plaintiffs who purchased the virtual currency XRP on foreign virtual currency exchanges and raises "issues of first impression regarding the federal securities laws['] applicability to a nascent technology," *Coffey*, 2018 WL 3812076, at *7, it raises the foreign relations concerns at the heart of alienage jurisdiction. Any decision concerning whether XRP is a "security" subject to the Securities Act could disrupt the regulatory processes in multiple countries. Thus, this case falls squarely within

6

the category of class actions CAFA intended to be litigated in federal court. *See Coffey*, 2018 WL 3812076, at \*7 (denying motion to remand related case and concluding that it fell within the category of class actions that gave rise to CAFA). Thus, the Court should grant the Petition and review the Remand Order.

## STATEMENT OF THE FACTS

This action concerns Petitioners' alleged sales of a virtual currency—XRP— "to the general public through global, online cryptocurrency exchanges." Ex. C ¶ 79. Respondent, a citizen of Israel who allegedly engaged in unspecified purchases and sales of XRP, *id.* ¶ 14, filed this action in the Superior Court of California, County of San Mateo alleging violations of the registration requirements of the Securities Act on behalf of a global class comprised of all purchasers of XRP since July 3, 2015. *Id.* ¶ 2.

On August 8, 2018, Petitioners filed a notice of removal on the basis of CAFA alienage jurisdiction. *See* Ex. B. Under CAFA, a putative class action may be removed to federal court if (1) the action purports to be a "class" action brought on behalf of 100 or more members; (2) any member of a plaintiff class is a citizen of a foreign country and any defendant is a citizen of a state (or vice versa); and (3) the amount in controversy exceeds $5 million. *See* 28 U.S.C. §§ 1332(d)(2)(B), (d)(5)(B), 1453(b). As this action (i) was brought on behalf of a "class" consisting of "thousands of members," Ex. C ¶ 89, (ii) by a citizen of Israel, on behalf of a

worldwide class, against California-based defendants, *id.* ¶¶ 14-27, 78-79, (iii) sought rescission of at least $167.7 million in sales of XRP, *id.* ¶¶ 52, 110, and (iv) fell within none of the three enumerated exceptions to CAFA removal, 28 U.S.C. § 1453(d)(1)-(3), it met all of CAFA's requirements. Ex. B at 3. Plaintiff-Respondent did not dispute that each requirement for CAFA removal was satisfied.

On September 7, 2018, Respondent moved to remand, arguing that Section 22(a) bars removal. Ex. D. Section 22(a) provides for concurrent jurisdiction in state and federal courts over Securities Act claims. *See* 15 U.S.C. § 77v(a). It also provides that "no case arising under [the Securities Act] and brought in any State court of competent jurisdiction shall be removed to any court of the United States." 15 U.S.C. § 77v(a). Respondent offered no textual analysis to explain why Section 22(a) should require remand when the plain language of CAFA provides a federal forum. Ex. D. Respondent's sole argument was that *Luther* compels remand. *Id.*

On October 15, 2018, the district court vacated the hearing on the motion to remand and remanded the action. Citing to *Luther*, the court held that "controlling Ninth Circuit authority requires remand" (Ex. A at 3) and stated that Petitioners "are free to argue to the Ninth Circuit that *Luther* was wrongly decided." *Id.* at 5.

## QUESTIONS PRESENTED

1.  Should the Court reconsider *Luther* in light of the decision in *Dart Cherokee*, subsequent court of appeal and district court decisions rejecting *Luther*,

and flaws recognized by other courts and legal scholars in *Luther's* reasoning, and conclude that cases asserting Securities Act claims are removable if they meet the requirements of CAFA?

2. Did the district court err in holding that *Luther* compelled remand of an action asserting Securities Act claims that was removed pursuant to CAFA's alienage provisions, 28 U.S.C. §§ 1332(d)(2)(B), 1453(b)?

## REASONS WHY APPEAL SHOULD BE ALLOWED

"Under CAFA, a party may seek leave to appeal a remand order to the court of appeals, which has discretion whether to accept the appeal." *Coleman*, 627 F.3d at 1100. To determine whether to hear an appeal, the court considers several factors, including "the presence of an important CAFA-related question," especially when it "appears to be either incorrectly decided or at least fairly debatable." *Id.* (alteration in original) (citation omitted). Such questions are present here. The other applicable factors—the likelihood that the question will "evade effective review," whether the record below is sufficiently developed, and whether the "balance of the harms" favor appeal—also support appeal here. *Id.*

## I. This Court Should Allow This Appeal To Reconsider *Luther*

### A. Subsequent Supreme Court Authority Rejected The Presumption On Which *Luther* Relied

This Petition raises an "important CAFA-related question," *Coleman*, 627 F.3d at 1100 (citation omitted)—the continuing validity of *Luther*—because later

Supreme Court authority "undercut [*Luther*'s] theory or reasoning . . . in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). In *Luther*, the court relied on the presumption that "removal statutes are strictly construed against removal" and that "any doubt is resolved against removability." *Luther*, 533 F.3d at 1034. However, *Dart Cherokee* rejected that very presumption in the CAFA context. In *Dart Cherokee,* the district court remanded the action relying "in part, on a purported 'presumption' against removal," *Dart Cherokee*, 135 S. Ct. at 554, and finding the notice of removal was deficient because it excluded evidence that the amount in controversy exceeded $5 million, *id.* at 552. In reversing the remand order, the Court held that "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Id.* at 554.

Indeed, the Ninth Circuit has "recognized that *Dart Cherokee* undermines *Luther*'s reasoning on that point." *Coffey*, 2018 WL 3812076, at *4 (citing *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1183 n.2 (9th Cir. 2015)). In *Jordan*, the court reversed a remand order by the district court "[i]n light of the Supreme Court's clear statement in *Dart Cherokee* that Congress intended for no antiremoval presumption to attend CAFA cases." *Jordan*, 781 F.3d at 1184. The court stated that it was "not bound by [the] court's prior rulings on this issue[, specifically including *Luther*,] because the Supreme Court's decision in *Dart*

10

*Cherokee* 'undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.* at 1183 n.2. (third alteration in original) (citation omitted).

Thus, in *Jordan*, the court concluded that a critical premise on which *Luther* relied was rejected by *Dart Cherokee*. This Court should thus revisit *Luther*. *See Dart Cherokee*, 135 S. Ct. at 555 (concluding a court abuses its discretion if it refuses to hear appeal based "on an erroneous view of the law" (citation omitted)).

**B.  Courts That Have Considered The Question Presented In *Luther* Have Reached The Opposite Conclusion Resulting In A Circuit Split That This Court Can Now Resolve**

Petitioners' Petition also provides an opportunity for this Court to reverse a clear circuit split, thereby furthering CAFA's goal of developing a uniform body of appellate law and consistent nationwide rules. *See Coleman*, 627 F.3d at 1100. Six months after *Luther*, the Seventh Circuit considered the same issue as *Luther*: whether a class action asserting Securities Act claims is removable under CAFA. *See Katz*, 552 F.3d at 561. Contrary to *Luther*, the court held that such actions are removable. The *Katz* court noted that "[u]sually the older law"—Section 22(a)— "yields to the newer"—CAFA. *Id.* Discussing *Luther*, the court noted that the "[t]he canon favoring preservation of specific statutes arguably affected by newer, but more general, statutes works when one statute is a subset of the other." *Id.* However, "§ 22(a) . . . is not a subset" of CAFA. *Id.* The court reasoned:

11

Section 22(a) covers only securities actions, but it includes all securities actions—single-investor suits as well as class actions, small class actions as well as large multi-state ones. [CAFA], by contrast, covers only large, multi-state class actions. Is the [Securities] Act more specific because it deals only with securities law, or is [CAFA] more specific because it deals only with nationwide class actions? There is no answer to such a question, which means that the canon favoring the specific law over the general one won't solve our problem.

*Id.* at 561-62.

The *Katz* court then explained that "[t]he language of [CAFA], rather than a canon, tells us how the new removal rule applies to corporate and securities actions." *Id.* at 562. While allowing removal of any class action meeting CAFA's requirements, Section 1453(d) of CAFA includes three specific exceptions to removal for any class action that "solely involves" a claim (i) "concerning a covered security," (ii) that "relates to the internal affairs or governance of a corporation," or (iii) that relates to the rights and duties relating to a security. 28 U.S.C. § 1453(d). These enumerated exceptions "tell[] us all we need to know." *Katz*, 552 F.3d at 562. "Claims listed in § 1453(d) are not removable. Other securities class actions are removable if they meet the requirements of [CAFA]." *Id.* In rejecting *Luther*, the *Katz* court observed that *Luther* "did not analyze [the exceptions in Section 1453(d)] or even acknowledge [their] existence." *Id.*

Since *Luther*, courts to have considered the issue have also rejected *Luther*'s view and adopted *Katz*'s reasoning. *See HarborView*, 581 F. Supp. 2d at 590 ("CAFA's main provision trumps § 22(a) of the Securities Act."); *Passarella*, 637

12

F. Supp. 2d at 355 (holding that the "general/specific tool of statutory construction" applied in *Luther* was not helpful and that an action subject to ILSA's removal bar was removable under CAFA). Even the author of the district court opinion affirmed in *Luther*, the Honorable Mariana Pfaelzer, observed in a later case that, "[d]efendants appear to have nonfrivolous arguments for a change in the law due to post-*Luther* developments." *Morgan Stanley*, 605 F. Supp. 2d at 1075 n.1.

Secondary sources have also strongly criticized *Luther*. Professor McLaughlin observed in his treatise on class actions that *Luther* "offered no reasons to support its assertion that the [Securities] act was the more specific statute." 2 *McLaughlin on Class Actions* § 12:6 (15th ed. 2018). He further noted that "[o]n the relevant issue of removability of [Securities] Act claims, CAFA is more specific" because "CAFA addresses the removability of class actions and an even narrower subset of [Securities] Act cases—securities class actions," while "§ 22(a) deals with removal of all 'cases' arising under the [Securities] Act." *Id.* Thus, "[t]he conclusion in *Luther* is at odds with [] the intent of Congress in enacting CAFA to expand federal jurisdiction over securities class actions of national import." *Id.* Additionally, Moore's Federal Practice concluded that "[g]iven the Supreme Court's assertion [in *Dart Cherokee*] that no antiremoval presumption applies to cases removed under CAFA, it is likely that the Seventh Circuit approach [in *Katz*] is correct." 16 *Moore's Federal Practice - Civil* § 107.91[b].

13

Maintaining uniformity amongst circuit courts is particularly important in the securities and CAFA contexts. In *Eminence Investors, L.L.L.P. v. Bank of New York Mellon*, 782 F.3d 504 (9th Cir. 2015), the court construed one of CAFA's exceptions consistently with the Second Circuit, remarking that it "prefer[red] not to create intercircuit conflicts unless . . . absolutely necessary." *Id.* at 508. The court noted that the "application of this wisdom [was] especially important []because the controversy deal[t] with securities," and the legislative history of CAFA "dictate[s] that a nationwide rule is of great significance." *Id.*

Because Petitioners removed this action pursuant to CAFA, and it involves the securities laws, the "especially important" need for intercircuit uniformity is present here. Indeed, *Luther*'s conflicting rule has already undermined CAFA's goal to prevent forum shopping. *See HarborView*, 581 F. Supp. 2d at 584 (discussing a purpose of CAFA includes preventing forum shopping). *Luther* has caused plaintiffs to select California state courts for Securities Act cases solely to avoid removals that are permitted elsewhere. *See Morgan Stanley*, 605 F. Supp. 2d at 1075 ("The only plausible reason that Plaintiffs sued in California state court is that courts in the [S.D.N.Y.] take a different view of [Securities] Act removal than do courts in the Ninth Circuit."). Thus, this Court should resolve the circuit split.

### C.     *Luther* Did Not Consider That Claims Subject To A Removal Bar Were Removable Under The Plain Language Of CAFA

This Court should also grant this Petition and reconsider *Luther* because

14

*Luther* is contrary to the plain language of CAFA and the larger statutory scheme governing removal—issues *Luther* did not consider. *See United States v. Aguon*, 851 F.2d 1158, 1175-76 (9th Cir. 1988) (Reinhardt, J., concurring), *overruled on other grounds by Evans v. United States*, 504 U.S. 255 (1992) (listing factors making reconsideration appropriate, including the existence of a circuit split, and whether "all of the critical issues were considered in the earlier decision").

To begin with, the general removal statute, Section 1441(a), states: "***Except as otherwise expressly provided by Act of Congress***, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . ." 28 U.S.C. § 1441(a) (emphasis added). "[C]ourts have interpreted § 1441(a)'s broad except clause as a reference to antiremoval provisions in other federal statutes," including Section 22(a). *Coffey*, 2018 WL 3812076, at *8 (collecting cases). Thus, removal under Section 1441(a) must defer to a removal bar given the "except clause" carve-out.

The instant case, however, was removed under CAFA's separately enacted removal provision, Section 1453(b). Unlike Section 1441(a), Section 1453(b) states: "[a] class action may be removed to a district court of the United States in accordance with section 1446 . . ." 28 U.S.C. § 1453(b). It does *not* contain the "except clause" language found in Section 1441(a). Accordingly, "[d]espite knowing exactly how to make a removal provision subordinate to antiremoval

statutes, Congress chose not to do so for § 1453." *Coffey*, 2018 WL 3812076, at *8. "Instead, Congress chose to enumerate only three specific exceptions to removal under § 1453." *Id.* "The absence of § 1441(a)'s except clause, or anything even resembling it, weighs heavily against reading such a broad exception into § 1453." *Id.* This is especially so given that the specific exceptions in Section 1453(d) pertain to certain types of claims under the Securities Act not asserted here. The fact "[t]hat Congress considered and excepted one part of the Securities Act but did not reference § 22(a), strongly suggests that [] court[s] should not read additional Securities Act exceptions into CAFA." *Id.* at *9. Indeed, the Ninth Circuit itself has observed that "[t]he general rule of statutory construction is that the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *Blausey v. United States Tr.*, 552 F.3d 1124, 1133 (9th Cir. 2009).

Interpreting Section 22(a) as barring removal under CAFA would render the "except clause" in Section 1441(a) surplusage. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (noting rule of statutory interpretation against treating "statutory terms as surplusage" (citation omitted)). "[I]f § 1441(a)'s except clause is to be taken seriously, then it should not be read into every [other] removal statute" because it would "render[] the except clause entirely superfluous." *Coffey*, 2018 WL 3812076, at *9. "By contrast, if [the court] give[s] effect to every clause in

16

Section 1441(a), the statutory conflict between [§ 1453(b)] and Section 22(a) dissolves." *Id.* (alterations in original) (citation omitted).

Likewise, when Congress passed CAFA, it not only expanded diversity and alienage jurisdiction; it also enacted a completely separate removal provision, Section 1453(b), using different language than Section 1441(a). If Section 1453(b) "is read to include § 1441(a)'s exception" despite such exception being absent from Section 1453(b)'s text, then Section 1453(b) "itself becomes largely superfluous." *Id.* at *10. That is so because Section 1332(d)(2) grants courts original jurisdiction over class actions satisfying CAFA's requirements. 28 U.S.C. § 1332(d)(2). Thus, "an action satisfying CAFA's diversity requirements could be removed pursuant to § 1441(a)," but this "would subject the removal to § 1441(a)'s except clause and the entire array of federal antiremoval statutes," including § 22(a)'s removal bar. *Coffey*, 2018 WL 3812076, at *10. "If Congress wanted that result, it could have omitted § 1453(b) entirely. Instead, Congress enacted an entirely different removal provision that does not include anything resembling § 1441(a)'s broad except clause." *Id. Luther*'s failure to consider the plain language of CAFA and broader statutory scheme provides another reason the Court should accept this appeal.

## II. Alienage Jurisdiction Is Based On Uniquely Federal Concerns That Were Neither Present Nor Considered In *Luther*

The Court should grant Petitioners' Petition for the additional reason that it raises an issue of first impression: whether Section 22(a) bars removal of cases

invoking CAFA's alienage jurisdiction. *See Coleman*, 627 F.3d at 1100 (finding appeal appropriate when case raises an unsettled CAFA issue). Article III, Section 2 of the United States Constitution provides federal courts with jurisdiction to hear cases and controversies between "a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. Const. art. III, § 2. "[A]lienage jurisdiction was necessary to 'avoid controversies with foreign powers' so that a single State's courts would not 'drag the whole community into war.'" *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 96 (2002) (citation omitted). "[T]he rationale underpinning [alienage jurisdiction] is distinct from diversity jurisdiction [in] that its purpose is to protect peculiarly federal interests that federal courts were specifically designed to adjudicate." *17th St. Assocs., LLP v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 603 (E.D. Va. 2005).

CAFA and this case implicate the concerns underlying alienage jurisdiction. CAFA loosened the requirements for alienage jurisdiction for putative class actions involving more than $5 million and 100 members to require only minimal, rather than complete, foreign citizenship among the parties. 28 U.S.C. §§ 1332(d)(2)(B), 1453(b). Congress' goals for CAFA reinforce the federal policies underlying alienage jurisdiction: to prevent individual state courts from making judgments that bind the entire country, to facilitate interstate (including international) commerce, and to "restore the intent of the framers . . . by providing for Federal court

18

consideration of interstate cases of national importance." Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, §§ 2(a)(4)(C), (b)(2), (b)(3).

The presence of alienage jurisdiction under CAFA and its implications for foreign relations make this case distinguishable from *Luther*. The *Luther* court was not asked to consider, and did not consider, the "peculiarly federal interests" alienage jurisdiction raises, *17th St.*, 373 F. Supp. 2d at 603, or the effect of Section 22(a) on CAFA's extension of alienage jurisdiction. Whether *Luther* should be extended to international class actions remains an open question.

Even the specific/general maxim the *Luther* court employed makes an exception if the purpose of the more "specific" statute is not served, and it would "'unduly interfere' with the operation" of the more general statute. *See Radzanower v. Touche Rosss & Co.*, 426 U.S. 148, 156 (1976). Here, assuming *arguendo* that Section 22(a)'s removal bar is more "specific" than CAFA's alienage provisions, applying the removal bar would fail to serve its purpose, while unduly interfering with CAFA. The purpose of Section 22(a)'s removal bar was to ensure that local plaintiffs had access to local courts. *See* E. Merrick Dodd, Jr., *Amending the Securities Act—The American Bar Ass'n Comm.'s Proposals*, 45 Yale L.J. 199, 224 (1935) (noting "objections to permitting removal is that there are a relatively small number of federal trial courts, and that to allow defendants to remove all cases to the federal courts would enable them . . . to remove the case to a point remote from

19

the plaintiff's home and inconvenient for him"); *see also* Felix Frankfurter, *Distribution of Judicial Power of Federal and State Courts*, 13 Cornell L.Q. 499, 517 (1928) (noting that removal bars are desirable "whenever federal rights arise out of transactions which are dominantly local and readily lend themselves to state remedies"). This case is not "dominantly local", it involves an Israeli citizen suing on behalf of a putative international class concerning a new global technology.

However, preventing removal *would* unduly interfere with the operation of CAFA's alienage provisions. This case concerns an issue of first impression— whether a virtual currency sold on foreign exchanges, XRP, is a security—a question that policymakers around the world are currently debating about virtual currencies generally. *See* Ex. E. If other countries take different approaches in regulating virtual currencies, a determination in this case, especially as applied to foreign plaintiffs and foreign exchanges, could conflict with the frameworks in other countries. Thus, in light of the strong federal interest at the heart of both alienage jurisdiction and CAFA, *Luther* should not bar removal here.

## CONCLUSION

For the foregoing reasons, the Court should grant this Petition.

Dated:  October 25, 2018                  Respectfully submitted,

_____
*/s/ Peter B. Morrison*
Peter B. Morrison
Attorneys for Petitioners

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the page limitations set forth in Federal Rule of Appellate Procedure 5(c) and Ninth Circuit Rule 5-2(b) and does not exceed 5,200 words or 20 pages. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Times New Roman 14-point font.

Dated: October 25, 2018           Respectfully submitted,

                               _____*/s/ Peter B. Morrison*_____
                                     Peter B. Morrison
                                   Attorneys for Petitioners

**EXHIBITS TO PETITION**

| EXHIBIT | DOCUMENT | ECF NO. |
|---|---|---|
| A | Order Granting Plaintiff's Motion to Remand and Vacating Hearing entered in *Greenwald v. Ripple Labs Inc. et al.*, No. 18-cv-04790-PJH (N.D. Cal.) on October 15, 2018. | 23 |
| B | Notice of Removal filed in *Greenwald v. Ripple Labs Inc. et al.*, No. 18-cv-04790-PJH (N.D. Cal.) on August 8, 2018. | 1 |
| C | Exhibit A to Notice of Removal - Class Action Complaint for Violations of the Securities Act of 1933 filed in *Greenwald v. Ripple Labs Inc. et al.*, No. 18-CIV-03461 (Cal. Super. Ct., San Mateo Cty.) on July 3, 2018. | 1-1 |
| D | Plaintiff's Notice of Motion and Motion to Remand; Memorandum of Points and Authorities in Support Thereof filed in *Greenwald v. Ripple Labs Inc. et al.*, No. 18-cv-04790-PJH (N.D. Cal.) on September 7, 2018. | 15 |
| E | Exhibit 4 to Declaration of Virginia F. Milstead ISO of Defendants' Opposition to Motion to Remand - June 2018 report titled "Regulation of Cryptocurrency Around the World" prepared by the staff of the Law Library of Congress, Global Legal Research Directorate. | 17-1 |

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AVNER GREENWALD,

             Plaintiff,

     v.

RIPPLE LABS, INC., et al.,

             Defendants.

Case No.  18-cv-04790-PJH

**ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND VACATING HEARING**

Re: Dkt. No. 15

      Before the court is plaintiff Avner Greenwald's motion to remand.  The matter is fully briefed and suitable for decision without oral argument.  Accordingly, the hearing set for October 24, 2018, is VACATED.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS plaintiff's motion to remand, for the following reasons.

      This is a putative securities class action brought by plaintiff Greenwald against defendants Ripple Labs, Inc. ("Ripple"), XRP II, LLC, a subsidiary of Ripple and various individual defendants.[1]  Compl. ¶¶ 1-2, 11-28.  Plaintiff originally filed this action in the San Mateo County Superior Court on July 3, 2018, and served the defendants on July 9, 2018.  Dkt. 1.

      In summary, plaintiff alleges that Ripple created a digital currency called XRP and "from 2013 to the present, defendants and their affiliates have been engaged in an ongoing scheme to sell XRP to the general public."  Compl. ¶¶ 38-41, 78-80.  Plaintiff

---

[1] The individual defendants are Bradley Garlinghouse, Christian Larsen, Ron Will, Antoinette O'Gorman, Eric Van Miltenburg, Susan Athey, Zoe Cruz, Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita.

United States District Court
Northern District of California

Greenwald, a resident of Israel, alleges that he "bought and sold XRP in both USD and Bitcoin between December 14, 2017, and May 12, 2018, and suffered losses on those investments as a result of the [defendants'] scheme."  Compl. ¶ 14.

Plaintiff further alleges that because XRP qualifies as a "security" under § 2(a)(1) of the Securities Act of 1933 (the "Securities Act"), 14 U.S.C. § 77b(a)(1), Ripple's past and ongoing sales of XRP constitute the selling of unregistered securities in violation of the Securities Act.  Compl. ¶¶ 3, 6, 12.  On behalf of "a class of all persons or entities who purchased XRP from July 3, 2015, through the present," Compl. ¶ 87, plaintiff asserts two causes of action: (1) for violation of §§ 5 & 12(a)(1) of the Securities Act against all defendants for the unregistered offer and sale of securities; and (2) for violation of § 15 of the Securities Act (control person liability) against Ripple and the individual defendants.

On August 8, 2018, defendants timely removed the action pursuant to the Class Action Fairness Act ("CAFA"), under 28 U.S.C. § 1453.  Dkt. 1.

CAFA "relaxed" the diversity requirements for putative class actions.  See Dart Cherokee Basin Operating Co., LLC v. Owens, ⸺ U.S. ⸺, 135 S.Ct. 547, 551, 190 L.Ed.2d 495 (2014).  Pursuant to CAFA, a defendant may remove an action under § 1453 if the amount in controversy exceeds $5 million, the putative class has more than 100 members, and the parties are minimally diverse.  Id. at 552; 28 U.S.C. §§ 1332(d), 1453.

Plaintiff's motion to remand does not contend that defendants cannot show this action fails to meet any of CAFA's three jurisdictional requirements.  Instead, plaintiff argues that § 22(a) of the Securities Act operates as a complete bar on removing any action that involves only Securities Act claims.[2]

Plaintiff is correct.  Plaintiff's only two causes of action are brought under the Securities Act.  Defendants' CAFA-based removal was therefore necessarily premised on

[2] Section 22(a) states:  "Except as provided in 77p(c) [§ 16(c)], no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."

United States District Court
Northern District of California

1    plaintiff's Securities Act claims.  In that situation, controlling Ninth Circuit authority

2    requires remand.

3           In Luther v. Countrywide Home Loans Servicing LP, 533 F.3d 1031 (9th Cir.

4    2008), the Ninth Circuit considered whether an action that solely alleged Securities Act

5    claims could be removed under CAFA.  Luther, 533 F.3d at 1032, 1034.  Luther reasoned

6    that because § 22(a) dealt "with a narrow, precise, and specific subject" that "applie[d]

7    only to claims arising under the Securities Act" it was "not submerged by [CAFA,] a later

8    enacted statute covering a more generalized spectrum of class actions."  Id. at 1034.

9    Thus, Luther held that, "by virtue of § 22(a) of the Securities Act of 1933, [plaintiff's] state

10   court class action alleging only violations of the Securities Act of 1933 was not

11   removable."  Id.

12          Despite this clear holding, defendants make a number of arguments that Luther

13   does not require remand here.  Those arguments fail to persuade.

14          First, defendants argue that Luther only addressed removal based on CAFA's

15   "minimal diversity" jurisdiction, see 28 U.S.C. § 1332(d)(2)(A), whereas the present action

16   was removed based on CAFA's "alienage jurisdiction" because plaintiff Greenwald is a

17   citizen of Israel, see 28 U.S.C. § 1332(d)(2)(B).  Neither Luther nor CAFA supports that

18   distinction.  Nothing in Luther suggests that the decision hinged on removal being

19   premised on minimal diversity jurisdiction, rather than alienage jurisdiction.[3]

20          In addition, § 1332(d)(2)(B) does not limit alienage jurisdiction to circumstances

21   where the named plaintiff is a citizen of a foreign state.  Instead, that subsection is

22   implicated whenever "any member of [the] class of plaintiffs is a foreign state or a citizen

23   or subject of a foreign state."  28 U.S.C. 1332(d)(2)(B) (emphasis added).  The court finds

24   it implausible that the Luther action "brought on behalf of all persons and entities who

25   acquired hundreds of billions of dollars worth of mortgage pass-through certificates,"

26

27   ───────────────────────

28   [3] Indeed, Luther would likely not have quoted the entirety of § 1332(d)(2) if it intended its
     holding to be limited to § 1332(d)(2)(A).  See Luther, 533 F.3d at 1033 n.2.

United States District Court
Northern District of California

1    Luther, 533 F.3d at 1032, would not have included a single putative class member

2    satisfying (and implicating) § 1332(d)(2)(B).  The same would be true for most Securities

3    Act class actions.

4         Second, defendants' alienage jurisdiction-related policy arguments also do not

5    move the needle.  As an initial matter, those arguments do not override Luther.

6    Moreover, Congress has already made clear that removal bars trump the policy

7    considerations unique to alienage jurisdiction.  Section 1332(a)(2) gives district courts

8    original jurisdiction over actions "between citizens of a State and citizens or subjects of a

9    foreign state."  As this court has previously discussed at length, the general removal

10   statute, § 1441(a), provides that subject to its except clause, a defendant may remove

11   any civil action from state to federal court if the district court would have original

12   jurisdiction over the action.[4]  See generally Coffey v. Ripple Labs Inc., No. 18-CV-03286-

13   PJH, ——— F. Supp. 3d ———, 2018 WL 3812076, at *2 (N.D. Cal. Aug. 10, 2018).  Courts

14   interpret "§ 1441(a)'s broad except clause as a reference to antiremoval provisions in

15   other federal statutes," such as § 22(a) of the Securities Act.  Id. at *8 (collecting cases).

16   Accordingly, despite the alienage jurisdiction considerations defendants articulate,

17   § 22(a) (as well as other antiremoval provisions) bars certain alienage actions from being

18   removed under § 1441(a).  Luther unambiguously held that in the case of pure Securities

19   Act actions, § 22(a) also applies to and trumps § 1453(b).  It makes no sense that

20   § 22(a)'s removal bar overrides the alienage jurisdiction-related considerations in the

21   context of § 1441(a), but does not do so vis-à-vis § 1453(b).  It makes even less sense

22   that Congress would intend that result without more explicitly saying so.[5]

23

24   [4] Section 1441(a) states "Except as otherwise expressly provided by Act of Congress,
     any civil action brought in a State court of which the district courts of the United States
25   have original jurisdiction, may be removed by the defendant or the defendants, to the
     district court of the United States for the district and division embracing the place where
26   such action is pending."

27   [5] Defendants' argument premised on Radzanower v. Touche Ross & Co., 426 U.S. 148,
     156, 96 S. Ct. 1989, 1994, 48 L. Ed. 2d 540 (1976), fails for a similar reason.  In the
28   context of § 1441(a), Congress had no difficulty with antiremoval provisions "unduly
     interfering" with alienage jurisdiction.  And Luther has already determined that § 22(a)

1    Third, defendants reliance on this court's decision in <u>Coffey</u> is misplaced.  In

2  <u>Coffey</u>, plaintiff's state law claims satisfied the removal requirements of § 1453.  <u>See</u>

3  <u>generally Coffey</u>, 2018 WL 3812076, at *2.  That allowed the entire action, including the

4  Securities Act claims, to be removed.  <u>Id.</u> at *7 n. 6.  <u>Luther</u> was inapplicable to that case

5  because <u>Luther</u> addressed only whether Securities Act claims that satisfied CAFA's

6  jurisdictional requirements (in one manner or another) could be the basis for removal

7  pursuant to § 1453.  <u>Id.</u> at *4.  <u>Luther</u> answered that question in the negative based on

8  § 22(a) and that is the exact situation presented here.

9    Fourth, defendants argue that CAFA's plain language allows removal despite

10  § 22(a), and that <u>Luther</u> was wrongly decided and should be limited or reconsidered.

11  Regardless of what defendants think CAFA's plain language allows, <u>Luther</u> held that

12  § 22(a) bars removal of pure Securities Act claims.  And while defendants are free to

13  argue to the Ninth Circuit that <u>Luther</u> was wrongly decided, those arguments fail to

14  persuade this court.

15    For the foregoing reasons, the court GRANTS plaintiff's motion and REMANDS

16  the action to San Mateo County Superior Court.  The October 24, 2018 hearing date is

17  VACATED.

18    **IT IS SO ORDERED.**

19  Dated: October 15, 2018

20  _____

21  PHYLLIS J. HAMILTON
    United States District Judge

22

23

24

25

26

27

28  does not "unduly interfere" with § 1453(b).

# EXHIBIT B

PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOHN NEUKOM (SBN 275887)
john.neukom@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

Attorney for Defendants
Ripple Labs Inc., XRP II, LLC, Bradley
Garlinghouse, Christian Larsen, Ron Will,
Antoinette O'Gorman, Eric van Miltenburg,
Susan Athey, Zoe Cruz, Ken Kurson, Ben
Lawsky, Anja Manuel, and Takashi Okita

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVNER GREENWALD, Individually And On Behalf Of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>          v.<br><br>RIPPLE LABS INC., et al.,<br><br>                         Defendants. | CASE NO.: 18-cv-4790<br><br>CLASS ACTION<br><br>**NOTICE OF REMOVAL** |

**<u>TABLE OF CONTENTS</u>**

<u>PAGE</u>

I.     INTRODUCTION ........................................................................................ 1

II.    REMOVAL IS PROPER UNDER THE CLASS ACTION FAIRNESS ACT ..................... 2

III.   SECTION 22(A) OF THE SECURITIES ACT DOES NOT BAR REMOVAL .................. 3

       A.     Luther Does Not Bar Removal Here ............................................... 4

       B.     Luther Has Been Abrogated By the Supreme Court .......................... 6

       C.     Luther Should Be Reconsidered ..................................................... 7

IV.    THIS REMOVAL NOTICE IS TIMELY AND SATISFIES ALL
       PREREQUISITES. ........................................................................................ 10

1

## TABLE OF AUTHORITIES

2

### CASES                                                                    PAGE(S)

3  Broadway Grill, Inc. v. Visa Inc.,
       856 F.3d 1274 (9th Cir. 2017) .............................................................................. 2
4
   California Public Employees Retirement System v. WorldCom, Inc.,
5      368 F.3d 86 (2d Cir. 2004) .................................................................................... 9

6  Cyan, Inc. v. Beaver County Employees Retirement Fund,
       138 S. Ct. 1061 (2018) ........................................................................................... 4
7
   Dart Cherokee Basin Operating Co. v. Owens,
8      135 S. Ct. 547 (2014) ......................................................................................... 6, 7

9  FDIC v. Countrywide Financial Corp.,
       No. 11-CV-10400-MRP-MANx, 2012 WL 12897152 (C.D. Cal. Mar. 20, 2012) ...... 9
10
   Holt v. Noble House Hotels & Resort, Ltd.,
11     No. 17CV2246-MMA (BLM), 2018 WL 539176 (S.D. Cal. Jan. 23, 2018) ............. 3

12 Jordan v. Nationstar Mortgage LLC,
       781 F.3d 1178 (9th Cir. 2015) ........................................................................... 6, 7
13
   Katz v. Gerardi,
14     552 F.3d 558 (7th Cir. 2009) ......................................................................... 7, 8, 9

15 Life of the South Insurance Co. v. Carzell,
       851 F.3d 1341 (11th Cir. 2017) ............................................................................ 4
16
   Luther v. Countrywide Home Loans Servicing LP,
17     533 F.3d 1031 (9th Cir. 2008) ....................................................................... passim

18 Miller v. Gammie,
       335 F.3d 889 (9th Cir. 2003) ................................................................................ 6
19
   Morrison v. National Australia Bank Ltd.,
20     561 U.S. 247 (2010) .............................................................................................. 5

21 New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4,
       581 F. Supp. 2d 581(S.D.N.Y. 2008) ................................................................ 5, 7
22
   Public Employees Retirement System of Mississippi v. Morgan Stanley,
23     605 F. Supp. 2d 1073 (C.D. Cal. 2009) ............................................................... 9

24 Rossetti v. Stearn's Products, Inc.,
       No. CV 16-1875-GW (SSx), 2016 WL 3277295 (C.D. Cal. June 6, 2016) ............ 3
25
   Russello v. United States,
26     464 U.S. 16 (1983) ............................................................................................... 9

27 SEC v. Glenn W. Turner Enterprises, Inc.,
       474 F.2d 476 (9th Cir. 1973) ............................................................................... 8
28

NOTICE OF REMOVAL                                                    Case No. 18-cv-4790

U.S. Industries, Inc. v. Gregg,
   348 F. Supp. 1004 (D. Del. 1972), rev'd on other grounds, 540 F.2d 142 (3d Cir. 1976) ............ 8

United States v. Providence Journal Co.,
   485 U.S. 693 (1988) .................................................................................................................... 9

## STATUTES

15 U.S.C. § 77p ......................................................................................................................... 3, 4

15 U.S.C. § 77v ......................................................................................................................... 3, 4

28 U.S.C. § 1332 .................................................................................................................... passim

28 U.S.C. § 1441 .......................................................................................................................... 8, 9

28 U.S.C. § 1446 ....................................................................................................................... 1, 10

28 U.S.C. § 1453 .................................................................................................................... passim

## OTHER AUTHORITIES

2 McLaughlin on Class Actions § 12:6 (14th ed. 2017) ............................................................. 9

15 Moore's Federal Practice – Civil § 102.73 (2018) ............................................................... 4

16 Moore's Federal Practice – Civil § 107.91[1][b] (2018) ..................................................... 7

NOTICE OF REMOVAL            Case No. 18-cv-4790

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**:  Please take notice that Defendants Ripple Labs Inc. ("Ripple"), XRP II, LLC ("XRP II"), Bradley Garlinghouse, Christian Larsen, Ron Will, Antoinette O'Gorman, Eric van Miltenburg, Susan Athey, Zoe Cruz, Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita (collectively, "Defendants"), by and through their undersigned attorneys, hereby remove the above-captioned civil action, and all claims and causes of action therein, from the Superior Court of the State of California, County of San Mateo, to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. §§ 1332(d) and 1453.  As required by 28 U.S.C. § 1446(a), all process, pleadings, and orders served on Defendants in the action to date are attached hereto as Exhibit A.  As the requisite "short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), Defendants state as follows:

## I.     INTRODUCTION

1.     This action arises out of Plaintiff's alleged purchase of a virtual currency, XRP, on "global, online cryptocurrency exchanges."  (Compl. ¶¶ 14, 78-79.)  Plaintiff does not allege that he lacked information about the nature of these transactions.  Nevertheless, Plaintiff claims that he was somehow injured because Defendants were allegedly required to register XRP as a "security" with the Securities & Exchange Commission ("SEC") but failed to do so.

2.     On July 3, 2018, Plaintiff filed a putative class action complaint in the Superior Court of California, County of San Mateo, purporting to sue on his own behalf and on behalf of "all persons or entities who purchased XRP from July 3, 2015 through the present."  (Compl. ¶ 87.)  Plaintiff asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933 ("Securities Act").  Plaintiff seeks, among other things, rescission of XRP purchases and/or damages (Compl. at 21(C)(D)) and a constructive trust over the proceeds of Defendants' alleged sales of XRP (Compl. at 21(G)).

3.     Defendants now remove this putative class action to this Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1453.  The Court has jurisdiction over the claims pursuant to 28 U.S.C. § 1332(d).

## II.    REMOVAL IS PROPER UNDER THE CLASS ACTION FAIRNESS ACT

4.    This alleged nationwide securities action falls within the original jurisdiction of this Court under CAFA.  Pursuant to CAFA, a putative class action may be removed to the appropriate federal district court if (1) the action purports to be a "class" action brought on behalf of 100 or more members; (2) any member of a class of plaintiffs is a citizen of a state different from any defendant or any member of the class is a member of a foreign state and any defendant is a citizen of a state; and (3) the amount in controversy exceeds $5 million.  See 28 U.S.C. §§ 1332(d)(2), (2)(A), (5)(B), 1453(b).  This action meets each of those requirements.

5.    ***Class exceeds 100 members***.  First, this is an alleged class action brought on behalf of over 100 members.  Plaintiff purports to assert claims on behalf of a "class" consisting of "thousands of members."  (Compl. ¶¶ 87, 89.)  That well exceeds the requirements of CAFA.  See 28 U.S.C. § 1332(d)(1)(B), (5)(B).

6.    ***Minimal Diversity***.  Second, minimal diversity of citizenship exists (i.e., at least one class member plaintiff has a different citizenship from any of the defendants), as required by Section 1332(d)(2)(A).  On the one hand, at least three of the Defendants are allegedly citizens of California.  (Compl. ¶¶ 15-27.)  On the other hand, there are members of the putative class who are citizens of states other than California or citizens of foreign states, including Plaintiff, who is a resident of Israel.  (Compl. ¶ 14.)  The Complaint purports to be brought on behalf of "all persons or entities who purchased XRP from July 3, 2015 through the present" without any geographic limitation.  (Compl. ¶ 87.)  The Complaint further alleges that Defendants have sold XRP to putative class members on "global, online cryptocurrency exchanges," which are accessible on the internet and therefore throughout the United States and the world.  (Compl. ¶¶ 78-79.)  Additionally, the Complaint alleges that "[b]y way of the internet, including Ripple Labs' website, Twitter, and the over 50 cryptocurrency exchanges that trade XRP, interstate means are used in connection with the offer and sale of XRP."  (Compl. ¶ 77.)  Given these allegations, citizens of states other than California or citizens of foreign states, including Plaintiff himself, have undoubtedly purchased XRP.  Therefore, members of the putative class are citizens of states different from Defendants.  See, e.g., Broadway Grill, Inc. v. Visa Inc., 856 F.3d 1274, 1276 (9th

NOTICE OF REMOVAL                                                        Case No. 18-cv-4790

Cir. 2017) (concluding that minimal diversity was satisfied when class definition, as pleaded, included a nationwide class and many non-citizens of California); Rossetti v. Stearn's Prods., Inc., 2016 WL 3277295, at *1-2 (C.D. Cal. June 6, 2016) (action pled as a nationwide class satisfied minimal diversity requirement).

7. **Amount in Controversy**. Third, this action meets CAFA's amount-in-controversy requirement of $5 million. 28 U.S.C. § 1332(d)(6). Among other things, Plaintiff seeks the rescission of Defendants' alleged sales of XRP to putative class members. (Compl. at 21(C).) Plaintiff alleges that in the first quarter of 2018 alone, "Defendants sold at least $167.7 million worth of XRP." (Compl. ¶ 52.) If all such sales were rescinded, the amount in controversy would exceed $5 million. While Defendants strongly deny that Plaintiff or any putative class members are entitled to recover any amount (or any other relief), Plaintiff plainly seeks to recover an aggregate amount over $5 million.

8. Moreover, Plaintiff seeks a constructive trust over the proceeds of Defendants' alleged sales of XRP. (Compl. at 21(G).) Based on the allegations in the Complaint, this amount is at least $167.7 million, in excess of the $5 million minimum. (Compl. ¶ 52); see also Holt v. Noble House Hotels & Resort, Ltd., 2018 WL 539176, at *4 (S.D. Cal. Jan. 23, 2018) (considering amount over which plaintiff was seeking a constructive trust and disgorgement in assessing amount in controversy).

9. **Exceptions**. None of the exceptions to removal set forth in CAFA applies to bar removal here. This action does not (i) involve a "covered security," as defined by 15 U.S.C. § 77p(f)(3); (ii) relate to the internal affairs or governance of a corporation and arise under the laws of the state in which such corporation was formed; or (iii) relate to the rights, duties, and obligations relating to or created by or pursuant to any security. See 28 U.S.C. § 1453(d)(1)-(3).

## III. SECTION 22(A) OF THE SECURITIES ACT DOES NOT BAR REMOVAL

10. The fact that Plaintiff purports to bring claims under the Securities Act does not preclude removal here. Section 22(a) of the Securities Act ("Section 22(a)") provides, "Except as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States." 15

3

U.S.C. § 77v(a).  Section 22(a) is known as a removal bar.  Although the Supreme Court recently concluded that the exception to the removal bar in section 77p(c)—a reference to the Securities Litigation Uniform Standards Act ("SLUSA")—does not permit removal of class actions alleging only Securities Act violations, <u>Cyan, Inc. v. Beaver County Employees Retirement Fund</u>, 138 S. Ct. 1061, 1075-76 (2018), the Supreme Court has not prohibited removal of class actions asserting Securities Act claims on the basis of CAFA, which expressly permits removal.

### A. <u>Luther Does Not Bar Removal Here</u>

11.    Defendants expressly acknowledge the decision of the United States Court of Appeals for the Ninth Circuit in <u>Luther v. Countrywide Home Loans Servicing LP</u>, 533 F.3d 1031, 1034 (9th Cir. 2008).  In <u>Luther</u>, the plaintiff asserted claims under the Securities Act.  <u>See id.</u> at 1032-33.  The court held that a class action brought in state court alleging violations of the Securities Act was not removable even though it met the requirements of CAFA.  <u>Id.</u> at 1034.  But <u>Luther</u> involved a removal based on minimum diversity between citizens of the United States.  <u>Id.</u> 1033-34.  It did not address a situation where, as here, CAFA permitted removal based not only on minimal diversity jurisdiction, but also on alienage jurisdiction because the Securities Act class action was brought by a citizen of a foreign state on behalf of a purportedly worldwide class of persons who purchased an alleged security from "global, online cryptocurrency exchanges." (Compl. ¶ 79.)

12.    This distinction is substantively important.   "[T]he major purpose of alienage jurisdiction is to promote international relations by assuring other countries that litigation involving their nationals will be treated at the national level."  <u>Life of the S. Ins. Co. v. Carzell</u>, 851 F.3d 1341, 1347 (11th Cir. 2017) (alteration in original) (applying alienage provisions of CAFA); <u>see also</u> 15 Moore's Federal Practice – Civil § 102.73 (2018) ("Alienage jurisdiction was intended to provide the federal courts with a form of protective jurisdiction over matters implicating international relations, in which the national interest is paramount," including when "entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level.").

13.    CAFA (i) broadened the definition of diversity and alienage jurisdiction in 28

U.S.C. § 1332 as it applied to certain class actions, <u>see</u> 28 U.S.C. § 1332(d); and (ii) created a separate statute allowing for removal of class actions falling within that broadened definition, <u>see</u> 28 U.S.C. § 1453. In doing so, CAFA specifically expanded the federal courts' jurisdiction "by establishing original jurisdiction in the federal courts for certain class actions that are national or international in scope," subject to certain enumerated exceptions. <u>New Jersey Carpenters Vacation Fund v. HarborView Mortg. Loan Trust</u>, 581 F. Supp. 2d 581, 583 (S.D.N.Y. 2008).

14.     A case like this one that seeks to apply, for the first time, U.S. securities laws to transactions that take place throughout the globe has just such a national and international scope. Among other things, it implicates international relations as other countries seek to regulate transactions in virtual currencies that take place within their own borders. <u>See</u> <u>HarborView</u>, 581 F. Supp. 2d at 588 (concluding that Securities Act case was removable under CAFA when it involved matters that were affecting the "international economy"). While Defendants in no way concede that the Securities Act applies to international transactions—it does not, <u>see</u> <u>Morrison v. National Australia Bank Ltd.</u>, 561 U.S. 247 (2010)—Plaintiff's attempt to apply the Securities Act to such transactions takes this case outside the purview of <u>Luther</u>.

15.     Indeed, the basis for the <u>Luther</u> court's holding that Section 22(a) bars removal notwithstanding CAFA was that Section 22(a) is "narrow, precise, and specific" and "applies only to claims arising under the Securities Act," whereas CAFA has broader application. <u>Luther</u>, 533 F.3d at 1034. But if Section 22(a) were interpreted to bar removal of Securities Act claims even when such claims purported to regulate transactions on an international scale, Section 22(a) would not have the "narrow, precise, and specific" application the <u>Luther</u> court described. Therefore, the reasoning in <u>Luther</u> does not apply to the situation here and does not bar removal.

16.     Defendants recognize that, if the Court does not conclude that <u>Luther</u> is distinguishable, the decision in <u>Luther</u> is binding precedent that appears to bar removal here. However, Defendants further contend that (i) subsequent United States Supreme Court authority has abrogated the conclusion and reasoning in <u>Luther</u>, and, if not, (ii) post-<u>Luther</u> developments in the law counsel that the Ninth Circuit should reconsider <u>Luther</u>.

17.     Defendants acknowledge that, to the extent the Court does not believe that <u>Luther</u>

has been abrogated, this Court may be bound by Luther and compelled to remand this action. In such circumstance, Defendants would request that the Ninth Circuit review such remand order so that it may reconsider Luther. CAFA itself provides for an appeal to the Ninth Circuit from any remand decision under CAFA. See 28 U.S.C. § 1453(c)(1) ("[A] court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not more than 10 days after entry of the order.").

### B. Luther Has Been Abrogated By the Supreme Court

18.     The Ninth Circuit has recognized that its own decisions are not binding on district courts if their "reasoning or theory" is "clearly irreconcilable" with subsequently decided United States Supreme Court authority. Miller v. Gammie, 335 F.3d 889, 893 (9th Cir. 2003). Such is the case with Luther. In reaching its holding, Luther relied on the general rules that "removal statutes are strictly construed against removal," and "any doubt is resolved against removability." Luther, 533 F.3d at 1034. However, in Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547 (2014), decided after Luther, the Supreme Court declared that "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." Id. at 554. On the contrary, CAFA's "provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." Id. (citation omitted). Accordingly, Luther's strict construction against removal to resolve the perceived conflict between Section 22(a)'s removal bar and CAFA's removal provisions cannot be squared with the Supreme Court's express instructions in the more recently decided Dart Cherokee "to interpret CAFA's provisions under section 1332 broadly in favor of removal." Jordan v. Nationstar Mortg. LLC, 781 F.3d 1178, 1184 (9th Cir. 2015) (reversing order of district court, "[i]n light of the Supreme Court's clear statement in Dart Cherokee that Congress intended for no antiremoval presumption to attend CAFA cases" and rejecting Luther's strict construction of CAFA against removal because it was inconsistent with Dart Cherokee).

19.     Likewise, Luther's interpretation of CAFA as a "general grant of the right of

removal of high-dollar class actions" that excludes nationwide class actions asserting claims under the Securities Act, Luther, 533 F.3d at 1034, cannot be squared with Dart Cherokee's characterization of CAFA as a tool to ensure federal consideration of "interstate cases of national importance." Dart Cherokee, 135 S. Ct. at 554 (citation omitted). In fact, other courts have concluded that application of CAFA to interstate securities class actions of national importance is essential to fulfill the purposes of CAFA. See HarborView, 581 F. Supp. 2d at 587-88 (concluding that "CAFA overrides the Securities Act's anti-removal provision because this case involves exactly the type of case CAFA was concerned about—a large, non-local securities class action dealing with a matter of national importance, the mortgage-backed securities crisis that is currently wreaking havoc with the national and international economy"). The ruling in Dart Cherokee thus "undercut[s] the theory or reasoning underlying [Luther] in such a way that [Luther and Dart Cherokee] are clearly irreconcilable." Jordan, 781 F.3d at 1183 n.2 (first alteration in original) (citation omitted); see also 16 Moore's Federal Practice - Civil § 107.91[1][b] (2018) (observing that "[g]iven the Supreme Court's assertion that no antiremoval presumption applies to cases removed under CAFA," the decision in Luther was likely incorrect). Thus, Luther has been abrogated.

### C. **Luther Should Be Reconsidered**

20. If the Court does not conclude that post-Luther decisions have abrogated Luther, Defendants believe Luther should be reconsidered in light of post-Luther developments in the law.

21. In addition to Dart Cherokee, shortly after the Ninth Circuit decided Luther, the Seventh Circuit considered the central legal question in Luther—the removability of Securities Act class actions meeting the removal requirements of CAFA. See Katz v. Gerardi, 552 F.3d 558 (7th Cir. 2009). The Katz court held that class actions meeting the requirements of CAFA, including those asserting claims under the Securities Act, are removable. Id. at 562. In doing so, Katz expressly disagreed with the reasoning in Luther.

22. In Luther, the court applied the "principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." Luther, 533 F.3d at 1034 (citation omitted). The court

reasoned that the Securities Act was "more specific" than CAFA because it "applies only to claims arising under the Securities Act," whereas CAFA "applies to a 'generalized spectrum'" of class actions. Id. On the basis that the purported specific statute controls over the more general statute, Luther found that Section 22(a)'s removal bar applied to bar removal of Securities Act claims notwithstanding that CAFA expressly permitted such removal.

23. The Katz court rejected and exposed this flawed reasoning. Contrary to Luther's conclusion, the Katz court explained that CAFA is **not** broader than the Securities Act because CAFA applies only to "large, multi-state class actions" while the Securities Act applies to "all securities actions—single-investor suits as well as class actions." Katz, 552 F.3d at 561; see also SEC v. Glenn W. Turner Enters., Inc., 474 F.2d 476, 481 n.5 (9th Cir. 1973) (noting "[t]he broad purpose of the Securities Act of 1933").

24. Thus, the Katz court concluded that the language of CAFA itself, "rather than a[ny] canon" of statutory construction, instructs how CAFA "applies to corporate and securities actions." Katz, 552 F.3d at 562. CAFA itself contains specific, enumerated exceptions to removal jurisdiction that address certain securities actions—none of which applies here—including actions "concerning a covered security," those relating to the internal affairs of a corporation, or those relating to the rights, duties, and obligations relating to or created by or pursuant to any security. Id. "This [list of exceptions] tells us all we need to know." Id. Claims falling within the exceptions are not removable, and all "[o]ther securities class actions are removable if they meet the requirements of" CAFA. Id.

25. Straightforward statutory construction of Congress's removal statutes confirms that the holding in Katz is correct and that the holding from Luther should be revisited. In particular, the general removal statute, 28 U.S.C. § 1441(a)—on which Defendants do **not** rely for removal here—authorizes removal when federal courts have "original jurisdiction" "[e]xcept as otherwise expressly provided by Act of Congress." 28 U.S.C. § 1441(a). Courts have concluded that this exception language—"[e]xcept as otherwise expressly provided by Act of Congress"—refers to anti-removal statutes such as Section 22(a) and prevents removal of an action when such claims are asserted. See U.S. Indus., Inc. v. Gregg, 348 F. Supp. 1004, 1015 n.10 (D. Del. 1972), rev'd on

1   other grounds, 540 F.2d 142 (3d Cir. 1976).

2       26.   However, Section 1453—the CAFA removal statute, the statute on which

3   Defendants **do** rely for removal—does **not** include the "[e]xcept as otherwise expressly provided

4   by Act of Congress" language.   See 28 U.S.C. § 1453.   As numerous courts have found, the

5   omission of this language in the CAFA removal statute demonstrates that, unlike with Section

6   1441(a), Congress did not intend anti-removal provisions to bar removal where the action meets

7   the requirements of CAFA.   See Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 106

8   (2d Cir. 2004) (allowing removal of Securities Act claim under 28 U.S.C. § 1452 because that

9   section does not include the exception language); FDIC v. Countrywide Fin. Corp., 2012 WL

10  12897152, at *1 (C.D. Cal. Mar. 20, 2012) (concluding that grant of federal jurisdiction over

11  claims involving FDIC made action removable under Section 1441(b), which at that time provided

12  for removal based on claims arising under federal law, and "trump[ed]" the removal bar in Section

13  22(a) because Section 1441(b) did not then contain exception language like Section 1441(a)).

14  Accordingly, straight forward statutory construction reveals that this action should be removable.

15  United States v. Providence Journal Co., 485 U.S. 693, 704-05 (1988) (citation omitted) (observing

16  that when two statutes included "[e]xcept as otherwise authorized by law," but that "by way of

17  vivid contrast," the third did not, the third statute provided for no exception); Russello v. United

18  States, 464 U.S. 16, 23 (1983) (alteration in original) (citation omitted) ("[W]here Congress

19  includes particular language in one section of a statute but omits it in another section of the same

20  Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

21  inclusion or exclusion.").   The Luther court never considered CAFA's plain language.

22      27.   For these reasons, Defendants respectfully submit that Katz is the correctly reasoned

23  decision, and that, to the extent necessary, Luther should be reconsidered.   Tellingly, the current

24  divide in authority led the author of the district court decision affirmed by the Ninth Circuit in

25  Luther, the Hon. Mariana Pfaelzer, to observe in another case, "Defendants appear to have

26  nonfrivolous arguments for a change in the law due to post-Luther developments."   Pub. Emps.'

27  Ret. Sys. of Miss. v. Morgan Stanley, 605 F. Supp. 2d 1073, 1075 n.1 (C.D. Cal. 2009).   See also 2

28  McLaughlin on Class Actions § 12:6 (14th ed. 2017) (collecting authorities and concluding Katz's

conclusion is correct).

## IV. <u>THIS REMOVAL NOTICE IS TIMELY AND SATISFIES ALL PREREQUISITES.</u>

28.     Plaintiff filed the above-captioned putative class action on July 3, 2018 in the Superior Court of the State of California, County of San Mateo, as case number 18-CIV-03461. The first Defendant to be served, Ripple, was served on July 9, 2018.  This Notice of Removal is timely because it has been filed within thirty days of Plaintiff's earliest purported service of the Complaint.  <u>See</u> 28 U.S.C. § 1446.

29.     No previous application has been made by the Defendants for this or similar relief.

30.     Written notice of the filing of this Notice of Removal will be given to the adverse parties and state court as required by § 1446(d).

DATED: August 8, 2018

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____*/s/Peter B. Morrison*_____
Peter B. Morrison
Attorney for Defendants

# EXHIBIT C

# Exhibit A

1  JOHN T. JASNOCH (CA 281605)
   SCOTT+SCOTT
2  ATTORNEYS AT LAW LLP
   600 W. Broadway, Suite 3300
3  San Diego, CA 92101
   Telephone: 619-233-4565
4  Facsimile: 619-233-0508
   Email: jjasnoch@scott-scott.com
5
     – and –
6
   THOMAS L. LAUGHLIN, IV
7  RHIANA SWARTZ
   The Helmsley Building
8  230 Park Avenue, 17th Floor
   New York, NY 10169
9  Telephone: 212-223-6444
   Facsimile: 212-223-6334
10 Email: tlaughlin@scott-scott.com
          rswartz@scott-scott.com
11
   *Counsel for Plaintiff*
12

**FILED**
**SAN MATEO COUNTY**

JUL 0 3 2018

Clerk of the Superior Court
By _____
        DEPUTY CLERK

FILED BY FAX

13
                 SUPERIOR COURT OF THE STATE OF CALIFORNIA
14
                          COUNTY OF SAN MATEO
15
                                                    Case No. **18 C I V 03461**
   AVNER GREENWALD, Individually and on
16 Behalf of All Others Similarly Situated,
                                                    **CLASS ACTION COMPLAINT FOR**
17                                    Plaintiff,    **VIOLATIONS OF THE SECURITIES ACT**
       v.                                           **OF 1933**
18
   RIPPLE LABS, INC., a Delaware Corporation,       **JURY TRIAL DEMANDED**
19 XRP II, LLC, a South Carolina Limited Liability
   Company, BRADLEY GARLINGHOUSE,
20 CHRISTIAN LARSEN, RON WILL,
   ANTOINETTE O'GORMAN, ERIC VAN
21 MILTENBURG, SUSAN ATHEY, ZOE
   CRUZ, KEN KURSON, BEN LAWSKY,
22 ANJA MANUEL, and TAKASHI OKITA,
23                                  Defendants.

18 – CIV – 03461
CMP
Complaint
1244161

24
25
26
27
28
                                      COMPLAINT

Plaintiff Avner Greenwald ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings and commentary, publicly available reports and information, analyst and media reports, and other commentary analysis. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF ACTION

1.      Plaintiff brings this securities class action under §§5, 12(a)(1), and 15 of the Securities Act of 1933 (the "Securities Act") against (1) Ripple Labs, Inc. ("Ripple Labs" or the "Company"); (2) Ripple Labs' wholly owned subsidiary, XRP II, LLP ("XRP II"); and (3) certain of Ripple Labs' controlling senior executives and directors (collectively, the "Individual Defendants"). Plaintiff alleges that Defendants sold unregistered securities to investors in violation of the Securities Act. Defendants are liable in their capacities as issuers, statutory sellers, and/or direct or indirect offerors of XRP.

2.      Plaintiff brings this action on behalf of all investors who purchased Ripple tokens ("XRP" or "Ripples") on or after July 3, 2015 and were damaged thereby.

3.      XRP qualify as securities under Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1). The purchase of XRP constitutes an investment contract as XRP purchasers, including Plaintiff, provided consideration (in the form of fiat, *i.e.*, U.S. dollars or other cryptocurrencies) in exchange for XRP. XRP is in investment in a common enterprise and purchasers reasonably expected to derive profits from their ownership of XRP. Defendants promoted this profit motive as a reason to purchase XRP.

4.      No registration statements have been filed with the SEC or have been in effect with respect to the XRP offerings alleged herein.

5.      All 100 billion XRP in existence were created out of thin air by Ripple Labs.[1]  Twenty billion XRP, or 20% of all XRP in existence, were given to the individual founders of Ripple Labs, including Defendant Chris Larsen, and the remaining 80 billion were retained by Ripple Labs.

6.      Defendants have since earned massive profits by selling the retained XRP to the public, without complying with federal securities laws, in what is essentially an ongoing initial coin offering ("ICO").  Like an initial public offering ("IPO"), in an ICO, digital assets are sold to consumers in exchange for legal tender or other cryptocurrencies (most often Bitcoin and Ethereum).

7.      Defendants sell XRP from the retained supply and use the proceeds from the sales to fund Company operations.

8.      In order to increase demand for XRP, and thereby increase the profits derived by selling XRP, Defendants portray XRP as a good investment, solicit sales, express optimistic price predictions, and conflate Ripple Labs' enterprise customer programs with usage and value of XRP.  Ripple Labs greatly increased these efforts to push XRP on the general public in recent years.

9.      These solicitation efforts were conducted by interstate means, as were the sales of XRP.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action pursuant to the California Constitution, Article VI, §10 and Section 22 of the Securities Act, 15 U.S.C. §77v.  The claims alleged herein arise under §§5, 12(a)(1), and 15 of the Securities Act.  *See* 15 U.S.C. §§77e, 77l, and 77o. Section 22 of the Securities Act, 15 U.S.C. §77v(a), expressly states that "[e]xcept as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  Section 77p(c) refers to "covered class action[s] brought in any State court involving a covered security, as set forth in subsection (b)," and subsection (b) of §77p in turn includes within its scope only covered class actions "based upon the

---

[1]     This is unlike other cryptocurrencies like Bitcoin and Ethereum that are "mined" by those validating transactions on their networks.

statutory or common law of any State or subdivision thereof." *See* 15 U.S.C. §77p. This is an action asserting only federal law claims. Thus, this action is not removable to federal court.

11. Venue is proper in this jurisdiction pursuant to the provisions of California Code of Civil Procedure §395(a) because certain Defendants reside in San Mateo County.

12. This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in and/or aimed at the state of California in connection with Defendants' unregistered offer and sale of securities in violation of §§5, 12(a)(1), and 15 of the Securities Act.

13. This Court also has personal jurisdiction over Defendants because they reside in or have their principal places of business in California.

## **PARTIES**

14. Lead Plaintiff Avner Greenwald is an individual and a resident of Israel. Plaintiff bought and sold XRP in both USD and Bitcoin between December 14, 2017 and May 12, 2018, and suffered losses on those investments as a result of the scheme alleged herein.

15. Defendant Ripple Labs, Inc. is a Delaware corporation with its principal place of business at 300 Montgomery Street, 12th Floor, San Francisco, California. Ripple Labs operates RippleNet, a global payments network based on blockchain technology. Through RippleNet, banks and payment providers can use XRP to process, clear, and settle financial transactions in real-time worldwide. Ripple Labs created XRP and, at all relevant times, solicited purchases of XRP by Plaintiff and the Class for its own benefit and the benefit of its executives and owners.

16. Defendant XRP II, LLC is wholly owned subsidiary of Ripple Labs. XRP II is a South Carolina limited liability company with its principal place of business in San Francisco, California. XRP II sold XRP and solicited the purchases of XRP by Plaintiff and the Class for its own benefit and the benefit of its parent, Ripple Labs, and its executives and owners.

17. Defendant Bradley Garlinghouse ("Garlinghouse") is the Chief Executive Officer ("CEO") of Ripple Labs and has been since January 2017. Garlinghouse was Ripple Labs' President and Chief Operating Officer from April 2015 through December 2016. Garlinghouse is a California citizen and a resident of San Mateo County. Garlinghouse exercised control over Ripple

Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

18.    Defendant Christian (Chris) Larsen ("Larsen") is Executive Chairman of Ripple Labs' Board of Directors and has been since January 2017.  Larsen is also a co-founder of Ripple Labs and a former CEO of Ripple Labs (through December 2016).  Larsen exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

19.    Defendant Ron Will ("Will") is Chief Financial Officer of Ripple Labs and has been since November 2017.  Will exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

20.    Defendant Antoinette O'Gorman ("O'Gorman") is Chief Compliance Officer of Ripple Labs.  O'Gorman exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

21.    Defendant Eric van Miltenburg ("van Miltenburg") is Senior Vice President for Business Operations of Ripple Labs.  Van Miltenburg exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

22.    Defendant Susan Athey ("Athey") is a Director of Ripple Labs.  As a Director, Athey exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

23.    Defendant Zoe Cruz ("Cruz") is a Director of Ripple Labs.  As a Director, Cruz exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

24.    Defendant Ken Kurson ("Kurson") is a Director of Ripple Labs.  As a Director, Kurson exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

25. Defendant Ben Lawsky ("Lawsky") is a Director of Ripple Labs. As a Director, Lawsky exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

26. Defendant Anja Manuel ("Manuel") is a Director of Ripple Labs. As a Director, Manuel exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

27. Defendant Takashi Okita ("Okita") is a Director of Ripple Labs. As a Director, Okita exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

28. The defendants referred to in ¶¶17-27 are referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.    The Background of XRP**

29. Unlike cryptocurrencies such as Bitcoin and Ethereum, which are mined by those validating transactions on their networks, all 100 billion XRP in existence were created out of thin air by Ripple Labs in 2013. Twenty billion XRP, or 20% of the total XRP supply, were given to the individual founders of Ripple Labs,[2] with the remaining 80 billion retained by Ripple Labs.

30. As for 80 billion XRP held by Ripple Labs, the plan was to sell them and use the proceeds to fund and improve Company operations, including the XRP ledger network.

31. Ripple Labs' own wiki notes that "Ripple Labs sells XRP to fund its operations and promote the network. This allows Ripple Labs to have a spectacularly skilled team to develop and promote the Ripple protocol and network."[3]

32. In the first quarter of 2018, "market participants purchased $16.6 million [of XRP] directly from XRP II, LLC," XRP II also "sold $151.1 million worth of XRP" on exchange.[4]

---

[2]    Defendant Chris Larsen received 9.5 billion XRP.

[3]    Ripple credits, https://wiki.ripple.com/Ripple_credits#XRP funds the development and promotion of the protocol and the network (last visited June 29, 2018).

33. Ripple Labs' primary business involves the operation of an open ledger protocol, payment, and exchange network. The native cryptocurrency for Ripple Labs' exchange network is XRP. Thus, XRP is both an investment in the Company (as sales are used to fund Company operations with the expectation that such investments in the Company will increase the value of XRP) and an investment in itself (with the expectation that the value of XRP will increase), as well as a means of exchange promoted by Ripple Labs.

34. Ripple Labs' exchange network is based around the XRP Ledger. The XRP Ledger consists of many servers, called nodes, which accept and process transactions. Client applications sign and send transactions to nodes, which then relay these candidate transactions throughout the network for processing. Transactions are then verified and become part of the XRP Ledger through a consensus process. Every XRP transaction must be made through Ripple Labs' XRP Ledger, which is maintained by Defendants. In order to open an account on the XRP Ledger, users must maintain a minimum account balance of 20 XRP. In addition, each time a transaction is made in XRP, there is a transaction cost to users.

35. Ripple Labs' founders and other Company insiders have also profited individually from their XRP holdings. In January 2018, Ripple co-founder Defendant Larsen was named one of the richest people in the United States, with an estimated net worth of $59.9 billion, primarily due to the increase in value in XRP and his personal ownership of billions of XRP and his significant stake in the Company.[5]

36. Defendants have control over how many XRP are in the market.

37. No registration statement has been filed for XRP with the SEC and no registration statement is in effect for XRP.

---

[4] Q1 2018 XRP Markets Report, https://ripple.com/insights/q1-2018-xrp-markets-report/ (last visited June 29, 2018).

[5] https://www.cnbc.com/2018/01/04/ripple-co-founder-is-now-richer-than-the-google-founders-on-paper.html (last visited on June 29, 2018).

COMPLAINT

**B. Defendants Solicit XRP Sales**

38.     From 2013 to the present, Defendants and their affiliates have been engaged in an ongoing scheme to sell XRP to the general public.

39.     Ripple Labs dedicates an entire section of its website to providing advice on "How to Buy XRP." This section provides links to online exchanges and instructions on "[h]ow to buy XRP" on those exchanges.[6] It also has a section titled "Market Performance" which proclaims that Ripple Labs is "committed to the long term health and stability of XRP markets."[7]

40.     Ripple Labs also consistently promotes the availability of XRP on exchanges. For example, on May 18, 2017, its Senior Vice-President for Business Development, Patrick Griffin, tweeted a link to the Kraken exchange with the caption: "Kraken Introduces New Fiat Pairs for XRP Trading! USD, JPY, CAD, EUR @ Ripple."[8]

41.     Similarly, on or about December 21, 2017, Ripple Labs tweeted in Japanese that XRP was now available on over 50 exchanges.[9] That tweet linked to an article on Ripple Labs' website which described XRP as "the fastest and most scalable [digital] asset on the market."[10] It continued, "[t]he market is taking notice of XRP's speed, reliability and scalability – which has strengthened the demand for XRP and where it's listed. In fact, we're proud to announce that XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide." The article also links to a number of online exchanges where XRP can be purchased, and states that "XRP's long-term value is determined by its utility – including its ability to help financial institutions source liquidity for payments into and out of emerging markets."

---

[6]     XRP Buying Guide, https://ripple.com/xm/buy-xrp/ (last visited on June 29, 2018).

[7]     Market Performance, https://ripple.com/xrp/market-performance/ (last visited on June 29, 2018)

[8]     @patgriffin9, https://twitter.com/patgriffin9/status/865251321867231233 (last visited on June 29, 2018).

[9]     @Ripple, https://twitter.com/Ripple/status/943999526783905792 (last visited on June 29, 2018).

[10]     XRP Now Available on 50 Exchanges Worldwide, https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/ (last visited on June 29, 2018).

42.     Ripple Labs also hosts conferences to generate interest in XRP.  For example, between October 16 and October 18, 2017, it hosted a conference named "Swell" in Toronto. Ripple Labs acknowledged that "[a]nticipation around the event spurred a meaningful spike in XRP, pushing it up 100 percent[.]"[11]

43.     On the same day, CoinDesk, a subsidiary of Digital Currency Group, which has an ownership interest in Ripple Labs, published an article titled "Ripple Price Passes Historic $1 Milestone."[12]  This was just one of many instances in which Ripple Labs would promote price movements of XRP.

44.     Ripple Labs' promotion of XRP's price reached new highs in December 2017.  In one instance, Ripple's XRP product manager retweeted a tweet exclaiming: "Wow, XRP at all-time high!  Forget about bitcoin, *we're all in on XRP*!"  (Emphasis added.)[13]

45.     Around that same time, on or about December 7, 2017, Ripple Labs announced that it had placed "55 billion XRP in a cryptographically-secured escrow account to create certainty of XRP supply at any given time."[14]  It had been previously announced in May 2017 that this would happen along with a limited distribution schedule.  This was done to limit the available supply of XRP and drive price appreciation, which allowed Defendants to maximize profits from XRP sales. The December 7, 2017 announcement stated:

> By securing the lion's share of XRP in escrow, people can now mathematically verify
> the maximum supply that can enter the market.  While Ripple has proved to be a
> responsible steward of XRP supply for almost five years – and has clearly
> demonstrated a tremendous track record of investing in and supporting the XRP

---

[11]     14Q3 2017 XRP Markets Report, https://ripple.com/xrp/q3-2017-xrp-markets-report/ (last visited on June 29, 2018).

[12]     Ripple Price Passes Historic $1 Milestone, https://www.coindesk.com/ripple-price-passes-historic-1-milestone/ (last visited on June 29, 2018).

[13]     @warpaul, https://twitter.com/yoshitaka_kitao/status/940785785925709829 (last visited on June 29, 2018).

[14]     https://ripple.com/insights/ripple-escrows-55-billion-xrp-for-supply-predictability (last visited on June 29, 2018).

COMPLAINT

ecosystem – this lockup eliminates any concern that Ripple could flood the market, which we've pointed out before is a scenario that would be bad for Ripple![15]

46.     The article contained a button to allow readers to share it on Twitter with the caption "Game changer for $XRP! 55 billion XRP now in escrow."[16]  Ripple also promoted this article through its own tweet, which proclaimed:  "55B $XRP is now in escrow.  Interested in what this means for $XRP markets?"[17]  Garlinghouse was even more enthusiastic, tweeting:  "Boom! 55 B $XRP now in escrow.  Good for supply predictability and trusted, healthy $XRP markets.  Glad to finally let this #cryptokitty out of the bag!"[18]

47.     Ripple's public commitment to limit the supply of XRP had its intended effect.  In the weeks that followed, the price of XRP rapidly increased, from approximately $0.22 per token on December 7, 2017 to $3.38 per token on January 7, 2018.[19]

48.     Ripple Labs' CEO, Brad Garlinghouse, has also been a vocal advocate for investing in XRP. In a December 14, 2017 interview with Canada's Business News Network ("BNN"), when asked if he is personally invested in XRP, the CEO stated "I'm long XRO, I'm very, very long XRP as a percentage of my personal balance sheet." He continued, stating that he is "not long some of the other [digital] assets, because it is not clear to me what's the real utility, what problem are they really solving."  And ended by reiterating "if you're solving a real problem, if it's a scaled problem, then I think you have a huge opportunity to continue to grow that.  We have been really fortunate obviously, *I remain very, very, very long XRP*, there is an expression in the industry HODL, instead of hold, its HODL . . . I'm on the HODL side" (emphasis added).

---

[15]    *Id.*

[16]    *Id.*

[17]    https://twitter.com/Ripple/status/938933967956389889.

[18]    https://twitter.com/bgarlinghouse/status/938933791145336832?lang=en.

[19]    XRP would subsequently lose nearly all its value in just over three months, falling to a low of approximately $0.48 per token on April 6, 2018.

COMPLAINT

49.     Later that same day, Garlinghouse tweeted: "Bloomberg welcomes $XRP to @theterminal and gets it right – #2 market cap behind $BTC at ~$80BB!"[20]

50.     About a week later, on or about December 22, 2017, Garlinghouse tweeted an article titled "Bitcoin Is So 2017 as Ripple Soars at Year End," with the caption "I'll let the headline speak for itself. $xrp."[21]

51.     On or about January 17, 2018, Garlinghouse tweeted a CNBC article titled "Ripple is sitting on close to $80 billion and could cash out hundreds of millions per month-but it isn't," with the caption "A good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."

52.     However, the reality was that Ripple Labs was doing exactly that – cashing out. Defendants sold at least $167.7 million worth of XRP between January 1, 2018 and March 31, 2018.

53.     Given its reliance on sales of XRP to fund its operations, it is unsurprising that Ripple Labs' aggressively markets XRP to drive demand, increase the price of XRP, and consequently, its own profits.

54.     Defendants' advertising and social media postings also conflate adoption and use of Ripple Labs' xCurrent and xVia enterprise solutions with adoption and use of XRP, even though they often have little to no correlation and do not involve the XRP Ledger.  Defendants do this to drive demand for XRP and thereby maximize profits from XRP sales.

55.     According to its site, "xCurrent is Ripple's enterprise software solution that enables banks to instantly settle cross-border payments with end-to-end tracking.  Using xCurrent, banks message each other in real-time to confirm payment details prior to initiating the transaction and to confirm delivery once it settles."[22]

---

[20]     @bgarlinghouse, https://twitter.com/bgarlinghouse/status/941375649549246464 (last visited on June 29, 2018).

[21]     @bgarlinghouse, https://twitter.com/bgarlinghouse/status/944325730338357248 (last visited on June 29, 2018).

[22]     Process Payments, xCurrent, https://ripple.com/solutions/process-payments/ (last visited on June 29, 2018).

56. xCurrent doesn't operate on the same technology as XRP or even require the use of XRP. In short, there is no reason to believe that adoption of xCurrent would correlate in any way with adoption of XRP.

57. Nor does use of Ripple Labs' xVia product require adoption of XRP. Ripple Labs states that its xVia product is "for corporates, payment providers and banks who want to send payments across various networks using a standard interface."[23]

58. Ripple Labs nevertheless conflates the adoption of xCurrent and xVia with the adoption of XRP.

59. Another of Ripple Labs' enterprise solutions, xRapid, which does use XRP, is also used to drive XRP sales (xRapid, along with xCurrent and xVia, are together referred to herein as "Ripple Labs' Enterprise Solutions").

60. Indeed, Ripple Labs regularly promotes its improvements to the XRP ecosystem, which are intended to increase demand for XRP and thus potential returns for XRP investors. For example, in describing the reasons behind the dramatic price appreciation of XRP during the fourth quarter of 2017, Ripple specifically cited as of "particular importance," the Company's various business initiatives, including: (i) Ripple's partnership with American Express/Santander; (ii) Ripple's activation of the previously discussed escrow of XRP to limit periodic offers and distributions; and (iii) a Japanese/Korean banking consortium backed by the Company.[24] In the report, Ripple stated that its "consistent and steadfast support of XRP is a major advantage as the payments industry continues to seriously consider it as an alternative liquidity solution."[25]

61. A November 2015 white paper by the Company highlighted "XRP's Role on Ripple and the Internet of Value" and how the Company's technologies could turn a "Spark to a Wildfire"

---

[23] Send Payments, xVia, https://ripple.com/solutions/send-payments/ (last visited on June 29, 2018).

[24] Q4 2017 XRP Markets Report, https://ripple.com/insights/q4-2017-xrp-markets-report/.

[25] *Id.*

by increasing liquidity and efficiencies for cross-border transactions for the Company's banking clients. A February 2016 white paper followed up on those purported "network effects," claiming that the use of the Ripple network at XRP would increase banks' returns on investment by improving the global payment infrastructure.

62. In addition, on March 20, 2017, Ripple Labs retweeted a Bloomberg article regarding adoption of Ripple Labs Enterprise Solutions, proclaiming "Ripple is the only company in this space with real customers who are really in production."[26]

63. The price of XRP increased rapidly following this tweet and on March 24, 2017 Ripple Labs tweeted: "The price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."[27]

64. On April 26, 2017, Ripple Labs tweeted a link to an article on its own site, proclaiming "#Ripple welcomes 10 additional customers to our #blockchain #paymentsnetwork."[28] Neither this tweet nor the article it linked to informed readers that the blockchain payments network did not refer to the XRP Ledger, but rather Ripple's xCurrent enterprise solution.

65. Just days later, on May 3, 2017, with the price of XRP continuing to rise, Ripple Labs tweeted: "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the last months' via @Nasdaq."[29]

66. Articles such as "Ripple XRP price picks up pace as demand for xVia API increases" have made the direct connection between the price of XRP and the adoption of the Company's

---

[26] @Ripple, https://twitter.com/Ripple/status/844009778309357568 (last visited on June 29, 2018).

[27] @Ripple, https://twitter.com/Ripple/status/845347809830195200 (last visited June 29, 2018).

[28] @Ripple, https://twitter.com/Ripple/status/857267304618278912 (last visited June 29, 2018).

[29] @Ripple, https://twitter.com/Ripple/status/859904105916923904 (last visited June 29, 2018).

Enterprise Solutions.[30]  Ripple itself has made this link, for example tweeting on May 16, 2017: "The appeal that Ripple has towards traditional financial institutions is a big advantage it has over Bitcoin."[31]

67.    On June 29, 2017, Ripple Labs tweeted a clip of an interview its CEO Brad Garlinghouse gave on CNBC with the caption: "#XRP-up 4000% this year-has shown the market favors a real use case for #digitalassets . . . ."[32]  In that interview, Garlinghouse proclaims that "digital assets are in a position to be more valuable than gold," and describes XRP as "solving a real-world use case, it's not just about speculators."

68.    On September 11, 2017, Garlinghouse stated in an interview with CNBC: "People are looking at the success Ripple has been having as a company, *and I think that's increased the value of XRP.*"[33]  (emphasis added).  He continued by stating that Ripple wants "to keep focusing on making XRP a valuable payments tool, and that value will increase accordingly," and he was "voting with my . . . pocketbook on the future increased value of cryptocurrencies."[34]

69.    On November 27, 2017, Garlinghouse tweeted "Ripple & $XRP are giving business 'what they want in a #blockchain,'" along with a link to a Motley Fool tweet.[35]  That Motley Fool tweet in turn stated that "AmEx and Banco Santander will use Ripple's blockchain network for instant intl. fund transfers.  *Could be a big deal for Ripple's XRP cryptocurrency.*  $ASP $SAN" (emphasis added.)[36]

---

[30]    https://globalcoinreport.com/ripple-xrp-price-picks-up-pace-as-demand-for-xvia-api-increases/.

[31]    @Ripple, https://twitter.com/Ripple/status/864635614020251649.

[32]    @Ripple, https://twitter.com/Ripple/status/880532198025121793 (last visited June 29, 2018).

[33]    https://www.cnbc.com/2017/09/11/ripple-ceo-brad-garlinghouse-on-bitcoin-and-xrp.html    (last visited June 29, 2018).

[34]    *Id.*

[35]    @bgarlinghouse, https://twitter.com/bgarlinghouse/status/935225940845711366 (last visited on June 29, 2018).

[36]    @themotleyfool, https://twitter.com/themotleyfool/status/934850515640471553 (last visited on June 29, 2018).

1    70.    Similarly, on December 14, 2017, Ripple Labs tweeted: "The Japan Bank

2  Consortium launched a Ripple pilot with two large Korean Banks -- the first time money moves

3  from Japan to Korea over RippleNet."[37]  On that same day, Ripple Labs tweeted "@garlinghouse

4  [its CEO's twitter handle] on why crypto prices will be driven by real utility, the multi-trillion $

5  problem @Ripple is solving and why $XRP will come out on top."[38]

6    71.    Ripple Labs would later acknowledge that "neither the AMEX news nor the Korean

7  bank initiative involved XRP."

8    72.    Nevertheless, this tweet linked to a BNN interview with Mr. Garlinghouse, in which

9  he says:

> The reason why XRP has performed so well this year, we're solving a real problem, it's a multi-trillion dollar problem around cross-border payments.  There is a lot of friction its very slow its expensive, we're working with the institutions to deal with that, so people have gotten excited.  We now have over 100 customers we've announced publicly.

He continues,

> [A]t the end of the day the value of digital assets will be driven by their utility.  If they are solving a real problem, and that problem has scale, and that problem, you know there is real value there, then there will be demand for the tokens and the price will go up.  For XRP we have seen because *its required*, its something that can really reduce the friction, and we're talking about a multi-trillion dollar problem in how cross-border payments flow.  And so, I think if you drive real utility, yes there's going to be demand for that.  *XRP is up 100x this year*, and I think it's *because the problem we are solving people realize is a real problem, it's a big problem*.

18  (Emphasis added.)

19    73.    On January 4, 2018, following XRP's rapid price increase, The *New York Times*

20  published an article by Nathaniel Popper titled: "Rise of Bitcoin Competitor Ripple Creates Wealth

21  to Rival Zuckerberg."[39]  Mr. Popper tweeted a link to this article with the caption: "On the rise of

---

[37]    @Ripple, https://twitter.com/Ripple/status/941501026267316224 (last visited on June 29, 2018).

[38]    @Ripple, https://twitter.com/Ripple/status/941352005058011137 (last visited on June 29, 2018).

[39]    @nathanielpopper, "Rise of Bitcoin Competitor Ripple Creates Wealth to Rival Zuckerberg," NY Times (Jan. 4, 2018).

Ripple. If this is a tulip fever, the fever has spread to chrysanthemums and poppies"[40]. He further

commented, "I've asked several people close to banks if banks are indeed planning to begin using

Ripple's token XRP, in a serious way, which is what investors seem to assume when they buy in at

the current XRP prices. This is a sampling what I heard back:

- Actual use of XRP by banks is not something I've heard about, I find the run up absolutely bluffing, as do all the blockchain folks I know at large Fis.

- XRP isn't used for anything. The hope is that someday it will be by banks, but there really aren't banks signaling that yet.

- I would be surprised if there have been any real bank transactions done with it (outside of maybe test transactions), despite people making claims to the contrary.

- It's not clear to me why XRP would be used by banks at all. XRP could potentially be adopted by consumers as a payment rail, although they don't yet have meaningful traction in that regard.

- I haven't seen a sufficiently large catalyst in the fundamentals of Ripple to justify a greater than 10x move in the price of $XRP in the last month.

- In a few years we're going to look back on 2017 and think WTF were we thinking."[41]

74.    Defendant Garlinghouse publicly responded to this, tweeting: "Over the last few

months I've spoken with ACTUAL banks and payment providers. They are indeed planning to use

xRapid (our XRP liquidity product) in a serious way . . . ." He follows up stating, "I don't think

you want to hear about validation for XRP. The @NYTimes should be above spreading

anonymous FUD."[42]    FUD, which stands for fear, uncertainty, and doubt, is an expression

frequently used among crypto-investors to deride or undermine criticism of an asset.

75.    On January 4, 2018, Ripple's XRP product manager also attacked Mr. Popper,

tweeting: "Do you think I left #Bitcoin and joined @Ripple to build bank software? Think again.

---

[40]    @nathanielpopper, https://twitter.com/bgarlinghouse/status/949129952716234752 (last visited on June 29, 2018).

[41]    @nathanielpopper, https://twitter.com/bgarlinghouse/status/949129952716234752 (last visited on June 29, 2018).

[42]    @nathanielpopper, https://twitter.com/bgarlinghouse/status/949129952716234752 (last visited on June 29, 2018).

1   $XRP."[43]   This tweet linked to a Ripple Labs tweet stating that "3 of the top 5 global money
2   transfer companies plan to use XRP in payment flows in 2018. Even more in the pipeline."

3   76.   In January 2018, Ripple Labs touted "a partnership with MoneyGram – one of the
4   world's largest money transfer companies – to use xRapid and XRP for near real-time cross-border
5   payments.  In addition, there are a number of other xRapid deals at various stages of completion in
6   the pipeline."  It also stated that it wanted "to build the necessary markets infrastructure for
7   eventual direct usage of XRP by financial institutions." Defendant Garlinghouse commented on
8   this partnership, saying: "And to be clear: @MoneyGram announcement is one step in a marathon
9   ahead to truly make $XRP the global liquidity solution for payment providers and banks."[44]

10   77.   By way of the internet, including Ripple Labs' website, Twitter, and the over 50
11   cryptocurrency exchanges that trade XRP, interstate means are used in connection with the offer
12   and sale of XRP.

13   **C. XRP Is a Security**

14   78.   Plaintiff and the Class invested fiat, including U.S. dollars, and other digital
15   currencies, such as Bitcoin and Ethereum, to purchase XRP.

16   79.   Defendants sold XRP to the general public through global, online cryptocurrency
17   exchanges. XRP can be bought or sold on over 50 exchanges.

18   80.   Every purchase of XRP by a member of the public is an investment contract.

19   81.   Under Section 2(a)(1) of the Securities Act, a "security" is defined to include an
20   "investment contract."  15 U.S.C. § 77b(a)(1).  An investment contract is "an investment of money
21   in a common enterprise with profits to come solely from the efforts of others."  *S.E.C. v. W.J.*
22   *Howey Co.*, 328 U.S. 293, 301 (1946).   Specifically, a transaction qualifies as an investment
23   contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a

24

25   [43]   @Warren Paul Anderson, https://twitter.com/warpaul (last visited on June 29, 2018).

26   [44]   @bgarlinghouse, https://twitter.com/bgarlinghouse/status/951461582424358912 (last visited on
27   June 29, 2018).

28

reasonable expectation of profits; (4) to be derived from the entrepreneurial or managerial efforts of others.  *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).  This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"  *Howey*, 328 U.S. at 299.  Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and the emphasis should be "on economic realities underlying a transaction, and not on the name appended thereto."  *Forman*, 421 U.S. at 849.

82.     Plaintiff and the Class were investing in a common enterprise with a reasonable expectation of profits when they invested in XRP.

83.     The profits of Plaintiff and the Class are intertwined with the fortunes of Ripple Labs.  Ripple Labs concedes that it "sells XRP to fund its operations and promote the network. This allows Ripple Labs to have a spectacularly skilled team to develop and promote the Ripple protocol and network."[45]

84.     Notably, the SEC has already concluded that virtual currency substantially similar to XRP are "securities and therefore subject to the federal securities laws."  As stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[46]

85.     No such valid exemption from registration requirements exists for XRP.

86.     The current SEC Chairman, Jay Clayton, III, recently said, "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security."[47]

---

[45]     Ripple credits, https://wiki.ripple.com/Ripple credits#XRP (last visited on June 29, 2018).

[46]     Press Release: *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities,* SEC (July 25, 2017), https://www.sec.gov/news/press-release/2017-131.

[47]     Dave    Michaels    and    Paul    Vigna,    "SEC    Fires    Warning    Shot    Against    Coin Offerings," WALL STREET JOURNAL (Nov. 9, 2017).

## CLASS ACTION ALLEGATIONS

87.     This suit is brought as a class action pursuant to Section 382 of the California Code of Civil Procedure, on behalf of a Class of all persons or entities who purchased XRP from July 3, 2015 through the present.  Excluded from the Class are Defendants; the officers and directors of the Company and XRP II at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

88.     Plaintiff reserves the right to amend the Class definition if further investigation and/or discovery indicate that the Class definition should be modified.

89.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class.  The members of the proposed Class may be identified from records maintained by the Company and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

90.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

91.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

92.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)    whether XRP are securities under the Securities Act;

        (b)    whether the sale of XRP violates the registration requirements of the Securities Act; and

        (c)    to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

18
COMPLAINT

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Unregistered Offering and Sale of Securities in Violation of Sections 5 and 12(a)(1)of the Securities Act
#### (Against All Defendants)

94.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

95.     Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

96.     XRP are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

97.     Plaintiff and members of the Class purchased XRP securities.

98.     No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.  No exemption to the registration requirement applies.

99.     SEC Rule 159A provides that, for purposes of Section 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.  17 C.F.R. § 230.159A(a).  The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. § 77b(a)(4).  Ripple Labs and XRP II are issuers of XRP.

100.     The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and

COMPLAINT

1    did so for financial gain. *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21 & 647 (1988); *accord, e.g., Steed*

2    *Finance LDC v. Nomura Sec. Int'l, Inc.* No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20,

3    2001). That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a

4    motivation to serve their own financial interest or those of the securities owner. *Pinter v. Dahl*, 486 U.S.

5    622, 647 (1988); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). Ripple Labs, XRP II, and the

6    Individual Defendants are all statutory sellers.

7        101.    By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c), and

8    12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

9        102.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff

10   and the Class have suffered damages in connection with their XRP purchases.

11                                    **SECOND CAUSE OF ACTION**

12                           **Violation of Section 15 of the Securities Act**
                        **(Against Ripple Labs and the Individual Defendants)**
13

14       103.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates

     herein by reference, each and every allegation contained in the preceding paragraphs of this Complaint,
15
     and further alleges as follows:
16

17       104.    This Count is asserted against Defendants Ripple Labs and the Individual Defendants

18   (collectively, the "Control Person Defendants") under Section 15 of the Securities Act, 15 U.S.C. §77o.

19       105.    The Control Person Defendants, by virtue of their offices, ownership, agency, agreements

20   or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth

     herein, controlling persons within the meaning of Section 15 of the Securities Act. The Control Person
21
     Defendants, and each of them, had the power and influence and exercised the same to cause the
22
     unlawful offer and sale of XRP securities as described herein.
23

24       106.    The Control Person Defendants, separately or together, possess, directly or indirectly, the

25   power to direct or cause the direction of the management and policies of XRP II, through ownership of

     voting securities, by contract, subscription agreement, or otherwise.
26

27       107.    The Control Person Defendants also have the power to direct or cause the direction of the

28   management and policies of Ripple Labs.

                                             20

1      108.    The Control Person Defendants, separately or together, have sufficient influence to have

2 caused XRP II and/or Ripple Labs to submit a registration statement.

3      109.    The Control Person Defendants, separately or together, jointly participated in Ripple

4 Labs' and/or XRP II's failure to register XRP.

5      110.    By virtue of the conduct alleged herein, the Control Person Defendants are liable for the

6 wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or

7 damages suffered.

8 **PRAYER FOR RELIEF**

9      WHEREFORE, Plaintiff prays for judgment as follows:

10      A.    Declaring this action to be a proper class action and certifying Plaintiff as Class

11 representative;

12      B.    Declaring that Defendants offered and sold unregistered securities in violation of

13 Sections 5(a), 12(a), and 15 of the Securities Act;

14      C.    Awarding Plaintiff and the other members of the Class rescission of their XRP purchases;

15      D.    Awarding Plaintiff and the other members of the Class compensatory damages;

16      E.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment

17 interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

18      F.    Requiring an accounting of all remaining assets and funds raised by Defendants through

19 the sale of XRP;

20      G.    Imposing a constructive trust over the assets and funds raised by Defendants through the

21 sale of XRP;

22      H.    Enjoining and restraining Defendants from violating the securities laws through the

23 continued unregistered sale of XRP; and

24

25

26

27

28

21
COMPLAINT

1    I.    Awarding Plaintiff and the other members of the Class such other and further relief as the

2  Court may deem just and proper.

3

4  DATED: July 3, 2018                SCOTT+SCOTT ATTORNEYS AT LAW LLP

5

6                                   JOHN P. JASNOCH (CA 281605)

7                                   600 W. Broadway, Suite 3300
San Diego, CA 92101

8                                 Telephone: 619-233-4565
Facsimile: 619-233-0508

9                                 Email: jjasnoch@scott-scott.com

10                               SCOTT+SCOTT ATTORNEYS AT LAW LLP
THOMAS L. LAUGHLIN, IV (*Pro Hac Vice*

11                               forthcoming)
RHIANA SWARTZ

12                               The Helmsley Building
230 Park Avenue, 17th Floor

13                               New York, NY 10169
Telephone: 212-223-6444

14                               Facsimile: 212-223-6334
Email: tlaughlin@scott-scott.com

15                                     rswartz@scott-scott.com

16                               *Counsel for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT D

1  SCOTT+SCOTT ATTORNEYS AT LAW LLP
   JOHN T. JASNOCH
2  600 W. Broadway, Suite 3300
   San Diego, CA  92101
3  Telephone: 619-233-4565
   Facsimile:  619-233-0508
4  jjasnoch@scott-scott.com

5  *Attorneys for Plaintiff*

6  [Additional counsel on signature block.]

7

8

9                    **UNITED STATES DISTRICT COURT**
10                   **NORTHERN DISTRICT OF CALIFORNIA**
                     **OAKLAND DIVISION**
11

12 AVNER GREENWALD, individually and on behalf    Case No. 18-cv-4790-PJH
   of all others similarly situated,
13                                                 **CLASS ACTION**
                          Plaintiff,
14                                                 **PLAINTIFF'S NOTICE OF**
   vs.                                             **MOTION AND MOTION TO**
15                                                 **REMAND; MEMORANDUM OF**
   RIPPLE LABS INC., *et al.*,                     **POINTS AND AUTHORITIES IN**
16                                                 **SUPPORT THEREOF**
                          Defendants.
17                                                 Date:  October 17, 2018
                                                   Time: 9:00 a.m.
18                                                 Courtroom:  3
19
                                                   Hon. Phyllis J. Hamilton
20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO:     ALL PARTIES AND THEIR ATTORNEYS OF RECORD

        PLEASE TAKE NOTICE that on October 17, 2018 at 9:00 a.m., before the Honorable Phyllis J. Hamilton, United States District Judge, at the United States District Court, Northern District of California, 1301 Clay Street, Courtroom 3, Oakland, California 94612, Avner Greenwald ("Plaintiff") will move this Court for an order, pursuant to 28 U.S.C. §1447(c), remanding this action to the Superior Court of the State of California, County of San Mateo.  This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the Declaration of John T. Jasnoch and the Proposed Order filed herewith, all pleadings and papers filed herewith, arguments of counsel, and any other matters properly before the Court.

**CONCISE STATEMENT OF RELIEF SOUGHT BY MOVANT**

        Plaintiff seeks an order remanding this case to the Superior Court of the State of California, County of San Mateo.  This case only asserts claims under the Securities Act of 1933 (the "Securities Act" or "1933 Act") and was improperly removed to this Court by Defendants[1] pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1453.  Because the 1933 Act bars removal of actions alleging only 1933 Act claims and 9th Circuit precedent, *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008), addresses this precise circumstance and holds that the 1933 Act removal bar prohibits removal under CAFA, this case must be remanded.

**QUESTIONS PRESENTED**

        1.      Does the anti-removal provision in Section 22(a) of the 1933 Act prohibit removal under CAFA of cases asserting only 1933 Act claims?

        2.      Should this case be remanded given that controlling 9th Circuit precedent, *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008), holds that the anti-removal

---

[1]      Defendants are Ripple Labs Inc. ("Ripple"), XRP II, LLC ("XRP II"), Bradley Garlinghouse, Christian Larsen, Ron Will, Antoinette O'Gorman, Eric van Miltenburg, Susan Athey, Zoe Cruz, Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita (collectively, "Defendants").

1    provision of the 1933 Act prohibits removal under CAFA of cases asserting only 1933 Act claims,

2    the precise issue to be addressed by the Court in this Motion?

3                         **MEMORANDUM OF POINTS AND AUTHORITIES**

4    **I.    INTRODUCTION**

5               This securities class action was commenced in the Superior Court of the State of California,

6    County of San Mateo, on July 3, 2018, on behalf of all persons or entities who purchased XRP

7    tokens, a virtual currency, from July 3, 2015 through the present.  (ECF No. 1-1, Compl., ¶87.)  This

8    action asserts **only** claims brought under §§5, 12(a)(1), and 15 of the Securities Act.  On August 8,

9    2018, Defendants removed the action to this Court under CAFA, 28 U.S.C. §1453(b).  *See* Defs'

10   Removal, ¶¶3-4.[2]  Defendants explicitly do not rely on the general removal statute, 28 U.S.C.

11   §1441(a).  Defs' Removal, ¶25.

12              Removal was improper because, as the U.S. Supreme Court recently confirmed, the 1933 Act

13   explicitly bars removal of actions bringing only 1933 Act claims.  15 U.S.C. §77v(a); *Cyan, Inc. v.*

14   *Beaver County Employees Retirement Fund*, 138 S. Ct. 1061 (2018).  Moreover, Defendants'

15   position that the 1933 Act's removal bar should be disregarded when CAFA is invoked is foreclosed

16   by controlling 9th Circuit law.  In *Luther*, the 9th Circuit squarely held that the 1933 Act's anti-

17   removal bar prohibits removal under CAFA.  533 F.3d at 1034.  The 9th Circuit's holding is directly

18   applicable here and requires the Court to resolve this motion in favor of remand.

19              Accordingly, the Court should grant Plaintiff's motion in full.

20   **II.   ARGUMENT**

21         **A.    Controlling Law of this Circuit Requires Remand**

22              Directly applicable 9th Circuit authority requires this Court to grant remand.  In *Luther*, the

23   9th Circuit held that section 22(a) of the Securities Act of 1933 provides an "express exception to

24

25

---

26   [2]         *See* Notice of Removal of State Court Action (ECF No. 1) ("Defs' Removal").

27

28

1    removal" that trumps CAFA, meaning that CAFA does not provide a basis for removal of cases that

2    only assert 1933 Act claims. 533 F.3d at 1034.[3]

3           Section 22(a) of the 1933 Act (enacted as part of the Private Securities Litigation Reform Act

4    of 1998 ("PSLRA")) states, "no case arising under this subchapter and brought in any State court of

5    competent jurisdiction shall be removed to any court of the United States."[4]  15 U.S.C. §77v(a).

6    CAFA authorizes removal of class actions where:  (1) the amount in controversy exceeds

7    $5,000,000; (2) the putative class has more than 100 members; and (3) any member of the class is a

8    citizen of a state different from any defendant.  28 U.S.C. §§1332(d)(2), (d)(2)(A), 5(B), 1453(b).

9    *Luther* held that "CAFA's general grant of the right of removal of high-dollar class actions does not

10   trump §22(a)'s specific bar to removal of cases arising under the Securities Act of 1933." 533 F.3d

11   at 1034.  *Luther* relied on "'a basic principle of statutory construction that a statute dealing with a

12   narrow, precise, and specific subject is not submerged by a later enacted statute covering a more

13   generalized spectrum.'"  *Id.* (citing *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)).

14   As here, *Luther* was a case that alleged only 1933 Act claims.  Applying *Luther*, remand is required.

15          This Court is bound by *Luther*'s interpretation of federal statutes.  "Circuit decisions are *stare*

16   *decisis* unless they are overruled by the court *en banc* or come into conflict with a subsequent

17   decision to which it owes obedience, such as a decision by the Supreme Court." *Hurst v. Prudential*

18   *Sec. Inc.*, 923 F. Supp. 150, 155 (N.D. Cal. 1995) (citing *Spinelli v. Gaughan*, 12 F.3d 853, 855 (9th

19   Cir. 1993); *Atonio v. Wards Cove Packing Co., Inc.*, 810 F.2d 1477, 1478-79 (9th Cir. 1987)).  "A

20   district judge may not respectfully (or disrespectfully) disagree with his learned colleagues on his

21   own court of appeals who have ruled on a controlling legal issue[.]"  *Hart v. Massani*, 266 F.3d

22

23

_____

24   [3]     In *Cyan*, the Supreme Court recently confirmed that SLUSA provides no basis for removal of
     pure 1933 Act cases.  *See generally Cyan,* 138 S. Ct. 1061.  Notably, CAFA was not even raised as a
25   potential source of defeating the removal ban.  *See id.*

26   [4]     There is an "except clause" to this provision, but it is not applicable here.

27

28
PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF
CASE NO. 18-CV-4790-PJH

1    1155, 1170 (9th Cir. 2001).  Since it was decided 10 years ago, neither the Supreme Court nor the

2    9th Circuit has overruled *Luther*.[5]

3         Indeed, during oral argument in a related case that, unlike this case, involved both 1933 Act

4    claims and state law claims, the Court unequivocally stated that *Luther* requires remand of pure 1933

5    Act cases.  In *Coffey v. Ripple Labs, Inc.*, No. 18-cv-03286-PJH, the Court considered the import of

6    *Luther* on the remand motion of a plaintiff who asserted both state law and 1933 Act claims.  2018

7    WL 3812076, at *1 (N.D. Cal. Aug. 10, 2018).[6]  Because of the presence of state law claims, *Coffey*

8    was materially different from the instant case and the Court's ultimate decision in *Coffey*, that the

9    presence of state law claims allowed for removal under CAFA is inapt.  However, during oral

10   argument, the Court acknowledged that *Luther* was controlling precedent and that *Luther* would

11   have required remand had *Coffey* only asserted 1933 Act claims.  Specifically, the Court stated that it

12   "has no authority to overturn *Luther*" and that, if the case had been brought with only 1933 Act

13   claims, "it wouldn't present a dilemma for me[;] ***I'd remand it, obviously***."  *Coffey* Aug. 1, 2018

14   Hr'g Trans., attached to Declaration of John T. Jasnoch ("Jasnoch Decl."), Ex. A at 13:11-12 and

15   28:17-19, respectively.  This sentiment was echoed in the Court's opinion, which stated, "defendants

16   did not remove this action based on the Securities Act claim satisfying CAFA's requirements –

17   likely a losing proposition under *Luther*."  2018 WL 3812076, at *4. By this motion, Plaintiff asks

18   no more than that the Court draw the "obvious" conclusion and remand pursuant to *Luther*.

19

20

21   [5]     The Supreme Court's decision in *Dart Cherokee Basin Operating Co.*, *LLC v. Owens*, 135 S.
22   Ct. 547 (2014), is not "clearly irreconcilable" with *Luther*.  *Dart Cherokee* addressed "'whether a
     defendant seeking removal to federal court is required to include evidence supporting federal
23   jurisdiction in the notice removal, or whether alleging the required short and plain statement of the
     grounds for removal [is] enough.'" *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1183 (9th Cir.
24   2015) (citing *Dart Cherokee*, 135 S. Ct. at 552-53)  This issue is wholly distinct from the issue
     decided in *Luther*.  The 9th Circuit has since made clear that *Dart Cherokee* limited *Luther* only as
25   related to the presumption against removal – a presumption that generally exists under 9th Circuit
     law, but which does not exist for CAFA cases after *Dart Cherokee*.  *Id.* at 1182-83.
26
     [6]      Coffey has since dismissed his case.  (ECF No. 29 in Case No. 18-cv-03286.)
27

28

**B.** **Greenwald's Foreign Citizenship Has No Impact on the Effect of the 1933 Act Removal Bar**

In an effort to avoid the result clearly compelled by *Luther*, Defendants put forth a nonsensical argument that Greenwald's "alienage" status somehow impacts this Court's remand analysis and "takes this case outside the purview of *Luther*." Defs' Removal, ¶¶11-15. This fig leaf argument cannot conceal the glaring weakness of Defendants' position or the fact that they ask the Court to ignore controlling precedent. Nothing in the cases cited by Defendants provides a basis for this Court not to follow *Luther* and remand.[7] To the extent Defendants argue that this case does not properly bring claims under the Securities Act because it addresses "international transactions" (Defs' Removal, ¶14), that issue is separate and apart from Greenwald's citizenship and, most importantly, an argument to be made in a motion to dismiss. That argument is not ripe for discussion at this jurisdictional stage.

**C.** **Defendants' Improper Removal Has Caused Unnecessary Delay and, Unless Promptly Corrected, Will Cause Inefficiency**

Defendants' removal has delayed this case from properly proceeding in state court and threatens to undermine judicial economy. This case was filed over two months ago, on July 3, 2018. Two related class actions are pending in the same state court, San Mateo County, and the instant case is ripe for coordination with those cases. *See Zakinov v. Ripple Labs, Inc.*, No. 18CIV02845 (Superior Court, San Mateo) (filed June 5, 2018); *Oconor v. Ripple Labs, Inc.*, No. 18CIV03332 (Superior Court, San Mateo) (filed June 27, 2018). Indeed, prior to removal, counsel in this case reached out to counsel in *Zakinov* and *Oconor* and discussed coordination.

*Zakinov* and *Oconor* allege state law claims on behalf of a class of California purchasers of XRP during the same class period alleged in the instant complaint, July 3, 2015 through the present. Jasnoch Decl., Exs. B and C. Like the instant case, *Zakinov* and *Oconor* allege that XRP should have been registered securities – but under California law, rather than federal law. *See*, *e.g.,* Ex. C,

---

[7] *New Jersey Carpenters Vacation Fund v. HarborView Mortg. Loan Trust 2006-4* held that CAFA overrode the 1933 Act's anti-removal provision to permit removal of case, unless a CAFA statutory exception applied. 581 F. Supp. 2d 581, 583 (S.D.N.Y. 2008). This is in direct conflict with *Luther* and thus is contrary to the law of this Circuit.

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 18-CV-4790-PJH

¶¶3-4, 58. Demonstrating the similarity of the issues raised, *Zakinov* and *Oconor* point to federal SEC guidance in support of their position. *See*, *e.g.*, Ex. C, ¶¶65-72; *see similarly* Compl., ¶¶84-86. Many of the factual allegations in *Zakinov* and *Oconor* overlap as they both relate to the creation, sale, and solicitation of XRP. *Compare* Compl., ¶¶29-77 *with* Ex. C, ¶¶14-57. Thus, coordination of dispositive motions and discovery makes sense in order to promote judicial economy.

Notably, Defendants did not seek to remove *Zakinoc* and *Oconor* to this Court. It makes little sense for this case to proceed in federal court while related cases have been consolidated and are proceeding in state court. In the consolidated state case, a Consolidated Complaint is due October 15, 2018. Jasnoch Decl., Ex. D, ¶8. Defendants have until November 29, 2018 to file a demurrer, and a briefing schedule has been put in place for the demurrer. *Id.*

The unnecessary delay caused by Defendants, potential for judicial inefficiency if this case is further delayed, and clarity of the *Luther* precedent warrant a prompt remand. *See similarly Book v. ProNAi Therapeutics, Inc.*, No. 16-7408, 2017 WL 2533664, at *1 (N.D. Cal. June 12, 2017) (holding that a stay pending the Supreme Court's consideration of writs of certiorari related to *Cyan* was not warranted ).

## III.    CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court remand this action to the Superior Court of the State of California, County of San Mateo.

DATED:  September 7, 2018                         Respectfully submitted,

SCOTT+SCOTT ATTORNEYS AT LAW LLP

s/ John T. Jasnoch

JOHN T. JASNOCH
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com

– and –

Thomas L. Laughlin, IV
Rhiana L. Swartz
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334

*Attorneys for Plaintiff Avner Greenwald*

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF
CASE NO. 18-CV-4790-PJH

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

   s/ John T. Jasnoch
JOHN T. JASNOCH

# EXHIBIT E

Exhibit 4

Case 18-80147, 10/25/2018, ID: 11069606, DktEntry: 11-8, Page 87 of 218

# Regulation of Cryptocurrency Around the World

June 2018



The Law Library of Congress, Global Legal Research Center
(202) 707-5080 (phone) • (866) 550-0442 (fax) • law@loc.gov • http://www.law.gov

Case 18-80147-jw10/25/2018 ID: 11069606 DktEntry: 1-1 Page 88 of 218

This report is provided for reference purposes only.
It does not constitute legal advice and does not represent the official
opinion of the United States Government. The information provided
reflects research undertaken as of the date of writing.
It has not been updated.

# Contents

**Comparative Summary** ...................................................................................................1

**The Americas** .............................................................................................................. 7

Argentina.............................................................................................................................7
Belize..................................................................................................................................8
Bermuda..............................................................................................................................8
Bolivia.................................................................................................................................9
Brazil...................................................................................................................................9
Canada...............................................................................................................................10
Chile..................................................................................................................................12
Colombia............................................................................................................................12
Costa Rica..........................................................................................................................13
Ecuador..............................................................................................................................14
El Salvador.........................................................................................................................14
Guatemala...........................................................................................................................15
Honduras............................................................................................................................16
Mexico...............................................................................................................................16
Venezuela...........................................................................................................................17

**The Caribbean** ........................................................................................................... 19

**I. Eastern Caribbean Central Bank** ...........................................................................19

**II. Country Surveys** .....................................................................................................20

Anguilla..............................................................................................................................20
Antigua and Barbuda...........................................................................................................21
Bahamas.............................................................................................................................22
Barbados.............................................................................................................................23
British Virgin Islands...........................................................................................................24
Cayman Islands...................................................................................................................24
Dominica............................................................................................................................25
Dominican Republic............................................................................................................25
Grenada..............................................................................................................................25
Jamaica...............................................................................................................................25
Montserrat...........................................................................................................................26
Saint Kitts and Nevis...........................................................................................................26
Saint Lucia..........................................................................................................................26
Saint Vincent and the Grenadines.........................................................................................27
Trinidad and Tobago............................................................................................................27

**Europe**..................................................................................................................................28

**I. EU Member States**............................................................................................................28

European Union .......................................................................................................................28
Austria.....................................................................................................................................30
Belgium....................................................................................................................................31
Bulgaria...................................................................................................................................32
Croatia.....................................................................................................................................33
Cyprus......................................................................................................................................33
Czech Republic ........................................................................................................................33
Denmark...................................................................................................................................34
Estonia.....................................................................................................................................36
Finland.....................................................................................................................................36
France.......................................................................................................................................38
Germany...................................................................................................................................40
Greece......................................................................................................................................42
Hungary....................................................................................................................................42
Ireland......................................................................................................................................42
Italy..........................................................................................................................................44
Latvia.......................................................................................................................................45
Lithuania..................................................................................................................................45
Luxembourg..............................................................................................................................46
Malta........................................................................................................................................47
Netherlands ..............................................................................................................................50
Poland......................................................................................................................................52
Portugal....................................................................................................................................53
Romania...................................................................................................................................53
Slovakia....................................................................................................................................54
Slovenia....................................................................................................................................54
Spain........................................................................................................................................55
Sweden.....................................................................................................................................55
United Kingdom ........................................................................................................................58

**II. Non-EU Members**...........................................................................................................59

Albania.....................................................................................................................................59
Armenia....................................................................................................................................60
Azerbaijan................................................................................................................................60
Belarus.....................................................................................................................................60
Bosnia and Herzegovina ...........................................................................................................61
Georgia.....................................................................................................................................61
Gibraltar...................................................................................................................................62
Guernsey...................................................................................................................................64
Iceland......................................................................................................................................65
Isle of Man ...............................................................................................................................66

Jersey..............................................................................................................69
Kosovo..............................................................................................................71
Liechtenstein..............................................................................................................71
Macedonia..............................................................................................................72
Moldova..............................................................................................................73
Montenegro..............................................................................................................73
Norway..............................................................................................................74
Russia..............................................................................................................75
Serbia..............................................................................................................77
Switzerland..............................................................................................................77
Ukraine..............................................................................................................80

## Middle East and North Africa ............................................................ 82

Algeria..............................................................................................................82
Bahrain..............................................................................................................82
Egypt..............................................................................................................82
Iran..............................................................................................................83
Iraq..............................................................................................................84
Israel..............................................................................................................84
Jordan..............................................................................................................85
Kuwait..............................................................................................................86
Lebanon..............................................................................................................86
Morocco..............................................................................................................87
Oman..............................................................................................................87
Qatar..............................................................................................................88
Saudi Arabia..............................................................................................................88
United Arab Emirates..............................................................................................................88

## Sub-Saharan Africa ............................................................................... 89

Ghana..............................................................................................................89
Kenya..............................................................................................................89
Lesotho..............................................................................................................90
Mozambique..............................................................................................................91
Namibia..............................................................................................................91
South Africa..............................................................................................................92
Swaziland..............................................................................................................94
Uganda..............................................................................................................94
Zambia..............................................................................................................95
Zimbabwe..............................................................................................................95

## Central Asia ................................................................................................................... 96

Kazakhstan .................................................................................................................96
Uzbekistan ..................................................................................................................96
Kyrgyzstan ..................................................................................................................96
Tajikistan ....................................................................................................................97

## South Asia ....................................................................................................................... 98

Bangladesh ..................................................................................................................98
India ............................................................................................................................99
Nepal .........................................................................................................................101
Pakistan .....................................................................................................................102

## East Asia and the Pacific ............................................................................................. 103

Australia ....................................................................................................................103
Brunei ........................................................................................................................106
China .........................................................................................................................106
Cambodia ..................................................................................................................107
Hong Kong ................................................................................................................108
Indonesia ...................................................................................................................109
Japan ..........................................................................................................................111
Macau ........................................................................................................................113
Malaysia ....................................................................................................................114
Marshall Islands ........................................................................................................116
New Zealand ..............................................................................................................117
Philippines .................................................................................................................119
Samoa ........................................................................................................................119
Singapore ...................................................................................................................120
South Korea ...............................................................................................................121
Taiwan .......................................................................................................................122
Thailand .....................................................................................................................123
Vanuatu .....................................................................................................................124
Vietnam .....................................................................................................................124

## *Maps*

Legal Status of Cryptocurrencies ................................................................................4
Regulatory Framework for Cryptocurrencies .............................................................5
Countries that Have or Are Issuing National or Regional Cryptocurrencies .............6

# Regulation of Cryptocurrency Around the World

*Prepared by the Staff of Global Legal Research Directorate*

## Comparative Summary

This report surveys the legal and policy landscape surrounding cryptocurrencies around the world. While not dissimilar in form to the 2014 Law Library of Congress report on the same subject, which covered forty foreign jurisdictions and the European Union, this report is significantly more comprehensive, covering 130 countries as well as some regional organizations that have issued laws or policies on the subject. This expansive growth is primarily attributable to the fact that over the past four years cryptocurrencies have become ubiquitous, prompting more national and regional authorities to grapple with their regulation. The resulting availability of a broader set of information regarding how various jurisdictions are handling the fast-growing cryptocurrency market makes it possible to identify emerging patterns, some of which are described below. The country surveys are also organized regionally to allow for region-specific comparisons.

One interesting aspect of the fast-growing cryptocurrency market is the fluidity of the terms used to describe the different products that fall within its ambit. While the various forms of what are broadly known as "cryptocurrencies" are similar in that they are primarily based on the same type of decentralized technology known as blockchain with inherent encryption, the terminology used to describe them varies greatly from one jurisdiction to another. Some of the terms used by countries to reference cryptocurrency include: digital currency (Argentina, Thailand, and Australia), virtual commodity (Canada, China, Taiwan), crypto-token (Germany), payment token (Switzerland), cyber currency (Italy and Lebanon), electronic currency (Colombia and Lebanon), and virtual asset (Honduras and Mexico).

One of the most common actions identified across the surveyed jurisdictions is government-issued notices about the pitfalls of investing in the cryptocurrency markets. Such warnings, mostly issued by central banks, are largely designed to educate the citizenry about the difference between actual currencies, which are issued and guaranteed by the state, and cryptocurrencies, which are not. Most government warnings note the added risk resulting from the high volatility associated with cryptocurrencies and the fact that many of the organizations that facilitate such transactions are unregulated. Most also note that citizens who invest in cryptocurrencies do so at their own personal risk and that no legal recourse is available to them in the event of loss.

Many of the warnings issued by various countries also note the opportunities that cryptocurrencies create for illegal activities, such as money laundering and terrorism. Some of the countries surveyed go beyond simply warning the public and have expanded their laws on money laundering, counterterrorism, and organized crimes to include cryptocurrency markets, and require banks and other financial institutions that facilitate such markets to conduct all the due diligence requirements imposed under such laws. For instance, Australia, Canada, and the Isle of Man recently enacted laws to bring cryptocurrency transactions and institutions that facilitate them under the ambit of money laundering and counter-terrorist financing laws.

Some jurisdictions have gone even further and imposed restrictions on investments in cryptocurrencies, the extent of which varies from one jurisdiction to another. Some (Algeria, Bolivia, Morocco, Nepal, Pakistan, and Vietnam) ban any and all activities involving cryptocurrencies. Qatar and Bahrain have a slightly different approach in that they bar their citizens from engaging in any kind of activities involving cryptocurrencies locally, but allow citizens to do so outside their borders. There are also countries that, while not banning their citizens from investing in cryptocurrencies, impose indirect restrictions by barring financial institutions within their borders from facilitating transactions involving cryptocurrencies (Bangladesh, Iran, Thailand, Lithuania, Lesotho, China, and Colombia).

A limited number of the countries surveyed regulate initial coin offerings (ICOs), which use cryptocurrencies as a mechanism to raise funds. Of the jurisdictions that address ICOs, some (mainly China, Macau, and Pakistan) ban them altogether, while most tend to focus on regulating them. In most of these latter instances, the regulation of ICOs and the relevant regulatory institutions vary depending on how an ICO is categorized. For instance, in New Zealand, particular obligations may apply depending on whether the token offered is categorized as a debt security, equity security, managed investment product, or derivative. Similarly, in the Netherlands, the rules applicable to a specific ICO depend on whether the token offered is considered a security or a unit in a collective investment, an assessment made on a case-by-case basis.

Not all countries see the advent of blockchain technology and cryptocurrencies as a threat, albeit for different reasons. Some of the jurisdiction surveyed for this report, while not recognizing cryptocurrencies as legal tender, see a potential in the technology behind it and are developing a cryptocurrency-friendly regulatory regime as a means to attract investment in technology companies that excel in this sector. In this class are countries like Spain, Belarus, the Cayman Islands, and Luxemburg.

Some jurisdictions are seeking to go even further and develop their own system of cryptocurrencies. This category includes a diverse list of countries, such as the Marshall Islands, Venezuela, the Eastern Caribbean Central Bank (ECCB) member states, and Lithuania. In addition, some countries that have issued warnings to the public about the pitfalls of investments in cryptocurrencies have also determined that the size of the cryptocurrency market is too small to be cause for sufficient concern to warrant regulation and/or a ban at this juncture (Belgium, South Africa, and the United Kingdom).

One of the many questions that arise from allowing investments in and the use of cryptocurrencies is the issue of taxation. In this regard the challenge appears to be how to categorize cryptocurrencies and the specific activities involving them for purposes of taxation. This matters primarily because whether gains made from mining or selling cryptocurrencies are categorized as income or capital gains invariably determines the applicable tax bracket. The surveyed countries have categorized cryptocurrencies differently for tax purposes, as illustrated by the following examples:

| | | |
|---|---|---|
| Israel | → | taxed as asset |
| Bulgaria | → | taxed as financial asset |
| Switzerland | → | taxed as foreign currency |
| Argentina & Spain | → | subject to income tax |
| Denmark | → | subject to income tax and losses are deductible |
| United Kingdom: | → | corporations pay corporate tax, unincorporated businesses pay income tax, individuals pay capital gains tax |

Mainly due to a 2015 decision of the European Court of Justice (ECJ), gains in cryptocurrency investments are not subject to value added tax in the European Union Member States.

In most of the countries surveyed for this report that have or are in the process of devising taxation rules, the mining of cryptocurrencies is also exempt from taxation. However, in Russia mining that exceeds a certain energy consumption threshold is taxable.

In a small number of jurisdictions surveyed cryptocurrencies are accepted as a means of payment. In the Swiss Cantons of Zug and a municipality within Ticino, cryptocurrencies are accepted as a means of payment even by government agencies. The Isle of Man and Mexico also permit the use of cryptocurrencies as a means of payment along with their national currency. Much like governments around the world that fund various projects by selling government bonds, the government of Antigua and Barbuda allows the funding of projects and charities through government-supported ICOs.

The following three maps visually represent findings from the report on the legal status of cryptocurrencies, the regulatory framework surrounding cryptocurrencies, and countries that have launched their own cryptocurrencies or are planning to do so.

Regulation of Cryptocurrency Around the World

| Implicit Ban | |
|---|---|
| ISO Code | Country Name |
| BH | Bahrain |
| BD | Bangladesh |
| CN | China |
| CO | Colombia |
| DO | Dominican Republic |
| ID | Indonesia |
| IR | Iran |
| KW | Kuwait |
| LS | Lesotho |
| LT | Lithuania |
| MO | Macau |
| OM | Oman |
| QA | Qatar |
| SA | Saudi Arabia |
| TW | Taiwan |

| Absolute Ban | |
|---|---|
| ISO Code | Country Name |
| DZ | Algeria |
| BO | Bolivia |
| EG | Egypt |
| IQ | Iraq |
| MA | Morocco |
| NP | Nepal |
| PK | Pakistan |
| AE | United Arab |

# Legal Status of Cryptocurrencies

*Source:* Created by the Law Library of Congress based on information provided in this report.

The Law Library of Congress



Regulation of Cryptocurrency Around the World

| Application of Tax Laws | |
|---|---|
| ISO Code | Country Name |
| AR | Argentina |
| AT | Austria |
| BG | Bulgaria |
| FI | Finland |
| IS | Iceland |
| IL | Israel |
| IT | Italy |
| NO | Norway |
| PL | Poland |
| RO | Romania |
| RU | Russia |
| SK | Slovakia |
| ZA | South Africa |
| ES | Spain |
| SE | Sweden |
| GB | United Kingdom |

| Anti-Money Laundering & Anti-Terrorism Financing Laws | |
|---|---|
| ISO Code | Country Name |
| KY | Cayman Islands |
| CR | Costa Rica |
| CZ | Czech Republic |
| EE | Estonia |
| GI | Gibraltar |
| HK | Hong Kong |
| IM | Isle of Man |
| JE | Jersey |
| LV | Latvia |
| LI | Liechtenstein |
| LU | Luxembourg |
| SG | Singapore |

| Both | |
|---|---|
| ISO Code | Country Name |
| AU | Australia |
| CA | Canada |
| DK | Denmark |
| JP | Japan |
| CH | Switzerland |

# Regulatory Framework for Cryptocurrencies:
## Application of Tax Laws, Anti-Money Laundering/Anti-Terrorism Financing Laws, or Both

*Source:* Created by the Law Library of Congress based on information provided in this report.

The Law Library of Congress

Regulation of Cryptocurrency Around the World



| Countries that have or are in the process of issuing their own national or regional cryptocurrency | |
|---|---|
| ISO Code | Country Name |
| AI | Anguilla (ECCB) |
| AG | Antigua and Barbuda (ECCB) |
| CN | China |
| DM | Dominica (ECCB) |
| GD | Grenada (ECCB) |
| IE | Ireland |
| LT | Lithuania |
| MH | Marshall Islands |
| MS | Montserrat (ECCB) |
| KN | Saint Kitts and Nevis (ECCB) |
| LC | Saint Lucia (ECCB) |
| VC | Saint Vincent and the Grenadines (ECCB) |
| VE | Venezuela |

# Countries that Have or Are Issuing National or Regional Cryptocurrencies

**Source & Note:** Created by the Law Library of Congress based on information provided in this report. As discussed in the report, the Eastern Caribbean Central Bank (ECCB), which is the monetary authority for eight island economies in the Eastern Caribbean Currency Union, has entered into an agreement for the development of a digital currency for member states.

The Law Library of Congress

Regulation of Cryptocurrency Around the World

## The Americas

### Argentina

Under the National Constitution of Argentina[1] the only authority capable of issuing legal currency is the Central Bank.[2] Bitcoins are not legal currency strictly speaking, since they are not issued by the government monetary authority and are not legal tender.[3] Therefore, they may be considered money but not legal currency, since they are not a mandatory means of cancelling debts or obligations.[4] Although bitcoins are not specifically regulated, they are increasingly being used in Argentina, a country that has strict controls over foreign currencies.[5] According to some experts[6] a bitcoin may be considered a good or a thing under the Civil Code,[7] and transactions with bitcoins may be governed by the rules of the sale of goods under the Civil Code.[8]

The latest amendment to the Income Tax Law provides that the profit derived from the sale of digital currency will be considered income and taxed as such.[9]

---

[1] CONSTITUCIÓN DE LA NACIÓN ARGENTINA [NATIONAL CONSTITUTION OF ARGENTINA] art. 75, para. 6, BOLETÍN OFICIAL [B.O.], Aug. 22, 1994, http://servicios.infoleg.gob.ar/infolegInternet/anexos/0-4999/804/norma.htm, *archived at* https://perma.cc/XN2T-C5G7.

[2] Ley No. 24.144, Carta Orgánica del Banco Central de la República Argentina [Law No. 24,144, Charter of the Central Bank of the Republic of Argentina] art. 30, B.O., Oct. 13, 1992, http://servicios.infoleg.gob.ar/infoleg Internet/anexos/0-4999/542/texact.htm, *archived at* https://perma.cc/2CVW-8VNX.

[3] *El Banco Central Argentino Considera Riesgoso Operar con Bitcoins* [*Central Bank of Argentina Considers Risky Operations with Bitcoins*], INFOTECNOLOGía (May 28, 2014), http://www.infotechnology.com/internet/El-Banco-Central-argentino-considera-riesgoso-operar-con-bitcoins-20140528-0003.html, *archived at* https://perma.cc/746A-JBYG.

[4] Mara Laudonia, *El Vacío Legal del Bitcoin, Es o No Es Dinero?* [*The Legal Vacuum of the Bitcoin: Is It or Is It Not Money?*], TÉLAM (Feb. 28, 2018), http://www.telam.com.ar/notas/201702/180185-el-vacio-legal-del-bitcoin-es-o-no-es-dinero.html, *archived at* https://perma.cc/P2WE-L8F9.

[5] José Crettaz, *Bitcoin: Fiebre Argentina por la Máquina de Dinero Digital* [*Bitcoin: Argentine Fever for the Digital Money Machine*], LA NACIÓN (June 30, 2013), http://www.lanacion.com.ar/1596773-bitcoin-pasion-argentina-por-la-nueva-maquina-de-hacer-billetes-digitales, *archived at* https://perma.cc/PMU9-KWB5; Diego Geddes, *Argentina es uno de los países que más usa el bitcoin* [*Argentina Is One of the Countries that Uses the Bitcoin*], CLARÍN (Dec. 31, 2013), http://www.clarin.com/sociedad/Argentina-paises-Bitcoin-moneda-virtual_0_1057694271.html, *archived at* https://perma.cc/N8SA-5H9L.

[6] *See*, *e.g.*, Andres Chomczyk, *Situación Legal del Bitcoin en Argentina*, ELBITCOIN.ORG (Oct. 10, 2013), http://elbitcoin.org/situacion-legal-de-bitcoin-en-argentina, *archived at* https://perma.cc/8GDA-CFPK.

[7] CÓDIGO CIVIL [CIVIL CODE] art. 2311, http://www.infoleg.gov.ar/infolegInternet/anexos/105000-109999/109481/texact.htm, *archived at* http://www.infoleg.gov.ar/infolegInternet/anexos/105000-109999/109481/ texact.htm.

[8] *Id.* art. 1323.

[9] Ley 27430 de Modificación del Impuesto a las Ganancias [Law 27430 Amending the Income Tax Law] art. 2, B.O., Dec. 29, 2017, http://www.telam.com.ar/notas/201702/180185-el-vacio-legal-del-bitcoin-es-o-no-es-dinero.html, *archived at* https://perma.cc/M758-JEK.

**Belize**

Belize does not appear to have any legislation that specifically regulates cryptocurrencies.[10] Trading businesses in Belize are regulated by the International Financial Services Commission of Belize. The Commission does not appear to issue licenses for companies to engage in cryptocurrency exchanges.[11]

**Bermuda**

Bermuda does not have legislation or regulations that specifically govern cryptocurrencies. The government is, however, in the early stages of crafting legislation and regulations that aim to establish Bermuda as an international destination for digital currencies, similar to its position in the insurance and reinsurance sectors.[12]

In late 2017, the government of Bermuda launched a task force to "advance the regulatory environment and develop Bermuda as a destination for Utility Tokens, Tokenized Securities, Cryptocurrencies and Coin Offerings."[13] The aims of the task force are as follows:

- Creating a Crypto Currency Association with a defined Code of Conduct and Rules of Operation. The Bermuda Crypto Association is in the process of being formed and our aim is for this Group to be self-governing.

- The Bermuda Monetary Authority in conjunction with the Ministry of Finance will work together to draft a letter or document confirming; Utility Tokens are not a security as long as there is no promise of future value. The will allow companies from all over the world to set up in Bermuda for Crowd Funding.

  Most importantly, the Legal and Regulatory Working Group will provide confirmation that Utility Tokens are not prohibited or contravening any local legislation.[14]

The task force has two working groups, directed by the Minister of National Security. One group is the Blockchain Legal and Regulatory Working Group and is tasked with ensuring that Bermuda's legislation and regulations are conducive for the development of cryptocurrencies. The other is known as the Blockchain Business Development Working Group, which is tasked with aiding in the development of technology for cryptocurrencies. The Business Development Agency

---

[10] *Legislation*, INTERNATIONAL FINANCIAL SERVICES COMMISSION BELIZE, https://www.ifsc.gov.bz/legislation/ (last visited Mar. 21, 2018), *archived at* https://perma.cc/BTB7-9ZQ4.

[11] *About IFSC*, INTERNATIONAL FINANCIAL SERVICES COMMISSION BELIZE, https://www.ifsc.gov.bz/ (last visited Mar. 21, 2018), *archived at* https://perma.cc/7BRX-2TDN.

[12] Scott Neil, *Island Spells Out Blockchain Ambitions*, THE ROYAL GAZETTE (Jan. 26, 2018), http://www.royal gazette.com/international-business/article/20180126/island-spells-out-blockchain-ambitions, *archived at* https://perma.cc/9BYN-LK5N.

[13] Press Release, The Government of Bermuda, Blockchain Working Group Members Announced (Nov. 22, 2017), https://www.gov.bm/articles/blockchain-working-group-members-announced, *archived at* https://www.gov.bm/online-services.

[14] Press Statement, Government of Bermuda, Cryptocurrency Initiative (Nov. 24, 2017), https://www.gov.bm/articles/cryptocurrency-initiative, *archived at* https://perma.cc/ZSJ3-B5W9.

is also partnering with the government in this endeavor to help bring new business to the island, create new jobs, and boost its gross domestic product.[15]

The government is also aiming to introduce a framework to regulate distributed ledger technologies (DLT) this year, to regulate firms that operate in or from Bermuda and use DLT to "store or transmit value belonging to others, such as virtual currency exchanges, coins and securitized tokens."[16]  This would cover "the promotion and sale of utility tokens, aligned with the DLT framework."[17]  There have been no further statements on the government of Bermuda's public website that discuss the proposed regulatory framework.

On January 17, 2018, the Bermuda Monetary Authority issued a press release warning of the risks of initial coin offerings, noting that whether such offerings fall within its regulatory boundaries is determined on a case-by-case basis, but that most such offerings are "unregulated because there are no requirements with which they are required to comply at this time."[18]

## Bolivia

The use of virtual currencies is prohibited in Bolivia.[19] The Central Bank has stated that the use of currency not issued by the monetary authority is not allowed in the country.[20] Cryptocurrencies such as Bitcoin are not regulated and therefore, the Central Bank warns about the possible losses that people using them are exposed to.[21]

## Brazil

On November 16, 2017, the Brazilian Federal Reserve Bank (Banco Central do Brasil) issued Notice No. 31,379 alerting citizens to the risks arising from the custody and trading operations of virtual currencies.  The notice stated in part as follows:

> Considering the growing interest of the economic agents (society and institutions) in so-called virtual currencies, the Brazilian Federal Reserve Bank warns that these are neither issued nor guaranteed by any monetary authority, so they have no guarantee of

---

[15] *Id.*

[16] *Id.*

[17] Sujha Sundararajan, *Government of Bermuda Launches Cryptocurrency Task Force*, COINDESK, (Nov. 24, 2017), https://www.coindesk.com/government-of-bermuda-launches-cryptocurrency-task-force/, *archived at* https://perma.cc/AL8K-VQFA.

[18] Press Release, Bermuda Monetary Authority, Risk of Initial Coin Offerings (Jan. 17, 2018), http://www.bma.bm/BMANEWS/Risks of Initial Coin Offerings.pdf, *archived at* https://perma.cc/8KBG-BWAD.

[19] *Banco Central de Bolivia Prohibe el Uso del Bitcoin y Otras 11 Monedas Virtuales* [*Central Bank of Bolivia Prohibits the Use of Bitcoin and Other 11 Virtual Currency*], ENLACES BOLIVIA (Apr. 2017), http://www.enlaces bolivia.net/9263-Banco-Central-de-Bolivia-prohibe-el-uso-de-bitcoins-y-otras-11-monedas-virtuales, *archived at* https://perma.cc/GFR6-7JSK.

[20] Comunicado, Banco Central Bolivia (Apr. 2017), https://www.bcb.gob.bo/webdocs/11_comunicados/04_2017_COMUNICADO_Uso_monedas.pdf, *archived at* https://perma.cc/YW8G-2Z73.

[21] *Id.*

conversion to sovereign currencies, nor are they backed in real assets of any kind, being the entire risk of the holders.

. . .

4. Companies that negotiate or keep so-called virtual currencies on behalf of users, natural persons or legal entities are not regulated, authorized, or supervised by the Brazilian Federal Reserve Bank. There is no specific regulation on virtual currencies in the legal and regulatory framework related to the National Financial System. The Brazilian Federal Reserve Bank, in particular, does not regulate or supervise operations with virtual currencies.

5. So-called virtual currency is not to be confused with the definition of electronic money referred to in Law 12,865 of October 9, 2013, and its regulation by means of normative acts issued by the Brazilian Federal Reserve Bank, according to the guidelines of the National Monetary Council. . . . .[22]

## Canada

Canada allows the use of cryptocurrencies, including Bitcoin. According to a Financial Consumer Agency of Canada webpage on digital currencies, "[y]ou can use digital currencies to buy goods and services on the Internet and in stores that accept digital currencies. You may also buy and sell digital currency on open exchanges, called digital currency or cryptocurrency exchanges."[23] However, cryptocurrencies, including Bitcoin, are not considered legal tender in Canada; "[o]nly the Canadian dollar is considered official currency in Canada."[24] The Currency Act defines legal tender as

- bank notes issued by the Bank of Canada under the Bank of Canada Act
- coins issued under the Royal Canadian Mint Act[.][25]

Canada's tax laws and rules also apply to digital currency transactions, including those made with cryptocurrencies, and digital currencies are subject to the Income Tax Act.[26] The Canada Revenue Agency (CRA) "has characterized cryptocurrency as a commodity and not a government-issued

---

[22] Banco Central do Brasil, Comunicado No. 31.379, de 16 de Novembro de 2017, http://www.bcb.gov.br/pre/normativos/busca/normativo.asp?numero=31379&tipo=Comunicado&data=16/11/2017, *archived at* https://perma.cc/G4GM-8HV6 (translation by author).

[23] *Digital Currency*, FINANCIAL CONSUMER AGENCY OF CANADA, https://www.canada.ca/en/financial-consumer-agency/services/payment/digital-currency.html (last modified Jan. 19, 2018), *archived at* https://perma.cc/G3PY-H8NR.

[24] *Id.*

[25] Currency Act, R.S.C., 1985, c. C-52, § 8, http://laws-lois.justice.gc.ca/eng/acts/c-52/page-1.html, *archived at* https://perma.cc/4A4E-3XBH.

[26] *Digital Currency*, *supra* note 23.

currency."[27] Accordingly, the use of cryptocurrency to pay for goods or services is "treated as a barter transaction."[28] According to the Financial Consumer Agency,

> [g]oods purchased using digital currency must be included in the seller's income for tax purposes. GST/HST also applies on the fair market value of any goods or services you buy using digital currency.
>
> . . .
>
> When you file your taxes you must report any gains or losses from selling or buying digital currencies.[29]

On the issue of taxation, the Canada Revenue Agency adds that,

> [w]here digital currency is used to pay for goods or services, the rules for barter transactions apply. A barter transaction occurs when any two persons agree to exchange goods or services and carry out that exchange without using legal currency. For example, paying for movies with digital currency is a barter transaction. The value of the movies purchased using digital currency must be included in the seller's income for tax purposes. The amount to be included would be the value of the movies in Canadian dollars.[30]

On June 19, 2014, the Governor General of Canada gave his assent to Bill C-31 (An Act to Implement Certain Provisions of the Budget Tabled in Parliament on February 11, 2014, and Other Measures),[31] which includes amendments to Canada's Proceeds of Crime (Money Laundering) and Terrorist Financing Act. The new law treats virtual currencies, including Bitcoin, as "money service businesses" for the purposes of the anti-money laundering law.[32] The Act is regarded as the "world's first national law on digital currencies, and certainly the world's first treatment in law of digital currency financial transactions under national anti-money laundering law."[33]

---

[27] Mariam Al-Shikarchy et al., Gowling WLG, *Canadian Taxation of Cryptocurrency ... So Far*, Lexology.com (Nov. 14, 2017), https://www.lexology.com/library/detail.aspx?g=6283077e-9d32-4531-81a5-56355fa54f47, *archived at* https://perma.cc/H9ZW-47KB.

[28] *Id.*

[29] *Id.*

[30] *What You Should Know About Digital Currency*, Canada Revenue Agency, https://www.canada.ca/en/revenue-agency/news/newsroom/fact-sheets/fact-sheets-2015/what-you-should-know-about-digital-currency.html (last updated Mar. 17, 2015), *archived at* https://perma.cc/CYV2-236S.

[31] Bill C-31, An Act to Implement Certain Provisions of the Budget Tabled in Parliament on February 11, 2014 and Other Measures, Second Session, Forty-first Parliament, 62-63 Elizabeth II, 2013-2014, Statutes of Canada 2014 Ch. 20, http://www.parl.ca/DocumentViewer/en/41-2/bill/C-31/royal-assent, *archived at* https://perma.cc/2N7Q-E68C.

[32] Tariq Ahmad, *Canada: Canada Passes Law Regulating Virtual Currencies as "Money Service Businesses"* Global Legal Monitor (July 9, 2014), http://www.loc.gov/law/foreign-news/article/canada-canada-passes-law-regulating-virtual-currencies-as-money-service-businesses/, *archived at* https://perma.cc/BQA6-K7MV.

[33] Christine Duhaime, *Canada Implements World's First National Bitcoin Law*, Duhaime Law (June 22, 2014), https://www.duhaimelaw.com/2014/06/22/canada-implements-worlds-first-national-bitcoin-law/, *archived at* https://perma.cc/Z3AQ-SKME.

On August 24, 2017, the Canadian Securities Administrators (CSA) published CSA Staff Notice 46-307 on Cryptocurrency Offerings,[34] "which outlines how securities law requirements may apply to initial coin offerings (ICOs), initial token offerings (ITOs), cryptocurrency investment funds and the cryptocurrency exchanges trading these products."[35] On February 1, 2018, *The Globe and Mail* reported that the Ontario Securities Commission had approved the country's first blockchain fund—Blockchain Technologies ETF.[36]

The Bank of Canada, Payments Canada, and R3, a distributed database technology company, are involved in a research initiative called Project Jasper "to understand how distributed ledger technology (DLT) could transform the wholesale payments system."[37] Phases 1 and 2 of the project are "focused on exploring the clearing and settlement of high-value interbank payments using DLT." Phase 3 explores "the potential benefits from integrating this "cash on ledger" with other assets such as foreign exchange and securities."[38]

### Chile

According to an unofficial statement from the Central Bank of Chile virtual currencies have no specific legal recognition in the country and trade and transactions involving cryptocurrency are not subject to the regulation or supervision of the monetary authority.[39]

### Colombia

The Superintendencia Financiera (SF) (Financial Superintendency) of Colombia warned in a June 2017 circular that bitcoin is not currency in Colombia and therefore may not be considered legal tender susceptible of cancelling debts.[40] The SF further emphasized that the Colombian peso is the

---

[34] *CSA Staff Notice 46-307 Cryptocurrency Offerings*, ONTARIO SECURITIES COMMISSION (Aug. 24, 2017), http://www.osc.gov.on.ca/en/SecuritiesLaw_csa_20170824_cryptocurrency-offerings.htm, *archived at* https://perma.cc/7XF6-3T3E.

[35] Press Release, Canadian Securities Administrators, Canadian Securities Regulators Outline Securities Law Requirements That May Apply to Cryptocurrency Offerings (Aug. 24, 2017), https://www.securities-administrators.ca/aboutcsa.aspx?id=1606, *archived at* https://perma.cc/4KL4-YSEV.

[36] Clare O'Hara, *OSC Approves Canada's First Blockchain ETF*, THE GLOBE AND MAIL (Feb. 1, 2018), https://www.theglobeandmail.com/globe-investor/funds-and-etfs/etfs/osc-approves-canadas-first-blockchain-etf/article37828183/, *archived at* https://perma.cc/V6TD-KZ5C.

[37] *Fintech Experiments and Projects*, BANK OF CANADA, https://www.bankofcanada.ca/research/digital-currencies-and-fintech/fintech-experiments-and-projects/ (last visited Apr. 6, 2018), *archived at* https://perma.cc/9F77-QHFN.

[38] *Id.*

[39] Claudia Ramírez, *El Avance de las Monedas Virtuales en Chile: Cuatro Empresas Transan Más de US$ 7 Millones Mensuales y Suman Casi 20 Mil Clientes* [*The Advance of Virtual Currency in Chile: Four Companies Transact More than US$ 7 Million Monthly and Adds Almost 20 Thousand Clients*], ECONOMÍA Y NEGOCIOS (July 2, 2017), http://www.economiaynegocios.cl/noticias/noticias.asp?id=375043, *archived at* https://perma.cc/VGM6-725C.

[40] Superintendencia Financiera de Colombia, Carta Circular 52 de 2017, Riesgos Potenciales Asociados a las Operaciones Realizadas con "Monedas Electronicas-Criptomonedas o MonedasVirtuales" [Potential Risks Associated with Operations Related to "Electronic Currency-Cryptocurrencies or Virtual Money"] (June 22, 2017),

only legal currency, and that the Banco de la República has the exclusive authority to issue money in Colombia.[41] According to the SF, cryptocurrencies have no value under capital market laws and therefore are also not recognized as a security.[42] The SF warned controlled financial institutions that they are not authorized to protect, invest, broker, or manage virtual money operations.[43] The SF called on persons to become informed and assume the risks related to virtual currencies if they choose to trade them, since these currencies do not have any private or state guarantee.[44]

## Costa Rica

The Central Bank of Costa Rica and its decentralized agencies (*órganos de desconcentración máxima*) issued a statement in October 2017 to participants in the financial, stock, securities, insurance, and pension markets, and to exchange houses, remittance agencies, the economic sector, and the general public, warning them about the risks associated with the acquisition of cryptocurrencies with the intention of using them either as financial savings or as a means of payment in Costa Rica. The statement explained that articles 42-51 of the Organic Law of the Central Bank establishes the colón as the monetary currency in Cost Rica. The statement also asserted that the Law designates the Central Bank as the sole issuer of bills and coins and establishes the unlimited power of the colón to liquidate all kinds of pecuniary obligations, both public and private. Due to this, the statement said, Bitcoin and similar cryptocurrencies are not recognized as legal tender in the country and do not have the backing of the Central Bank or the state of Costa Rica. Moreover, cryptocurrencies' effectiveness or use as a means of payment in the economy of the country cannot be guaranteed, nor can any person be forced to accept them as a means of payment for the transaction of goods and services.

The statement also asserted that because cryptocurrencies are not issued by a foreign central bank, they cannot be considered a foreign currency under the monetary exchange regime, and for this reason they do not have the security offered by the free currency convertibility provisions of articles 48 and 49 of the Organic Law of the Central Bank.

In the statement, the Central Bank and its decentralized agencies emphasized that they do not in any way regulate or supervise cryptocurrencies as a means of payment; moreover, they emphasized that transactions with cryptocurrencies cannot be made through the National System of Electronic Payment (SINPE) used in Costa Rica.

The statement warned that if any financial entity becomes directly or indirectly involved with its customers in the commercialization or use of any of these digital assets, such operation are undertaken at the financial entity's own risk and responsibility, as well as that of its customers. The statement added that the foregoing is in accordance with the obligation established by

---

*available at* https://actualicese.com/normatividad/2017/06/22/carta-circular-52-de-22-06-2017/, *archived at* https://perma.cc/V4MW-TNUD.

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

Case 4:18-cv-04790/25/2018 Document 17-96, Filed 09/21/18 Page 46 of 218
Case 4:18-cv-04790-JPB Document 17-96 Filed 09/21/18 Page 46 of 218
Regulation of Cryptocurrency Around the World

prudential regulations on the prevention of money laundering and the financing of terrorism, which imposes a duty on financial entities to carry out the necessary risk analysis with respect to new technologies.

The statement reiterated that any person who acquires digital currencies, either as a form of savings or with the interest of using them as means of payment, and those who accept them with this function in commercial transactions, also do so at their own risk and responsibility, warning that they will be participating in operations not contemplated by the banking regulations or the payment mechanisms authorized by the Central Bank of Costa Rica. The statement concluded by saying that the warnings it contains are not limiting and do not exclude other risks inherent in the use of digital currency, and that the Central Bank will continue to study the issue.[45]

### Ecuador

The Central Bank of Ecuador has stated that Bitcoin is not an authorized payment method in Ecuador.[46] It further clarified that the bitcoin, as a cryptocurrency, is not backed by any authority, because its value is based merely on speculation.[47] Furthermore, financial transactions with bitcoins are not controlled, supervised, or regulated by any Ecuadoran entity, and therefore they represent a financial risk for those who invest in them.[48]

The Central Bank also stated, however, that the purchase and sale of cryptocurrencies such as bitcoin through the internet are not forbidden,[49] but it reiterated that bitcoin is not legal tender and is not an authorized payment method for goods and services according to the Código Orgánico Monetario y Financiero (Organic Monetary and Financial Code).[50]

### El Salvador

The Central Reserve Bank of El Salvador issued a statement on November 6, 2017, expressing its position on cryptocurrencies, which can be summarized as follows:

---

[45] Press Release, Banco Central de Costa Rica, Posición del Banco Central de Costa Rica (BCCR) y sus Órganos de Desconcentración Máxima (ODM) con Respecto a las Criptomonedas (Oct. 9, 2017), http://www.bccr.fi.cr/noticias/historico/2017/Posicion_bccr_criptomonedas.html, *archived at* https://perma.cc/KD4P-WXX8.

[46] *Comunicado Oficial a la Ciudadanía*, BANCO CENTRAL DEL ECUADOR (Jan. 8, 2018), https://www.bce.fin.ec/index.php/boletines-de-prensa-archivo/item/1028-comunicado-oficial-sobre-el-uso-del-bitcoin, *archived at* https://perma.cc/9AVZ-9H3V.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] CÓDIGO MONETARIO Y FINANCIERO [MONETARY AND FINANCE CODE] art. 94, REGISTRO OFICIAL [R.O.], Sept. 12, 2014, http://www.asambleanacional.gob.ec/es/system/files/ro_codigo_organico_monetario_y_financiero.pdf, *archived at* https://perma.cc/M63F-4ZRG.

- At the international and national level there is a discussion about the use of cryptocurrencies.

- Cryptocurrencies are not legal tender in any jurisdiction; they, unlike the conventional currencies issued by a monetary authority, are not controlled or regulated and their price is determined by the supply and demand of their market.

- In accordance with articles 36–37 of the Organic Law of the Central Reserve Bank of El Salvador, and articles 3 and 6 of the Monetary Integration Law of El Salvador, the colón and the United States dollar are the only unrestricted legal tender that can be used for the payment of monetary obligations in the national territory.

- Any transaction that is made with virtual currency is the responsibility and risk of the person who carries it out.

- Fundraising using digital currencies is prohibited. According to article 184 of the Banking Law, all public fundraising with or without advertising, and in any form, is prohibited by those who are not authorized in accordance with the Banking Law, or other laws in force that regulate fundraising.

- According to the Central Reserve Bank, as the monetary authority, regulator of the financial system, and watchdog of payment systems, there is currently no legal or regulatory framework applicable to cryptocurrencies or their equivalents.

- The Central Reserve Bank will remain vigilant on this and other related issues.[51]

**Guatemala**

In December 2017 the acting President of the Bank of Guatemala, Sergio Recinos, confirmed that both Bitcoin and other types of cryptocurrencies are not legal tender in the country and do not have regulatory backing. He stated that according to Guatemalan legislation, the quetzal is the national currency and the Bank of Guatemala is the only issuer of bills and coins within the national territory, in accordance with articles 1 and 2 of the Monetary Law (Ley Monetaria). In this sense, virtual currencies are not recognized as a currency in Guatemala and neither are they recognized as foreign currency; therefore, they do not constitute a means of legal payment. Recinos added that due to their anonymous origin, cryptocurrencies can easily be used for illicit activities, such as money laundering, terrorism, drug purchases, and tax evasion, among others, to a degree that could be higher than with cash. Moreover, he said that cryptocurrencies are exposed to cyberattacks or hacking, which could lead to irreversible loss for the user. Lastly, Recinos warned that cryptocurrencies are not backed by any government and do not depend on a central bank issuer; therefore, no one is trying to maintain their value over time. He recommended that persons carefully examine the issue before deciding to invest in cryptocurrencies.[52]

---

[51] *Aviso sobre el Uso de Criptomonedas y Similares*, BANCO CENTRAL DE RESERVA DE EL SALVADOR (Nov. 6, 2017), http://www.bcr.gob.sv/esp/index.php?option=com_k2&view=item&id=1067:aviso-sobre-el-uso-de-criptomonedas-o-similares&Itemid=168, *archived at* https://perma.cc/JDR7-EHYK.

[52] Rosa María Bolaños, *Banguat Refiere que Criptomonedas no son un Medio de Pago Legal*, PRENSA LIBRE (Dec. 19, 2017), http://www.prensalibre.com/economia/banguat-refiere-que-criptomonedas-no-son-un-medio-de-pago-legal, *archived at* https://perma.cc/5TWQ-8Q7B.

## Honduras

In January 2018, the Honduran Central Bank issued a statement in response to inquiries made by economic and financial agents in relation to the use of cryptocurrencies within the national territory, either as an investment or as a means of payment for goods and services. The response stated that cryptocurrencies such as bitcoin, ethereum, litecoin, and other similar cryptocurrencies do not have the backing of the Central Bank of Honduras. Therefore, the Central Bank does not regulate or guarantee their use and such cryptocurrencies do not enjoy the legal protection granted by the laws of the country in terms of the payment system. As a result, any transaction that is made with this type of currency or virtual assets is the responsibility and risk of the person who conducts the transaction, the statement said.[53]

## Mexico

Mexico's Law to Regulate Financial Technology Companies, enacted in March 2018, includes a chapter on operations with "virtual assets," commonly known as cryptocurrencies.[54] This chapter defines virtual assets as representations of value electronically registered and utilized by the public as a means of payment for all types of legal transactions, which may only be transferred electronically.[55]

In addition, Mexico has enacted a law extending the application of its laws regarding money laundering to virtual assets, thereby requiring financial institutions that provide services relating to such assets to report transactions exceeding certain amounts.[56]

Mexico's Central Bank is granted broad powers under the Law to regulate virtual assets, including

- specifying those virtual assets that financial companies are allowed to operate with in the country, defining their particular characteristics, and establishing the conditions and restrictions applicable to transactions with such assets; and

- authorizing financial companies to perform transactions with virtual assets.[57]

---

[53] Banco Central de Honduras, Comunicado (Jan. 19, 2018), http://www.bch.hn/download/boletines_prensa/2018/boletin_otro_01_18.pdf, *archived at* https://perma.cc/JN2B-PSC8.

[54] Ley para Regular las Instituciones de Tecnología Financiera [Law to Regulate Financial Technology Companies] arts. 30–34, Diario Oficial de la Federación [D.O.F], Mar. 9, 2018, available as originally enacted on the website of Mexico's House of Representatives *at* http://www.diputados.gob.mx/LeyesBiblio/pdf/LRITF_090318.pdf, *archived at* https://perma.cc/SB6N-RQY7.

[55] *Id.* art. 30.

[56] Ley Federal para la Prevención e Identificación de Operaciones con Recursos de Procedencia Ilícita [Federal Law for the Prevention and Identification of Transactions with Resources of Illicit Origin] art. 17(XVI), Nota de vigencia, D.O.F., Oct. 17, 2012, available as amended through March 2018 on the website of Mexico's House of Representatives *at* http://www.diputados.gob.mx/LeyesBiblio/pdf/LFPIORPI_090318.pdf, *archived at* https://perma.cc/4UVN-GM98. .

[57] Ley para Regular las Instituciones de Tecnología Financiera [Law to Regulate Financial Technology Companies] arts. 30–32, 88.

Pertinent regulations applicable to these assets must be issued by Mexico's Central Bank within a year from the enactment of the Law.[58]

Financial companies that carry out transactions with virtual assets must disclose to their clients the risks applicable to these assets.[59] At a minimum, these companies must inform their clients, in a clear and accessible manner on their respective websites or through the means that they utilize to provide services, of the following:

- A virtual asset is not a legal currency and is not backed by the federal government nor by Mexico's Central Bank;

- Once executed, transactions with virtual assets may be irreversible;

- The value of virtual assets is volatile; and

- Technological, cybernetic, and fraud risks are inherent in virtual assets.[60]

**Venezuela**

Under Decree 3196 of December 8, 2017,[61] the government of Venezuela was authorized to create its own cryptocurrency, the petro, which would be physically backed by Venezuelan barrels of oil.[62] One petro would be backed by a purchase-sale contract for one barrel of Venezuelan oil as quoted in the OPEC Reference Basket, as well as other commodities, including gold, diamond, coltan, and gas.[63]

Decree 3196 mainly provides for the operational details of the petro, including its issuance, mining, and trading in Venezuela according to the rules on purchase and sale contained in the Civil Code.[64] According to a legal expert on information technology law, all cryptocurrencies are considered a financial asset subject to the rules applicable to such assets under Decree 3196 and none of its provisions declare them illegal.[65] The Decree also creates the Superintendencia de los

---

[58] *Id.* sexta disposicion transitoria (II).

[59] *Id.* art. 34.

[60] *Id.*

[61] Decreto 3196 Mediante el cual se Autoriza la Creación de la Superintendencia de los Criptoactivos y Actividades Conexas Venezolana [Decree 3196 Authorizing the Creation of the Venezuelan Superintendency of Cryptoassets and Related Activities], GACETA OFICIAL [G.O.], Dec. 8, 2017, http://gacetaoficial.tuabogado.com/gaceta-oficial/decada-2010/2017/gaceta-oficial-6346-del-8-diciembre-2017, *archived at* https://perma.cc/CSC3-BKBV.

[62] *Id.* art. 4.

[63] *Id.*

[64] *Id.* art. 3.

[65] Raymond Orta, *Efectos sobre el Bitcoin y otras Criptomonedas del Decreto sobre Creación del PETRO y la Superintendencia de los Criptoactivos* [*Effects of Decree Creating the PETRO and the Superintendency of Crypto Assets on Bitcoin and other Cryptocurrencies*], TUABOGADO.COM ( Dec. 28, 2017), http://www.tuabogado.com/venezuela/secciones/derecho/informatico/efectos-sobre-el-bitcoin-y-otras-criptomonedas-del-decreto-sobre-creacion-del-petro-y-la-superintendencia-de-los-criptoactivos-raymondorta, *archived at* https://perma.cc/3RU6-ANVU.

Criptoactivos y Actividades Conexas Venezolana (Superintendency of Venezuelan Crypto-Assets and Related Activities) as the supervisory authority of cryptocurrencies.[66]

Decree 3196 states that the holder of petro will be able to exchange the market value of the cryptoasset for the equivalent in another cryptocurrency or in bolívares (the traditional currency of Venezuela) at the market exchange rate published by a national cryptoasset exchange house.[67] The holder of each petro would also own a virtual wallet, which was to be his/her own responsibility, along with the risks related to its custody and management.[68]

According to Decree 3196, an initial coin offering will be made through auction or direct assignment by the Superintendence of Cryptoassets and Related Venezuelan Activities.[69]

On March 8, the Asamblea Nacional (National Assembly, the Venezuelan Congress), declared that the issuance of a domestic cryptocurrency such as the petro is illegal, because in order to enter into a public debt and borrow on behalf of the Venezuelan government, congressional approval and a special law is required under the National Constitution.[70] In addition, only the Central Bank of Venezuela may issue national currency.[71] The Asamblea National further stated that oil reserves are public national assets that belong to the Republic and are non-transferrable assets, and therefore cannot be used as guarantee for any debt.[72]

Despite these declarations by the Asamblea National, the Government has said the petro will become legal tender for all transactions involving government institutions within 120 days of April 9, 2018.[73]

---

[66] *Id.* art. 1.

[67] Decreto 3196, art. 5.

[68] *Id.*

[69] *Id.* art. 8.

[70] Asamblea Nacional de la República Bolivariana de Venezuela, Acuerdo sobre la Implementación del Petro [Accord on the Implementation of Petro] (Mar. 6, 2018), http://www.asambleanacional.gob.ve/documentos_archivos/acuerdo-sobre-la-implementacion-del-petro-191.pdf, *archived at* https://perma.cc/L6GQ-QUXV (citing CONSTITUCION DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA [CRBV] art. 312, G.O., Mar. 24, 2000, http://www.cne.gov.ve/web/normativa_electoral/constitucion/titulo2.php#art12, *archived at* https://perma.cc/3BLG-R5P4).

[71] *Id.* (citing CRBV art. 318).

[72] *Id.* (citing CRBV art. 12).

[73] Decreto Constituyente sobre Criptoactivos y la Criptomoneda Soberana Petro [Constitutional Decree on Cryptocurrency and the Sovereign Cryptocurrency Petro], G.O., Apr. 9, 2018, pp. 3–7, *available at* http://pandectasdigital.blogspot.com/2018/04/decreto-constituyente-sobre.html, *archived at*

## The Caribbean

### I.  Eastern Caribbean Central Bank

The Eastern Caribbean Central Bank (ECCB) is the monetary authority for eight island economies in the Eastern Caribbean Currency Union that use a common currency known as the Eastern Caribbean dollar[74]—Anguilla, Antigua and Barbuda, the Commonwealth of Dominica, Grenada, Montserrat, Saint Kitts and Nevis, Saint Lucia, and Saint Vincent and the Grenadines.[75]  On March 9, 2018, the ECCB signed a memorandum of understanding with the Barbados-based financial technology company Bitt Inc. agreeing to participate in a pilot program that will enable it to issue a digital currency.  Expected to start at the end of 2018, the pilot will specifically involve

> the development of a digital Eastern Caribbean Dollar using distributed ledger technology with a blockchain platform specifically designed for a safe and secure digital financial ecosystem. Essentially, [it] would be a proof of concept, designed to demonstrate the viability and functionality of the ECCB issuing Digital Eastern Caribbean Dollars.[76]

The ECCB will work closely with Bitt Inc. to

> develop, deploy and test technology which focuses on data management, compliance and transaction monitoring system for Know Your Customer, Anti-Money Laundering, and Combating the Financing of Terrorism. . . . The pilot will also focus on developing a secure, resilient digital payment and settlement platform with embedded regional and global compliance; and the issuance of a digital EC [Eastern Caribbean] currency which will operate alongside physical EC currency.[77]

While this summarizes the regional effort to adopt a common digital currency, national efforts by ECCB member states to deal with emerging cryptocurrencies are discussed below, along with the efforts of other Caribbean countries that are not participating in the ECCB pilot.

---

[74] TREVOR O.B. BRATHWAITE, ECCB, MONETARY UNIONS IN THE CARIBBEAN CONTEXT – THE CHALLENGES FACED BY THE EASTERN CARIBBEAN CURRENCY UNION SINCE THE CRISIS (Mar. 2016), http://www.centralbank.cw/uploads/files/Monetary Unions in the Caribbean Context II.pdf, *archived at* https://perma.cc/VMQ2-V8HP.

[75] Eastern Caribbean Central Bank Agreement Act 1983, http://eccb.slu.lc/files/documents/legal_regulatory/bank_agreement1983.pdf, *archived at* https://perma.cc/5YHT-3T7Y.

[76] ECCB STRATEGIC PLAN 2017–2021, at 58, https://www.eccb-centralbank.org/files/documents/Stategic_Plan/ECCB_Stategic_Plan_2017%20Revised%202.2.18.pdf, *archived at* https://perma.cc/GL38-SSJP; Press Release, ECCB, ECCB to Embark on Blockchain Pilot Initiative With Bitt Inc. (Mar. 13, 2018), https://www.eccb-centralbank.org/news/view/eccb-to-embark-on-blockchain-pilot-initiative-with-bitt-inc, *archived at* https://perma.cc/UD6D-AT44.

[77] *Id.*

## II. Country Surveys

**Anguilla**

The Anguillan government announced at the end of 2017 that it would introduce legislation, known as the Anguilla Utility Token Offering Act (the AUTO Act), to regulate initial offerings of certain types of cryptocurrencies (ICOs).[78]  The government has noted that some types of tokens are considered to be securities, and thus are already regulated under the existing securities framework,[79] but that

> there remained a large swath of non-security tokens with no clear guidance as to where they would fit in the emerging blockchain economy.  Therefore, we focused our efforts on creating a safe and effective regulatory framework for non-security token offerings, which appear to represent a majority of the current capital raising activity within the blockchain community.[80]

The new legislation will serve to provide a regime for Anguillan entities to register in order to conduct an offering of non-security tokens, which are tokens that do not have the same features securities do, but that "have one or more 'utility' features within the issuer's current or proposed blockchain platform."[81]

The AUTO Act is structured in a way to regulate utility tokens, while avoiding the burden imposed by securities regulations and the "higher levels of regulatory scrutiny that would have to take place were the tokens to fall under securities laws."[82]  As such, utility tokens are categorized as those that may be redeemed for consumer goods or services, rather than a share in profits or an interest in technology connected to the offering.[83]

---

[78] Lonnie Hobson, *The Government of Anguilla Announces World's First Cryptocurrency Registration Process for "Utility Token Offerings"*, LINKEDIN (Nov. 15, 2017), https://www.linkedin.com/pulse/government-anguilla-announces-worlds-first-process-utility-hobson/.

[79] Securities Act, cap. S13, REVISED STATUTES OF ANGUILLA, at 3, http://www.gov.ai/laws/S013-00-Securities%20Act/.  Section 1 of the Securities Act defines "securities" as "shares and stock in the share capital of a company; (b) any instrument creating or acknowledging indebtedness which is issued or proposed to be issued by a company including, in particular, debentures, debenture stock, loan stock, bonds and notes; (c) bonds and other instruments creating or acknowledging indebtedness issued by or on behalf of any Participating Government; (d) any right (whether conferred by warrant or otherwise) to subscribe for shares or debt securities (e) any option to acquire or dispose of any other security; (f) units in a collective investment scheme, including shares in or securities of an investment company; and (g) any other instruments prescribed to be securities for the purposes of this Act."

[80] *Government of Anguilla Announces Regulatory Framework for Non-Security Token Offerings*, ECONOTIMES (Nov. 14, 2017), https://www.econotimes.com/Government-of-Anguilla-announces-regulatory-framework-for-non-security-token-offerings-1005960, *archived at* https://perma.cc/P87S-AC86.

[81] Hobson, *supra* note 78.

[82] Michaela Ross & Lydia Beyoud, *A Tiny Caribbean Island Looks to Lead in ICO Regulation*, BLOOMBERG LAW (Dec. 19, 2017), https://www.bna.com/tiny-caribbean-island-n73014473343/, *archived at* https://perma.cc/WG8M-PVVQ.

[83] *Id.*

In order to become registered, the entity must put together a "white paper," along with its disclosure documents, which must undergo a technical and legal review that must include information about the companies structure, location, business status, description of the project, a technical and legal description of the tokens that will be offered, how any proceeds made will be used, and anti-money laundering provisions along with any risk factors present for purchasing the tokens.[84] The Anguillan government will financially benefit from the legislation by collecting a registration fee, along with a "1.5 percent levy on the total amount raised by a token offering."[85]

The government of Anguilla has stated as follows:

> We believe this new AUTO Act will help Anguilla become the leader in establishing best practices for cryptocurrency offerings, to protect the people of Anguilla and the participating public. . . . We believe the AUTO Act would be a significant step in the right direction, to provide clearly defined rules and increased safety for the blockchain community.[86]

On December 13, 2017, the Executive Council of Anguilla stated that officials should formulate a regulatory regime for Utility Token Offerings that would be submitted to the Governor.[87] No further information about the status of this bill has been located.

Anguilla has also signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

## Antigua and Barbuda

Antigua and Barbuda currently does not have any legislation that specifically regulates the use of cryptocurrency. Newspapers on Antigua and Barbuda have reported that the government of Antigua has instructed its Attorney General to "draft laws for the implementation of bitcoin."[88] No specifics or further information on this reported proposed legislation was located.

The government of Antigua and Barbuda has reportedly permitted the funding of projects and charities in the country through an Initial Coin Offering for Development[89] by selling a state-

---

[84] Hobson, *supra* note 78.

[85] Ross & Beyoud, *supra* note 82.

[86] Hobson, *supra* note 78.

[87] *Minutes of the 123rd Meeting of the Eleventh Anguilla Executive Council Held on Wednesday 13th December 2017*, Ex Min. 17/574, http://www.gov.ai/documents/exco/171213%20Mn17-123.pdf, *archived at* https://perma.cc/N7DL-VYQB.

[88] Jima Augustin, *A&B Looking to Embrace Bitcoin*, THE DAILY OBSERVER (Apr. 28, 2017), https://antiguaobserver. com/ab-looking-to-embrace-bitcoin/, *archived at* https://perma.cc/KLV5-8VXM.

[89] Press Release, CNET Antigua, The Government of Antigua and Barbuda Supports CNET's Investment Development Projects and Charities Funded by the Initial Coin Offering for Development (Apr. 28, 2018), https://www.prnewswire.com/news-releases/the-government-of-antigua-and-barbuda-supports-cnets-investment-development-projects-and-charities-funded-by-the-initial-coin-offering-for-development-300605628.html, *archived at* https://perma.cc/NA4Q-VX6S.

supported (not state-sponsored) Antigua and Barbuda Development Coin, based on the Ethereum cryptocurrency.[90]  No further information on this offering via a government source was located.

Antigua and Barbuda has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

**Bahamas**

The Bahamas does not have any legislation that specifically applies to cryptocurrencies. Regulation of cryptocurrencies in the Bahamas currently varies according to whether the currency is considered to be a security, currency, or commodity.[91]  Despite not having legislation specifically designed to addresses cryptocurrencies, the Central Bank of the Bahamas has stated that regulations it issued in 2017, which provide a framework for a system of national electronic payments services, also apply to cryptocurrencies.[92]  The regulations "apply best international standards for the provision of local payments services" and define "electronic money" as

> electronically stored monetary value as represented by a claim on the issuer, which is issued
> on receipt of funds for the purpose of making payment transactions and which is accepted
> as a means of payment by persons other than the issuer, and includes monetary value stored
> magnetically or in any other tangible or intangible device (such as a SIM card
> or software).[93]

The Central Bank further stated that converting instruments in and out of the Bahamian currency would be governed by Exchange Control Regulations, and that "[t]he Securities Commission of The Bahamas would reserve the right to supervise any non-payments aspect of crypto currency operations domiciled in The Bahamas."[94]

The Bahamas is actively looking at developing blockchain technology to use on the Island to help create efficient and simplified transactions.  Specifically, the government has noted that "[t]he

---

[90] Adam Reese, *Antigua and Barbuda to Support Ethereum-based 'ICO For Development'*, ETHNEWS (Feb. 28, 2018; updated Mar. 1, 2018), https://www.ethnews.com/antigua-and-barbuda-to-support-ico-for-development, *archived at* https://perma.cc/DD5P-6994.

[91] Aliya Allen & Graham Thompson*, The Bahamas' Place in a Cryptographic World: A Whitepaper*, GRAHAMTHOMPSON (Mar. 2018), http://www.grahamthompson.com/uploads/1609/doc/Crypto_Article,_AAllen,_March_2018,_IBFS.pdf, *archived at* https://perma.cc/Y7SS-P7VL.

[92] Remarks by John Rolle, Governor of the Central Bank of the Bahamas, at Blockchain Seminar, Digital Currency – Extending the Payments System Modernisation Initiative (Mar. 1, 2018), http://www.centralbankbahamas.com/download/031486300.pdf, *archived at* https://perma.cc/XUH7-3C83.

[93] Payment Instruments Oversight Regulations 2017, SI 53/2017, art. 2, EXTRAORDINARY OFFICIAL GAZETTE OF THE BAHAMAS (July 26, 2017), http://laws.bahamas.gov.bs/cms/images/LEGISLATION/SUBORDINATE/2017/2017-0053/PaymentInstrumentsOversightRegulations2017_1.pdf, *archived at* https://perma.cc/B5VG-5222.

[94] Remarks by John Rolle, *supra* note 92.

Bahamas is also currently developing programs for block chain-based solutions, fin-tech and crypto-currency companies, and we intend to promote block chain as a sub-industry within ICT."[95]

The Bahamas is in the process of considering a bill that would bring virtual currencies within the ambit of the proceeds of crime legislation.[96]  Clause 2 of the bill defines "virtual currency" as

> a digital representation of value which can be digitally traded and functions as – (a) a medium of exchange; (b) a unit of account; or (c) a store of value, that does not have legal tender status or carry any security or guarantee in any jurisdiction.[97]

If enacted, the bill's provisions on money laundering and counterterrorism financing would apply to cryptocurrencies.[98]

It also appears that the Bahamas might act to both bring cryptocurrency exchanges within the remit of the Central Bank of the Bahamas and introduce a "digital version of the Bahamian dollar."[99]

**Barbados**

Barbados does not appear to have any laws that specifically regulate cryptocurrencies.  In 2015, the Central Bank of Barbados (CBB) issued a paper that discussed whether cryptocurrencies should be included in its portfolio of international reserves, but it does not appear to have acted to do this.[100]

Barbados is home to Bitt Inc., the financial technology startup that has signed a Memorandum of Understanding with the ECCB to launch a pilot of blockchain technology, which will enable eight Caribbean countries to test the use of cryptocurrencies alongside their national currencies (see ECCB discussion, *supra*). While Barbados is not a party to this Memorandum of Understanding, there have been reports that Bitt Inc. is to create a digital Barbadian dollar that would be tied to the value of the country's physical currency, but the government has not yet issued a statement on this subject.[101]

---

[95] Press Release, Bahamas Information Services, Small Business License Fees in the GB Port Area May Soon Change (Jan. 26, 2018), https://www.bahamas.gov.bs/wps/portal/public/gov/government/news/ (search by title, then select from list), *archived at* https://perma.cc/7EHL-XSAQ.

[96] Proceeds of Crime Bill 2018, https://www.bahamas.gov.bs/wps/wcm/connect/200c0a64-83a6-4f69-b115-405396e05b8e/DOC16_39_1302_02_18.pdf?MOD=AJPERES, *archived at* https://perma.cc/NW5Z-ZMLG.

[97] *Id.* § 2.

[98] *Id.*, Objects and Reasons.

[99] Remarks by John Rolle, *supra* note 92.

[100] Winston Moore & Jeremy Stephen, *Should Cryptocurrencies be Included in Portfolio of International Reserves Held by the Central Bank of Barbados*? (CBB Working Paper No. WP/15/16), http://www.centralbank.org.bb/Portals/0/Files/Working_Papers/2015/Should Cryptocurrencies be included in the Portfolio of International Reserves held by the Central Bank of Barbados.pdf (last visited Mar. 26, 2018), *archived at* https://perma.cc/VGF3-T75Q.

[101] Noelle Acheson, *How a Tiny Island Could Give Cryptocurrency a Big Boost*, Coindesk (May 30, 2017), https://www.coindesk.com/how-a-tiny-island-could-give-cryptocurrency-a-big-boost/, *archived at* https://perma.cc/HB7Y-H4B8.

## British Virgin Islands

The British Virgin Islands has yet to issue any guidance that applies to cryptocurrency and does not appear to have legislation or regulations that specifically apply to this area,[102] with the government instead appearing to opt for a wait-and-see approach.[103] One commentator has noted that its existing laws appeal to companies that wish to do initial coin offerings (ICOs), and a number of companies have already registered under the country's company laws and then conducted ICOs.[104]

## Cayman Islands

The Cayman Islands appear to have a fairly flexible regulatory environment for cryptocurrencies and blockchain technologies. While there appears to be no specific legislation geared towards regulating cryptocurrencies, there are laws that in certain circumstances may be applicable. These include the Securities Investment Business Law (2015 Revision),[105] Anti-Money Laundering (AML) Laws and regulations,[106] Money Services Law (2010 Revision),[107] and Electronic Transactions Law (2003 Revision). Lawyers Chris Humphries and James Smith predict that

> more-specific legislation will eventually be created although, for the time being, the regulators and lawmakers in the Cayman Islands are keen to avoid rushing through any legislation before the potential benefits and pitfalls of blockchain technology, cryptocurrencies and ICOs are properly understood.[108]

On January 29, 2018, Cayman Islands' Premier, Alden McLaughlin, reportedly spoke at a leading blockchain conference called "d10e" where he encouraged blockchain companies to establish themselves at Cayman Enterprise City, a "special economic zone that caters to tech-related

---

[102] *Home*, GOVERNMENT OF THE VIRGIN ISLANDS, http://www.bvi.gov.vg/ (last visited Mar. 26, 2018), *archived at* https://perma.cc/WTT9-7E3M.

[103] Michael Killourhy, *Crypto-currency and ICOs in the British Virgin Islands*, OGIER (Feb. 2, 2018), http://www.ogier.com/publications/crypto-currency-and-icos-in-the-british-virgin-islands?utm_source=Mondaq &utm_medium=syndication&utm_campaign=View-Original, *archived at* https://perma.cc/RA4T-T2SV.

[104] *Id*.

[105] Securities Investment Business Law (2015 Revision), EXTRAORDINARY GAZETTE No. 53 (July 17, 2015), https://www.cima.ky/upimages/commonfiles/1499349906SecuritiesInvestmentBusinessLaw2015Revision.pdf, *archived at* https://perma.cc/356F-5DBD.

[106] Proceeds of Crime Law (2017 Revision), Anti-Money Laundering Regulations, 2017, EXTRAORDINARY GAZETTE No. 79 (Sept. 20, 2017), https://www.cima.ky/upimages/commonfiles/1507843083Anti-MoneyLaudering Regulations2017.pdf, *archived at* https://perma.cc/F5MN-XM5K.

[107] Money Services Law (2010 Revision), EXTRAORDINARY GAZETTE No. 23 (Nov. 8, 2010), https://www.cima.ky/ upimages/commonfiles/1499348940MoneyServicesLaw2010Revision.pdf, *archived at* https://perma.cc/Q7UC-DB5G.

[108] Chris A. Humphries & James Smith, Stuarts Walker Hersant Humphries, *Cayman Islands: Initial Coin Offerings (ICO) in The Cayman Islands*, MONDAQ (Feb. 19, 2018), http://www.mondaq.com/caymanislands/x/667952/ Commodities+Derivatives+Stock+Exchanges/Initial+Coin+Offerings+ICO+In+The+Cayman+Islands, *archived at* https://perma.cc/5XPY-LXGQ.

entities."[109] Cayman Enterprise City CEO Charlie Kirkconnell stated at the conference that some fifty blockchain companies have established or are in the process of establishing themselves in the zone.[110]

## Dominica

On March 14, 2015, Dominica was reportedly scheduled to host an event, officially titled "The Bit Drop," which was meant to put bitcoins into the hands of Dominica's entire population, reported to be 70,000 people, but the project was cancelled.[111] According to *Dominica News Online*, organizers indicated that they did not receive enough support from the government on the event, and an election cycle may have "complicated matters."[112]

More recently, Dominica signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

## Dominican Republic

The Dominican Central Bank has indicated that virtual currencies are not backed by the Bank and are not legal currency under Dominican law.[113] Thus, financial institutions authorized to operate in the country may not engage in transactions that use these currencies, and individuals who acquire them or accept them as payment do so at their own risk.[114]

## Grenada

Grenada does not have any specific legislation to regulate cryptocurrencies. It has, however, signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

## Jamaica

In a press release issued on February 5, 2018, the Bank of Jamaica warned the public to "exercise caution in the use of virtual currencies (cryptocurrencies) given the associated risks and the absence of appropriate governance and consumer protection arrangements," according to the

---

[109] Ken Silva, *Cayman Courting Blockchain Companies*, CAYMAN COMPASS (Jan. 30, 2018), https://www.cayman compass.com/2018/01/30/cayman-courting-blockchain-companies/, *archived at* https://perma.cc/T79T-TCYH.

[110] *Id.*

[111] Pete Rizzo, *Plan to Distribute Bitcoin in Dominica Shelved*, COIN DESK (Feb. 10, 2015), https://www.coindesk.com/plan-distribute-bitcoin-dominica-shelved/, *archived at* https://perma.cc/ZV5K-6NQP.

[112] *Bitcoin Event in Dominica Cancelled*, DOMINICA NEWS ONLINE (Feb. 11, 2015), http://dominicanewsonline.com/news/homepage/news/business/bitcoin-event-in-dominica-cancelled/, *archived at* https://perma.cc/6T86-CC65.

[113] Banco Central de la Republica Dominicana, Comunicado (June 29, 2017), https://www.bancentral.gov.do/noticias/avisos/archivos/aviso20170628.pdf, *archived at* https://perma.cc/C2Y6-FD4G.

[114] *Id.*

*Jamaica Observer*.[115]  While noting the advantages of virtual currencies in potentially promoting "financial inclusion," the Bank warned that

> . . . the following risks need to be taken into consideration:
>
> 1. Virtual currencies are not legal tender in Jamaica.
> 2. Bank of Jamaica neither issues nor backs virtual currencies.
> 3. Virtual currencies are not foreign currencies as there is no monetary authority that issues or backs them.
> 4. Bank of Jamaica does not regulate or supervise virtual currencies.
> 5. Bank of Jamaica has not authorised any entity to operate a virtual currency platform.
> 6. Transactions in virtual currencies, such as bitcoin, are susceptible to abuse by criminals and may facilitate money laundering and the financing of terrorism.[116]

## Montserrat

Montserrat does not have any specific legislation to regulate cryptocurrencies. It has, however, has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside its national currency (see ECCB discussion, *supra*).

## Saint Kitts and Nevis

Saint Kitts and Nevis does not have specific legislation to regulate cryptocurrencies.  However, it has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

While the country has no specific legislation on the subject, the Saint Kitts and Nevis Citizenship by Investment Unit (CIU) reportedly issued a statement in June 2014 that it would not accept digital currency as a means by which applicants for citizenship through the Citizenship by Investment Program could participate in the program. "We further emphasize that we do not accept Bitcoins, have never accepted Bitcoins, and will not accept Bitcoins," the CIU was quoted as saying.[117]

## Saint Lucia

Saint Lucia does not have specific legislation to regulate cryptocurrencies. However, it has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

---

[115] *BOJ Warns against Use of Virtual Currencies for Economic Transactions*, JAMAICA OBSERVER (Feb. 5, 2018), http://www.jamaicaobserver.com/latestnews/BOJ_warns_against_use_of_virtual_currencies_for_economic_transactions_?profile=1228, *archived at* https://perma.cc/2NEA-LAHE.

[116] *Id.*

[117] Shiva Bissessar, ECLAC, *Opportunities and Risks Associated with the Advent of Digital Currency in the Caribbean*, ECLAC– STUDIES AND PERSPECTIVES SERIES– THE CARIBBEAN No. 46, at 32 (Jan. 2016), http://repositorio.cepal.org/bitstream/handle/11362/39860/S1501234_en.pdf;sequence=1, *archived at* https://perma.cc/F69E-MRTB.

## Saint Vincent and the Grenadines

Saint Vincent and the Grenadines does not have any specific legislation to regulate cryptocurrencies. It has, however, signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside its current national currency (see ECCB discussion, *supra*).

## Trinidad and Tobago

A February 24, 2018, news article reported that the Trinidad and Tobago Finance Ministry has distanced itself from a recent digital currency offering, and in clarifying its position emphasized in a statement that "[t]he Commission, has not as of this date approved any Initial Coin Offering."[118]    According to the article, the Commission's statement also identified the following risks and urged the public to exercise caution:

> 1) Heightened potential for fraud – the fact that the products and those selling them may in some cases not be subject to regulation, [may] expose the investors to fraud;
>
> 2) Cross-border distribution risks – the issuer may be operating the ICO from outside of the investor's jurisdiction, therefore, following the money in the event of a collapse of the ICO as well as recovering invested funds, may prove extremely difficult [for the investor];
>
> 3) Information asymmetry – investors may not be able to understand the risks, costs and expired returns . . . arising from their investment;
>
> 4) Liquidity risks – In some jurisdictions, cryptocurrency exchanges may also be unregulated and operate without oversight.  Thus leaving investors vulnerable to dramatic price changes and possibility that they may not be able to exit their holdings (funds invested) . . . .
>
> Based on the foregoing, the Ministry of Finance advises members of the public to exercise caution when engaging in any form of investment and when in doubt, seek the advice of the Regulatory Bodies – The Securities and Exchange Commission and/or the Central Bank of Trinidad and Tobago.[119]

---

[118] Laura Dowrich-Phillips, *Finance Ministry Distances Itself from Digital Currency Offering*, LOOP (Feb. 24, 2018), http://www.looptt.com/content/finance-ministry-distances-itself-digital-currency-offering, *archived at* https://perma.cc/86BF-FSK8.

[119] *Id.*

## Europe

### I. EU Member States

**European Union**

On July 5, 2016, the European Commission presented a legislative proposal to amend the Fourth Anti-Money Laundering Directive (AMLD).[120] It suggested, inter alia, bringing custodian wallet providers and virtual currency exchange platforms within the scope of the AMLD, meaning they would be obligated to fulfill due diligence requirements and have in place policies and procedures to detect, prevent, and report money laundering and terrorist financing. The proposal contains a definition of virtual currencies, which are described as "a digital representation of value that is neither issued by a central bank or a public authority, nor necessarily attached to a fiat currency, but is accepted by natural or legal persons as a means of payment and can be transferred, stored or traded electronically."[121] On January 29, 2018, the text agreed at the interinstitutional negotiations of the European Parliament and the Council was approved in committee. The European Parliament adopted the text in plenary session on April 19, 2018.[122] The updated Directive will enter into force three days after its publication in the Official Journal of the European Union.

Furthermore, on March 8, 2018, the European Commission presented an Action Plan on how to take advantage of the opportunities presented by technology-enabled innovation in financial services (FinTech), like blockchain, artificial intelligence, and cloud services.[123] The FinTech Action Plan includes the recently launched EU Blockchain Observatory and Forum, which will report on the challenges and opportunities of crypto assets later in 2018 and is working on a comprehensive strategy on distributed ledger technology and blockchain addressing all sectors of the economy.[124]

On October 22, 2015, the European Court of Justice (ECJ) held in its decision *Hedqvist* that transactions to exchange a traditional currency for bitcoin or other virtual currencies and vice versa

---

[120] *Proposal for a Directive of the European Parliament and of the Council Amending Directive (EU) 2015/849 on the Prevention of the Use of the Financial System for the Purposes of Money Laundering or Terrorist Financing and Amending Directive 2009/101/EC*, COM (2016) 450 final (July 5, 2016), https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52016PC0450&from=EN, *archived at* http://perma.cc/D4NP-V5UA.

[121] *Id.* at 30.

[122] Press Release, European Parliament, Anti-money Laundering: MEPs Vote to Shed Light on the True Owners of Companies (Apr. 19, 2018), http://www.europarl.europa.eu/news/en/press-room/20180411IPR01527/anti-money-laundering-meps-vote-to-shed-light-on-the-true-owners-of-companies, *archived at* https://perma.cc/ZZQ4-HQ36.

[123] *Communication From the Commission to the European Parliament, the Council, the European Central Bank, the European Economic and Social Committee and the Committee of the Regions. FinTech Action Plan: For a More Competitive and Innovative European Financial Sector*, COM (2018) 109 final (Mar. 8, 2018), http://eur-lex.europa.eu/resource.html?uri=cellar:6793c578-22e6-11e8-ac73-01aa75ed71a1.0001.02/DOC_1&format=PDF, *archived at* http://perma.cc/F7NP-YPCP.

[124] *Id.*; Press Release, European Commission, European Commission Launches the EU Blockchain Observatory and Forum (Feb. 1, 2018), http://europa.eu/rapid/press-release_IP-18-521_en.htm, *archived at* http://perma.cc/Q4GD-LX6P.

constitute the supply of services for consideration, but fall under the exemption from value-added-tax (VAT).[125] Buying or selling bitcoin is therefore exempt from VAT in all EU Member States.

On February 12, 2018, the European Supervisory Authorities for securities (ESMA), banking (EBA), and insurance and pensions (EIOPA) jointly issued a warning to consumers regarding virtual currencies, stating that they are "highly risky and unregulated products and are unsuitable as investment, savings or retirement planning products."[126] The warning complements the earlier two statements by ESMA on initial coin offerings (ICOs) in November 2017[127] and a warning to consumers and two opinions on virtual currencies by EBA in December 2013, July 2014, and August 2016, respectively.[128] EBA welcomes the decision of the European Commission to bring custodian wallet providers and virtual currency exchange platforms within the scope of the Fourth AMLD and not to extend the EU Payment Services Directive 2015/2366 to virtual currency transactions for the time being.[129] EBA suggests a separate regulatory regime to mitigate all the risks arising from virtual currencies.[130]

The President of the European Central Bank (ECB), Mario Draghi, warned that bitcoin and other digital currencies are "very risky assets" due to their high volatility and speculative prices.[131] He stated that "digital currencies are not subject to a specific supervisory approach," but that "[w]ork is under way in the Single Supervisory Mechanism[132] to identify potential prudential risks that

---

[125] Case C-264/14, Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718, http://curia.europa.eu/juris/celex.jsf?celex=62014CJ0264&lang1=en&type=TXT&ancre, archived at http://perma.cc/7Q6Q-MM9V.

[126] European Supervisory Authorities, WARNING. ESMA, EBA and EIOPA Warn Consumers on the Risks of Virtual Currencies (Feb. 12, 2018), https://www.eba.europa.eu/documents/10180/2139750/Joint+ESAs+Warning+on+Virtual+Currencies.pdf, archived at http://perma.cc/EAH5-XTZE.

[127] ESMA, STATEMENT. ESMA Alerts Firms Involved in Initial Coin Offerings (ICOs) to the Need to Meet Relevant Regulatory Requirements (Nov. 2017), https://www.esma.europa.eu/sites/default/files/library/esma50-157-828_ico_statement_firms.pdf, archived at http://perma.cc/5PL8-WZ4K; ESMA, STATEMENT. ESMA Alerts Investors to the High Risks of Initial Coin Offerings (ICOs), Nov. 2017, https://www.esma.europa.eu/sites/default/files/library/esma50-157-829_ico_statement_investors.pdf, archived at http://perma.cc/3KXT-FNFD.

[128] EBA, Warning to Consumers on Virtual Currencies (Dec. 2013), https://www.eba.europa.eu/documents/10180/598344/EBA+Warning+on+Virtual+Currencies.pdf, archived at http://perma.cc/QL4M-ZLXW; EBA, EBA Opinion on 'Virtual Currencies', July 4, 2014, http://www.eba.europa.eu/documents/10180/657547/EBA-Op-2014-08+Opinion+on+Virtual+Currencies.pdf, archived at http://perma.cc/9P9W-A3KT; EBA, Opinion of the European Banking Authority on the EU Commission's Proposal to Bring Virtual Currencies into the Scope of Directive (EU) 2015/849 (4AMLD), Aug. 11, 2016, https://www.eba.europa.eu/documents/10180/1547217/EBA+Opinion+on+the+Commission%E2%80%99s+proposal+to+bring+virtual+currency+entities+into+the+scope+of+4AMLD, archived at http://perma.cc/SF65-HA37.

[129] EBA, Opinion of the European Banking Authority on the EU Commission's Proposal to Bring Virtual Currencies into the Scope of Directive (EU) 2015/849 (4AMLD), supra note 128, nos. 8 & 16.

[130] Id. no. 19.

[131] Mario Draghi, President of the ECB, Introductory Statement and Closing Remarks at the European Parliament Plenary Debate on the ECB Annual Report for 2016 (Feb. 5, 2018), https://www.ecb.europa.eu/press/key/date/2018/html/ecb.sp180205.en.html, archived at http://perma.cc/M6WX-T3RR.

[132] The Single Supervisory Mechanism refers to the system of banking supervision that comprises the ECB and the national supervisory authorities of the participating countries, see Single Supervisory Mechanism, ECB, https://www.bankingsupervision.europa.eu/about/thessm/html/index.en.html (last visited Mar. 20, 2018), archived at http://perma.cc/M2ST-SE3H.

these digital assets could pose to supervised institutions."[133]  In addition, in December 2016, the ECB and the Bank of Japan (BOJ) launched a joint research project named "Stella," which looks at the possible use of distributed ledger technology for financial market infrastructures.[134]

**Austria**

The Austrian Ministry of Finance (Bundesministerium der Finanzen, BMF) does not qualify cryptocurrencies as legal tender or as financial instruments. Instead, it classifies them as other (intangible) commodities.[135] It stated that cryptocurrencies are treated like other business assets for income tax purposes. According to the Ministry, "mining" generally is a commercial activity and is therefore treated like any other production of goods. The same applies to the operation of online trading platforms and cryptocurrency ATMs.[136]

With regard to VAT, the BMF follows the jurisprudence of the ECJ in *Hedqvist*.[137] Transactions to exchange a traditional currency for bitcoin or other virtual currencies and vice versa are therefore exempt from VAT. Bitcoin or other virtual currencies that are used as a means of payment for services or goods are treated the same as traditional means of payment. Mining is not subject to VAT, because there is no identifiable recipient.[138]

The Austrian National Bank (Oesterreichische Nationalbank, OeNB) does not qualify bitcoin as a currency, because it does not fulfill the typical functions of money due to a strict limitation on quantity and no stabilizing central authority.[139] Bitcoin is currently not covered by the E-Money Act or the Payment Services Act.[140] Ewald Nowotny, governor of the OeNB, has pointed out the risks of cryptocurrencies.[141] He stated that "[b]itcoin & Co. . . . are highly speculative investments which entail high risks for individuals." He therefore welcomed the initiative of the Federal Minister of Finance, Hartwig Löger, to establish a Fintech Regulation Council to regulate cryptocurrencies. In addition, he voiced support for the amendment of the EU Money Laundering

---

[133] Draghi, *supra* note 131131.

[134] *BOJ/ECB Joint Research Project on Distributed Ledger Technology*, ECB & BOJ (Sept. 6, 2017), https://www.ecb.europa.eu/paym/intro/news/shared/20170906_stella_report_leaflet.pdf, *archived at* http://perma.cc/27QZ-ST83.

[135] *Steuerliche Behandlung von Kryptowährungen (virtuelle Währungen)* [*Tax Treatment of Cryptocurrencies (Virtual Currencies)*], BMF, https://www.bmf.gv.at/steuern/kryptowaehrung_Besteuerung.html (last updated July 25, 2017), *archived at* http://perma.cc/BU4Z-3BFY.

[136] *Id.*

[137] Case C-264/14, Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718, http://curia.europa.eu/juris/celex.jsf? celex=62014CJ0264&lang1=en&type=TXT&ancre, *archived at* http://perma.cc/7Q6Q-MM9V.

[138] *Steuerliche Behandlung von Kryptowährungen (virtuelle Währungen)*, *supra* note 135.

[139] *Sind virtuelle Währungen wie Bitcoin eine Alternative zu klassischen Währungen wie dem Euro?* [*Are Virtual Currencies Like Bitcoin an Alternative to Traditional Currencies Like the Euro?*], OeNB, https://www.oenb.at/FAQ/sonstiges.html (last visited Mar. 20, 2018), *archived at* http://perma.cc/AN2L-WHS5.

[140] *Id.*

[141] Press Release, *OeNB begrüßt Regulierungsinitiative von BM Löger zu Kryptowährungen* [*OeNB Welcomes Regulation Initiative of Federal Minister Löger on Cryptocurrencies*], OeNB (Mar. 2, 2018), https://www.oenb.at/Presse/20180302.html, *archived at* https://www.oenb.at/Presse/20180302.html.

Case: 18-80176, 04/30/2018, ID: 10860696, DktEntry: 12-6, Page 123 of 218
Case 4:18-cv-04790-PJH Document 1-6 Filed 09/21/18 Page 63 of 218

Regulation of Cryptocurrency Around the World

Directives, as well as the proposal of the Austrian Ministry of Finance to require prospectuses for ICOs and introduce licensing by the Financial Market Authority (FMA).[142] Finally he added that any regulatory initiative should be complemented by improving the financial education of the public.

Like the OeNB, the FMA has warned investors of the risks of cryptocurrencies.[143] It stated that virtual currencies like bitcoin and trading platforms are neither regulated nor supervised by the FMA. The FMA does not qualify them as legal tender payment instruments or as tradable foreign currencies. However, it pointed out that certain business models might require authorization from the FMA.[144] The FMA decides on a case-by-case basis whether an ICO requires authorization.[145]

**Belgium**

Cryptocurrencies remain unregulated in Belgium, and there appear to have been very few official pronouncements on the subject.

In January 2014, the Belgian National Bank (Banque nationale de Belgique, BNB) and the Financial Services and Markets Authority (Autorité des services et marchés financiers, FSMA) issued a joint press release warning consumers about the risks of cryptocurrencies.[146] Their main points were that cryptocurrencies are not legal tender, and that they are completely unregulated and do not fall within the purview of any monitoring or regulatory authority.[147] More recently, in December 2017, the governor of the BNB, Jan Smets, repeated in an interview that bitcoin is not an actual currency, as it is not guaranteed by a central bank or a government as a means of payment.[148]

The Belgian Finance Minister, in response to a question by a Belgian senator, stated in July 2013 that while bitcoin seems to be somewhat problematic as a tool for money laundering and other

---

[142] *Id.*

[143] *Bitcoins*, FMA, https://www.fma.gv.at/en/fma-thematic-focuses/bitcoins/ (last visited Mar. 20, 2018), *archived at* http://perma.cc/C3QF-N7NU. FMA, *Focus on Virtual Currencies. Bitcoin, Ethereum, Ripple & Co from the Perspective of Investor Protection*, https://www.fma.gv.at/download.php?d=3090 (last visited Apr. 5, 2018), *archived at* http://perma.cc/K7WF-HBAY.

[144] *Id.*

[145] *Focus on Initial Coin Offerings*, FMA, https://www.fma.gv.at/en/fma-thematic-focuses/fma-focus-on-initial-coin-offerings/ (last visited Mar. 20, 2018), *archived at* http://perma.cc/3HT8-HES7; *FinTech Navigator*, FMA, https://www.fma.gv.at/en/cross-sectoral-topics/fintech/fintech-navigator/ (last visited Mar. 20, 2018), *archived at* http://perma.cc/9MVT-QA9M.

[146] *Attention à l'argent virtuel, comme Bitcoin* [*Beware of Virtual Currencies, Such as Bitcoin*], BNB, FSMA (Jan. 15, 2014), https://www.nbb.be/fr/articles/attention-largent-virtuel-comme-bitcoin, *archived at* https://perma.cc/H457-2T49.

[147] *Id.*

[148] Joseph Young, *Belgium Central Bank Governor: Bitcoin Is Not a Threat Because Its Not "Stable,"* CNN (Dec. 23, 2017), https://www.ccn.com/belgium-central-bank-governor-bitcoin-is-not-a-threat-because-its-not-stable/, *archived at* https://perma.cc/G6Y8-CC4N.

illegal activities, such problems should not be overstated.[149] He also said that, based on studies by the BNB and the European Central Bank, bitcoin does not present any significant risks to price stability, to the financial system in general, or to its individual users. Finally, in this same statement, the Minister of Finance indicated that government intervention with regard to bitcoin does not appear necessary given how small the bitcoin market was at the time.[150]

In April 2017, Belgian Minister of Justice Koen Geens announced that he plans to establish a legal framework for cryptocurrencies.[151] One of the Minister's main objectives is to set up a mechanism to verify the conversion and exchange rates of cryptocurrencies, similarly to what exists for traditional financial circuits.[152] He also would like to better monitor those who promise unrealistic returns and conversion rates, as well as find ways around the anonymity of cryptocurrency payments so as to curtail their use as vehicles for money laundering. Additionally, Geens would like to establish a mechanism for the courts to properly evaluate cryptocurrencies when they are seized as part of criminal investigations.[153] This plan seems to be mostly aspirational, and no action appears to have been taken in furtherance of it so far.

## Bulgaria

On February 14, 2018, the National Bank of Bulgaria announced that it joins the position of the European supervisory authorities on the risks inherent in buying virtual currencies. The Bank noted that such currencies show extreme price volatility and signs of a pricing bubble.[154] According to the Bank, consumers buying virtual currencies should be aware that there is a high risk that they will lose a large amount, or even all, of the money invested.[155]

---

[149] Sénat de Belgique [Senate of Belgium], Question écrite n° 5-8723 de Martine Taelman du 16 avril 2013 au ministre des Finances [Written Question No. 5-8723 of Martine Taelman of 16 April 2013 to the Minister of Finance], July 31, 2013, http://www.senate.be/www/?MIval=/Vragen/SVPrint&LEG=5&NR=8723&LANG=fr, *archived at* https://perma.cc/3YK4-M2WY.

[150] *Id.*

[151] *Comment mieux contrôler le bitcoin? Koen Geens a un plan* [*How to Better Control Bitcoin? Koen Geens Has a Plan*], RTBF.BE (Apr. 15, 2017), https://www.rtbf.be/info/economie/detail_comment-mieux-controler-le-bitcoin-koen-geens-a-un-plan?id=9581709&utm_source=dlvr.it&utm_medium=twitter, *archived at* https://perma.cc/3VNZ-CA5W.

[152] *Id.*

[153] *Id.*

[154] Press Release, National Bank of Bulgaria, European Supervisors Warn Consumers About the Risks of Buying Virtual Currencies (Feb. 14, 2018), http://www.bnb.bg/PressOffice/POPressReleases/POPRDate/PR_20180214_BG (in Bulgarian), *archived at* https://perma.cc/Z3S7-KCMM.

[155] *Bulgaria Central Bank Warns Consumers of Cryptocurrency Risks*, REUTERS (Feb. 14, 2018), https://www.reuters.com/article/crypto-currency-bulgaria/bulgaria-central-bank-warns-consumers-of-cryptocurrency-risks-idUSL8N1Q45KW, *archived at* https://perma.cc/YKZ9-9F6R.

Bulgarian tax authorities reportedly issued rulings in 2014 requiring individuals to pay taxes on gains from selling cryptocurrencies, similar to the sale of financial assets.[156]

In 2015 a Bulgarian court reportedly concluded that activities associated with buying, selling, and paying with cryptocurrencies are not subject to licensing requirements.[157]

## Croatia

On December 18, 2017, Croatia's Financial Stability Council warned that individuals investing in virtual currencies bear sole responsibility for their losses and should be aware of possible taxation.[158] It stated that Croatian regulators are not responsible for the oversight of the individuals who issue virtual currencies or trade in them. The Council noted that virtual currencies are associated with considerable risks, such as those of digital wallet theft and transaction misuse, fraud, etc. A similar warning was issued by the National Bank of Croatia on September 22, 2017.[159]

## Cyprus

The Central Bank of Cyprus has issued a warning stating that virtual currencies are not legal tender, that there are no specific regulatory protection measures to cover losses from their use, and that their prices are subject to volatility.[160]

## Czech Republic

On February 27, 2018, Mojmír Hampl, the Vice-Governor of the Czech National Bank (CNB) made the following statement:

> The fact that cryptocurrencies are . . . commodities [rather than currencies] also shapes our light-touch, liberal approach to regulation at the CNB. We do not want to ban them and we are not hindering their development, but we are also not actively helping or promoting them and we are not protecting them or the customers that use them. Like in a casino, everyone investing in a cryptocurrency must be prepared to lose the entire bet. And central banks do not regulate casino visits.[161]

---

[156] Marin Marinov, Legal and Tax Treatment of Bitcoin in Bulgaria, RUSKOV & COLLEAGUES (Nov. 20, 2017), https://www.ruskov-law.eu/bulgaria/article/legal-tax-treatment-bitcoin.html, *archived at* https://perma.cc/ZA9H-4RGF.

[157] *Id.*

[158] Press Release, Financial Stability Council, 9th Session of the Financial Stability Council (Dec. 18, 2017), http://www.vfs.hr/dokumenti/priopcenja/2017/e-priopcenje-18122017.pdf, *archived at* https://perma.cc/29MV-2XP2.

[159] Press Release, National Bank of Croatia, Possible Risks Associated with Investing in Virtual Currency (Sept. 22, 2017), https://www.hnb.hr/-/moguci-rizici-povezani-s-ulaganjima-u-virtualne-valute (in Croatian), *archived at* https://perma.cc/L2NC-NPZ3.

[160] Press Release, Central Bank of Cyprus, Attention to the Risks Associated With Virtual Currencies (Feb. 7, 2014), https://www.centralbank.cy/en//announcements/07022014, *archived at* https://perma.cc/3AP9-9DKC.

[161] Majomir Hampl, Czech National Bank, A Digital Currency Useful for Central Banks?, Address before the 7th BBVA Seminar for Public Sector Investors and Issuers, Bilbao (Feb. 27, 2018), https://www.cnb.cz/en/

Amendments have been made to the Czech Republic's anti-money laundering legislation, making it also applicable to persons providing services related to virtual currencies—i.e., those who buy, sell, store, manage, or mediate the purchase or sale of virtual currencies or provide other services related to such currencies as a business.[162]

**Denmark**

Denmark has no laws specifically addressing cryptocurrencies, and no regulatory proposals on cryptocurrencies are pending in the Danish Parliament. However, government agencies have issued a number of statements on cryptocurrencies.[163]

Denmark's Finanstilsynet (Financial Supervisory Authority) issued a statement in 2013 rejecting the bitcoin as a currency and stating that it will not regulate bitcoin use.[164] In its statement the Financial Supervisory Authority emphasized that it has evaluated the use of the bitcoin system and found that it does not fall under any of the financial services categories, including the issuing of electronic money, payment for services, currency exchanges, or the issuing of mortgages; thus, bitcoin activity is not covered under current financial regulations.[165] In 2017 the Financial Supervisory Authority released a report on ICOs (Initial Coin Offerings) in which it stated that cryptocurrencies that are solely used as a means of payment continue to not be regulated by the Authority.[166] However, ICOs may be conducted in such a way as to fall under the purview of the Authority[167] and thus would be subject to Danish regulation—for example, "legislation on alternative investment funds, prospectuses, and money laundering."[168]

The Danish Central Bank has been critical of cryptocurrencies. In 2014, it issued an initial statement declaring that bitcoin is not a currency.[169] According to the statement, "[b]itcoin does not have any real trading value compared to gold and silver, and thus is more similar to glass

---

public/media_service/conferences/speeches/hampl_20180227_bbva.html, *archived at* https://perma.cc/N97Z-NQCW.

[162] Law No. 368/2016 Coll., Nov. 14, 2016, Sbirka Zakonu No. 147/2016, https://www.zakonyprolidi.cz/cs/2016-368 (in Czech), *archived at* https://perma.cc/MFX9-42H2.

[163] *See* Elin Hofverberg, *Denmark, in* Law Library of Congress, Regulation of Bitcoin in Selected Jurisdictions (Jan. 2014), https://www.loc.gov/law/help/bitcoin-survey/regulation-of-bitcoin.pdf, *archived at* https://perma.cc/Z7EQ-L988.

[164] Press Release, Finanstilsynet, Advarsel mod virtuelle valutaer (bitcoin m.fl.) [Warnings Regarding Digital Currencies (Bitcoins etc.)] (Dec. 17, 2013), https://www.finanstilsynet.dk/da/Nyheder-og-Presse/Presse meddelelser/Arkiv/Presse-2013/Advarsel-mod-virtuelle-valutaer-bitcom-mfl-2013, *archived at* https://perma.cc/UZ2E-G7S7.

[165] *Id.*

[166] Press Release, Finanstilsynet, Orientering om ICO'er [Orientation on ICOs] (Nov. 13, 2017), https://finanstil synet.dk/da/Nyheder-og-Presse/Sektornyt/2017/Orientering-om-ICO, *archived at* https://perma.cc/3A5Y-W4PS.

[167] *Id.*

[168] *Id.*

[169] Press Release, Danish Central Bank [Nationalbanken], Bitcoin er ikke penge [Bitcoin Is Not Money] (Mar. 18, 2104), http://www.nationalbanken.dk/da/presse/Documents/2014/03/PH_bitcoin.pdf#search=Bitcoin, *archived at* https://perma.cc/D3C6-ND34.

beads."[170] The Danish Central Bank went on to point out that bitcoins are not protected by any national laws or guarantees, such as a deposit guarantee.[171] Similarly, in a 2014 document the Danish Central Bank discussed virtual currencies, determining that virtual currencies are not regulated and therefore associated with high risks to consumers.[172] In 2017 the Director of the Danish Central Bank issued warnings against the use of bitcoin.[173] His critique of cryptocurrencies was reiterated in 2018.[174] In addition, the Danish Central Bank has made it clear that it is not in favor of the creation of an official Danish e-currency (issued by the Central Bank), unlike neighboring Sweden.[175]

SKAT (the Danish Tax Authority) has issued a number of statements on virtual and cryptocurrencies. For example in 2014 it published a binding reply (a response to a public question from a taxpayer that is binding on the interpretation of the Tax Authority) in which it declared that an invoice amount cannot be issued in bitcoins, but must be issued in Danish kroner or another recognized currency.[176] The Authority went on to state that any bitcoin losses cannot be deducted as a cost of doing business when bitcoins are used as a means of payment.[177] In 2016 the Authority discussed cryptocurrencies in relation to value-added tax (VAT) and found that cryptocurrencies are exempt from VAT.[178] The determination is consistent with the decision of the Court of Justice of the European Union in 2015.[179] The Authority has also commented on how the mining of

---

[170] *Id.*

[171] *Id.*

[172] Anders Laursen & Jon Hasling Kyed, *Virtuelle Valutaer* [*Virtual Currencies*], *in* DANMARKS NATIONALBANK KVARTALSOVERSIGT, 1. KVARTAL, 2014 [DENMARK NATIONAL BANK QUARTERLY BULLETIN, Q1, 2014] at 85, http://www.nationalbanken.dk/da/publikationer/Documents/2014/03/Virtuelle_KVO1_2014.pdf, *archived at* https://perma.cc/8FTD-DPXF.

[173] Stine Jacobsen, *Danish Central Bank Head Issues Stark Warning on "Deadly" Bitcoin*, REUTERS (Dec. 2017), https://in.reuters.com/article/bitcoin-denmark/danish-central-bank-head-issues-stark-warning-on-deadly-bitcoin-idINKBN1EC19R, *archived at* https://perma.cc/QSM3-QGJZ.

[174] LARS ROHDE, DANMARKS NATIONALBANK, BITCOIN AND BLOCKCHAINS: PERSPECTIVES OF THE DANISH CENTRAL BANK (Apr. 4, 2018), http://www.nationalbanken.dk/da/presse/taler/Documents/2018/04/LRO_tale_FCCA_040418.pdf#search=bitcoin, *archived at* https://perma.cc/3AL3-WCW7.

[175] Digitale centralbankpenge giver ikke bedre betalings-løsninger [Digital Central Bank Currency Does Not Create Better Payment Solutions], NYT (Dec. 15, 2017), https://www.nationalbanken.dk/da/publikationer/Documents/2017/12/Nyt - Digitale centralbankpenge giver ikke bedre betalingsløsninger.pdf, *archived at* https://perma.cc/C7MK-UMXU; *compare* Swedish report, *infra.*

[176] Bitcoins, ikke erhvervsmæssig begrundet, anset for særkilt virksomhed [Bitcoins, Not Commercially Justified, Considered Special Activity], SKAT (Apr. 1, 2014), https://www.skat.dk/SKAT.aspx?oId=2156173, *archived at* https://perma.cc/6B89-6WQ2.

[177] *Id.*

[178] Momsfritagelse og lønsumsafgift - Køb og salg af Bitcoins [VAT Exemption and Payroll Taxes – Purchase and Sale of Bitcoins], SKAT (Jan. 26, 2016), http://skat.dk/skat.aspx?oid=2225268, *archived at* https://perma.cc/XZG2-WB6J.

[179] Case C‑264/14. Skatteverket v. David Hedqvist, 2015 CURIA EUROPA, ECLI:EU:C:2015:718 (Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?docid=170305&doclang=EN, *archived at* https://perma.cc/LU2G-U6VD.

bitcoins should be treated from a VAT tax perspective.[180] The case involved a Danish person who wanted to sell hashing capacity on the electrical grid, an activity that was subject to VAT.[181]

The Danish Tax Council in 2018 declared that losses on sales of bitcoins purchased as an investment are tax deductible and that profits are subject to income taxation.[182]

## Estonia

On November 27, 2017, Estonia enacted amendments to its anti-money laundering legislation[183] that define cryptocurrencies (virtual currencies) as value represented in digital form that is digitally transferable, preservable, or tradable and that natural persons or legal persons accept as a payment instrument, but that is not the legal tender of any country or funds (banknotes or coins, scriptural money held by banks, or electronic money). The anti-money laundering legislation now also applies to providers of a service for exchanging virtual currency with fiat currency and providers of a virtual currency wallet service, which is defined as a service in which keys are generated for customers or customers' encrypted keys are kept, which can then be used for the purpose of keeping, storing, and transferring virtual currencies.[184] Virtual currency service providers are required to have a license.[185]

## Finland

Finland does not have specific regulations that deal with cryptocurrencies and there is no proposed legislation on cryptocurrencies pending in the Finnish Parliament. However, a number of agencies have issued advisory statements on how they view cryptocurrencies.

The Finnish Financial Supervisory Authority issued an advisory in 2017 that cryptocurrencies are risk-filled investment alternatives.[186] It also noted that, depending on the initial coin offering (ICO), there may be regulatory effects of the purchase—for instance, EU rules on alternative

---

[180] Bitcoin mining og tilrådighedsstillelse af datakapacitet - moms og godtgørelse af elafgifter [Bitcoin Mining and Supply of Data Capacity – VAT and Payment of Electricity Fees], SKAT (June 27, 2017), http://skat.dk/skat. aspx?oid=2249418, archived at https://perma.cc/N772-UTZQ.

[181] *Id.*

[182] Gevinst og tab ved afståelse af bitcoins [Profit and Loss of Realized Bitcoins], SKM2018.104.SR, Case No. 17-1369067, SKAT (Feb. 27, 2018), http://skat.dk/skat.aspx?oid=2271294, *archived at* https://perma.cc/PT9E-BZ3R (emphasis added).

[183] Rahapesu Ja Terrorismi Rahastamise Tõkestamise Seadus [Money Laundering and Terrorist Financing Prevention Act], Riigi Teataja [Official Gazette] RT I Nov. 17, 2017, § 3, *available at* https://www.riigiteataja. ee/ akt/117112017002 (in Estonian), *archived at* https://perma.cc/5UVE-RJ4B, English translation *available at* https://www.riigiteataja.ee/en/eli/517112017003/consolide, *archived at* https://perma.cc/TFF7-Z9FU.

[184] *Id.* § 2.

[185] *Id.* § 70.

[186] Press Release, Finansinspektionen, Finansinspektionens varning: kryptovalutor och ICO:s (Initial Coin Offering) är riskfyllda investeringsobjekt [Financial Supervisory Authority's Warning: Cryptocurrencies and ICOs Are Risk Filled Investment Objects] (Nov. 22, 2017), http://www.finanssivalvonta.fi/se/Publicerat/pressmeddelanden/Pages/17_2017.aspx, *archived at* https://perma.cc/V3WG-CBAW.

investment funds.[187] In 2017 the Finnish Supervisory Authority also discussed the future of ICOs in a blog post.[188]

The Central Bank of Finland issued a statement in 2014 declaring that cryptocurrencies, especially bitcoin, are inherently associated with risks, noting that "[t]he use of Bitcoin is not currently supervised or regulated in any way,"[189] nor does it not amount to a payment service as defined in the Payment Services Act.[190] In a 2017 report published by the Central Bank, Central Bank affiliates were more positive, reportedly calling bitcoin "revolutionary" and "apparent[ly] functio[nal] and useful."[191]

The Finnish Tax Authority (Vero Skatt) issued instructions for the income taxation of virtual currencies, including bitcoin, in 2013.[192] When transferred to another currency, the rules on taxation of capital gains apply, the Tax Authority said. When the currency is used as a form of payment for goods and services it is treated as a trade and the increase in value that the currency might have gained after it was obtained is taxable.[193] The sale of bitcoins at a loss in value compared to the original purchase price is not deductible under the Finish Income Taxation Act, because such a loss in value is not specifically described as deductible in the Act.[194] In 2017 the Tax Authority issued additional recommendations, stating that the exchange rate is determined at the time of realization of the bitcoin (i.e., when it becomes cash), and that cryptocurrency records should be kept for six years.[195]

---

[187] *Id.*

[188] Hanna Heiskanen, *Kryptovaluutat ja ICO (Initial Coin Offering) sijoituskohteina, onko kyse kuplasta?* [*Cryptocurrencies and ICOs, Is It a Bubble?*], FINANSINSPEKTIONEN (Nov. 22, 2017), https://helda.helsinki.fi/ bof/bitstream/handle/123456789/14961/Fiva_blogi_kryptovaluutat.pdf?sequence=1&isAllowed=y, *archived at* https://perma.cc/6FZ7-ACTH.

[189] Press Release, Finlands Bank, Bitcoin Involves Risk (Jan. 14, 2014), https://www.suomenpankki.fi/en/media-and-publications/news/2014/bitcoin-involves-risks/, *archived at* https://perma.cc/T634-EMZM.

[190] *Id.*

[191] Gur Huberman et al., *Monopoly without a Monopolist: An Economic Analysis of the Bitcoin Payment System* 36 (Bank of Finland Research Discussion Papers 27, Sept. 5, 2017), https://helda.helsinki.fi/bof/bitstream/handle/ 123456789/14912/BoF_DP_1727.pdf, *archived at* https://perma.cc/2GAN-W8ZM; *see also* Rachel Rose O'Leary, *"Revolutionary": Finnish Central Bank Paper Heaps Praise of Bitcoin*, COINDESK (Sept. 11, 2017), https://www.coindesk.com/revolutionary-finland-central-bank-paper-heaps-praises-bitcoin/, *archived at* https://perma.cc/5QD3-PUF3.

[192] Press Release, Vero Skatt, Inkomstbeskattning av virtuella valutor [Income Taxation of Virtual Currencies] (Aug. 28, 2013), https://www.vero.fi/sv/Detaljerade_skatteanvisningar/anvisningar/48411/inkomstbeskattning_ av_virtuella_valuto/, *archived at* https://perma.cc/JEU5-BKLW.

[193] *Id.*

[194] *Id.*

[195] Press Release, Vero, Har du använt virtuella valutor? [Have You Used Virtual Currencies?] (Apr. 10, 2017), https://www.vero.fi/sv/skatteforvaltningen/skatteforvaltningen/nyheter/uutiset/2017/har_du_anvant_virtuella_valuto, *archived at* https://perma.cc/ZT5Z-34EL.

Sales of bitcoins have reportedly resulted in millions in revenue for the Finnish Tax Authority.[196] The Tax Authority has monitored both those who trade and those who use cryptocurrencies.[197]

The Åbo Appeals Court is reported to have found that Finnish Customs may auction off bitcoins it has confiscated in relation to drug crimes, and as of February 2018 such bitcoins were estimated to be worth €19 million (approximately US$23.5 million).[198] The Finnish government is said to have issued guidelines on how to store confiscated bitcoins.[199]

**France**

Cryptocurrencies remain largely unregulated in France, with two ordinances on blockchain technology being the only legislative action taken so far. However, the French government is actively moving towards establishing a regulatory regime.

A 2016 ordinance included two provisions that allowed the use of blockchain technology for a specific type of zero-coupon bond called a "mini-bond" (*minibon*).[200] The main impact of this ordinance was to provide the first definition of blockchain in French law, but otherwise these provisions only had a very narrow application. Another ordinance, from December 2017, went further and will make it possible to use blockchain technology for a broader range of financial instruments.[201] This ordinance will come into force when the application decree is published, or on July 1, 2018, at the latest.[202]

The French Financial Market Authority (Autorité des marchés financiers, AMF) and Prudential Supervisory Authority (Autorité de contrôle prudentiel et de resolution, ACPR) recently issued a

---

[196] Patrik Skön, *Skatteförvaltningen: Bitcoin ger miljoner i skatteintäkter* [*Tax Authority: Bitcoin Results in Millions in Tax Revenue*], YLE (Sept. 24, 2017), https://svenska.yle.fi/artikel/2017/09/24/skatteforvaltningen-bitcoin-ger-miljoner-i-skatteintakter, *archived at* https://perma.cc/2VSH-ZQ3V.

[197] *Id.*

[198] TT, *Finska tullen auktionerar ut bitcoin* [*Finnish Customs Auctions Off Bitcoins*], NYTEKNIK (Feb. 21, 2018), https://www.nyteknik.se/digitalisering/finska-tullen-auktionerar-ut-bitcoin-6900140, *archived at* https://perma.cc/GD4Q-B6DA; *see also* TULLI, FINNISH CUSTOMS ENFORCEMENT 2017, http://tulli.fi/documents/2912305/4898005/Finnish%20Customs%20Enforcement%202017/9f35b47e-6ff0-4a54-af9d-776b270da7aa, *archived at* https://perma.cc/CR4C-7XMU.

[199] Daniel Palmer, *Finland Mandates Cold Storage, Public Auctions of Seized Bitcoins*, COINDESK (Feb. 20, 2018), https://www.coindesk.com/finland-releases-new-guidelines-for-storage-of-confiscated-bitcoins/, *archived at* https://perma.cc/GT87-C7EF.

[200] Ordonnance n° 2016-520 du 28 avril 2016 relative aux bons de caisse [Ordinance No. 2016-520 of 28 April 2016 Regarding Zero Coupon Bonds] art. 2, https://www.legifrance.gouv.fr/affichTexte.do?cidTexte=JORFTEXT000032465520&categorieLien=id, *archived at* https://perma.cc/K3UP-AJ9D.

[201] Ordonnance n° 2017-1674 du 8 décembre 2017 relative à l'utilisation d'un dispositif d'enregistrement électronique partagé pour la représentation et la transmission de titres financiers [Ordinance No. 2017-1674 of 8 December 2017 Regarding the Use of a Shared Electronic Registration Method for the Representation and Conveyance of Financial Instruments], https://www.legifrance.gouv.fr/affichTexte.do?cidTexte=JORFTEXT000036171908&categorie Lien=id, *archived at* https://perma.cc/ESA7-89E6.

[202] *Id.* art. 8.

joint notice to investors, warning about the current unregulated nature of cryptocurrencies.[203] This document notes that bitcoin and other cryptocurrencies are not considered financial instruments under French law, and therefore do not fall under the regulatory framework of actual currencies or under the AMF's supervision.[204] The AMF and ACPR recognize the potential benefits that blockchain technology can hold for companies, but warn that cryptocurrencies are unregulated and particularly volatile investments.[205] This document is reminiscent of a slightly longer report that the French Central Bank (Banque de France) published in December 2013.[206] That report explained that bitcoin cannot be considered a real currency or means of payment under current French law,[207] and criticized it as a vehicle for speculation as well as an instrument for money laundering and other illegal activities.[208] The 2013 report also suggested that the conversion between bitcoin and real currencies should be considered a payment service, which therefore could only be performed by payment service providers authorized and supervised by the ACPR.[209] The ACPR acknowledged this position in a 2014 document in which it stated that entities that habitually engage in the activity of purchasing or selling cryptocurrencies in exchange for actual legal tender must be licensed as payment services providers by the ACPR.[210] However, the AMF and ACPR's 2017 joint notice recognizes that "the purchase/sale of and investments in bitcoin currently operate outside of any regulated market."[211]

In parallel to the independent regulatory institutions mentioned above, the French legislative and executive branches are actively investigating how best to regulate cryptocurrencies. To that purpose, the National Assembly (Assemblée nationale, one of the two houses of the French Parliament) has initiated a fact-finding mission on cryptocurrencies,[212] and a separate fact-finding mission on "blockchains and other technologies for the certification of ledgers."[213] Additionally,

---

[203] *Achats de Bitcoin: l'AMF et l'ACPR mettent en garde les épargnants* [*Bitcoin Purchases: The AMF and ACPR Warn Savers*], AMF, ACPR (Dec. 4, 2017), https://acpr.banque-france.fr/sites/default/files/medias/documents/20171204-cp-bitcoin.pdf, *archived at* https://perma.cc/CM6Q-EGUH.

[204] *Id.*

[205] *Id.*

[206] Banque de France, *Les dangers liés au développement des monnaies virtuelles: l'exemple du bitcoin* [*The Dangers of the Development of Virtual Currencies: The Bitcoin Example*], FOCUS No. 10 (Dec. 5, 2013), https://publications.banque-france.fr/sites/default/files/medias/documents/focus-10_2013-12-05_fr.pdf, *archived at* https://perma.cc/K93L-HLAC.

[207] *Id.* at 1.

[208] *Id.* at 2–3.

[209] *Id.* at 6.

[210] ACPR, *Position de l'ACPR relative aux opérations sur Bitcoins en France* [*Position of the ACPR Regarding Bitcoin Operations in France*] (Jan. 29, 2014), https://acpr.banque-france.fr/sites/default/files/20140101_acpr_position_bitcoin.pdf, *archived at* https://perma.cc/M6YT-EG6J.

[211] *Achats de Bitcoin, supra* note 203.

[212] *Mission d'information sur les monnaies virtuelles* [*Information Mission on Cryptocurrencies*], ASSEMBLÉE NATIONALE [NATIONAL ASSEMBLY], http://www2.assemblee-nationale.fr/15/commissions-permanentes/commission-des-finances/missions-d-information/monnaies-virtuelles (last visited Mar. 19, 2018), *archived at* https://perma.cc/JNU5-4MRG.

[213] *Mission d'information commune sur les usages des bloc-chaînes (blockchains) et autres technologies de certification de registres* [*Joint Information Mission on the Uses of Blockchains and Other Technologies for the*

the Minister of the Economy has recently tasked a former deputy governor of the Banque de France
with researching how to best regulate cryptocurrencies to "better control their development and to
prevent their use for tax evasion, money laundering, or the financing of criminal or
terrorist activities."[214]

It is also worth noting that France and Germany have jointly requested that cryptocurrencies be
discussed by the G-20, so that coordinated initiatives may be taken at the international level.[215]

**Germany**

The German Federal Financial Supervisory Authority (Bundesanstalt für
Finanzdienstleistungsaufsicht, BaFin) qualifies virtual currencies/cryptocurrencies as units of
account and therefore financial instruments.[216] Undertakings and persons that arrange the
acquisition of tokens, sell or purchase tokens on a commercial basis, or carry out principal broking
services in tokens via online trading platforms, among others, are generally required to obtain
authorization from BaFin in advance.[217]

In February 2018, the German BaFin published information on the regulatory assessment of ICOs
and the tokens, coins, and cryptocurrencies they are based on.[218] It stated that firms involved in
ICOs need to assess on a case-by-case basis whether the ICOs qualify as financial instruments
(transferable securities, units in collective investment undertakings, or investments) or as securities
and therefore trigger the need to comply with the relevant financial legislation.

*Certification of Ledgers*], ASSEMBLÉE NATIONALE, http://www2.assemblee-nationale.fr/15/commissions-permanent
es/commission-des-finances/missions-d-information/chaines-de-blocs/(block)/47252 (last visited Mar. 19, 2018),
*archived at* https://perma.cc/3TKA-Y7L7.

[214] *Un ancien de la Banque de France chargé d'une mission sur le bitcoin* [*Former Banque de France Official
Tasked with a Mission on Bitcoin*], AFP / LE POINT (Jan. 15, 2018), http://www.lepoint.fr/economie/un-ancien-de-
la-banque-de-france-charge-d-une-mission-sur-le-bitcoin-15-01-2018-2186834_28.php, *archived at*
https://perma.cc/R6CD-GCV9.

[215] *Berlin et Paris veulent mobiliser le G20 sur les cryptomonnaies* [*Berlin and Paris Want to Mobilize the G20 on
Cryptocurrencies*], REUTERS (Feb. 9, 2018), https://fr.reuters.com/article/technologyNews/idFRKBN1FT19L-
OFRIN, *archived at* https://perma.cc/RF3M-ZVZM.

[216] Gesetz über das Kreditwesen [KWG] [Banking Act], Sept. 9, 1998, BUNDESGESETZBLATT [BGBL.] [FEDERAL
LAW GAZETTE] I at 2776, § 1, para. 11, sentence 1, no. 7, http://www.gesetze-im-internet.de/kredwg/KWG.pdf,
*archived at* http://perma.cc/WTA6-DYS7, unofficial English translation *available at* https://www.bafin.de/Shared
Docs/Downloads/EN/Aufsichtsrecht/dl_kwg_en.pdf?__blob=publicationFile&v=3 (updated through July 15, 2014),
*archived at* http://perma.cc/8M5A-7WYR; *Virtual Currency (VC)*, BAFIN, https://www.bafin.de/EN/Aufsicht/
FinTech/VirtualCurrency/virtual_currency_node_en.html (last visited Mar. 16, 2018), *archived at*
http://perma.cc/K29E-WRGL.

[217] Banking Act, § 32; *Virtual Currency (VC)*, *supra* note 216.

[218] BaFin, Hinweisschreiben (WA). Aufsichtsrechtliche Einordnung von sog. Initial Coin Offerings (ICOs) zugrunde
liegenden Token bzw. Kryptowährungen als Finanzinstrumente im Bereich der Wertpapieraufsicht [Information
Letter (WA). Regulatory Qualification of Tokens or Cryptocurrencies on Which So-Called Initial Coin Offerings
(ICOs) are Based as Financial Instruments for Purposes of Securities Regulation], reference no. WA 11-QB 4100-
2017/0010, https://www.bafin.de/SharedDocs/Downloads/DE/Merkblatt/WA/dl_hinweisschreiben_einordnung_
ICOs.pdf?__blob=publicationFile&v=2, *archived at* http://perma.cc/583S-GGV3.

Also in February 2018, the German Federal Ministry of Finance published guidance on value-added-tax (VAT) treatment of bitcoin and other virtual currencies. It determined that transactions to exchange a traditional currency for bitcoin or other virtual currencies and vice versa constitute the taxable supply of other services for consideration, but fall under the exemption from VAT. It stated that bitcoin or other virtual currencies that are used simply as a means of payment are treated the same as traditional means of payment. Using bitcoin or other virtual currencies for no other purpose than as a means of payment is therefore not taxable. This guidance is in line with the European Court of Justice (ECJ) decision *Hedqvist* from October 22, 2015.[219] Virtual gaming money, meaning in-game currencies, particularly in online games, is not exempt, because it does not constitute a means of payment within the meaning of VAT law.[220] The Ministry also addressed several follow-up questions regarding the taxation of mining, digital wallets, and online trading platforms.[221]

The German Bundesbank stated that bitcoin cannot be qualified as a virtual currency. According to Dirk Schrade, Bundesbank expert in the area of payments, bitcoin is neither a virtual currency nor digital money, because it does not fulfill the typical functions of a currency, nor is it part of the national monetary system. The Bundesbank recommends using the term "crypto token."[222]

In an article published in the newspaper *Frankfurter Allgemeine Zeitung* (FAZ), Carl-Ludwig Thiele, a member of the executive board of the German Bundesbank, warned investors in bitcoin and other cryptocurrencies to beware of their riskiness, fluctuations in value, costliness, and high-energy-need for mining, among other concerns.[223] However, he also pointed out that blockchain technology promises great potential for innovation and mentioned a joint project with the German stock exchange group (Deutsche Börse Gruppe) that tests the application and performance of blockchain technology in the settlement of securities transactions between banks.[224]

---

[219] Bundesministerium der Finanzen [BMF] [Federal Ministry of Finance], BMF-Schreiben. Umsatzsteuerliche Behandlung von Bitcoin und anderen sog. virtuellen Währungen; EuGH-Urteil vom 22. Oktober 2015, C-264/14, Hedqvist [BMF-Letter. VAT Treatment of Bitcoin and Other So-Called Virtual Currencies; ECJ Decision of October, 2015, C-264/14, Hedqvist] (BMF Letter), Feb. 27, 2018, at 1 & 2, http://www.bundesfinanzministerium. de/Content/DE/Downloads/BMF_Schreiben/Steuerarten/Umsatzsteuer/Umsatzsteuer-Anwendungserlass/2018-02-27-umsatzsteuerliche-behandlung-von-bitcoin-und-anderen-sog-virtuellen-waehrungen.pdf?__blob=publication File&v=1, *archived at* http://perma.cc/56TQ-9RJJ; Case C-264/14, Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718, http://curia.europa.eu/juris/celex.jsf?celex=62014CJ0264&lang1=en&type=TXT&ancre, *archived at* http://perma.cc/7Q6Q-MM9V.

[220] BMF Letter, *supra* note 219, at 3.

[221] *Id*. at 2 & 3; Jenny Gesley, *Germany: Federal Ministry of Finance Publishes Guidance on VAT Treatment of Virtual Currencies*, GLOBAL LEGAL MONITOR (Mar. 13, 2018), http://www.loc.gov/law/foreign-news/article/germany-federal-ministry-of-finance-publishes-guidance-on-vat-treatment-of-virtual-currencies/, *archived at* http://perma.cc/2FEA-UJFE.

[222] *"Bitcoin Is Not a Virtual Currency,"* GERMAN BUNDESBANK (Feb. 20, 2018), https://www.bundesbank.de/Redaktion/EN/Topics/2018/2018_02_19_diskussion_bitcoin.html?https=1, *archived at* http://perma.cc/K8EK-VZJM.

[223] Carl-Ludwig Thiele, *Beware Bitcoin*, FAZ (Feb. 4, 2018), https://www.bundesbank.de/Redaktion/EN/Standardartikel/Press/Contributions/2018_02_04_thiele_fas.html, *archived at* http://perma.cc/X9UM-GYPE.

[224] *Id*.; Press Release, Joint Deutsche Bundesbank and Deutsche Börse Blockchain Prototype (Nov. 28, 2016), https://www.bundesbank.de/Redaktion/EN/Pressemitteilungen/BBK/2016/2016_11_28_blockchain_prototype.html?https=1, *archived at* http://perma.cc/GD77-79FN.

## Greece

The Bank of Greece on two occasions has issued announcements adopting the views of European supervisory authorities warning consumers of the risks of virtual currencies.[225]

## Hungary

On December 20, 2016, the National Bank of Hungary warned[226] consumers that using virtual currencies have many risks as they operate in a legally unregulated virtual system and there are no proper rules on liability, guarantee, and compensation that would protect the interests of consumers in the event of abuse.[227] The Bank had made similar statements in 2014[228] and 2015.[229]

## Ireland

Ireland does not appear to have any laws that specifically regulate cryptocurrencies.[230] The Central Bank of Ireland noted in March 2018 that in cases of initial coin offerings (ICOs), if the token issued can be deemed a "transferable security," which is determined on a case-by-case basis, then the existing financial services legislation in Ireland will apply to it.[231] The Central Bank of Ireland also stated,

---

[225] Bank of Greece, Ενημέρωση για τη χρήση εικονικών νομισμάτων [Information on the Use of Virtual Currencies] (Feb. 11, 2014), https://www.bankofgreece.gr/Pages/el/Bank/News/Announcements/DispItem.aspx?Item_ID=4517&List_ID=1af869f3-57fb-4de6-b9ae-bdfd83c66c95, *archived at* https://perma.cc/W9NN-3HDH; Bank of Greece, Ενημέρωση για τη χρήση εικονικών νομισμάτων [Information on the Use of Virtual Currencies] (Feb. 12, 2018), https://www.bankofgreece.gr/Pages/el/Bank/News/Announcements/DispItem.aspx?Item_ID=5981&List_ID=1af869f3-57fb-4de6-b9ae-bdfd83c66c95, *archived at* https://perma.cc/VT22-F9R2.

[226] Press Release, National Bank of Hungary, Virtual Money Available on the World Wide Web Carries Increased Risks (Dec. 20, 2016), http://www.mnb.hu/sajtoszoba/sajtokozlemenyek/2016-evi-sajtokozlemenyek/fokozott-kockazatot-hordoznak-a-vilaghalon-elerheto-virtualis-fizetoeszkozok (in Hungarian), *archived at* https://perma.cc/27DT-J7GZ; *see also* Christian Keszthelyi, *MNB Again Warns about Cryptocurrency Risks*, BUDAPEST BUSINESS JOURNAL (Dec. 20, 2016), https://bbj.hu/economy/mnb-again-warns-about-cryptocurrency-risks_126505, *archived at* https://perma.cc/Q9SL-SYN6.

[227] *Id.*

[228] Press Release, National Bank of Hungary, Warning: It Is Extremely Risky for Consumers to Use Bitcoin (Sept. 11, 2014), https://www.mnb.hu/fogyasztovedelem/sajtoszoba/figyelemfelhivas-rendkivul-kockazatos-a-fogyasztoknak-a-bitcoin (in Hungarian), *archived at* https://perma.cc/GY27-A73N.

[229] Press Release, National Bank of Hungary, New Risks for Virtual Payment Tools (June 10, 2015), http://www.mnb.hu/felugyelet/felugyeleti-keretrendszer/felugyeleti-hirek/hirek-ujdonsagok/sajtokozlemeny-ujabb-kockazatok-a-fizetesre-hasznalhato-virtualis-eszkozok-koreben (in Hungarian), *archived at* https://perma.cc/SZQ4-UC5L.

[230] DEPARTMENT OF FINANCE & DEPARTMENT OF JUSTICE AND EQUALITY, NATIONAL RISK ASSESSMENT FOR IRELAND: MONEY LAUNDERING AND TERRORIST FINANCING 85, *available at* http://www.inis.gov.ie/en/JELR/National_Risk_Assessment_Money_Laundering_and_Terrorist_Financing_Oct16.pdf/Files/National_Risk_Assessment_Money_Laundering_and_Terrorist_Financing_Oct16.pdf (last visited Mar. 20, 2018), *archived at* https://perma.cc/W8BV-GGKU.

[231] Speech by Gerry Cross, Director of Policy and Risk, Central Bank of Ireland, at Joint Session: Banknotes / Identity High Meeting 2018 Security Printers, International Conference & Exhibition Hosted by Intergraf, Tomorrow's Yesterday: Financial Regulation and Technological Change (Mar. 20, 2018), https://www.centralbank.

where the features of any given ICO match those of financial instrument issuance, then financial regulation applies, as of this moment, and issuers and others must, subject to legal penalty, ensure that they comply with the relevant rules.[232]

Capital gains tax law applies to transactions involving cryptocurrencies,[233] and this tax is chargeable if an individual makes a profit from buying and selling such currencies.[234]

The Central Bank of Ireland has endorsed a statement by the European Banking Authority, warning consumers of risks when undertaking transactions with virtual currencies,[235] and of the high risks of ICOs.[236]

The Irish government continues to take a wait-and-see approach to the regulation of cryptocurrencies:

> To the extent that virtual currencies, ICOs, or those involved in their issuance or trading, are not subject to existing regulation, then the question arises: has the regulation fallen behind developments and needs updating. Or is it the case that these activities are just new examples of old types of activity and there is no need for further regulatory intervention, beyond making consumers properly aware of the significant risks through consumer warnings? Or might it simply be too early to say? . . .At the Central Bank, we are actively engaged with other European and international policy makers as we all try to figure out a way forward, including for example, work at the ESAs [European Supervisory Authorities]. Given the cross-jurisdictional nature of virtual currencies and ICOs, we at the Central Bank welcome these efforts by the ESAs.[237]

---

ie/news/article/financial-regulation-and-technological-change-gerry-cross, *archived at* https://perma.cc/C9LH-EGCN.

[232] *Id.*

[233] *Capital Gains Tax (CGT) on the Sale, Gift or Exchange of an Asset*, Irish Tax and Customs (Nov. 21, 2017), https://www.revenue.ie/en/gains-gifts-and-inheritance/transfering-an-asset/index.aspx, *archived at* https://perma.cc/3B4L-LW7N.

[234] *Irish Tax Guide to Cryptocurrency Trading & Investing*, Liam Burns & Co. Accountants and Tax Advisers, https://liamburnsandco.ie/cryptocurrency-tax-guide/ (last visited Apr. 18, 2018), *archived at* https://perma.cc/LH8P-E3GD.

[235] *EBA Warning and Opinion on Virtual Currencies*, Central Bank of Ireland, https://www.centralbank.ie/consumer-hub/consumer-notices/eba-opinion-on-virtual-currencies (last visited Mar. 20, 2018), *archived at* https://perma.cc/2ZCW-8SZ9.

[236] *Alert on Initial Coin Offerings*, *Information Notice December 2017*, Central Bank of Ireland, https://www.centralbank.ie/consumer-hub/consumer-notices/alert-on-initial-coin-offerings, *archived at* https://perma.cc/JR3C-NJX4.

[237] Speech by Gerry Cross, *supra* note 231.

Ireland has harnessed the use of cryptocurrency to help its tourism industry, adopting the "Irishcoin,"[238] a currency aimed predominantly at the tourism market that is accepted in some locations across Ireland.[239]

**Italy**

A Ministerial Resolution of September 2016 issued by the Revenue Agency (Agenzia delle Entrate)[240] addressed aspects of the tax treatment of bitcoin and other cybercurrencies. This Resolution implemented the decision issued by the European Court of Justice (ECJ) in the case of *Skatteverket v. David Hedqvist*,[241] which held that the value added tax (VAT) does not apply to transactions in which cybercurrencies are exchanged for traditional currencies or vice versa.[242]

In addition, the Resolution of 2016 indicates that for purposes of the corporate income tax (Imposta sul Reddito sulle Società, IRES) and the Italian regional production tax (Imposta Regionale sulle Attività Produttive, IRAP), profits and losses on such transactions constitute corporate income and losses subject to taxation.[243] The Resolution contains specific requirements for the registration of cybercurrency operations, including names, amounts, dates, and other information on transactions.[244] Bitcoin operations performed by individuals who hold bitcoin for other than commercial or corporate purposes do not generate taxable income, according to the Resolution.[245]

---

[238] *Home*, IRISHCOIN, http://irishcoin.org (last visited Mar. 20, 2018), *archived at* https://perma.cc/XYM3-UE9E.

[239] Barry Flanagan, *Cryptocurrencies: 'Lack of Regulation Means Investors Can Make a Lot of Money Fast'*, THE JOURNAL.IE (July 2, 2017), http://www.thejournal.ie/readme/cryptocurrencies-lack-of-regulation-means-investors-can-make-a-lot-of-money-fast-3470179-Jul2017/, *archived at* https://perma.cc/69UV-S86N.

[240] Risoluzione Ministeriale 72/E del 2 settembre 2016, Interpello ai sensi dell'art. 11, legge 27 luglio 2000, n. 212, Trattamento Fiscale Applicabile alle Societa che Svolgono Attivita di Servizi Relativi a Monete Virtuali [Ministerial Resolution 72/E of September 2, 2016, Rule Issued According to Art. 11 of Law No. 212 of July 27, 2000, Fiscal Treatment Applicable to Companies that Develop Service Activities Related to Virtual Currencies] (Agenzia Entrate), https://www.finaria.it/pdf/bitcoin-tasse-agenzia-entrate.pdf, *archived at* https://perma.cc/9EAZ-LS79.

[241] Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718 (ECJ Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?text=&docid=170305&pageIndex=0&doclang=en&mode=lst&dir=&occ=first&part=1&cid=302749, *archived at* https://perma.cc/JYH8-Q6AL.

[242] Paolo Luigi Burlone, *Dichiarazione dei Redditi e Bitcoin* [*Declaration of Income and Bitcoin*], COINLEX, https://coinlexit.wordpress.com/2016/04/26/dichiarazione-dei-redditi-e-bitcoin/ (last visited Mar. 16, 2018), *archived at* https://perma.cc/QSN8-XSHV.

[243] *Id.*

[244] Margherita Pignatelli, *Servizi Relativi a Monete Virtuali: il Trattamento Fiscale da Applicare* [*Services Related to Virtual Currencies: Fiscal Treatment to Apply*], FISCOIOGGI (Sept. 2, 2016), http://www.fiscooggi.it/normativa-e-prassi/articolo/servizi-relativi-monete-virtualiil-trattamento-fiscale-applicare, *archived at* https://perma.cc/4E6Z-YWK8.

[245] *Bitcoin e Tasse: Come Fare per la Dichiarazione dei Redditi?* [*Bitcoin and Taxes: How to Make the Declaration of Income?*], MERCATI 24, https://www.mercati24.com/bitcoin-tasse/ (last visited Mar. 21, 2018), *archived at* https://perma.cc/S3W4-5BP5.

Legislative Decree No. 90 of 2017 subjected virtual currency providers to the regulations established for traditional money exchange operators.[246] To that effect, Legislative Decree No. 90 charged the Ministry of the Economy and Finance to issue a ministerial decree setting forth the modalities and timelines for the legal performance of such activities throughout the country.[247] Accordingly, the Ministry of Economy and Finance's Treasury Department published a public notice requesting comments before February 17, 2018, on the proposed text of the ministerial decree.[248] It is expected that the ministerial decree will be issued during the upcoming months.

## Latvia

The position of the Bank of Latvia and the State Revenue Service is that cryptocurrency is a contractual, not statutory, means of payment that can be used in transactions of exchange. Cryptocurrency cannot be considered as official currency or legal tender because the issuance and use of these instruments remains unregulated and they are not linked to any national currency.[249]

In November of 2017 Latvia amended its anti-money laundering legislation and introduced monitoring requirements for virtual currency service providers, including providers of virtual currency exchange services. Virtual currency is now defined as the digital representation of a value that may be digitally transmitted, stored, or traded, and acts as an exchange instrument without being legal tender.[250]

## Lithuania

On October 11, 2017, the Bank of Lithuania stated that financial services must be clearly dissociated from activities related to virtual currencies and that financial market participants should not provide services associated with virtual currencies. In particular, they should not engage

---

[246] Decreto Legislativo 25 maggio 2017, n. 90 Attuazione della Direttiva (UE) 2015/849 Relativa alla Prevenzione dell'Uso del Sistema Finanziario a Scopo di Riciclaggio dei Proventi di Attività Criminose e di Finanziamento del Terrorismo [Legislative Decree No. 90 of May 25, 2017, Implementing Directive (EU) 2015/849 of the European Parliament and of the Council of 20 May 2015 on the Prevention of the Use of the Financial System for the Purposes of Money Laundering or Terrorist Financing. . .] (L.D. No. 90), art. 8, ¶ 1, G.U. June 19, 2017, n. 140, http://www.normattiva.it/uri-res/N2Ls?urn:nir:stato:decreto.legislativo:2017-05-25;90!vig=2018-03-14, *archived at* https://perma.cc/YQX5-BJWK.

[247] *Id.*

[248] *Valuta Virtuale: Consultazione Pubblica sul Decreto Ministeriale di cui all'Articolo 17-bis, Comma 8-ter del Decreto Legislativo 13 Agosto 2010, n.141 e Successive Modificazioni* [*Virtual Currency: Public Consultation on the Ministerial Decree referred to by Article 17-bis, Paragraph 8-ter of Legislative Decree No. 141 of August 13, 2010, and Successive Amendments*], DIPARTIMENTO DEL TESORO [TREASURY DEPARTMENT], http://www.dt.tesoro.it/it/consultazioni_pubbliche/prestatori_virtuale.html (last visited May 9, 2018), *archived at* https://perma.cc/XC9W-J924.

[249] *Global Cryptocurrency Boom: Latvian Tax Treatment (1)*, PRICEWATERHOUSECOOPERS (Jan. 25, 2018), https://www.mindlink.lv/en/topical/cryptocurrency_1_en/, *archived at* https://perma.cc/5JG2-88RF.

[250] Amendments to the Law on Prevention of Money Laundering and Terrorist Financing, No. 222 (6049) of Nov. 8, 2017, OFFICIAL GAZETTE No. 2017/222.7, https://www.vestnesis.lv/op/2017/222.7 (in Latvian), *archived at* https://perma.cc/8GEV-DSF2; *see also* Dmitriy Kolesnikov, *Regulation of Virtual Currencies Came into Existence in Latvia*, NJORD LAW FIRM (Nov. 10, 2017), https://www.njordlaw.com/ru/latvia-introduces-regulation-crypto/ (in Russian), *archived at* https://perma.cc/8T7M-JE5U.

in the sale of virtual currencies, provide conditions for customers to pay in payment instruments issued by them (debit or credit cards), or exchange or execute any other operations in virtual currencies.[251]

As to initial coin offerings (ICOs), the Bank clarified that depending on the nature of the offering, legal acts regulating crowdfunding, collective investment, provision of investment services, etc. must be applied.[252]

On March 6, 2018, the Bank of Lithuania announced that it plans to issue the world's first digital collector coin using blockchain or other equivalent technologies.[253]

## Luxembourg

Cryptocurrencies remain largely unregulated in Luxembourg, although the Duchy's government appears to display a more welcoming attitude towards the phenomenon than some of its European counterparts.

On March 14, 2018, the Financial Sector Monitoring Commission (Commission de Surveillance du Secteur Financier, CSSF) of Luxembourg issued a statement warning about the risks of investing in cryptocurrencies.[254] The CSSF's main objections are that cryptocurrencies are very volatile, offer no protection against theft and hacking, lack liquidity, are often the subject of misleading information, lack transparency, and are often used for fraud and money laundering.[255] The statement also warned against the risks of Initial Coin Offerings.[256] The CSSF, however, recognized the value of blockchain technology, noting that it could be used advantageously by the financial sector.[257] Furthermore, the CSSF's letter stated that while there is no legal framework that specifically applies to cryptocurrencies, the provision of any financial services—including those involving cryptocurrencies—requires an authorization from the Minister of Finance.[258]

---

[251] Press Release, Bank of Lithuania, Bank of Lithuania Announces Its Position on Virtual Currencies and ICO (Oct. 11, 2017), https://www.lb.lt/en/news/bank-of-lithuania-announces-its-position-on-virtual-currencies-and-ico, *archived at* https://perma.cc/B7C8-CPMN.

[252] Position of the Bank of Lithuania on Virtual Currencies and Initial Coin Offering, Approved by the Board of the Bank of Lithuania on Oct. 10, 2017, https://www.lb.lt/uploads/documents/files/Pozicijos del virtualiu valiutu ir VV zetonu platinimo EN.pdf, *archived at* https://perma.cc/V85N-PG47.

[253] Press Release, Bank of Lithuania, Lithuania's Central Bank to Issue the World's First Digital Collector Coin (Mar. 6, 2018), https://www.lb.lt/en/news/lithuania-s-central-bank-to-issue-the-world-s-first-digital-collector-coin, *archived at* https://perma.cc/574C-LU3P.

[254] CSSF, *Avertissement sur les monnaies virtuelles* [*Warning About Cryptocurrencies*] (Mar. 14, 2018), http://www.cssf.lu/fileadmin/files/Protection_consommateurs/Avertissements/A_monnaies_virtuelles_140318.pdf, *archived at* https://perma.cc/7B3F-QLKY.

[255] *Id.* at 2–3.

[256] *Id.* at 3–4.

[257] *Id.* at 1.

[258] *Id.* at 4.

Despite this warning from its main financial services regulator, Luxembourg appears to see the development of cryptocurrencies in a positive light.  In June 2017, the Luxembourger Minister of Finance, Pierre Gramegna, recognized before Parliament that cryptocurrencies are actual currencies, as "they are accepted as a means of payment for goods and services by a sufficiently large circle of people."[259]  He also stated that there was currently no regulation "from a monetary perspective" regarding cryptocurrencies, but that cryptocurrency dealers in Luxembourg are bound by the same rules as any other financial service providers with regards to the fight against money laundering and the financing of terrorism.[260]  More recently, Gramegna publicly welcomed the establishment of BitFlyer, a major bitcoin trading platform, as a fully licensed payment service provider in Luxembourg.[261]  In an interview shortly thereafter, Gramegna stated that cryptocurrencies and blockchain technology were both an "unavoidable phenomenon that brings added value and efficient services to consumers."[262]  Much work remains to be done to provide a legislative and regulatory framework for cryptocurrencies, however, as such a framework is largely inexistent at this time.  During the welcoming ceremony for BitFlyer, the company's founder noted that it had taken them two years to obtain their license and that "the regulation is unclear.  There is no specific law and one must nevertheless protect the consumer."[263]

**Malta**

Malta currently does not have any legislation that specifically applies to cryptocurrency, but this will soon change.  The Maltese government has actively encouraged the development of cryptocurrency and issuing many consultations and papers that discuss its regulation and development.  The aim of these regulations is "[t]o provide the necessary legal certainty to allow this industry to flourish."[264]

In October 2017, the government issued a consultation document that proposed a regulatory framework for collective investment schemes and investment in cryptocurrencies.  As a result of

---

[259] *L'État garde un œil sur la monnaie virtuelle* [*The Government Keeps an Eye on Cryptocurrencies*], L'ESSENTIEL (June 26, 2017), http://www.lessentiel.lu/fr/luxembourg/story/L-tat-garde-un-oeil-sur-la-monnaie-virtuelle-29561059, *archived at* https://perma.cc/U2DS-ZUGJ.

[260] *Id.*

[261] Pierre Sorlut, *Monnaies virtuelles: Pierre Gramegna se félicite de l'arrivée de BitFlyer* [*Cryptocurrencies: Pierre Gramegna Satisfied by the Arrival of BitFlyer*], LUXEMBURGER WORT (Jan. 27, 2018), https://www.wort.lu/fr/ economie/monnaies-virtuelles-pierre-gramegna-se-felicite-de-l-arrivee-de-bitflyer-5a6c3646c1097cee25b7c821, *archived at* https://perma.cc/Q4QS-YWAK.

[262] Pierre Sorlut, *Ce qu'en pense le ministre des Finances: Les monnaies virtuelles, «un phénomène incontournable»* [*What the Minister of Finances Thinks of It: Cryptocurrencies, an "Unavoidable Phenomenon"*], LUXEMBURGER WORT (Jan. 31, 2018), https://www.wort.lu/fr/economie/ce-qu-en-pense-le-ministre-des-finances-les-monnaies-virtuelles-un-phenomene-incontournable-5a70269ac1097cee25b7ca3b, *archived at* https://perma.cc/TD7M-EQL4.

[263] Sorlut, *Monnaies virtuelles*, *supra* note 261.

[264] Ivan Martin, *Malta Digital Innovation Authority Unveiled: Government Working on Green Paper on AI and Internet of Things*, TIMES OF MALTA (Feb. 16, 2018), https://www.timesofmalta.com/articles/view/20180216/local/malta-digital-innovation-authority-unveiled.670847, *archived at* https://perma.cc/7P7W-7V3R.

the consultation, Malta Financial Services Authority (MFSA) published conditions that apply to professional investor funds that invest in cryptocurrencies on January 22 and 29, 2018.[265]

In November 2017, the government published the *Discussion Paper on Initial Coin Offerings, Virtual Currencies and Related Service Providers*, which noted that while some cryptocurrencies might fall within the scope of existing financial services legislation, others would be outside the scope and thus unregulated.[266]  In January 2018, the government issued a further discussion paper that "present[ed]a conceptual framework through which DLT Platforms can be subject to certification in Malta."[267]  The government has issued a statement that it intends to facilitate a regulatory framework for cryptocurrency-related activities and initial coin offerings (ICOs).[268]

Malta is currently considering three bills that would provide a regulatory framework for cryptocurrency and is following a principles-oriented approach to this legislation to help prevent the laws from becoming rapidly obsolete, or from stifling technological development.[269]  The three bills are as follows:

- The Malta Digital Innovation Authority Bill (MDIA Bill) would establish the Malta Digital Innovation Authority (MDIA), which would "focus on innovative technology arrangements and their uses such that Malta can take the greatest advantage of new technology arrangements while at the same time protect[ing] the public interest."[270]  One of the first objectives for the MDIA would be to promote government policies that favor technical innovation, particularly with reference to digital ledger technology and its adoption by the government in systems of public administration.[271]  Other objectives would include maintaining Malta's reputation and protecting consumers.[272]  The MDIA would also bear responsibility for certifying technology arrangements and registering technology services providers under the "TAS Bill."[273]

- The "TAS Bill" would establish a regime for the registration of technology service providers and provide for the certification of certain technology arrangements.  This regime will initially

---

[265] PARLIAMENTARY SECRETARIAT FOR FINANCIAL SERVICES ET AL., MALTA: A LEADER IN DLT REGULATION 9 (2018), *available at* https://meae.gov.mt/en/Public_Consultations/OPM/Documents/PS FSDEI - DLT Regulation Document OUTPUT.PDF, *archived at* https://perma.cc/29US-4V9D.

[266] MFSA, *Discussion Paper on Initial Coin Offerings, Virtual Currencies and Related Service Providers*, MFSA Ref: 08-2017 (Nov. 30, 2017; closing date Jan. 11, 2018), http://act.com.mt/media/images/active/downloads/ DiscussionPaperVCs.pdf, *archived at* https://perma.cc/2M25-K9SF.

[267] *Id.*

[268] Press Release, Parliamentary Secretariat for Financial Services, Digital Economy and Innovation, PR172729 (Nov. 29, 2017), https://www.gov.mt/en/Government/Press%20Releases/Pages/2017/November/29/pr172729.aspx, *archived at* https://perma.cc/FW37-K2WX.

[269] PARLIAMENTARY SECRETARIAT FOR FINANCIAL SERVICES ET AL., *supra* note 265, at 265.

[270] *Id.* at 11.

[271] *Id.* at 12.

[272] *Id.*

[273] *Id.*

cover distributed ledger technology platforms and related contracts.[274]  The proposals would require technology service providers that provide services for any distributed ledger technology platform in or from Malta be certified by the MDIA. Those who provide these services in other specified cases may voluntary register with the MDIA.[275]

- The Virtual Currency Bill would establish a framework for ICOs and a regulatory regime that would apply to certain services relating to cryptocurrencies, such as brokers, wallet providers, and virtual currency exchanges.[276] The *Times of Malta* has reported that the government is considering introducing its own cryptocurrency "within a 'controlled framework,' which would enable regulators to test possible controls and legislation for the technology."[277]  The Virtual Currency Bill aims to regulate ICOs that relate to virtual currency not falling within the existing legislation.  The bill will ensure that the offerings meet transparency requirements and will incorporate obligations that apply to initial public offerings that the issuer must follow.[278]

The MFSA has also proposed a "financial instrument test" that would enable individuals to determine,

> with regulatory certainty[,] . . . whether, based on its specific features, an ICO or a VC [virtual currency] falls within the scope of the existing legislative framework, reflecting EU law on the subject, or if not, whether this will be required to comply with the new regulatory framework being proposed by the MFSA.[279]

The test proposed would be a two-stage test, the first of which would determine whether a cryptocurrency is a financial instrument within existing Maltese or European Union legislation. The second stage would determine if the cryptocurrency was an asset under the proposed Virtual Currency Bill.[280]

The MFSA would be the regulator for the financial services contained in the Virtual Currency Bill, and would have regulatory and investigatory powers that reflect those contained in the country's other financial services laws, including the authority to suspend an ICO or trading of a cryptocurrency.[281]

---

[274] *Id*. at 13.

[275] *Id*. at 14.

[276] *Id.*

[277] *Id.*

[278] *Id*. at 26.

[279] *Id*. at 24.

[280] *Id.*

[281] *Id*. at 26.

The government has also established a National Blockchain Strategy Taskforce to advise the government on a framework for distributed ledger technologies.[282]

After one of Malta's largest banks, the Bank of Valletta, blocked cryptocurrency transfers,[283] the government of Malta stated that it does not "interfere with individual banks' operational policies, which are dictated by circumstances which they are best placed to assess."[284] Many residents of Malta expressed surprise at the actions of the Bank, particularly as the government of Malta is its largest shareholder, owning approximately 25% of the Bank's shares.[285]

The Malta Gaming Authority has also stated that it is "committed to allow[ing] the use of crypto-currencies by its licensees in the immediate future,"[286] and a new Gaming Bill is currently being considered that includes virtual currencies under the definition of "money and, or money's worth."[287]

## Netherlands[288]

The Central Bank of the Netherlands (De Nederlandsche Bank, DNB) has stated that it is studying the opportunities offered by blockchain and virtual currencies, but acknowledged that there are certain risks and drawbacks involved.[289] Furthermore, in January 2018, it published a position paper on cryptocurrencies and ICOs in which it highlighted that cryptocurrencies "do not currently fulfill the role of money—in fact, they are hardly ever used for payment, and they are not a universally accepted and stable medium of exchange, a suitable unit of account or a reliable store of value. Accordingly, they do not have any implications in terms of monetary policy."[290]

---

[282] *Id.* at 9.

[283] Bertaind Borg, *BOV Turns Against Cryptocurrencies*, Times of Malta (Nov. 28, 2017), https://www.timesofmalta.com/articles/view/20171128/local/bov-turns-against-cryptocurrencies.664322, *archived at* https://perma.cc/KR2K-FN68.

[284] Press Release, Parliamentary Secretariat for Financial Services, Digital Economy and Innovation, *supra* note 268.

[285] Borg, *supra* note 283.

[286] Malta Gaming Authority, A White Paper to Future Proof Malta's Gaming Legal Framework 28 (July 2017), https://meae.gov.mt/en/Public_Consultations/OPM/Documents/Legal Overhaul Consultation with Annexes.pdf, *archived at* https://perma.cc/25QQ-8YZV.

[287] Gaming Bill 2018, cl. 2(1), http://justiceservices.gov.mt/DownloadDocument.aspx?app=lp&itemid=28971&l=1, *archived at* https://perma.cc/NV7F-VCD5.

[288] At present there are no Law Library of Congress research staff members versed in Dutch. This survey of the law of the Netherlands has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[289] *Virtual Currencies*, DNB, https://www.dnb.nl/en/payments/virtuele-valuta/index.jsp (last visited Mar. 20, 2018), *archived at* http://perma.cc/N3KY-MSLJ.

[290] DNB, Position Paper by De Nederlandsche Bank. Roundtable Cryptocurrencies/ICO's 1 (Jan. 22, 2018), https://www.dnb.nl/en/binaries/TR17025%20Position%20paper%20Cryptocurrencies_tcm47-371493.pdf?2018032021, *archived at* http://perma.cc/6C3N-GF4B.

The DNB supports the decision of the EU to extend the scope of the Fourth AMLD to include crypto exchanges and issuers of crypto wallets.[291] It is looking into whether converting cryptocurrencies into euros or other currencies, and vice versa, qualifies as issuing electronic money or as providing a payment service. It does not currently support a ban on cryptocurrencies.[292]

As a pilot project, the DNB has started the "DNBCoin" experiment for internal test purposes and focused on the blockchain as a vehicle for a virtual currency. They have developed several prototypes to study the way the bitcoin software can be adapted and used for financial market infrastructures.[293]

The Dutch Authority for the Financial Markets (Autoriteit Financiële Markten, AFM) has issued a warning regarding serious risks associated with ICOs.[294] It has advised consumers to avoid investing in ICOs, because they are vulnerable to misrepresentation, fraud, and manipulation and may also be structured in such a way that they are not subject to supervision by the AFM. The AFM assesses on a case-by-case basis whether the tokens in an ICO qualify as a security or a unit in a collective investment scheme as defined in the Financial Supervision Act and are therefore subject to authorization by the AFM.[295]

The Dutch Minister of Finance, Wopke Hoekstra, stated in a letter to parliament that the Netherlands does not want to ban the cryptocurrency trade, but that it should be regulated on a European or international level.[296] Any regulation, however, should not jeopardize the potential of the technique.[297] He also supports the application of anti-money laundering legislation to custodian wallet providers and virtual currency exchange platforms.[298]

---

[291] *Id.* at 3.

[292] *Id.*

[293] Ron Berndsen, De Nederlandsche Bank, Speech at the Dutch Blockchain Conference, If Blockchain is the Answer, What is the Question? (June 20, 2016), https://www.dnb.nl/binaries/Speech%20Ron%20Berndsen_tcm46-342846.pdf, *archived at* http://perma.cc/SM4V-K99L.

[294] *Initial Coin Offerings (ICO's): Serious Risks*, AFM, https://www.afm.nl/en/professionals/onderwerpen/ico (last visited Apr. 5, 2018), *archived at* http://perma.cc/7LGR-W95Y.

[295] *Id.*; Wet op het financieel toezicht [Wft] [Financial Supervision Act], Sept. 28, 2006, STAATSBLAD VAN HET KONINKRIJK DER NEDERLANDEN [STB.] [OFFICIAL GAZETTE OF THE KINGDOM OF THE NETHERLANDS] 2006, no. 475, as in force on Feb. 9, 2018, art. 1:1, http://wetten.overheid.nl/BWBR0020368/2018-02-09, *archived at* http://perma.cc/CA3G-Y5ZK.

[296] Brief van de Minister van Financiën Aan de Voorzitter van de Tweede Kamer der Staten-Generaal [Letter of the Minister of Finance to the Chairman of the House of Representatives], Mar. 8, 2018, https://1848.nl/static/pdf/43/a5/43a59ddec48a8119409c4d021cedecd22ac9162a.pdf, *archived at* http://perma.cc/2J54-H8QC.

[297] *Id.*

[298] *Id.*

## Poland

On July 7, 2017, the Polish National Bank and the Financial Supervision Commission jointly issued a warning against investing in virtual currencies, citing price volatility and the risk of fraud. The regulators clarified that virtual currencies are not considered legal tender in Poland. At the same time they noted that trading in virtual currencies is not an infringement of Polish or European law. The regulators consider that buying, holding, and selling of virtual currencies by financial institutions is not in line with the principles of stable and prudent management, and that having established relations with virtual currency traders could pose legal and reputational risk.[299]

On January 24, 2018, Prime Minister Morawiecki stated that Poland will either ban cryptocurrency or introduce regulations to ensure that it does not turn into a pyramid scheme.[300]

On April 4, 2018, the Ministry of Finance published guidance on the tax effects of trading in cryptocurrencies.[301] Income from transactions on cryptocurrencies is subject to income tax with two brackets of 18% and 32%, while the act of selling or purchasing digital currencies is considered a transfer of property rights, which is subject to a 1% levy on the value of the transaction.[302]

---

[299] Statement by Narodowy Bank Polski (NBP) and the Polish Financial Supervision Authority (KNF) on "Virtual Currencies" (July 7, 2017), https://www.knf.gov.pl/en/news?articleId=57368&p_id=19, *archived at* https://perma.cc/4T6N-VBT8; *see also* Wolfie Zhao, *Polish Regulators Warn Banks and Consumers on Cryptocurrency Risks*, COINDESK (July 7, 2017), https://www.coindesk.com/polish-regulators-warn-banks-consumers-cryptocurrency-risks/, *archived at* https://perma.cc/G9X5-7SPU.

[300] Michał Żuławiński, *Morawiecki: We Will Ban Cryptocurrencies or Regulate Them. "We Do Not Want Another Amber Gold"*, BANKIER.PL (Jan. 25, 2018), https://www.bankier.pl/wiadomosc/Morawiecki-Zakazemy-kryptowalut-lub-je-uregulujemy-Nie-chcemy-kolejnego-Amber-Gold-7568737.html (in Polish), *archived at* https://perma.cc/6UWU-AKBQ.

[301] Press Release, Ministry of Finances, Tax Consequences of Trading in Cryptocurrencies for Individual Income Tax, Value-Added Tax and Tax on Civil Law Transactions, https://www.mf.gov.pl/ministerstwo-finansow/wiadomosci/aktualnosci/ministerstwo-finansow2/-/asset_publisher/M1vU/content/skutki-podatkowe-obrotu-kryptowalutami-w-pit-vat-i-pcc (in Polish), *archived at* https://perma.cc/37N9-TS6C.

[302] Konrad Krasuski, *Crypto Traders Protest Poland's Tax Decision*, BLOOMBERG (Apr. 9, 2018), https://www.bloomberg.com/news/articles/2018-04-09/crypto-traders-protest-as-poland-wants-tax-from-all-transactions, *archived at* https://perma.cc/2EUZ-GQM9.

## Portugal

According to the Federal Reserve Bank of Portugal (Banco de Portugal), the activity of issuing and trading virtual currencies is neither regulated nor supervised by the Federal Reserve Bank of Portugal or any other authority of the financial system, national or European, in particular by the European Central Bank.[303]  The absence of regulations on operations with virtual currencies does not make these activities illegal or prohibited, the Bank noted.  However, entities that issue and sell virtual currencies are not subject to any obligation of authorization or registration with the Federal Reserve Bank of Portugal, so their activity is not subject to any kind of prudential or behavioral supervision.[304]

## Romania

On February 6, 2018, Romania's National Bank announced that it discourages any involvement of local credit institutions in the cryptocurrency sector because of reputational risks.[305] The Bank reminded of its earlier warning issued in March of 2015[306] on the high risks of losing the money invested in cryptocurrencies. Following this announcement the local banks closed the accounts of several cryptocurrency exchanges.[307]

In March of 2018 the National Agency for Fiscal Administration reportedly declared that income from transactions with cryptocurrencies are taxable.[308]

---

[303] *Moedas Virtuais*, BANCO DE PORTUGAL, https://www.bportugal.pt/page/moedas-virtuais (last visited Mar. 19, 2018), *archived at* https://perma.cc/YR5Q-9DWV.  For further discussion of the European Central Bank's position on digital currencies, see the EU survey, *supra*.

[304] *Id.*

[305] Press Release, National Bank of Romania, The Position of the National Bank of Romania in Relation to the Virtual Currencies (Feb. 6, 2018), http://www.bnr.ro/page.aspx?prid=14338 (in Romanian), *archived at* https://perma.cc/G9T9-CF3K; *see also Romania's Central Bank Warns Local Lenders Not to Get Involved with Bitcoin*, ROMANIA-INSIDER.COM (Feb. 7, 2018), https://www.romania-insider.com/bnr-warning-bitcoin/, *archived at* https://perma.cc/Y65Q-KLW2.

[306] Press Release, National Bank of Romania, Commentary on Virtual Currency Schemes (Mar. 11, 2015), http://www.bnr.ro/page.aspx?prid=10016 (in Romanian), *archived at* https://perma.cc/S8T2-DGRG.

[307] *Romanian Banks Stop Working with Cryptocurrency Platforms*, ROMANIA-INSIDER.COM (Feb. 19, 2018), https://www.romania-insider.com/banks-stop-working-cryptocurrency-platforms/, *archived at* https://perma.cc/Z5HE-SA2G.

[308] *Romanians with Bitcoin Must Pay Tax and Social Contributions Despite Virtual Currency Not Being Regulated in Romania*, LIBERTATEA (Mar. 4, 2018), https://www.libertatea.ro/stiri/exclusiv-romanii-cu-bitcoin-datori-la-fisc-trebuie-platit-impozit-pe-venit-si-contributii-sociale-desi-monedele-virtuale-nu-sunt-reglementate-in-romania-2163395 (in Romanian), *archived at* https://perma.cc/H966-59E4.

## Slovakia

On March 23, 2018, the Ministry of Finance published guidance explaining that revenues stemming from cryptocurrencies must be taxed, and that any type of exchange, such as an exchange of a virtual currency for an asset or a service rendered or for another virtual currency, must be considered to be a taxable transfer.[309] The guidance says that virtual currencies must be treated as "short-term financial assets other than money" and priced at market value at the time of transaction, and that cryptocurrencies directly obtain from mining shall be kept off-balance sheet until they are sold or traded.[310] Earlier the Finance Minister had noted that trade in cryptocurrencies, which is unregulated and anonymous, involves risks of terrorism and organized crime.[311]

In 2013 the National Bank of Slovakia issued a warning to inform the general public that virtual currencies are not national currencies and that unauthorized currency production constitutes a criminal offense.[312]

## Slovenia

On January 18, 2018, the Bank of Slovenia warned citizens that virtual currencies are not a digital replacement for banknotes and coins, and are not regulated.[313] The Bank explained that entities purchasing, depositing, or trading virtual currencies in Slovenia are not systematically regulated and supervised. It advised citizens to inform themselves about virtual currencies before buying them and to be aware that they could lose their investments in those currencies.[314] Following the Bank's warning commercial banks reportedly stopped selling cryptocurrencies via ATMs.[315]

Earlier on October 9, 2017, the Financial Stability Board recommended that investors in virtual currencies consider whether the risks are in line with their personal preferences and investment

---

[309] Methodological Guideline of the Ministry of Finance of the Slovak Republic No. MF/10386/2018-721 for the Procedure of Taxing Virtual Currency, *available at* http://src.bna.com/xod (in Slovak), *archived at* https://perma.cc/C897-ZS9T; *see also* Jan Sojaspal, *Slovakia to Tax Cryptocurrency Income*, BLOOMBERG (Mar. 28, 2018), https://www.bna.com/slovakia-tax-cryptocurrency-n57982090526/, *archived at* https://perma.cc/F34Q-U9V5.

[310] Methodological Guideline, *supra* note 309.

[311] *Finance Minister Plans to Start Taxing Bitcoin*, THE SLOVAK SPECTATOR (Jan. 8, 2018), https://spectator.sme.sk/c/20733083/financial-minister-plans-to-start-taxing-bitcoin.html, *archived at* https://perma.cc/NN5W-JEJY.

[312] Press Release, National Bank of Slovakia, Národná Banka Slovenska's Warning to the Public on Bitcoin (Nov. 26, 2013), https://www.nbs.sk/en/press/all-press-releases/press-release/_narodna-banka-slovenska-s-warning-to-the-public-on-bitcoin, *archived at* https://perma.cc/9A5B-3PCR.

[313] Press Release, Bank of Slovenia, Questions and Answers on Virtual Currencies (Jan. 18, 2018), https://www.bsi.si/en/media/1180/questions-and-answers-on-virtual-currencies, *archived at* https://perma.cc/C3XV-HR2A.

[314] *Slovenia Cbank Warns about Virtual Currency Risks*, REUTERS (Jan. 18, 2018), https://www.reuters.com/article/slovenia-cenbank/update-1-slovenia-cbank-warns-about-virtual-currency-risks-idUSL8N1PD4II, *archived at* https://perma.cc/TK6R-ZW4D.

[315] *Slovenian Regulator Bans Sale of Cryptocurrency on ATMs*, TOTAL-SLOVENIA-NEWS (Feb. 8, 2018), http://www.total-slovenia-news.com/business/602-slovenian-regulator-bans-sale-of-cryptocurrency-on-atms, *archived at* https://perma.cc/DT4N-W3X7.

goals,[316] and that investors in ICOs should invest in amounts that would not leave them too exposed.[317]

## Spain

Spain's Comisión Nacional de Valores (National Securities Commission) and the Banco de España (Bank of Spain) issued a joint statement regarding the use of bitcoin in February 2018[318] noting that cryptocurrency is not issued, registered, authorized, or verified by any regulatory agency in Spain. Therefore, cryptocurrencies purchased or held in Spain are not backed by any of the guarantees or safeguards provided by regulations applicable to banking or investment products.[319] The statement aimed to alert investors of the inherent risk of loss or fraud associated with these types of transactions.[320]

Notwithstanding this warning, the government is considering the adoption of legislation friendly towards cryptocurrencies, which would include possible tax breaks to attract companies in the blockchain technology sector.[321]

Profits derived from transactions with cryptocurrencies are taxable under the Law on Income Tax of Individuals.[322] However, the Dirección General de Tributos (General Directorate on Taxation) has established that transactions with bitcoins are exempt from value added tax.[323]

## Sweden

Sweden does not have any specific regulation that deals with cryptocurrencies. A number of agencies have issued statements, reports, and preliminary judgements on how they interpret cryptocurrencies and how such currencies relate to Swedish law.

---

[316] Press Release, Bank of Slovenia, Financial Stability Board (Sept. 10, 2017), https://www.bsi.si/en/media/1138/opozorilo-glede-virtualnih-valut, *archived at* https://perma.cc/GLK6-XB9X.

[317] *Slovenia's Financial Watchdog Warns about Virtual Currency Risks*, REUTERS (Oct. 9, 2017), https://www.reuters.com/article/us-slovenia-watchdog/slovenias-financial-watchdog-warns-about-virtual-currency-risks-idUSKBN1CE1ZE, *archived at* https://perma.cc/J7DF-LJMC.

[318] Comunicado Conjunto de la Comisión Nacional del Mercado de Valores (CNMV) y Banco de España [Joint Press Statement by CNMV and Banco de España on "Cryptocurrencies" and "Initial Coin Offerings" (ICOs)] (Feb. 8, 2018), https://www.cnmv.es/loultimo/NOTACONJUNTARiptoES%20final.pdf, *archived at* https://perma.cc/K5J4-WJM4.

[319] *Id.*

[320] *Id.*

[321] *España Busca Aprobar una Legislación Amistosa para las Criptomoneda* [*Spain Seeks to Approve Friendly Legislation Towards Cryptocurrencies*], HARWAREATE (Feb. 18, 2018), https://hardwareate.com/espana-busca-aprobar-una-legislacion-amistosas-las-criptomonedas, *archived at* https://perma.cc/6VTJ-NRRV.

[322] José Trecet, *Declaración de Impuesto a la Renta: Cómo Tributan los Bitcoins en la Renta* [*Income Tax Reporting: How Are Bitcoins Taxed*], BOLSAMANÍA (Mar. 1, 2018), http://www.bolsamania.com/declaracion-impuestos-renta/como-tributan-los-bitcoins-en-la-renta/, *archived at* https://perma.cc/G4Y7-A59M.

[323] *Id.*

The Swedish Financial Supervisory Authority (Finansinspektionen) has made the determination that bitcoins are subject to its authority, as trade in bitcoins (i.e., offering a site where bitcoins can be bought and sold similar to an exchange) is a financial service (*annan finansiell verksamhet*) and thus subject to mandatory reporting requirements.[324] In 2017, the Authority issued a report titled *The Authority's Role in Innovation*, which among other things described its role in relation to novel concepts such as bitcoin.[325] The report described ICOs as investment projects and means of securing capital.[326] The Authority has also issued warnings against the use of ICOs, noting that they are unregulated and not subject to its review.[327] It referred to the European Supervisory Authority for its interpretation that ICOs may be regulated by the Prospectus Directive, the Markets in Financial Instruments Directive (MiFID), the Alternative Investment Fund Managers Directive (AIFMD), and the Fourth Anti-Money Laundering Directive.[328] The Authority's 2017 report stated that it is unaware of any Swedish corporation that secures funding through ICOs.[329]

In March of 2018 the Swedish Central Bank announced that "[b]itcoins are not money."[330] The announcement explained that cryptocurrencies are not seen as currencies, referencing a new financial report on cryptocurrencies written by the Central Bank of Sweden staff.[331] The Central Bank of Sweden is considering launching an e-currency, but the project is still in the review stage.[332]

---

[324] Press Release, Finansinspektionen, Valutaväxlare och annan finansiell verksamhet [Currency Exchanges and Other Financial Activity] (updated Jan. 24, 2017), https://www.fi.se/sv/bank/sok-tillstand/valutavaxlare-och-annan-finansiell-verksamhet/, *archived at* https://perma.cc/K7DH-T2NN.

[325] FINANSINSPEKTIONEN, MYNDIGHETENS ROLL KRING INNOVATIONER [THE AUTHORITY'S ROLE REGARDING INNOVATION] 12 (Dec. 1, 2018), https://www.finansinspektionen.se/contentassets/d3cd30fe473d4a7995f0c38209ddb7f1/myndighetens-roll-kring-innovationer.pdf, *archived at* https://perma.cc/Y229-M3A7.

[326] *Id.*

[327] Press Release, Finansinspektionen, Varning för risker med Initial Coin Offerings (ICO) [Warning of Risks Associated with Initial Coin Offerings] (Nov. 7, 2017), http://www.fi.se/sv/publicerat/nyheter/2017/varning-for-risker-med-initial-coin-offerings/, *archived at* https://perma.cc/D9BS-K8C6.

[328] *Id.*; *see also* Press Release, European Securities and Market Authority, ESMA Highlights ICO Risks for Investors and Firms (Nov. 13, 2017), https://www.esma.europa.eu/press-news/esma-news/esma-highlights-ico-risks-investors-and-firms, *archived at* https://perma.cc/XGT3-T3QW.

[329] FINANSINSPEKTIONEN, *supra* note 63, at 325.

[330] Press Release, Sveriges Riksbank, Bitcoin är inte pengar [Bitcoins Are Not Money] (Mar. 14, 2018), https://www.riksbank.se/sv/press-och-publicerat/nyheter-och-pressmeddelanden/nyheter/2018/bitcoin-ar-inte-pengar/, *archived at* https://perma.cc/KXK7-PPW8.

[331] Gabriel Söderberg, Ekonomiska kommentarer, Är Bitcoin och andra kryptotillgångar pengar? [Financial Commentary: Are Bitcoin and Other Cryptocurrencies Money?], SVERIGES RIKSBANK (Mar. 14, 2018), https://www.riksbank.se/globalassets/media/rapporter/ekonomiska-kommentarer/svenska/2018/ar-bitcoin-och-andra-kryptotillgangar-pengar, archived at https://perma.cc/PDP4-X2HU.

[332] *See Behöver Sverige en e-krona?*[*Does Sweden Need a E-Currency?*], SVERIGES RIKSBANK (Apr. 9, 2018), https://www.riksbank.se/sv/finansiell-stabilitet/det-finansiella-systemet/betalningar/behover-sverige-en-e-krona/?, *archived at* https://perma.cc/KKD8-WBJE.

In 2015 the Swedish Tax Authority published a guideline on how it will view and tax mined bitcoins for the 2014 tax year.[333] Unless specific conditions are met the digital currency mined is considered income from a hobby, and generally tax exempt.[334] The Tax Authority has not issued a determination on the applicability of the Income Tax Act with respect to potential capital gains from bitcoins.

The Swedish Skatterättsnämnden (Swedish Tax Board) issued a preliminary ruling in 2013 on value-added tax (VAT) and bitcoins, stating that trade in bitcoins is not subject to Swedish VAT, but is instead subject to Financial Supervisory Authority regulations and treated as a currency. The decision was appealed by the Swedish Tax Authority.[335] The Swedish Administrative Supreme Court ruled that bitcoins and similar cryptocurrencies are not subject to VAT.[336] That decision was rendered following a preliminary judgment from the Court of Justice of the European Union holding that cryptocurrencies are exempt from VAT.[337]

In 2014 representatives of the Swedish Enforcement Authority announced to Swedish media outlets that it would start to investigate and seize bitcoin holdings when collecting funds from indebted individuals.[338] The first seized bitcoins were auctioned off online in 2017.[339]

---

[333] Guidelines available at Skatteverket Dnr: 131 191846-15/111 Beskattning vid mining av bitcoin och andra virtuella valutor m.m. [Guidelines on the Taxation of Mining of Bitcoins and Other Virtual Currencies] (Apr. 24, 2015), https://www4.skatteverket.se/rattsligvagledning/338713.html?q=131+191846-15%2F111, *archived at* https://perma.cc/QVH3-H8AL; *see also* Elin Hofverberg, *Sweden: Tax Authority Publishes Guidelines for Income Tax on Bitcoin Mining, Suggests Prohibition of Bitcoin Use in Waste and Scrap Metal Transactions*, GLOBAL LEGAL MONITOR (May 20, 2015), http://www.loc.gov/law/foreign-news/article/sweden-tax-authority-publishes-guidelines-for-income-tax-on-bitcoin-mining-suggests-prohibition-of-bitcoin-use-in-waste-and-scrap-metal-transactions/, *archived at* https://perma.cc/ZR8B-UP8X (emphasis added).

[334] Skatteverket, *supra* note 333.

[335] Skatterättsnämnden, Förhandsbesked [Preliminary Ruling], Mervärdesskatt: Handel med bitcoins [VAT: Trade with Bitcoins] (Oct. 14, 2013), http://skatterattsnamnden.se/skatterattsnamnden/forhandsbesked/2013/forhandsbesked2013/mervardesskatthandelmedbitcoins.5.46ae6b26141980f1e2d29d9.html, *archived at* https://perma.cc/AET4-3T4N.

[336] Högsta förvaltningsdomstolens dom [Supreme Administrative Court's Judgment] (SAC Judgment), Nr. 7101-13 (Feb. 2, 2016), http://www.hogstaforvaltningsdomstolen.se/Domstolar/regeringsratten/Avg%C3%B6randen/2016/Februari/7101-13.pdf, *archived at* https://perma.cc/JU5G-KLWE; *see also* Elin Hofverberg, *Sweden: Supreme Administrative Court Rules Trade in Bitcoins Not Subject to VAT*, GLOBAL LEGAL MONITOR (Feb. 4, 2016), http://www.loc.gov/law/foreign-news/article/sweden-supreme-administrative-court-rules-trade-in-bitcoins-not-subject-to-vat/, *archived at* https://perma.cc/82P2-CBBA.

[337] Case C‑264/14. Skatteverket v. David Hedqvist, 2015 CURIA EUROPA, ECLI:EU:C:2015:718 (Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?docid=170305&doclang=EN, *archived at* https://perma.cc/LU2G-U6VD.

[338] *Kronofogden ska leta Bitcoins hos skuldsatta* [*Swedish Enforcement Authority to Look for Bitcoins from Indebted Individuals*], SVERIGES RADIO (Oct. 6, 2014), http://sverigesradio.se/sida/artikel.aspx?programid=1646&artikel=5983956, *archived at* https://perma.cc/AR5S-V7G2; *see also* Elin Hofverberg, *Sweden: Enforcement Authority to Collect Bitcoins*, GLOBAL LEGAL MONITOR (Oct. 23, 2014), http://www.loc.gov/law/foreign-news/article/sweden-enforcement-authority-to-collect-bitcoins/, *archived at* https://perma.cc/6YVP-CLNX.

[339] Press Release, Kronofogden, Nu kan du köpa bitcoin hos Kronofogden [Now You Can Purchase Bitcoins from the Swedish Enforcement Authority] (Oct. 12, 2017), https://www.kronofogden.se/66713.html, *archived at* https://perma.cc/ZT5P-VWDS; *see also* Elin Hofverberg, *Sweden: Bitcoins Seized During Asset Seizure*, GLOBAL

In a response to a question from a member of Parliament the Swedish government has advised caution in the use of cryptocurrencies by citizens, as it is unregulated and carries risk.[340]

On July 23, 2017, the Nasdaq Stockholm Disciplinary Committee rendered a decision that ordered the bitcoin company XBT Provider AB to pay a fine of SEK1,000,000 (approximately US$120,000) for failing to publish annual reports and make its prospectus available online.[341]

## United Kingdom

The United Kingdom does not have any laws that specifically regulate cryptocurrencies, such as bitcoin, ethereum, litecoin, etc. The governor of the Bank of England reportedly stated that regulation of cryptocurrencies is necessary:

> A better path would be to regulate elements of the crypto-asset ecosystem to combat illicit activities, promote market integrity, and protect the safety and soundness of the financial system[.][342]

Section 2A of the Bank of England Act 1998 specifies that the Bank of England has responsibility to both protect and enhance the stability of the financial system of the UK.[343] Pursuant to this objective, the Bank has considered the risk cryptocurrencies pose to the stability of the UK's financial markets and determined that the size of the cryptocurrency market is currently not large enough to pose a "material risk to monetary or financial stability in the UK."[344]

Other concerns raised by the use of cryptocurrencies include ensuring consumers are protected when using this form of payment, money laundering, taxation, and the use of these systems to finance terrorism and other crimes.[345]

---

LEGAL MONITOR (Nov. 7, 2017), http://www.loc.gov/law/foreign-news/article/sweden-bitcoins-seized-during-asset-seizure/, *archived at* https://perma.cc/8QBR-V887.

[340] Statsrådet Per Bolund (MP), Kryptovalutor på svenska marknaden, Svar på skriftlig fråga 2017/18:484 [Cryptocurrencies on the Swedish Market, Answer to Written Question 2017/18:484] (Jan. 10, 2018), http://www.riksdagen.se/sv/dokument-lagar/dokument/svar-pa-skriftlig-fraga/kryptovalutor-pa-svenska-marknaden_H512484, *archived at* https://perma.cc/959K-AWSY.

[341] Nasdaq Stockholm Disciplinary Committee, Decision 2017:07 (July 23, 2017), http://www.nasdaqomx.com/digitalAssets/106/106081_decision.pdf, *archived at* https://perma.cc/B3U3-PS6R.

[342] Arjun Kharpal, *Bank of England's Carney Calls for More Regulation around the 'Speculative Mania' of Cryptocurrencies*, CNBC (Mar. 2, 2018), https://www.cnbc.com/2018/03/02/bank-of-england-mark-carney-cryptocurrency-regulation.html, *archived at* https://perma.cc/G8G9-Y32W.

[343] Bank of England Act 1998, c. 11, § 2A, http://www.legislation.gov.uk/ukpga/1998/11, *archived at* https://perma.cc/A3KP-XSF9.

[344] Robleh Ali et al., *The Economics of Digital Currencies*, 54(3) BANK OF ENGLAND QUARTERLY BULLETIN 262, 276 (2014), https://www.bankofengland.co.uk/-/media/boe/files/digital-currencies/the-economics-of-digital-currencies.pdf?la=en&hash=BE28BE59F18E79CCE705643CF14F36DF8897E56D, *archived at* https://perma.cc/XH6S-NHJX; *Digital Currencies*, BANK OF ENGLAND, https://www.bankofengland.co.uk/research/digital-currencies (last visited Mar. 12, 2018), *archived at* https://perma.cc/TAM8-2E5P.

[345] Ali, *supra* note 344, at 344.

With regard to taxation, Her Majesty's Revenue and Customs notes that "[c]ryptocurrencies have a unique identity and cannot therefore be directly compared to any other form of investment activity or payment mechanism."[346] The taxability of income received from cryptocurrencies is dependent upon the "activities and parties involved."[347] Value added tax (VAT) (approximately equivalent to US sales tax) is only chargeable from suppliers for any goods or services sold in the UK in exchange for cryptocurrency.[348]

Corporate tax rules apply to businesses for the profits or losses in currency exchanges, which includes cryptocurrencies. HM Revenue and Customs has stated, "[f]or the tax treatment of virtual currencies, the general rules on foreign exchange and loan relationships apply. We have not at this stage identified any need to consider bespoke rules."[349] Any company that enters into transactions that involves cryptocurrencies are thus treated in the same manner as regular transactions under the current corporate tax rules, and any gains made are taxed accordingly.

For unincorporated businesses, income tax is chargeable to the profits and losses that can be attributed to cryptocurrency transactions.[350] The UK also taxes the earnings of transactions in which a gain is realized after a transaction with cryptocurrencies if an individual user buys and sells coins as an investor.[351] Such gains fall within capital gains tax, and this tax is chargeable to any gain made that involves a cryptocurrency.

## II. Non-EU Members

### Albania

On July 13, 2017, the Bank of Albania declared that the legal and regulatory framework then in place did not envisage carrying out operations with cryptocurrency in Albania and users were exposed to certain risks. The Bank noted that because of the high degree of anonymity, transactions in such currency may be misused for criminal activities, including money laundering, terrorism financing, or the smuggling of goods. The Bank urged the Albanian public to be mature and responsible in the administration of the savings or liquidity they possess, while national and international stakeholders intensively work to adequately regulate and supervise cryptocurrency.[352]

---

[346] HM Revenue & Customs, *Revenue and Customs Brief 9 (2014): Bitcoin and Other Cryptocurrencies* (Mar. 3, 2014), https://www.gov.uk/government/publications/revenue-and-customs-brief-9-2014-bitcoin-and-other-cryptocurrencies/revenue-and-customs-brief-9-2014-bitcoin-and-other-cryptocurrencies, *archived at* https://perma.cc/MP2E-GQKV.

[347] *Id.*

[348] *Id.*

[349] *Id.*

[350] *Id.*

[351] *Id.*

[352] Press Release, Bank of Albania, Risks Associated with the Use of Virtual Currency (July 13, 2017), https://www.bankofalbania.org/Press/On_the_risks_associated_with_the_use_of_virtual_currency.html, *archived at* https://perma.cc/86NT-2FQZ.

## Armenia

On March 1, 2018, the government of Armenia published a document stating that adoption of a proposed law on cryptocurrencies is not advisable given that the majority of the leading countries urge people to refrain from operations with cryptocurrencies.[353] The document was prepared in response to a draft law on the development of digital technologies introduced by an opposition political party that would provide for the liberalization of mining activities and their exemption from taxes until the end of 2023.[354]

## Azerbaijan

On February 12, 2018, the chairman of the board of Azerbaijan's Central Bank, Elman Rustamov, stated that cryptocurrency is a very volatile instrument and urged the population to be more careful in dealing with cryptocurrencies.[355] Earlier in January it was reported that a working group has been established to develop a draft law on the regulation of trade in cryptocurrencies.[356]

## Belarus

In Belarus the Presidential Decree on the development of the digital economy[357] came into effect on March 28, 2018. It permits buying, selling, exchanging, and mining cryptocurrency. Most of the tax and currency regulations in the decree extend only to legal entities operating on the territory of the High Technologies Park, a special economic zone. However, individuals are permitted to engage in mining; acquire tokens; and exchange, sell, donate, bequeath, and otherwise dispose of cryptocurrency. Income generated by mining and operations in cryptocurrencies is exempt from taxation until 2023. The Decree also provides for the possibility of the creation of ICO operators in the High Technologies Park. The Park will also host a crypto-exchange and mining operators.

---

[353] Government of Armenia, Recommendations on the Draft Law on Development of Digital Technologies (Mar. 1, 2018), http://parliament.am/draft_history.php?id=9504&Suggestion=687&do=showSuggestion (in Armenian), *archived at* https://perma.cc/4AX3-DMWC; *see also The Armenian Government Rejected the Bill on the Development of Digital Technologies*, GOLOS ARMENII (Mar. 1, 2018), http://golosarmenii.am/article/ 63337/pravitelstvo-armenii-otverglo-zakonoproekt-%C2%ABo-razvitii-cifrovyx-texnologij%C2%BB (in Russian), *archived at* https://perma.cc/R9AP-2RMC.

[354] Artem Yerkanyan, *Bitcoin of Armenian Origin*, NEW TIME (Feb. 10, 2018), http://nv.am/bitkoin-armyanskogo-proishozhdeniya/ (in Russian), *archived at* https://perma.cc/C6T9-ZFBX.

[355] *Head of the Central Bank of Azerbaijan Urged Population to Be More Careful with Cryptocurrencies*, SPUTNIK AZERBAIJAN (Jan. 15, 2018), https://ru.sputnik.az/economy/20180212/414014374/azerbajdzhan-centrobank-kriptovaluta-preduprezhdenie.html (in Russian), *archived at* https://perma.cc/9GWW-RUST.

[356] Lada Yevgrashina, *Azerbaijan Took Up Cryptocurrencies, A Bill Is Being Prepared, The Country Will Be Visited by Ethereum Cofounder*, 1NEWS.AZ (Jan. 29, 2018), http://www.1news.az/news/azerbaydzhan-vzyalsya-za-kriptovalyuty-gotovitsya-zakonoproekt-stranu-posetit-so-osnovatel-ethereum (in Russian), *archived at* https://perma.cc/GC8Y-HBJD.

[357] Decree of the President of the Republic of Belarus No. 8 of Dec. 21, 2017, http://president.gov.by/ru/official_ documents_ru/view/dekret-8-ot-21-dekabrja-2017-g-17716/, *archived at* https://perma.cc/S9UM-CKRG (in Russian).

Regulation of Cryptocurrency Around the World

The Decree has not established rules for the operation of ICO operators and the crypto-exchange; these areas will be left to self-regulation. The exchange of cryptocurrency for fiat money must be approved by the National Bank. Operators of cryptocurrency exchanges will be treated as high-risk clients similar to operators of lottery games and casinos.[358]

Businesses operating in the Park are exempt from taxes and only have to pay 1% of their turnover to the government. This arrangement is guaranteed by the government to last until 2049.  The minimum capital requirements are 1 million Belarusian rubles (approximately, US$505,000) for the operator of a crypto-platform and 200,000 rubles (approximately US$101,000) for the operator of a cryptocurrency exchange office.[359]

**Bosnia and Herzegovina**

On January 9, 2018, the Central Bank of Bosnia and Herzegovina announced that the convertible mark (the currency of Bosnia and Herzegovina) is the only legal means of payment in the country, and it is not possible to exchange bitcoins and other cryptocurrencies for convertible mark. At the same time, the Bank stated that there were no plans to limit or prevent the purchase of and trading in virtual currencies.[360]

**Georgia**

On December 20, 2017, the National Bank of Georgia confirmed that cryptocurrency is not legal tender in Georgia and is not regulated by Georgian law.[361] The Bank urged Georgian citizens to be careful in dealing with cryptocurrencies.[362]

---

[358] *Premiere of Digits, Belarus is the First in the World to Comprehensively Legalize Cryptocurrencies*, RG.RU (Mar. 26, 2018), https://rg.ru/2018/03/26/belarus-pervoj-v-mire-kompleksno-vvedet-kriptovaliuty-v-zakon.html (in Russian), *archived at* https://perma.cc/X258-2T5A.

[359] *Mining Is Allowed, Bitcoin Mining Has Been Legalized in Belarus*, RG.RU (Dec. 27, 2017), https://rg.ru/2017/12/27/v-belarusi-legalizovali-dobychu-bitkoina.html (in Russian), *archived at* https://perma.cc/9DLQ-EMGX.

[360] *It Is Required to Be Informed in Detail about Cryptocurrencies, The Money Invested Is Not Secured*, VIJESTI.BA (Jan. 9, 2018), https://vijesti.ba/clanak/389130/o-kriptovalutama-se-potrebno-detaljno-informirati-ulozeni-novac-nije-osiguran (in Bosnian), *archived at* https://perma.cc/BJ7Y-Q5SJ.

[361] Press Release, National Bank of Georgia, Warning of the National Bank of Georgia (Dec. 20, 2017), https://www.nbg.gov.ge/index.php?m=340&newsid=3247 (in Georgian), *archived at* https://perma.cc/JC64-3JLP.

[362] *Cryptocurrencies Outlawed in Georgia*, SPUTNIK GEORGIA (Dec. 21, 2017), https://sputnik-georgia.ru/economy/20171221/238633463/Kriptovaljuty-v-Gruzii-objavleny-vne-zakona.html (in Russian), *archived at* https://perma.cc/N4UC-EDFP.

## Gibraltar

The government of Gibraltar recently introduced regulations governing the provision of Distributed Ledger Technology (DLT)[363] and is currently in the process of introducing draft legislation to regulate initial coin offerings (ICOs). It is also considering a further regulatory framework that would address the sale and promotion of tokens to complement the DLT regulations.[364]

On October 12, 2017, the government of Gibraltar introduced the Financial Services (Distributed Ledger Technology Providers) Regulations 2017[365] under the Financial Services (Investment and Fiduciary Services) Act.[366]  These Regulations entered into force on January 1, 2018.[367]  The regulatory framework covers firms that operate in or from Gibraltar and provide DLT services, defined in the Financial Services (Investment and Fiduciary Services) Act as "[c]arrying on by way of business, in or from Gibraltar, the use of distributed ledger technology for storing or transmitting value belonging to others."[368]  The regulations require these firms to apply for a license from the Gibraltar Financial Services Commission to become a DLT provider.[369]

DLT license holders are also required to pay an annual fee, charged at a flat rate of £10,000 (approximately US$14,000), although an additional fee of up to £20,000 (approximately US$28,000) may be charged "depending upon the complexity of regulating the DLT Provider."[370] Companies that are currently licensed under the existing financial legislation in Gibraltar and use DLT to

---

[363] Distributed ledger technology (DLT) is defined in the Financial Services (Investment and Fiduciary Services) Act 1989, Act No. 49-1989, sched. 3 ¶ 10(2), http://www.gibraltarlaws.gov.gi/articles/1989-47o.pdf, *archived at* https://perma.cc/MUK3-5Q3T, as "a database system in which – (a) information is recorded and consensually shared and synchronised across a network of multiple nodes; and (b) all copies of the database are regarded as equally authentic; and 'Value' includes assets, holdings and other forms of ownership, rights or interests, with or without related information, such as agreements or transactions for the transfer of value or its payment, clearing or settlement."

[364] Statement on Initial Coin Offerings, Gibraltar Financial Services Commission (Sept. 22, 2017), http://www.gfsc.gi/news/statement-on-initial-coin-offerings-250, *archived at* https://perma.cc/CN3Z-A9AS.

[365] Financial Services (Distributed Ledger Technology Providers) Regulations 2017, Legal Notice No. 204/2017, GIBRALTAR GAZETTE No. 4401 (Oct. 12, 2017), http://www.gfsc.gi/uploads/DLT regulations 121017 (2).pdf, *archived at* https://perma.cc/QG2W-8TQ6.

[366] Financial Services (Investment and Fiduciary Services) Act 1989, §§ 5, 7, 53, 56.

[367] Financial Services (Distributed Ledger Technology Providers) Regulations 2017, reg 1(2).  *See also* Press Release, Gibraltar Financial Services Commission, Distributed Ledger Technology (DLT) Regulatory Framework (Jan. 2, 2018), http://www.gfsc.gi/news/distributed-ledger-technology-dlt-regulatory-framework-270, *archived at* https://perma.cc/7DPW-ANKK.

[368] Financial Services (Investment and Fiduciary Services) Act 1989, sched. 3, ¶ 10.

[369] *Distributed Ledger Technology Regulatory Framework (DLT Framework)*, GIBRALTAR FINANCIAL SERVICES COMMISSION (Jan. 2, 2018), http://www.gfsc.gi/dlt, *archived at* https://perma.cc/L753-37RN.

[370] Financial Services Commission (Fees) Regulations 2016, LN 2016/071, sched. 1, http://www.gibraltarlaws.gov.gi/articles/2016s071.pdf, *archived at* https://perma.cc/7KHF-LXNJ.

> improve their controls, procedures and processes will not need to obtain a separate licence under the DLT framework, unless the activities are not currently caught within the scope of the licence they hold . . . . However, if [they] are licensed as a bank, but intend to provide virtual currency wallets and/or services [they] will be required to obtain a licence under the DLT regime.[371]

DLT providers must comply with Gibraltar's requirements concerning anti-money laundering and combatting the financing of terrorism, as well as those of any jurisdiction in which they also operate.[372]

Under the Regulations the provision of DLT services without a license is an offense, punishable with a fine of up to £10,000 (approximately US$14,000).[373] The government of Gibraltar claims that the Gibraltar Financial Services Commission is the first regulator to introduce a framework regulating Distributed Ledger Technology (DLT).[374] The aim of introducing the legislation is to protect consumers and the reputation of Gibraltar as a well-regulated and safe environment for firms that use DLT, and enable Gibraltar to prosper from the use and growth of new financial technology.

The government of Gibraltar has expressed concern over the use of tokenized digital assets (tokens) and cryptocurrency given by companies to raise capital and bypass the traditional, regulated, capital-raising process required by financial institutions or venture capitalists.[375] It is currently working to develop legislation to regulate the use of tokens, "essentially those created and traded using [DLT]"[376] that will align with the DLT regulations,[377] and expects a bill to be before Parliament by the second quarter of 2018.[378]

---

[371] *Distributed Ledger Technology Regulatory Framework (DLT Framework)*, *Frequently Asked Questions*, GIBRALTAR FINANCIAL SERVICES COMMISSION, *supra* note 369.

[372] *Id*.

[373] Financial Services (Penalty Fees) Regulations 1993, LN 1993/147, sched., http://www.gibraltarlaws.gov.gi/articles/1993s147.pdf, *archived at* https://perma.cc/A58V-PQ2C.

[374] Press Release, Gibraltar Financial Services Commission, Distributed Ledger Technology (DLT) Regulatory Framework (Jan. 2, 2018), http://www.gfsc.gi/news/distributed-ledger-technology-dlt-regulatory-framework-270, *archived at* https://perma.cc/7DPW-ANKK.

[375] Gibraltar Financial Services Commission, Statement on Initial Coin Offerings (Sept. 22, 2017), http://www.fsc.gi/ news/statement-on-initial-coin-offerings-250, *archived at* https://perma.cc/HD3M-N6UB.

[376] Press Release, HM Government of Gibraltar and Ministry of Commerce, HM Government of Gibraltar and the Gibraltar Financial Services Commission Announce Plans for Token Legislation (Feb. 12, 2018), http://www.gfsc.gi/news/hm-government-of-gibraltar-and-the-gibraltar-financial-services-commission-announce-plans-for-token-legislation-272, *archived at* https://perma.cc/9FVC-L4Z8.

[377] *Distributed Ledger Technology Regulatory Framework (DLT Framework)*, GIBRALTAR FINANCIAL SERVICES COMMISSION, *supra* note 369.

[378] Press Release, HM Government of Gibraltar and Ministry of Commerce, *supra* note 376.

## Guernsey

Guernsey is a Crown Dependency of the United Kingdom and is a low-tax jurisdiction with a large financial sector. In 2014, the Guernsey Financial Services Commission, which is responsible for supervising and regulating licensees from the banking, fiduciary, insurance, and investment sectors,[379] issued a statement that the Commission was adopting a cautionary approach towards "virtual currencies" and may refuse application to register financial service businesses if virtual currency is involved.[380] Specifically,

> [t]he Commission has a policy of encouraging innovation. Virtual currencies are an area of innovation which the Commission continues to monitor closely while recognising that there are currently significant risks associated with them. In the light of those risks, the Commission will adopt a cautious approach and may well refuse applications to register financial services business where the use of virtual currency is involved. However, this approach will be regularly reviewed in the light of international developments.[381]

In 2015, a report commissioned by the Guernsey government noted that the major drawback for cryptocurrencies was the difficulty in complying with international anti-money laundering standards.[382] Three years after the issuance of the first statement, on February 27, 2018, the Guernsey Financial Services Commission issued a further statement that it believes there are "significant risks in the use of virtual or crypto currencies especially for retail customers. Nevertheless, we understand that professional investors with a high risk appetite may wish to invest in this developing sector."[383]

The Financial Services Commission has stated that it will assess any application on its individual merits against the criteria used for asset types or structures, as cryptocurrencies "could interact with [the countries] regulatory laws[384] in a number of ways."[385] Applicants must demonstrate how they will comply with the laws and rules to counter financial crime and terrorist financing, with

---

[379] *About Us*, GUERNSEY FINANCIAL SERVICES COMMISSION, https://www.gfsc.gg/commission/about-us (last visited Mar. 20, 2018), *archived at* https://perma.cc/C9FR-KUTK.

[380] *Virtual Currencies*, GUERNSEY FINANCIAL SERVICES COMMISSION (Feb. 11, 2014), https://www.gfsc.gg/news/article/virtual-currencies, *archived at* https://perma.cc/JT8Q-7PMS.

[381] *Id.*

[382] PRICEWATERHOUSECOOPERS, GUERNSEY COMMERCE AND EMPLOYMENT, STATES OF GUERNSEY: A STRATEGIC VISION FOR FINTECH 28, (July 2015), https://www.gov.gg/CHttpHandler.ashx?id=96797&p=0, *archived at* https://perma.cc/9CRX-ESAC.

[383] *Virtual Currencies, Crypto Currencies and Initial Coin Offerings ("ICO")*, GUERNSEY FINANCIAL SERVICES COMMISSION (Feb. 27, 2014), https://www.gfsc.gg/news/article/virtual-currencies-crypto-currencies-and-initial-coin-offerings-ico, *archived at* https://perma.cc/3WTX-QGQJ.

[384] Laws, regulations, and codes that govern the financial sector and could have an impact on a business using or offering cryptocurrencies are available at: *Legislation and Guidance*, GUERNSEY FINANCIAL SERVICES COMMISSION, https://www.gfsc.gg/commission/legislation-and-guidance (last visited Mar. 20, 2018), *archived at* https://perma.cc/3VKH-HXWN.

[385] *Virtual Currencies, Crypto Currencies and Initial Coin Offerings ("ICO")*, GUERNSEY FINANCIAL SERVICES COMMISSION, *supra* note 383383.

particularly regard to establishing the identity of both investors and beneficial owners.[386]   The Commission has stated that it would continue to be cautious to approve applications for initial coin offerings that could later be traded on the secondary market due to the risk of fraud and money laundering, along with applications for any kinds of digital currency exchanges.

## Iceland

The legality of cryptocurrencies in Iceland is unclear. In 2014, the Central Bank of Iceland, in anticipation of the launch of the Icelandic peer-to-peer cryptocurrency Auroracoin,[387] announced that bitcoin was not a recognized currency and even if it was, purchases of bitcoins would still be illegal as such purchases would have violated the foreign transactions restrictions then in place.[388] The Icelandic Foreign Exchange Act then specified that Icelandic currency could not leave the country.[389] A purchase of an overseas-based cryptocurrency would have been a violation of the Act, as the cryptocurrency would have been considered purchased from abroad.[390]

Since then, however, Iceland has eased its foreign exchange and asset control rules and now allows for cross-border transactions of Icelandic krónur.[391] However, according to the Icelandic Central Bank, restrictions on so-called offshore króna assets and special reserve requirements for specified investments in connection with new inflows of foreign currency will remain in place.[392]   For example, there is still a requirement to notify the Icelandic Central Bank of international purchases of Icelandic krónur and derivative transactions, and rules also require a special reserve when there is an inflow of a foreign currency into Iceland.[393]   Restrictions will also remain in place on "i)

---

[386] *Id*.

[387] *See* Elin Hofverberg, *Iceland: National Digital Currency Auroracoin Launched*, GLOBAL LEGAL MONITOR (Aug. 12, 2014), http://www.loc.gov/law/foreign-news/article/iceland-national-digital-currency-auroracoin-launched/, *archived at* https://perma.cc/DSJ3-XUF7.

[388] Press Release, Central Bank of Iceland, Significant Risk Attached to Use of Virtual Currency (Mar. 19, 2014), https://www.cb.is/publications-news-and-speeches/news-and-speeches/news/2014/03/19/Significant-risk-attached-to-use-of-virtual-currency/, *archived at* https://perma.cc/H5BR-TJSC.

[389] Act No. 87/1992 on Foreign Exchange, as in force in 2014.

[390] *See* Press Release, Central Bank of Iceland (2014), *supra* note 388.

[391] Lög um gjaldeyrismál (1992 nr. 87 17. Nóvember) [Foreign Exchange Act (no. 87/1992 )], *as amended through* 105/2016, http://www.althingi.is/lagas/148a/1992087.html, *archived at* https://perma.cc/9DXZ-9WVD, unofficial translation *available at* https://www.government.is/media/fjarmalaraduneyti-media/media//frettatengt2016/English-translation-of-the-Foreign-Exchange-Act---Nov-2016.pdf, *archived at* https://perma.cc/YXV2-YKGL; *see also* Press Release, Central Bank of Iceland, Central Bank of Iceland Concludes Agreement with Owners of Offshore Króna Assets (Mar. 12, 2017), https://www.cb.is/publications/news/news/2017/03/12/Central-Bank-of-Iceland-concludes-agreement-with-owners-of-offshore-krona-assets/, *archived at* https://perma.cc/J34F-4K7K; Elin Hofverberg, *Iceland: Central Bank Eases Currency Restrictions, Ends Financial Crisis Capital Controls*, GLOBAL LEGAL MONITOR (May 16, 2017), http://www.loc.gov/law/foreign-news/article/iceland-central-bank-eases-currency-restrictions-ends-financial-crisis-capital-controls/, *archived at* https://perma.cc/WWA6-CVNR.

[392] Press Release, Central Bank of Iceland, New Rules on Foreign Exchange (Mar. 12, 2017), https://www.cb.is/publications/news/news/2017/03/12/New-Rules-on-Foreign-Exchange-/, *archived at* https://perma.cc/6Y8E-G5TP.

[393] Central Bank of Iceland, Rules on Foreign Exchange arts. 3, 8, 12, 14 & 17; Central Bank of Iceland, Rules Amending the Central Bank of Iceland Rules No. 490/2016 on Special Reserve Requirements for New Foreign Currency Inflows, with Subsequent Amendments (Mar. 12, 2017), https://cb.is/library/Skraarsafn---EN/Capital-

derivatives trading for purposes other than hedging; ii) foreign exchange transactions carried out between residents and non-residents without the intermediation of a financial undertaking; and iii) in certain instances, foreign-denominated lending by residents to non-residents."[394] It is possible that trade and investments in cryptocurrencies would be limited by these regulations. Because cross-border transactions with Icelandic krónur are allowed, however, bitcoins would not be limited for this reason alone.[395]

The Central Bank of Iceland has not commented on whether cryptocurrency transactions are transactions "carried out between residents and nonresidents without the intermediation of a financial undertaking."[396]

The Icelandic Tax Authority has issued guidelines for filing income taxes for the tax year 2017, requiring that bitcoins be included under section 4.4, "*Aðrar eignir áður ótaldar*" (Other Assets).[397] The value of cryptocurrency holdings is based on the prevailing exchange rate on December 31 of the tax year.[398]

Reportedly, members of Parliament are considering adopting legislation that would tax companies that mine cryptocurrencies in Iceland, based on their usage of natural resources (electricity).[399]

**Isle of Man**

The Isle of Man is a Crown Dependency of the United Kingdom and is a low-tax jurisdiction with a robust online gambling industry and burgeoning financial sector. Referred to in some reports as "Bitcoin Island," many establishments across the Island already accept bitcoins as payment alongside its national currency.[400]

---

surveillance/Enska_Reglur um breytingu á reglum um bindingu reiðufjár 11032017-2 enACB_Final.pdf, *archived at* https://perma.cc/U55Y-FXLF.

[394] Press Release, Central Bank of Iceland (2017), *supra* note 392.

[395] *Compare* Press Release, Central Bank of Iceland (2014), *supra* note 388.

[396] For an update on capital controls regulation see *Progress of the Plan for Removal of Capital Controls*, GOVERNMENT.IS (Oct. 25, 2017), https://www.government.is/library/Files/greinargerd_okt17-2_enska.pdf, *archived at* https://perma.cc/3SMS-QB2Z.

[397] Ríkisskattstjóri (RSK), *Leiðbeiningar Skattframtal einstaklinga* [*Guidelines on Tax Return for Individuals*] 15 (2018), https://www.rsk.is/media/baeklingar/rsk_0801_2018.is.pdf, *archived at* https://perma.cc/65VK-7N2K.

[398] *Id*.

[399] Stan Higgins, *Icelandic Lawmaker Floats Bitcoin Mining Tax*, COINDESK (Feb. 12, 2018), https://www.coindesk.com/icelandic-lawmaker-floats-bitcoin-mining-tax/, *archived at* https://perma.cc/WZ2B-BTXD.

[400] Cahal Milmo, *Bitcoin: How The Isle of Man is Leading a Cryptocurrency Revolution*, INDEPENDENT (London) (Jan. 3, 2016), https://www.independent.co.uk/news/uk/home-news/bitcoin-how-the-isle-of-man-is-sparking-a-cryptocurrency-revolution-a6794756.html, *archived at* https://perma.cc/NUY8-XTS4.

The Isle of Man was an early adopter of legislation to regulate cryptocurrencies within its jurisdiction. The Proceeds of Crime Act 2008 was amended in 2015 to include virtual currency businesses within its regulated sector as a "designated business,"[401] specifically those that are in

> the business of issuing, transmitting, transferring, providing safe custody or storage of, administering, managing, lending, buying, selling, exchanging or otherwise trading or intermediating convertible virtual currencies, including crypto-currencies or similar concepts where the concept is accepted by persons as a means of payment for goods.[402]

This amendment brought businesses that engaged in these activities, including those that wish to offer initial coin offerings (ICO),[403] within the ambit of its anti-money laundering laws,[404] requiring the use of know-your-customer practices, such as collecting identifying information, knowing the beneficial owner of any currency, and record keeping and reporting requirements for certain transactions.[405] These businesses are overseen by the Isle of Man Financial Services Authority to ensure compliance with these laws.[406]

The Isle of Man distinguishes between four different types of online currencies:

> Digital currency refers to any electronic representation of a fiat currency and this can include representations of virtual currency.

> Virtual currency is a narrower asset and is a digital representation of value which can be traded digitally. The nature of a virtual currency means that it does not need to be centrally controlled or administered. Virtual currency can be either convertible or non-convertible.

> Convertible virtual currency, which includes crypto-currency, can be converted into a fiat currency, either directly, or through an exchange. For a currency to be convertible, there does not need to be set rate or an established benchmark, but that merely a market exists and the ownership rights can be transferred from one person to another, whether for consideration or not.

> Non-convertible virtual currency, once purchased, cannot be transferred to another person and cannot be redeemed for fiat currency, either directly or through an exchange. (Note

---

[401] Isle of Man Financial Services Authority, *Questions & Answers in Respect of Persons Seeking to Launch an Initial Coin Offering in or from The Island*, at 1, https://www.iomfsa.im/media/2365/icoguidanceforapplicants.pdf (last visited Apr. 18, 2018), *archived at* https://perma.cc/PUQ3-ZLNM.

[402] Proceeds of Crime (Business in the Regulated Sector) Order 2015, 2015/0073, Sched., art. 1(1)(mm), https://www.gov.im/media/470633/proceedsofcrime-businessintheregulatedsector-order2015-final.pdf, *archived at* https://perma.cc/M83K-C2JM, *amending* Proceeds of Crime Act 2008, No. 13 of 2008, Sched. 4, http://www.legislation.gov.im/cms/images/LEGISLATION/PRINCIPAL/2008/2008-0013/ProceedsofCrimeAct2008_6.pdf, *archived at* https://perma.cc/JX8R-EHNY.

[403] Isle of Man Financial Services Authority, *Questions & Answers, supra* note 401.

[404] *Designated Businesses (Registration and Oversight) Act 2015 – AML/CFT Handbook* (last updated Jan. 2018), ISLE OF MAN FINANCIAL SERVICES AUTHORITY, https://www.iomfsa.im/amlcft/amlcft-requirements-and-guidance/designated-businesses/, *archived at* https://perma.cc/S3X6-T58G.

[405] Isle of Man Financial Services Authority, *Virtual Currency Business: Sector Specific AML/CFT Guidance Notes* (Oct. 2016), *available at* https://www.iomfsa.im/media/1606/virtualcurrencyguidance.pdf, *archived at* https://perma.cc/4UWC-S4BK.

[406] *Designated Businesses (Registration and Oversight) Act 2015 – AML/CFT Handbook, supra* note 404.

that the Schedule 4 to POCA [Proceeds of Crime Act] definition does not extend to non-convertible currency businesses).[407]

The Designated Business (Registration and Oversight) Act 2015[408] provides that virtual currency businesses are designated businesses, requiring such businesses to register with, and be overseen by, the Isle of Man Financial Services Authority.[409] Virtual currency businesses are defined in the Act as those that are in

> the business of issuing, transmitting, transferring, providing safe custody or storage of, administering, managing, lending, buying, selling, exchanging or otherwise trading or intermediating convertible virtual currencies, including crypto-currencies or similar concepts where the concept is accepted by persons as a means of payment for goods or services, a unit of account, a store of value or a commodity[.][410]

Businesses registered under this Act are required to submit annual returns that show compliance with anti-money laundering laws. The register of companies that engage in cryptocurrencies and operate from the Island has been created using blockchain technology to store the data, making the Isle of Man the first government to use this type of technology to store official data, according to Bloomberg.[411]

For ICOs, the FSA has stated that it will not register an applicant if the ICO provides tokens that do not offer any benefit to the purchaser other than the token itself, because

> [s]uch characteristics are generally considered by the FSA to pose an unacceptably high risk that the money raised from the ICO could be used for unanticipated and illegal purposes, as well as posing a risk to consumers. It is because of these risks that it is the policy of the FSA to refuse to register this type of business.[412]

The Isle of Man recently amended its online gambling laws to enable operators to accept virtual currencies.[413]

---

[407] Isle of Man Financial Services Authority, *Virtual Currency Business: Sector Specific AML/CFT Guidance Notes*, *supra* note 405, at 4.

[408] Designated Business (Registration and Oversight) Act 2015, No. 9 of 2015, https://legislation.gov.im/cms/ images/LEGISLATION/PRINCIPAL/2015/2015-0009/DesignatedBusinessesRegistrationandOversight Act2015_6.pdf, *archived at* https://perma.cc/SMR3-LYKL.

[409] *Designated Businesses (Registration and Oversight) Act 2015 – AML/CFT Handbook*, *supra* note 404.

[410] Designated Business (Registration and Oversight) Act 2015, No. 9 of 2015, sched. 1(1), https://legislation.gov. m/ cms/images/LEGISLATION/PRINCIPAL/2015/2015-0009/DesignatedBusinessesRegistrationandOversight Act2015_6.pdf, *archived at* https://perma.cc/SMR3-LYKL.

[411] Jeremy Kahn, *Greetings From Bitcoin Island*, BLOOMBERG MARKETS (Sept. 7, 2015), https://www.bloomberg. com/news/features/2015-09-07/isle-of-man-tax-haven-with-tailless-cats-becomes-bitcoin-hub, *archived at* https://perma.cc/4MMD-C3CH.

[412] Isle of Man Financial Services Authority, *Questions & Answers*, *supra* note 401.

[413] Online Gambling (Amendments) Regulations 2016, SD 2016/0341, reg. 11(1)–(2), https://www.gov.im/media/ 1354648/online-gambling-amendments-regulations-2016.pdf, *archived at* https://perma.cc/TJ24-UKYF. *See also* Isle of Man Gambling Supervision Commission, *AML/CFT Guidance for Virtual Currencies* (May 2017), *available*

Regulation of Cryptocurrency Around the World

**Jersey**

Jersey is a Crown Dependency of the United Kingdom and is a low-tax jurisdiction with a large financial sector. The jurisdiction issued a consultation on the regulation of cryptocurrencies in 2015, noting "[t]he creation of a business-friendly framework that encourages innovation, jobs and growth in both the financial services and digital sectors is a priority for the Government of Jersey."[414] The majority response to the consultation was that cryptocurrencies should be regulated only to the extent of ensuring compliance with anti-money laundering laws and to counter the financing of terrorism.[415] The government or Jersey rejected "a full prudential and conduct of business regime" for cryptocurrencies, as it considered it was too early to issue such regulations given that cryptocurrencies are in the early stages of development and that doing so could be over-burdensome, and restrict development and innovation.[416]

The result of the consultation was the issuance of a document by the Chief Minister's Department explaining Jersey's policy position regarding the regulation of virtual currencies. According to the document,

> [u]ltimately, the aim of this policy is to further enhance Jersey's proposition as a world leading Fintech jurisdiction . . . [and] to outline Jersey's commitment to creating an environment that encourages confidence and innovation in the digital sector whilst protecting the Island from the most prominent money laundering and terrorist financing risks that are presented by virtual currencies in their current form.[417]

Jersey's anti-money laundering laws and counterterrorism financing laws were extended to cover cryptocurrencies through measures that entered into force on September 26, 2016.[418] "Virtual currencies" are defined in the Proceeds of Crime Act as a currency rather than a commodity, thus enabling it to fall within the current regulatory framework and be regulated by the Jersey Financial Services Commission.[419] Specifically, the Act defines "virtual currency" as

---

*at* https://www.gov.im/media/1356960/aml-guidance-notes-virtual-currencies.pdf, *archived at* https://perma.cc/9856-6MJ2.

[414] Chief Minister's Department, *Regulation of Virtual Currency: Consultation Paper* (July 9, 2015; presented to the States July 10, 2015), *available at* http://www.statesassembly.gov.je/assemblyreports/2015/r.80-2015.pdf, *archived at* https://perma.cc/K5PY-GZRP.

[415] Chief Minister's Department, *Regulation of Virtual Currency Policy Document* ¶ 1.1 (Oct. 21, 2015), *available at* https://www.gov.je/SiteCollectionDocuments/Government and administration/P Regulation of Virtual Currency 20151021 GP.PDF, *archived at* https://perma.cc/9QBL-YQNT.

[416] *Id.* ¶ 1.2.

[417] *Id.* at 2.

[418] Proceeds of Crime (Miscellaneous Amendments) (Jersey) Regulations 2016, R&O 63/2016, https://www.jerseylaw.je/laws/enacted/PDFs/RO-063-2016.pdf, *archived at* https://perma.cc/F2H5-2KNV; Proceeds of Crime (Supervisory Bodies) (Virtual Currency Exchange Business) (Exemption) (Jersey) Order 2016, REVISED LAWS OF JERSEY, https://www.jerseylaw.je/laws/revised/PDFs/08.785.80.pdf, *archived at* https://perma.cc/A8W9-7753.

[419] Proceeds of Crime Act 1999, Sched. 2, Part B, ¶ 9, https://www.jerseylaw.je/laws/revised/Pages/08.780.aspx#_Toc468266188, *archived at* https://perma.cc/K2YU-7KA4.

(4)   . . . any currency which (whilst not itself being issued by, or legal tender in, any jurisdiction) –

    (a)   digitally represents value;

    (b)   is a unit of account;

    (c)   functions as a medium of exchange; and

    (d)   is capable of being digitally exchanged for money in any form.[420]

The term "virtual currency exchange" is defined in the Act as "the exchange of virtual currency for money in any form, or vice versa," with the clarification that "a reference to providing a service to third parties shall not include a company's providing that service to a connected company."[421]

Virtual currencies were also brought within the ambit of the Money Laundering (Jersey) Order 2008,[422] which requires individuals operating a "Money Service Business" to register with the Jersey Financial Services Commission and comply with the jurisdiction's anti-money laundering and counterterrorism financing laws if they have an annual turnover greater than £150,000 (approximately US$210,000).[423]  Subject to certain exemptions, these laws require such businesses to adopt policies and procedures to prevent and detect money laundering and terrorist financing and appoint a money laundering compliance officer and reporting officer, along with ensuring that record keeping and customer due diligence measures are implemented,[424] such as know-your-customer measures to one-off transactions greater than €1,000 (approximately US$1,220).[425]

Businesses that trade in goods and receive payments of €15,000 (approximately US$18,500) and above per transaction in cryptocurrency are classed as "high value dealers" under the Proceeds of Crime Act 1999.[426]  Such dealers must be registered and supervised by the Jersey Financial Services Commission and comply with Jersey's money laundering and counter terrorist financing laws.[427]

---

[420] *Id.* Sched. 2, Part B, ¶ 4(4).

[421] *Id.* Sched. 2, Part B, ¶ 9(2)(a)–(b).

[422] Money Laundering (Jersey) Order 2008, REVISED LAWS OF JERSEY, https://www.jerseylaw.je/laws/revised/Pages/08.780.30.aspx, *archived at* https://perma.cc/6YXY-JJW6.

[423] Proceeds of Crime (Supervisory Bodies) (Jersey) Law 2008, REVISED LAWS OF JERSEY, https://www.jersey law.je/laws/revised/PDFs/08.785.pdf, *archived at* https://perma.cc/U5CQ-EQGY; Money Laundering (Jersey) Order 2008, REVISED LAWS OF JERSEY, https://www.jerseylaw.je/laws/revised/Pages/08.780.30.aspx, *archived at* https://perma.cc/PT5L-A4X6.

[424] Proceeds of Crime Act 1999, Sched. 2, Part B, ¶ 3 (defining customer due diligence measures).

[425] Chief Minister's Department, *Regulation of Virtual Currency Policy Document*, *supra* note 415, ¶ 1.14.  *See also* Money Laundering (Jersey) Order 2008, REVISED LAWS OF JERSEY, https://www.jerseylaw.je/laws/revised/Pages/08.780.30.aspx, *archived at* https://perma.cc/5QDP-PE8Y.

[426] Proceeds of Crime (Jersey) Law 1999, Sched. 2, Part B, ¶ 4, https://www.jerseylaw.je/laws/revised/Pages/08.780.aspx#_Toc468266188, *archived at* https://perma.cc/K2YU-7KA4.

[427] *Id.* Sched. 2, Part B, ¶ 4.

Regulation of Cryptocurrency Around the World

At the time of the consultation, the government considered the regulation of distributed ledger and blockchain technology, but considered that this area was evolving too quickly to regulate effectively.[428] It opted to actively monitor these areas for development and consideration of regulation in the future.[429]

**Kosovo**

The Central Bank of Kosovo has issued several warnings about the use of cryptocurrencies. The latest, published on January 31, 2018, reminded persons that virtual money is not recognized as legal tender and that financial losses may result from investing in cryptocurrencies. The Bank also noted the unreliability of virtual platforms for trading in cryptocurrencies and their susceptibility to cybertheft. The Bank said it is considering adapting recommendations made internationally to limit the anonymous use of cryptocurrencies and to enact rules to combat money laundering and terrorist financing via such currencies.[430]

On February 27, 2018, the Bank announced the establishment of a permanent advisory group for evaluating and addressing regulatory challenges related to virtual money.[431]

**Liechtenstein**

Liechtenstein has included "virtual currencies" in the latest amendment of its Due Diligence Act.[432] The due diligence obligations codified in the Act serve to combat money laundering, organized crime, and terrorist financing and apply to providers of exchange services, among others. An "exchange office (bureau de change)" is defined as any "natural or legal person whose activities consist in the exchange of legal tender at the official exchange rate or of virtual currencies against legal tender and vice versa."[433] "Virtual currencies" are defined as "digital monetary units, which can be exchanged for legal tender, used to purchase goods or services or to preserve value and thus assume the function of legal tender."[434]

---

[428] Chief Minister's Department, *Regulation of Virtual Currency Policy Document*, *supra* note 415, ¶ 1.34.

[429] *Id.* ¶ 1.36.

[430] Press Release, Central Bank of the Republic of Kosovo, Warning on the Use of Virtual Money (Jan. 31, 2018), https://bqk-kos.org/index.php?id=104&l=1487 (in Albanian), *archived at* https://perma.cc/HG65-TT9E.

[431] Press Release, Central Bank of the Republic of Kosovo, The CBK Executive Board Established a Permanent Body for Evaluating and Addressing Regulatory Challenges Related to Virtual Money (Feb. 27, 2018), https://bqk-kos.org/index.php?id=104&l=1496 (in Albanian), *archived at* https://perma.cc/P5HM-E36F.

[432] Gesetz über berufliche Sorgfaltspflichten zur Bekämpfung von Geldwäscherei, organisierter Kriminalität und Terrorismusfinanzierung [Sorgfaltspflichtgesetz] [SPG] [Act on Professional Due Diligence to Combat Money Laundering, Organized Crime, and Terrorist Financing [Due Diligence Act] [DDA]], Dec. 11, 2008, LANDESGESETZBLATT NUMMER [LGBL.-NR.] [OFFICIAL LAW GAZETTE NO.] 2009.047, as amended, art. 2, para. 1(l), https://www.gesetze.li/konso/pdf/2009047000?version=19, *archived at* http://perma.cc/LT2C-3BNS, unofficial English translation *available at* http://www.regierung.li/media/medienarchiv/952_1_17_11_2017_en_636524807784985165.pdf?t=5, *archived at* http://perma.cc/ND5C-4G8T.

[433] *Id*. art. 2, para. 1(l).

[434] *Id*.

Case 4:18-cv-04790-PSH Document 27-1 Filed 09/21/18 Page 164 of 218
Case 4:18-cv-04790-PSH Document 27-1 Filed 09/21/18 Page 106 of 276

Regulation of Cryptocurrency Around the World

The Financial Market Authority of Liechtenstein (Finanzmarktaufsicht, FMA) has issued a factsheet on virtual currencies like bitcoin.[435] It stated that virtual currencies are generally defined as a "digital representation of a (cash equivalent) value that is neither issued by a central bank or a public authority" and do not constitute fiat currency (legal tender). However, it is pointed out that virtual currencies are similar to fiat currencies when they are used as a means of payment or traded on an exchange. The production and the use of virtual currencies as a means of payment are currently not subject to any licensing requirement governed by specialized legislation. However, the FMA states that depending on the specific design of the business model, licensing requirements might apply. Business models are assessed on a case-by-case basis.[436] In particular, due diligence requirements according to the Due Diligence Act may apply.

The FMA has also issued a factsheet on ICOs.[437] Depending on the specific design and the function of the tokens, tokens may constitute financial instruments if they have characteristics of equity securities or other investments. Activities relating to financial instruments are subject to licensing by the FMA.[438] The FMA assesses ICOs on a case-by-case basis.[439]

## Macedonia

On September 28, 2016, the National Bank of Macedonia issued a warning against cryptocurrencies.[440] The Bank reminded Macedonian residents that they are not allowed to have bank accounts or securities abroad, with certain exceptions, and therefore, investments by residents in cryptocurrencies are also not allowed. The Bank also underscored the possibility of losing money on cryptocurrency investments due to devaluation, theft, the poor functioning of cryptocurrency exchanges, and possible links to criminal activities.[441]

---

[435] FINANZMARKTAUFSICHT [FMA] [FINANCIAL MARKET AUTHORITY], FACT SHEET ON VIRTUAL CURRENCIES (Feb. 16, 2018), https://www.fma-li.li/files/fma/fma-fact-sheet-virtual-currencies.pdf, *archived at* http://perma.cc/X87T-3KT9.

[436] *Id.*

[437] FMA, FACT SHEET ON INITIAL COIN OFFERINGS (Sept. 10, 2017), https://www.fma-li.li/files/fma/fma-factsheet-ico.pdf, *archived at* http://perma.cc/Z3L3-B3D5.

[438] *Id.* at 2.

[439] *What Needs to Be Observed*, FMA, https://www.fma-li.li/en/regulation/fintech-in-liechtenstein/what-needs-to-be-observed.html (last visited Mar. 19, 2018), *archived at* http://perma.cc/KC3S-U8H7.

[440] Announcement of the National Bank of the Republic of Macedonia (NBRM) (Sept. 28, 2016), http://nbrm.mk/ns-newsarticle-soopshtieniie_na_nbrm_28_9_2016.nspx (in Macedonian), *archived at* https://perma.cc/A2TD-BGY8.

[441] *NBRM: Macedonian Regulations Do Not Allow Investment in Cryptocurrencies*, VECER (Sept. 28, 2016), https://vecer.mk/ekonomija/nbrm-makedonskata-regulativa-ne-dozvoluva-investiranje-vo-kripto-valuti (in Macedonian), *archived at* https://perma.cc/QUV5-KYFW.

## Moldova

On February 15, 2018, the National Bank of Moldova issued a statement[442] recommending that Moldovans be as cautious as possible in deciding whether to invest in crypto-assets, given the technical characteristics of cryptocurrency, its high volatility, and the absence of any regulation that would protect investors.[443]

In Transnistria, a breakaway territory of Moldova, a law was passed on January 31, 2018, to legalize mining activities.[444] It provides for creation of free economic zones for mining purposes. The authorities of the self-proclaimed republic promise exemption from taxes, duty-free import and export of mining equipment, and assistance with energy supply.[445]

## Montenegro

In November 2014 the Central Bank of Montenegro reportedly issued a warning saying that individuals may own bitcoins at their own risk, although virtual currencies are not legal tender in Montenegro.[446]

---

[442] Press Release, National Bank of Moldova, NBM Warns about High Risks of Investing in Cryptocurrencies (Feb. 15, 2018), http://www.bnm.md/ru/content/nbm-preduprezhdaet-chto-investicii-v-kriptovalyuty-predpolagayut-vysokie-riski (in Russian), *archived at* https://perma.cc/ZT9T-5X4Z.

[443] *National Bank Warns Moldovans of Reckless Risks*, Sputnik Moldova (Feb. 15, 2018), https://ru.sputnik.md/economics/20180215/17319739/Nacbank-Moldova-preduprezhdaet-opasnosti-riski.html (in Russian), *archived at* https://perma.cc/F5QW-4Q6C.

[444] Law of the Pridenstrovskaia Moldavskaia Respublika No. 39-3-VI of Feb. 9, 2018, on the Development of Information Blockchain Technologies in the Pridenstrovskaia Moldavskaia Respublika, *available at* http://www.minjust.org/oo/Publication.nsf/805c7c76d1c2ddb8c2258213005be80f/1607b43c42a8b926c225822f00350545!OpenDocument (in Russian), *archived at* https://perma.cc/L4MA-T7S9.

[445] *Will There Be a Circulation of Cryptocurrency in Transnistria?*, Sputnik Moldova (Jan. 31, 2018), https://ru.sputnik.md/economics/20180215/17319739/Nacbank-Moldova-preduprezhdaet-opasnosti-riski.html (in Russian), *archived at* https://perma.cc/FQ64-54WD.

[446] *CBCG: You Can Possess Bitcoins but at Your Own Risk*, Vijesti (Nov. 30, 2014), http://www.vijesti.me/vijesti/cbcg-mozete-posjedovaati-bitkoine-ali-na-sopstveni-rizik-807566 (in Montenegrin), *archived at* https://perma.cc/SNH7-6MKK.

## Norway

The Norwegian Financial Supervisory Authority issued warnings against cryptocurrencies both in 2013 and 2018.[447] It has also warned against initial coin offerings (ICOs).[448] Both warnings came as a result of warnings by the European Supervisory Authority, ESMA.[449]

The Central Bank of Norway has not recognized cryptocurrencies, but it also does not prohibit its staff from owning or investing in them as per ethical guidelines from November 23, 2012.[450]

The Norwegian Tax Authority has issued a principle statement that bitcoins will be treated as capital property, at least for tax purposes.[451] Capital property legislation allows deductions for losses and taxes winnings.[452] Although travel currencies are exempted from the capital gains tax, bitcoins are not as the bitcoin and other virtual currencies are not recognized as travel currencies.[453]

---

[447] Press Release, Finanstilsynet, Advarsel til forbrukere - informasjon om virtuelle valutaer [Warnings to Users – Information on Virtual Currencies] (Dec. 13, 2013), https://www.finanstilsynet.no/nyhetsarkiv/nyheter/2013/advarsel-til-forbrukere---informasjon-om-virtuelle-valutaer/, archived at https://perma.cc/Z2MK-EGWD; Press Release, Finanstilsynet, Finanstilsynet advarer forbrukere om kryptovaluta [Financial Supervisory Authority Warns Users on Cryptocurrencies] (Feb. 28, 2018), https://www.finanstilsynet.no/markedsadvarsler/2018/finanstilsynet-advarer-forbrukere-om-kryptovaluta/, archived at https://perma.cc/9N75-VE5Y.

[448] Press Release, Finanstilsynet, Initial Coin Offerings (ICO-er) – advarsel til investorer og foretak [Initial Coin Offerings – Warnings to Investors and Companies] (Nov. 20, 2017), https://www.finanstilsynet.no/markeds advarsler/2017/initial-coin-offerings-icoer---advarsel-til-investorer-og-foretak/, archived at https://perma.cc/9ZRM-RSJB.

[449] Press Release, Finanstilsynet (2018), supra note 447; Press Release, Finanstilsynet (2017), supra note 448.

[450] Central Bank ethical guidelines are available at Norges Bank, Utfyllende Etiske Regler fo Ansatte i Norges sentralbankvirksomhet [Additional Ethical Rules for Employees of Norway's Central Bank] (Sept. 10, 2014), https://www.norges-bank.no/Om-Norges-Bank/Mandat-og-oppgaver/Lover-og-regelverk-i-tilknytning-til-Norges-Banks-virksomhetsomrade/Utfyllende-etiske-regler/, archived at https://perma.cc/7J56-Y6RT.

[451] Bruk av bitcoins – skatte- og avgiftsmessige konsekvenser [Use of Bitcoins – Tax Effects], SKATTEETATEN (Nov. 11, 2013), https://www.skatteetaten.no/rettskilder/type/uttalelser/prinsipputtalelser/bruk-av-bitcoins--skatte--og-avgiftsmessige-konsekvenser/, archived at https://perma.cc/5223-NKR4; see also Elin Hofverberg, Norway: Bitcoins Are Capital Property, Not Currency, Says Norwegian Tax Authority, GLOBAL LEGAL MONITOR (Dec. 11, 2013), http://www.loc.gov/law/foreign-news/article/norway-bitcoins-are-capital-property-not-currency-says-norwegian-tax-authority/, archived at https://perma.cc/QVF6-BBFQ.

[452] §§ 5-1; 5-20; 6-1 LOV OM SKATT AV FORMUE OG INNTEKT (SKATTELOVEN) [ACT ON TAXATION OF INCOME (TAX ACT)] (LOV-1999-03-26-14), https://lovdata.no/dokument/NL/lov/1999-03-26-14, archived at https://perma.cc/S8Y6-8RPR.

[453] SKATTEETATEN, supra note 451.

All Norwegian residents are required to report taxable income (including from capital gains such as those from cryptocurrencies) in accordance with the Norwegian Income Tax Act.[454] Such income derived from cryptocurrencies should be filed as "other income."[455]

Sales of cryptocurrencies are exempt from Norwegian value-added tax (VAT). In a 2013 statement the Norwegian Tax Authority determined that the sale of bitcoins by a commercial actor was subject to a 25% VAT as the trade in bitcoins on a web-based site is an electronic service subject to VAT and not a VAT-exempt financial service.[456] However, in 2015 the Court of Justice of the European Union ruled that cryptocurrencies are exempt from VAT.[457] This caused Norway to start a process whereby the Finance Department was to determine how bitcoins (and other cryptocurrencies) should be treated in relation to VAT.[458] Final guidance was issued in 2017, establishing that the sale of cryptocurrencies is exempt from VAT.[459]

**Russia**

A draft law on digital financial assets was published by the Ministry of Finances on January 20, 2018, and introduced in the State Duma on March 20, 2018. The bill defines "mining" as activities aimed at the creation of cryptocurrency with the purpose of receiving compensation in the form of cryptocurrency. Mining is treated as an entrepreneurial activity subject to taxation if the miner exceeds the energy consumption limits established by the government for three months in a row.[460] As to initial coin offerings (ICO), only qualified investors are allowed to participate in them, except

---

[454] § 2-1 skatteloven.

[455] As per income tax guidelines at *3.1.12 Annen inntekt* [*Other Income*], SKATTEETATEN, https://www.skatteetaten. no/person/skatt/skattemelding/finn-post/3/1/12/ (last visited Apr. 6, 2018), *archived at* https://perma.cc/96P3-QXNK.

[456] SKATTEETATEN, *supra* note 451; *see also* Hofverberg, *supra* note 451.

[457] Case C-264/14, Skatteverket v. David Hedqvist, 2015 CURIA EUROPA ECLI:EU:C:2015:718 (Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?docid=170305&doclang=EN, *archived at* https://perma.cc/LU2G-U6VD.

[458] Skriftlig spørsmål fra Sveinung Rotevatn (V) til finansministeren [Written Question from Sveinung Rotevatn (V) to the Minister of Finance], Dokument nr. 15:1436 (2015-2016) (Aug. 10, 2016), https://www.stortinget.no/no/ Saker-og-publikasjoner/Sporsmal/Skriftlige-sporsmal-og-svar/Skriftlig-sporsmal/?qid=66127, *archived at* https://perma.cc/SBC3-9M7Q.

[459] Letter from the Finance Department to the Norwegian Tax Authority, Merverdiavgift – unntaket for finansielle tjenester [VAT Fees – Exemption for Financial Services] (Feb. 6, 2017), https://www.regjeringen.no/no/ dokumenter/merverdiavgift---unntaket-for-finansielle-tjenester/id2538129/, *archived at* https://perma.cc/8GV3-TU4Q.

[460] Bill No. 419059-7, Federal Law of the Russian Federation on Digital Financial Assets, http://asozd2c.duma. gov.ru/addwork/scans.nsf/ID/E426461949B66ACC4325825600217475/$FILE/419059-7_20032018_419059-7.PDF?OpenElement (in Russian), *archived at* https://perma.cc/UM68-PKN8; *see also The Ministry of Telecom and Mass Communications Has Proposed a Regulatory Moratorium for Industrial Miners*, RBC (Mar. 22, 2018), https://www.rbc.ru/ins/economics/22/03/2018/5ab36c129a79477b7bc615b7 (in Russian), *archived at* https://perma.cc/4DFX-M58U.

Regulation of Cryptocurrency Around the World

for cases to be defined by the Central Bank, according to news reports.[461] Tokens and coins are classified in the bill as property and are not considered legal tender. The bill does not authorize the exchange of cryptocurrency for rubles or foreign currency. The exchange of tokens for rubles and foreign currency is allowed but only through licensed operators.[462] The bill also provides a definition of a "smart contract."[463]

The Ministry of Telecom and Mass Communications has presented its own concept of the draft law on digital financial assets. It recommends introducing the term "industrial mining," registering miners with the tax office, and setting forth requirements for energy consumption. It also recommends exempting miners from taxation for a period of two years to stimulate their activities. Earlier the Ministry had offered to create a special exchange platform for the miners to ensure the transparency of cryptocurrency exchange.[464]

Separately, amendments were introduced to the Civil Code[465] in order to protect the rights of the owners of cryptocurrency coins and tokens. The document defines "digital money" and "digital rights," and provides for their judicial protection. The authors say that these regulations will allow coins and tokens to be included in a bankruptcy estate or a deceased person's estate.[466]

It is expected that the legislative framework for cryptocurrency regulation will be enacted by July 1, 2018, after which the rules on the taxation of cryptocurrency operations will be introduced.[467]

---

[461] Lyudmila Petukhova, *Passion for Bitcoin: How Cryptocurrencies and ICO Will Be Regulated in Russia*, RBC (Mar. 20, 2018), https://www.rbc.ru/finances/20/03/2018/5ab125e69a79474518a5c2a1 (in Russian), *archived at* https://perma.cc/JZT9-5N48.

[462] *Id.*

[463] *Id.*

[464] *The Ministry of Telecom and Mass Communications Has Proposed a Regulatory Moratorium for Industrial Miners*, RBC, *supra* note 460.

[465] Bill No. 424632-7, Federal Law of the Russian Federation on Amending Parts One, Two and Four of the Civil Code of the Russian Federation, http://asozd2c.duma.gov.ru/addwork/scans.nsf/ID/B91DEDFBCF19B4 E04325825C0032641E/$FILE/424632-7_26032018_424632-7.PDF?OpenElement (in Russian), *archived at* https://perma.cc/HV5Z-DXRJ.

[466] Tatyana Zamakhina, *Money in the Web, A Bill on Digital Economy Has Been Submitted to the State Duma*, RG.RU (Mar. 26, 2018), https://rg.ru/2018/03/26/v-gosdumu-vnesen-zakonoproekt-o-cifrovom-prave.html?utm_source=rg.ru&utm_medium=offline&utm_campaign=back_to_online (in Russian), *archived at* https://perma.cc/9GH7-LDTR.

[467] Yevgueniy Gayva, *Cryptocurrency Transactions Will Be Taxed*, RG.RU (Jan. 25, 2018), https://rg.ru/2018/01/25/operacii-s-kriptovaliutami-oblozhat-nalogami.html (in Russian), *archived at* https://perma.cc/53VR-YLTG.

## Serbia

The National Bank of Serbia made two announcements, one on October 2, 2014,[468] and the other on May 4, 2016,[469] to clarify that "anyone investing in bitcoins or engaging in any other activity involving virtual currencies shall do so at their own liability, bearing all financial risks and risks in terms of noncompliance with regulations governing foreign exchange operations, taxation, trade, etc."[470] The Bank explained that bitcoin is not legal tender in Serbia and cannot be subject to sale and purchase by banks or licensed exchange dealers. The Bank said that a particular issue is the use of virtual currency to acquire other goods and services, adding that the law requires prices to be expressed in Serbian dinars and that expressing the prices of goods or services in virtual currency would be against the provisions of the law.[471] The Bank said it would consider, in cooperation with other state authorities, whether there is any need for designing a regulatory or other response in relation to cryptocurrencies.[472]

## Switzerland

The Swiss Canton of Zug is trying to establish itself as a hub for cryptocurrencies and Fintech start-ups. On November 2, 2017, the Commercial Register Office in the Canton of Zug started accepting bitcoin and ether as payment for administrative needs.[473] Furthermore, the Commercial Register accepts cryptocurrencies as a contribution in kind for purposes of forming a company.[474] In the city of Zug, municipal services (resident registration) of up to CHF200 (about US$210) can be paid with bitcoin.[475]

---

[468] Press Release, National Bank of Serbia (NBS), NBS Warns that Bitcoin Is Not Legal Tender in Serbia (Oct. 2, 2014), http://www.nbs.rs/internet/english/scripts/showContent.html?id=7607&konverzija=no, *archived at* https://perma.cc/DK4U-ZEUL.

[469] Press Release, NBS, Bitcoin Will Not Replace Euro or Any Other Currency (May 4, 2016), http://www.nbs.rs/internet/latinica/scripts/showContent.html?id=9612&konverzija=yes, *archived at* https://perma.cc/VL7X-PF4E.

[470] *Id.*

[471] Maja Zivanovic, *Serbian Bank Advises Caution Over Bitcoin Fever*, BALKANINSIGHT (Dec. 26, 2017), http://www.balkaninsight.com/en/article/serbian-national-bank-advise-caution-with-bitcoin-12-25-2017, *archived at* https://perma.cc/5RM3-ZUWU.

[472] Press Release, NBS, Bitcoin Will Not Replace Euro or Any Other Currency, *supra* note 469.

[473] Press Release, Kanton Zug [Canton Zug], Handelsregisteramt Zug akzeptiert Kryptowährungen Bitcoin und Ether als Zahlungsmittel [Commercial Register Office Zug Accepts Cryptocurrencies Bitcoin and Ether as Means of Payment] (Nov. 2, 2017), https://www.zg.ch/behoerden/volkswirtschaftsdirektion/handelsregisteramt/aktuell/handelsregisteramt-zug-akzeptiert-kryptowaehrungen-bitcoin-und-ether-als-zahlungsmittel, *archived at* http://perma.cc/384H-BEUE.

[474] Press Release, Kanton Zug, HR Zug lässt Kryptowährungen als Sacheinlage zu [Commercial Register Office in Zug Accepts Crytocurrencies as a Contribution in Kind] (Sept. 4, 2017), https://www.zg.ch/behoerden/volkswirtschaftsdirektion/handelsregisteramt/aktuell/bitcoin-als-sacheinlage? searchterm=bitcoin, *archived at* http://perma.cc/H5A7-AUJH.

[475] Press Release, Stadt Zug [City of Zug], Von Bitcoin zu Blockchain-Anwendungen [From Bitcoin to Blockchain Applications] (Nov. 15, 2016), http://www.stadtzug.ch/de/ueberzug/ueberzugrubrik/aktuelles/aktuelles informationen/welcome.php?action=showinfo&info_id=351680&ls=0&sq=&kategorie_id=&date_from=&date_to=, *archived at* http://perma.cc/LZL9-CNHR.

On January 1, 2018, the municipality of Chiasso, in the Swiss Canton of Ticino, started accepting bitcoin as tax payments for amounts of up to CHF250 (around US$263).[476]

On February 16, 2018, the Swiss Financial Market Supervisory Authority (Eidgenössische Finanzmarktaufsicht, FINMA) published guidelines on the regulatory treatment of ICOs,[477] which complement its earlier FINMA Guidance from September 2017.[478] Currently, there is no ICO-specific regulation, nor is there relevant case law or consistent legal doctrine.[479] FINMA stated that due to the fact that each ICO is designed in a different way, it must be decided on a case-by-case basis whether and which financial regulations are applicable.

In an ICO, investors receive blockchain-based coins or tokens in exchange for the funds they transfer. The tokens are created and stored either on a blockchain specifically created for the ICO or on a pre-existing blockchain.[480] FINMA differentiates between payment tokens (cryptocurrencies), utility tokens, and asset tokens. Payment tokens (cryptocurrencies) are defined as tokens that are used as a means of payment or as a means of money or value transfer. Utility tokens are those that provide digital access to an application or service by means of a blockchain-based infrastructure. Asset tokes represent assets such as a debt or an equity claim against the issuer. According to FINMA, asset tokens are analogous to equities, bonds, and derivatives.[481]

Operators of financial market infrastructures are subject to authorization by FINMA.[482] If the tokens received in an ICO qualify as securities, trading will require authorization. Securities are defined as "standardised certificated or uncertificated securities, derivatives and intermediated securities which are suitable for mass standardised trading,"[483] meaning they are "publicly offered for sale in the same structure and denomination or are placed with more than 20 clients, insofar as

---

[476] *Possibilità di pagamento imposte in Bitcoin* [*Possibility to Pay Taxes in Bitcoin*], COMUNE DI CHIASSO [MUNICIPALITY OF CHIASSO] (Feb. 1, 2018), https://www.chiasso.ch/possibilita-pagamento-imposte-bitcoin/, *archived at* http://perma.cc/2VR9-STWR.

[477] FINMA, Guidelines for Enquiries Regarding the Regulatory Framework for Initial Coin Offerings (ICOs) (FINMA ICO Guidelines) (Feb. 16, 2018), https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/myfinma/1bewilligung/fintech/wegleitung-ico.pdf?la=en, *archived at* http://perma.cc/PV9L-5AEK.

[478] FINMA Guidance 04/2017. Regulatory Treatment of Initial Coin Offerings (FINMA Guidance) (Sept. 29, 2017), https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/myfinma/4dokumentation/ finma-aufsichtsmitteilungen/20170929-finma-aufsichtsmitteilung-04-2017.pdf?la=en&hash=9DCC5C1FF8F61C9 AA9412FAD2D7C70533F341EF2, *archived at* http://perma.cc/6YGB-LSCP.

[479] FINMA ICO Guidelines, *supra* note 477, at 2, no. 3.

[480] *Id*. at 1, no. 1.

[481] *Id*. at 3, no. 3.1.

[482] Finanzmarktinfrastrukturgesetz [FinfraG] [Financial Market Infrastructure Act] [FMIA], June 19, 2015, SYSTEMATISCHE RECHTSSAMMLUNG [SR] [SYSTEMATIC COLLECTION OF LAWS] 958.1, art. 4, https://www.admin.ch/opc/de/classified-compilation/20141779/201708010000/958.1.pdf, *archived at* http://perma.cc/5F64-2WFF, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/20141779/201708010000/958.1.pdf, *archived at* http://perma.cc/WT73-EMWN.

[483] FMIA art. 2, let. b.

they have not been created especially for individual counterparties."[484] FINMA does not treat payment tokens or utility tokens whose sole purpose is to confer digital access rights as securities. However, utility tokens that have an additional investment purpose or a sole investment purpose at the time of issue, as well as asset tokens that are standardized and suitable for mass standardized trading, are classified as securities.[485]

Funds raised in an ICO generally do not qualify as deposits within the meaning of the Banking Act. However, if there are liabilities with debt capital character, for example a promise to return capital with a guaranteed return, then such an ICO would require the organizer to obtain a banking license.[486] When assets collected as part of the ICO are managed externally by third parties, the provisions of the Collective Investment Schemes Act apply.[487] Provisions on combating money laundering and terrorist financing, which give rise to a range of due diligence requirements, apply to the ICO of a payment token (cryptocurrency) as soon as the tokens can be technically transferred on a blockchain infrastructure.[488] In addition, the exchange of a cryptocurrency for fiat money or a different cryptocurrency as well as the offering of services to transfer tokens if the service provider maintains the private key (custody wallet provider) equally trigger the due diligence requirements according to the Anti-Money Laundering Act.[489]

In September 2017, FINMA closed down the unauthorized providers of the fake cryptocurrency "E-Coin", liquidated the companies, and issued a general warning about fake cryptocurrencies to investors.[490] Furthermore, three other companies were put on FINMA's warning list due to suspicious activity and eleven investigations were conducted into other presumably unauthorized business models relating to such coins.[491]

---

[484] Finanzmarktinfrastrukturverordnung [FinfraV] [Financial Market Infrastructure Ordinance] [FMIO], Nov. 25, 2015, SR 958.11, art. 2, para. 1, https://www.admin.ch/opc/de/classified-compilation/20152105/201708010000/958.11.pdf, *archived at* http://perma.cc/NW3S-JAGZ, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/20152105/201708010000/958.11.pdf, *archived at* http://perma.cc/2423-R4HG.

[485] FINMA ICO Guidelines, *supra* note 477, at 4, no. 3.2.1-3.2.3.

[486] *Id*. at 6, no. 3.4; Bankengesetz [BankG] [Banking Act], Nov. 8, 1934, SR 952.0, arts. 1, 3, https://www.admin.ch/opc/de/classified-compilation/19340083/201601010000/952.0.pdf, *archived at* http://perma.cc/R5N5-E4KE.

[487] FINMA ICO Guidelines, *supra* note 477, at 6, no. 3.5; Kollektivanlagengesetz [KAG] [Collective Investment Schemes Act] [CISA], June 23, 2006, SR 951.31, https://www.admin.ch/opc/de/classified-compilation/20052154/201607010000/951.31.pdf, *archived at* http://perma.cc/9HHP-QTY6, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/20052154/201607010000/951.31.pdf, *archived at* http://perma.cc/8NAX-442E.

[488] FINMA ICO Guidelines, *supra* note 477, at 6, no. 3.6; Geldwäschereigesetz [GwG] [Anti-Money Laundering Act] [AMLA], Oct. 10, 1997, SR 955.0, https://www.admin.ch/opc/de/classified-compilation/19970427/201601010000/955.0.pdf, *archived at* http://perma.cc/E9UX-3EBW, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/19970427/201601010000/955.0.pdf, *archived at* http://perma.cc/M4M6-UW5U.

[489] FINMA ICO Guidelines, *supra* note 477, at 7, no. 3.6.

[490] Press Release, FINMA, FINMA Closes Down Coin Providers and Issues Warning About Fake Cryptocurrencies (Sept. 19, 2017), https://www.finma.ch/en/news/2017/09/20170919-mm-coin-anbieter/, *archived at* http://perma.cc/VN3C-2ZUK.

[491] *Id.*

Case 4:18-cv-04790-PJH Document 27-1 Filed 09/21/18 Page 172 of 218
Case 4:18-cv-04790-PJH Document 17-1 Filed 09/21/18 Page 114 of 276

Regulation of Cryptocurrency Around the World

In Switzerland, the individual cantons, the Swiss states, are obligated to levy income tax and wealth tax on the total property (assets and rights with a cash value) of taxpayers that are resident in their canton.[492] Tax rates vary between the individual cantons. Cryptocurrencies are treated like foreign currencies for tax purposes and are subject to wealth tax.[493] Holders of bitcoin or other cryptocurrencies are taxed at the rate determined by the tax authorities on December 31 of the fiscal year. As an example, the tax rate for bitcoin determined on December 31, 2017, by the Swiss Federal Tax Administration was CHF13,784.38 (about US$14,514).[494] This rate is a recommendation for the cantonal tax authorities.

In January 2018, the Swiss State Secretariat for International Finance (Staatssekretariat für internationale Finanzfragen, SIF) reported that it would set up a working group on blockchain and ICOs.[495] The working group will work together with the Federal Ministry of Justice and FINMA and involve interested businesses. It will study the legal framework for financial sector-specific use of blockchain technology with a particular focus on ICOs and report back to the Federal Council, the Swiss government, by the end of 2018.

## Ukraine

On November 30, 2017, the financial regulators of Ukraine issued a joint statement on the status of cryptocurrencies in the country. According to the statement, cryptocurrencies cannot be classified as money, foreign currency, a means of payment, electronic money, securities, or a money surrogate. The regulators also stated that they continue to work on defining the legal status of cryptocurrencies and the legislative regulation of transactions involving them. The regulators warned about the extremely high probability of losses in dealing with cryptocurrencies and said all investors in cryptocurrencies should realize that they are acting at their own peril and risk.[496]

---

[492] Bundesgesetz über die Harmonisierung der direkten Steuern der Kantone und Gemeinden [StHG] [Federal Act on the Harmonization of Direct Taxes Levied by Cantons and Municipalities], Dec. 14, 1990, SR 642.14, art. 2, para. 1, https://www.admin.ch/opc/de/classified-compilation/19900333/201801010000/642.14.pdf, *archived at* http://perma.cc/5QP8-2NXP.

[493] *See* as an example KANTON ZUG. FINANZDIREKTION. STEUERVERWALTUNG [CANTON ZUG. FINANCE DIRECTORATE. TAX ADMINISTRATION], KRYPTOWÄHRUNGEN (BITCOIN, ETHEREUM, TOKENS USW.): MERKBLATT STEUERN FÜR PRIVATPERSONEN [CRYPTOCURRENCIES (BITCOIN, ETHEREUM, TOKENS ETC.): EXPLANATORY LEAFLET FOR PRIVATE PERSONS] (Nov. 30, 2017), https://www.zg.ch/behoerden/finanzdirektion/steuerverwaltung/krypto waehrungen/download/Kryptowaehrungen%20-%20Merkblatt%20def.%20-%2030.11.2017.pdf/download, *archived at* http://perma.cc/VGX2-C5HS.

[494] *Course Listing Federal Income Tax 2018*, FEDERAL TAX ADMINISTRATION, https://www.ictax.admin.ch/extern/ en.html#/ratelist/2018 (last visited Apr. 5, 2018), *archived at* http://perma.cc/9JCD-MHSE.

[495] Press Release, *Arbeitsgruppe Blockchain/ICO wird ins Leben gerufen* [*Working Group Blockchain/ICO Set Up*], Eidgenössisches Finanzdepartement [EFD] [Swiss Federal Department of Finance], Jan. 18, 2018, https://www.admin.ch/gov/de/start/dokumentation/medienmitteilungen.msg-id-69539.html, *archived at* http://perma.cc/2WJV-XXPD.

[496] Press Release, National Bank of Ukraine, Joint Statement of Financial Regulators on the Status of Cryptoassets in Ukraine (Nov. 30, 2017), https://bank.gov.ua/control/uk/publish/printable_article;jsessionid=175FC525F862C 3D896D522CFC9CC47BB?art_id=59735329&showTitle=true (in Ukrainian), *archived at* https://perma.cc/K8WF-KS5W; *see also Cryptocurrency in the Ukraine – the Position of the Authorities*, NEXUS FINANCIAL CONSULTING (Dec. 1, 2017), https://www.nexus.ua/novosti-offshornogo-biznesa/ukraina/5218-kriptovalyuty-v-ukraine-pozitsiya-vlastej (in Russian), *archived at* https://perma.cc/V3SC-3UFL.

On January 11, 2018, the cybersecurity unit of the National Security and Defense Council issued a statement saying that Ukraine can no longer allow the uncontrolled turnover of cryptocurrency on its territory and that the Council plans to create a working group to develop the regulatory framework, determine the regulatory body and the procedures for monitoring, identifying and taxing transactions with cryptocurrency.[497] On January 30, 2018, the head of the cybercrime department of the Police stated that circulation of cryptocurrencies must be banned if its legal status is not regulated in the near future.[498] In March of 2018 the government approved supplementing the classification of economic activities with a paragraph on cryptocurrency mining.[499]

In late 2017 Ukrainian MPs introduced two alternative draft bills that would regulate cryptocurrencies, one of which would define them as goods and the other as financial assets. However, both drafts were rejected by the country's financial regulators.[500]

---

[497] Press Release, National Security and Defense Council of Ukraine, O. Turchinov: The Development of the Market of Cryptoassets Cannot Be Left Out of Government Attention (Jan. 11, 2018), http://www.rnbo.gov.ua/news/2965.html (in Ukrainian), *archived at* https://perma.cc/9R89-4967; *see also Turchinov Saw in Cryptocurrency a Threat to the Security of Ukraine*, NEWSONE (Jan. 11, 2018), https://newsone.ua/news/politics/turchinov-uvidel-v-kriptovalyute-ugrozu-dlya-bezopasnosti-ukrainy.html (in Russian), *archived at* https://perma.cc/Q5XE-BM7H.

[498] *The Head of the Ukrainian Cyberpolice Called for Defining the Status of Cryptocurrency*, GORDON (Jan. 30, 2018), http://gordonua.com/news/money/glava-kiberpolicii-ukrainy-prizval-opredelit-status-kriptovalyuty-229317.html (in Russian), *archived at* https://perma.cc/GH4Z-KSC5.

[499] Yana Largo, *The Government of Ukraine Will Equate Mining to Economic Activity*, CRYPTO.PRO (Mar. 15, 2018), https://news.crypto.pro/pravitelstvo-ukrainy-priravnjaet-majning-k-jekonomicheskoj-dejatelnosti/ (in Russian), *archived at* https://perma.cc/6CYQ-87TS.

[500] Oleksiy Shevnin, *Legalization of Cryptocurrencies, How the Government Will Lay Its Hands on Bitcoin*, DEPO.UA (Jan. 25, 2018), https://www.depo.ua/rus/money/legalizaciya-kriptovalyut-yak-derzhava-naklade-lapu-na-bitkoyn-20180124714146 (in Russian), *archived at* https://perma.cc/L88L-USG4.

Case 4:18-cv-04790-PJH Document 27-6 Filed 09/21/18 Page 116 of 276
Case 4:18-cv-04790-PJH Document 27-6 Filed 09/21/18 Page 174 of 218
Regulation of Cryptocurrency Around the World

# Middle East and North Africa

**Algeria**

The 2018 Financial Law of Algeria has prohibited the use of any cryptocurrencies. It stipulates:

> The purchase, sale, use, and possession of so-called virtual currency are prohibited. A virtual currency is one used by Internet users over the Internet. It is characterized by the absence of physical support such as coins, paper money, or payments by check or credit card.

> Any violation of this provision is punishable in accordance with the laws and regulations in force.[501]

**Bahrain**

The governor of the Central Bank of Bahrain, Rasheed Al Maraj, has issued a warning against cryptocurrencies, especially bitcoin. During a parliamentary session that took place in the Shura Council, Al Maraj declared that the bitcoin is not recognized by any financial institution. He also mentioned that using bitcoin in Bahrain is illegal; however, Bharani citizens have the right to invest in cryptocurrencies outside Bahrain.[502]

**Egypt**

The Central Bank of Egypt issued a warning in January 2018 against the trading of cryptocurrencies, such as bitcoin, due to the extremely high risk associated with such currencies. The Central Bank also asserted that commerce within the Arab Republic of Egypt is confined only to the official paper currencies approved by the Bank.[503]

Egypt's Dar al-Ifta, the primary Islamic legislator in Egypt, has issued a religious decree classifying commercial transactions in bitcoin as *haram* (prohibited under Islamic law). Dar al-Ifta has stated that cryptocurrencies could damage national security and central financial systems, and could also be used to fund terrorism and terrorists activities.[504]

---

[501] Law No. 17-11 of 1917 (Dec. 27, 2017) art. 117, Official Gazette No. 76 of 2017 (Dec. 28, 2017), https://www.joradp.dz/FTP/JO-ARABE/2017/A2017076.pdf (in Arabic), *archived at* https://perma.cc/JE65-VFFF (translation by author). French translation of the Law *available at* https://www.mfdgi.gov.dz/images/pdf/lois_de_finances/LF2018F.pdf, *archived at* https://perma.cc/XP6A-8Q4A.

[502] *Al Maraj: We Do Not Recognize Bitcoin and It is Dangerous to Deal With It*, AL-WATAN (Jan. 7, 2018), http://alwatannews.net/article/752396/Bahrain/ المعراج-لا-نعترف-بالبيتكوينو التعامل-بها-خطر (in Arabic), *archived at* https://perma.cc/WDT3-7R9F.

[503] Press Release, Central Bank of Egypt, A Warning Statement (Jan. 10, 2018), http://www.cbe.org.eg/en/Pages/HighlightsPages/Bitcoin%20Press%20Release.aspx, *archived at* https://perma.cc/3X6D-WFEG.

[504] Religious Decree No. 4205, *The Status of Transactions in Bitcoins and other Cryptocurrencies under Islamic Law*, EGYPT'S DAR AL-IFTA (Dec. 28, 2017), http://www.dar-alifta.org/ar/ViewFatwa.aspx?sec=fatwa&ID=14139 (in Arabic), *archived at* https://perma.cc/432D-NHE5.

Case 4:18-cv-04790-P5IF-DI 20180 Dn 11089606 DktEntry:11-18 Page 117 of 276
Case 4:18-cv-04790-P5IF Document 27-1 Filed 09/21/18 Page 175 of 218

Regulation of Cryptocurrency Around the World

**Iran**

The Central Bank of Iran (CBI) officially announced on April 22, 2018, that it has prohibited the handling of cryptocurrencies by all Iranian financial institutions, including banks and credit institutions. The decision also bans currency exchanges from buying and selling virtual currencies or adopting measures to facilitate or promote them.[505]

The CBI's action was in line with Iran's recent efforts to address deficiencies in its policies on anti-money laundering and combating the financing of terrorism, with the aim of complying with the action plan of the Financial Action Task Force on Money-Laundering (FATF). The FATF, an intergovernmental organization established to combat international money-laundering and terrorist financing, will determine at its plenary meeting in June 2018 whether to remove Iran from the FATF list of Non-Cooperative Countries or Territories.[506] Previously, the CBI had only sought to warn people of the potential risks inherent in cybercurrencies,[507] although a directive passed by the Money and Credit Council, the most important policy decision-making organ of the CBI, "[had] deemed non-physical and virtual transactions against the law, meaning that Iranian [currency exchanges could] not deal in cryptocurrencies."[508]

The Bank's decision to ban the use of cryptocurrencies by financial institutions is a blow for those in Iran who viewed virtual currencies as a means of overcoming problems related to the banking industry and international sanctions, and who see them as "currently shaping the future of banking" and, when precisely and transparently regulated, of preventing people in the country from buying and selling them secretly and using them fraudulently.[509] Before the ban was announced, the CBI's Information Technology Chief had reported that, along with the adoption of a framework that

---

[505] *Iranian Financial Institutions Barred from Using Crypto-Currencies*, FINANCIAL TRIBUNE (Apr. 22, 2018), https://financialtribune.com/articles/business-and-markets/85114/iranian-financial-institutions-barred-from-using-crypto (available by subscription).

[506] *Id.*; Barry Lerner, *Iran: IMF Evaluates Iran's Legislative and Institutional Efforts to Combat Money Laundering and Terrorism Financing*, GLOBAL LEGAL MONITOR (Apr. 13, 2018), http://www.loc.gov/law/foreign-news/article/iran-imf-evaluates-irans-legislative-and-institutional-efforts-to-combat-money-laundering-and-terrorism-financing, *archived at* https://perma.cc/J5NX-YLWK.

[507] *No Bitcoin Trade for Moneychangers*, FINANCIAL TRIBUNE (Dec. 23, 2017), https://financialtribune.com/articles/economy-business-and-markets/78454/no-bitcoin-trade-for-moneychangers, *archived at* https://perma.cc/8EM7-XESG. The CBI is responsible for, inter alia, "formulating the monetary and credit system of the country, formulating the regulations pertaining to outflow as well as repatriation of Iranian and foreign currency, [and] foreign exchange transactions." *Laws & Regulations*, CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, https://www.cbi.ir/section/1454.aspx (last visited Mar. 19, 2018), *archived at* https://perma.cc/38FZ-SXVC.

[508] *No Bitcoin Trade for Moneychangers*, *supra* note 507; CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, CENTRAL BANKING IN IRAN, at 12–13, https://www.cbi.ir/page/4252.aspx (last visited Mar. 19, 2018), *archived at* https://perma.cc/92DQ-CM3B.

[509] *Iran's Banks Banned from Dealing in Crypto-currencies*, BBC NEWS (Apr. 23, 2018), http://www.bbc.com/news/ technology-43865105, *archived at* https://perma.cc/TQD5-889D; *Iranian Banker Calls for Cryptocurrency Recognition*, FINANCIAL TRIBUNE (Jan. 7, 2018), https://financial tribune.com/articles/economy-business-and-markets/79459/iranian-banker-calls-for-cryptocurrency-recognition, *archived at* https://perma.cc/H9HS-AGWK; *Iranian Banker Calls for Cryptocurrency Recognition*, FINANCIAL TRIBUNE (Jan. 7, 2018), https://financial tribune.com/articles/economy-business-and-markets/79459/iranian-banker-calls-for-cryptocurrency-recognition, *archived at* https://perma.cc/H9HS-AGWK; *No Bitcoin Trade for Moneychangers*, *supra* note 507.

should be adhered to for using cryptocurrencies, the Central Bank was considering the adoption of a national virtual currency, either to be generated by the Central Bank or another entity.[510] One of the motivations for developing such a currency was that it could potentially be used to replace the US dollar, an attractive prospect for Iran because US sanctions over Iran's nuclear program bar Iran from using the US financial system.[511]

## Iraq

The Iraqi Central Bank has issued a statement prohibiting the use of cryptocurrencies. It stated that currency traders who carry out transactions in cryptocurrencies will be punished by penalties cited in the country's anti-money laundering law.[512]

## Israel

Israel's Supervision on Financial Services (Regulated Financial Services) Law 5776-2016 requires persons engaging in providing services involving "financial assets" to obtain a license from the Supervisor of Financial Services.[513] The definition of "financial assets" includes "virtual currency."[514] A license will generally be issued to an Israeli citizen or a resident who has reached the age of majority, is legally competent, and has not been declared bankrupt or, in the case of a corporation, is not required to dissolve. Additional licensing requirements include that the licensee has a minimum specified amount of equity and, if an individual, has not been convicted of an offense that due to its nature makes the licensee unfit to handle financial transactions.[515]

A statement issued by Bank of Israel and several regulatory agencies on February 19, 2014, warned the public against dealing in virtual currencies. The warning laid out the dangers associated with trading in virtual currencies, including fraud, money laundering, and financing of terrorism, among others.[516] In addition, the Bank of Israel said in a January 2018 statement that "it would not recognize virtual currencies such as bitcoin as actual currency and . . . it was difficult to devise

---

[510] *Iran's CB Issues Warning over Bitcoin and Other Cryptocurrencies*, FINANCIAL TRIBUNE (Nov. 14, 2017), https://financialtribune.com/articles/economy-business-and-markets/76148/irans-cb-issues-warning-over-bitcoin-and-other, *archived at* https://perma.cc/U8W7-VH3.

[511] *CBI Governor Urges Caution on Bitcoin Trade*, FINANCIAL TRIBUNE (Dec. 31, 2017), https://financialtribune.com/articles/economy-business-and-markets/78986/cbi-governor-urges-caution-on-bitcoin-trade, *archived at* https://perma.cc/7HZM-DFMF.

[512] Statement, Central Bank of Iraq, Bitcoin (Dec. 3, 2017), https://cbi.iq/news/view/512 (in Arabic), *archived at* https://perma.cc/JG54-PDHV.

[513] Supervision on Financial Services (Regulated Financial Services) Law 5776-2016, §§ 2 &12, SEFER HAHUKIM [BOOK OF LAWS, official gazette] 5776 No. 2570 p. 1098, *as amended* (in Hebrew).

[514] *Id*. § 11A, subsection (7) of the definition of "financial asset."

[515] *Id*. § 15.

[516] *Id*. ¶ 4, Bank of Israel Capital Market, Insurance and Saving Branch, Tax Authority, Securities Authority and the Prevention of Money Laundry and Financing of Terrorism Authority, Public Announcement Regarding Possible Risks Contained in Virtual Coins Such as Bitcoin (Feb. 19, 2014), https://taxes.gov.il/About/PublicAnnouncements/PublishingImages/190214/odaa190214.pdf (in Hebrew), *archived at* https://perma.cc/VQ7Z-GDRQ.

Case 4:18-cv-04790-PJH Document 27-1 Filed 09/21/18 Page 177 of 218
Case 4:18-cv-04790-PJH Document 27-1 Filed 09/21/18 Page 119 of 276

Regulation of Cryptocurrency Around the World

regulations to monitor the risks of such activity to the country's banks and their clients," according to Reuters.[517]

Although virtual currencies are not recognized as actual currency by the Bank of Israel, the Israel Tax Authority has proposed that the use of virtual currencies should be considered as a "means of virtual payment" and subject to taxation.[518] Specifically, for the purpose of income tax and value added tax requirements, virtual currency is viewed as "an asset" and is taxed in accordance with relevant transaction classifications under the Income Tax Ordinance (New Version), 1961, and the Value Added Tax Law, 5736-1975.[519] Accordingly,

> [u]nlike a regular currency, the Israel Tax Authority will regard an increase in the value of a cryptocurrency as a capital gain rather than an exchange fluctuation, making it subject to capital gains tax. Individual investors will not be liable for value-added tax, but anyone engaging in cryptocurrency mining will be classified as a "dealer" and subject to VAT, according to the circular. Anyone trading as a business will be classified as a "financial institution" for tax purposes, meaning that they will be unable to reclaim VAT on expenses but will be subject to an extra 17 percent "profit tax" applied to financial institutions.[520]

The Israel Tax Authority requires documentation of trade transactions involving virtual currency to enable verification of their existence and scope.[521]

**Jordan**

In 2014, the Central Bank of Jordan (CBJ) warned the public against the use of bitcoin and sent out a press release to the media that stated:

> Recently, a global phenomenon of trading a virtual currency called bitcoin became active around the world. CBJ seeks to protect citizens and the investors, by warning them that virtual currencies are not legal tender and there is no obligation on any central bank in the world or any government to exchange its value for real money issued by them nor backed by underlying international commodities or gold.[522]

---

[517] Steven Scheer, *Bitcoin Is an Asset, Not a Currency - Israel's Central Bank*, REUTERS (Jan. 8, 2018), https://www.reuters.com/article/uk-bitcoin-israel/bitcoin-is-an-asset-not-a-currency-israels-central-bank-idUSKBN1EX18E, *archived at* https://perma.cc/3458-ZY58.

[518] Israel Tax Authority, Taxation of Activity by Means of Virtual Payment (Known as 'Virtual Currencies'), Israel Tax Authority Circular No. 05/2018 (Jan. 17, 2018), https://taxes.gov.il/incometax/documents/hozrim/hor_acc%2015.2.18.pdf (in Hebrew), *archived at* https://perma.cc/SJ48-L77X.

[519] *Id.* §§ 3.1–3.2; Income Tax Ordinance (New Version), 1961, 1 LAWS OF THE STATE OF ISRAEL (LSI) (New Version) 1967 and the Value Added Tax Law, 5736-1975, 30 LSI 46 (1975/76), both as amended.

[520] Matthew Kalman, *Israel Taxman's Guidelines Killing Cryptocurrency Boom?*, BNA (Feb. 21, 2018), https://www.bna.com/israel-taxmans-guidelines-n57982089034/, *archived at* https://perma.cc/J8DE-6AJQ.

[521] Israel Tax Authority Circular No. 05/2018, *supra* note 518, § 3.3.

[522] Omar Obeidat, *Central Bank Warns Against Using Bitcoin,* JORDAN TIMES (Feb. 22, 2014), http://www.jordantimes.com/news/local/central-bank-warns-against-using-bitcoin, *archived at* https://perma.cc/LJ9J-7FS7.

## Kuwait

Kuwait's Ministry of Finance does not recognize cryptocurrencies for purposes of official commercial transactions. Similarly, the Central Bank of Kuwait (CBK) prohibits the banking sector and companies under its control from trading in cryptocurrencies. The prohibition includes acceptance of cryptocurrency usage in e-payment transactions, and mediation between the parties to cryptocurrency transactions.[523] The CBK has asked the Ministry of Commerce and Industry to warn consumers about the risks of cryptocurrencies such as bitcoin.[524]

In January 2018, the CBK confirmed news that it was creating an infrastructure for the financial and banking sector in the country including the issuance of an e-currency, which it distinguished from virtual currencies. The establishment of a local digital currency will fall under the umbrella of e-payments, the statement said. The Central Bank highlighted that the local digital currency will have the same characteristics as paper money, such as an issuance number. It will also be monitored by the Kuwaiti government. Furthermore, it could be exchanged with other currencies as well as used to pay for goods and services.[525]

## Lebanon

On December 19, 2013, the Banque du Liban (BDL), the Lebanese Central Bank, issued a notice to the country's banks and financial institutions warning them of the dangers of using cybercurrencies, especially bitcoin. Among other concerns, the notice stated that "the platforms and networks used for the issuance and trading in such currencies are not subject to any laws or regulations."[526]

Riad Salameh, Governor of the BDL announced in October 2017 that the institution intended to launch its own cybercurrency. He is quoted as saying:

> We understand that electronic currency will play a prominent role in the future. But BDL must first make the necessary arrangement before taking this step and develop [a] protection system from cybercrime. Both the Special Investigation Commission and Banking Control Commission are cooperating to prevent such electronic crimes.[527]

---

[523] *Ministry of Finance Says Does Not Recognize Virtual Currency Bitcoin*, ARAB TIMES (Dec. 18, 2017), https://www.arabtimesonline.com/news/ministry-finance-says-not-recognise-virtual-currency-bitcoin/, *archived at* https://perma.cc/DBZ9-E66N.

[524] Darius McQuaid, *Kuwait Refuses to Trade Cryptocurrency Amid Price Surge*, EXPRESS (Dec. 20, 2017), https://www.express.co.uk/finance/city/894639/bitcoin-banned-Kuwait-KPMG, *archived at* https://perma.cc/KX9A-VM73.

[525] Press Release, Central Bank of Kuwait (Jan. 18, 2018), http://www.cbk.gov.kw/ar/cbk-news/announcements-and-press-releases/press-releases.jsp?kcp=o8QTtSFuP5Ix5WoYWwA74iHHhdsnIQ (in Arabic), *archived at* https://perma.cc/RXB3-F447.

[526] Notice No. 900, 19 Dec. 2013, Banque du Liban, http://www.bdl.gov.lb/news/more/5/111/65 (in Arabic), *archived at* https://perma.cc/XAW8-FT7N.

[527] Brooke Anderson, *Salameh: Central Bank to Launch Digital Currency*, THE DAILY STAR (Oct. 27, 2017), http://www.dailystar.com.lb/Business/Local/2017/Oct-27/424064-salameh-central-bank-to-launch-digital-currency.ashx, *archived at* https://perma.cc/57JH-T5R8.

Salameh explained that the new currency will be monitored by the BDL and be subject to Lebanese law, but did not state how this will be done or provide a time frame.[528]

Salameh also again expressed his opposition to the use of bitcoin, explaining that its use, which is not regulated, constitutes a threat to consumers and to the payment system in Lebanon.[529]

**Morocco**

In a press release posted on its official website, the Moroccan Exchange Office informed the public that the transactions effectuated through virtual currencies constitute a violation of the exchange regulations and are subject to penalties and fines provided by the texts in force.[530]

The Office called on the persons concerned to abide by the exchange regulations, which provide that financial transactions with foreign entities must be effectuated through approved intermediaries and with foreign currencies listed by the Bank Al-Maghrib.

The release also warns of the risks associated with the use of a virtual system of payment that is not backed by a financial institution.

The release finally states that the Exchange Office, in collaboration with the Bank of Al-Maghrib and the Professional Grouping of the Banks of Morocco, are following with interest the evolution of virtual currencies in Morocco.

The release does not bear a date but media reports indicate that it was issued in November 2017.[531]

**Oman**

The Central Bank of Oman's board issued a press release in December 2017 declaring that there are no policies or guidelines to regulate "digital currencies" or "cryptocurrencies." It also urged Omani citizens to be cautious when dealing with cryptocurrencies, asserting that the Central Bank is not responsible for any financial consequences stemming from dealings in cryptocurrencies.[532]

---

[528] *Id.*

[529] *Id.*

[530] Press Release, Office des Changes, Mise au point au sujet de l'utilisation des monnai es virtuelle [Focusing on the use of virtual currency] (undated) http://www.oc.gov.ma/portal/sites/default/files/actualites/communiqu%C3%A9%20monnaies%20virtuelles.pdf (in French) (last visited Mar. 21, 2018), *archived at* https://perma.cc/B3K7-T6Z6.

[531] Sana Elouazi, *Bye-Bye Bitcoin: Morocco Bans Cryptocurrencies*, MOROCCO WORLD NEWS (Nov. 21, 2017), https://www.moroccoworldnews.com/2017/11/234382/bitcoin-morocco-cryptocurrencies-economy/, *archived at* https://perma.cc/2SEL-XLAU.

[532] Press Release, Central Bank of Oman (Dec. 12, 2017), http://www.cbo-oman.org/news/PressRelease18Dec17.pdf (in Arabic), *archived at* https://perma.cc/CL9W-F7VC.

## Qatar

In February 2018 the Supervision and Control of Financial Institution Division at Qatar's Central Bank issued a circular to all banks operating in Qatar warning against trading in bitcoin. The circular described bitcoin as illegal and unsupported by any central bank or government. It also stated that trade in cryptocurrencies involves high risks of price volatility and the risk of being used in financial crimes.  Finally, the circular prohibited all banks operating in Qatar from dealing with cryptocurrencies, subject to penalties for violators.[533]

## Saudi Arabia

The Saudi Arabian Monetary Agency (SAMA) has issued a warning against bitcoin because it is not being monitored or supported by any legitimate financial authority.[534]

In October 2017, SAMA announced that it will implement a pilot project to issue a local digital currency (Riyal) that will only be used in transactions among banks.[535]

## United Arab Emirates

Under article D.7.3 of the Regulatory Framework for Stored Values and an Electronic Payment System, issued by the Central Bank of the United Arab Emirates in January 2017, all transactions in "virtual currencies" (encompassing cryptocurrencies in Arabic) are prohibited.[536]

In January 2018, the governor of the UAE Central Bank, Mubarak Rashid Al-Mansoori, reiterated a warning against trading in cryptocurrencies. According to news reports, when Al-Mansouri was asked about his views concerning cryptocurrencies, he said that citizens should avoid these types of currencies because they are not approved by the Central Bank. Previously, in October 2017, Al-Mansouri issued a warning pertaining to cryptocurrencies, which said that such currencies were susceptible to use in money laundering or terrorism funding. He also added that cryptocurrencies such as bitcoin cannot be monitored by any legitimate financial authority.[537]

---

[533] Circular No. 6/2018, Central Bank of Qatar (Feb. 2, 2018), http://www.qcb.gov.qa/sitelists/CircularsTo Banks/Lists/Circulars/Attachments/173/Circular%20no.%206-2018.pdf,*archived at* https://perma.cc/AKG5-TJLF.

[534] Statement, Saudi Arabian Monetary Agency (July 4, 2017), https://twitter.com/SAMA_GOV/status/882190896 967692288 (in Arabic), *archived at* https://perma.cc/V552-BSBU.

[535] *SAMA to Launch Digital Riyals for Banks*, ARAB NEWS (Oct. 5, 2017), http://www.arabnews.com/node/1172906/business-economy, *archived at* https://perma.cc/XC72-Y8U5.

[536] Central Bank of the United Arab Emirates, Regulatory Framework for Stored Values and an Electronic Payment System art. D.7.3 (Jan. 1, 2017), https://www.centralbank.ae/en/pdf/notices/Regulatory-Framework-For-Stored-Values-And-Electronic-Payment-Systems-En.pdf, *archived at* https://perma.cc/R2GF-UF4W.

[537] Sarah Diaa, *UAE Central Bank Warns against Cryptocurrencies Again*, GULF NEWS (Feb. 10, 2018), http://gulfnews.com/business/sectors/markets/uae-central-bank-warns-against-cryptocurrencies-again-1.2171259, *archived at* https://perma.cc/7M44-9YXX.

Regulation of Cryptocurrency Around the World

## Sub-Saharan Africa

**Ghana**

In January 2018, the Bank of Ghana issued a brief notice to banks and the general public advising against the use of "virtual or digital currencies, also known as cryptocurrencies," mainly because such currencies and the entities that facilitate their transactions are not sanctioned by the government.[538] The notice stated that

> [t]he Bank of Ghana wishes to notify the general public that these activities in digital currency are currently not licensed under the Payments System Act 2003 (Act 662).
>
> . . .
>
> The public is therefore strongly encouraged to do business with only institutions licensed by the Bank of Ghana to ensure that such transactions fall under our regulatory purview.[539]

**Kenya**

In December 2015, the Central Bank of Kenya issued a public notice titled "Caution to the Public on Virtual Currencies such as bitcoin."[540] The notice stated that virtual currencies are not legal tender and remain unregulated in Kenya, which means that "no protection exists in the event that the platform that exchanges or holds the virtual currency fails or goes out of business."[541] It outlined the risks associated with the use, holding of, and/or trading of virtual currencies as follows:

- Transactions in virtual currencies such as bitcoin are largely untraceable and anonymous making them susceptible to abuse by criminals in money laundering and financing of terrorism.

- Virtual currencies are traded in exchange platforms that tend to be unregulated all over the world. Consumers may therefore lose their money without having any legal redress in the event these exchanges collapse or close business.

- There is no underlying or backing of assets and the value of virtual currencies is speculative in nature. This may result in high volatility in value of virtual currencies thus exposing users to potential losses.[542]

---

[538] Bank of Ghana, Digital and Virtual Currencies Operations in Ghana, Notice No. BG/GOV/SEC/2018/02 (Jan. 22, 2018), https://www.bog.gov.gh/privatecontent/Public_Notices/Digital and Virtual Currencies Operations in Ghana.pdf, *archived at* https://perma.cc/4XYQ-KP7G.

[539] *Id.*

[540] *Caution to the Public on Virtual Currencies such as Bitcoin*, CENTRAL BANK OF KENYA (Dec. 2015), https://www.centralbank.go.ke/images/docs/media/Public_Notice_on_virtual_currencies_such_as_Bitcoin.pdf, *archived at* https://perma.cc/EE4P-UZ57.

[541] *Id.*

[542] *Id.*

The notice concluded with a warning to the public to "desist from transacting in Bitcoin and similar products."[543]

## Lesotho

In November 2017, the Central Bank of Lesotho issued a press statement regarding the growing popularity of cryptocurrencies.[544]  In it the Bank warned the public of the risks associated with the use of cryptocurrencies, given the fact that the Bank "does not oversee, supervise or regulate the cryptocurrencies, their systems, promoters or intermediaries," and stated that

> [a]ny activities related to the acquisition, trading or use of cryptocurrencies is at the user's sole and independent risk. Members of the public are therefore notified that in the event of losses or similar eventualities, there shall not be recourse to the Central Bank of Lesotho.[545]

The Bank also warned the public of the risk of exposure to criminal charges that may result from the use of cryptocurrencies, stating

> it is important to highlight that cryptocurrencies expose participants to violation of:
> - Anti-money laundering and combating of terrorist financing laws;
> - Tax laws; and
> - Exchange control laws
>
> Which are prosecutable transgressions.[546]

The Bank issued a follow-up statement in February 2018, where in addition to providing information that reinforced the contents of the previous statement, it noted that cryptocurrencies are neither legal tender in Lesotho nor considered foreign currency.[547]  It also barred the operation of individuals and entities that promote investment in cryptocurrency because any and all investment advisors must be licensed.[548]

---

[543] *Id.*

[544] Press Statement, Central Bank of Lesotho, The Emerging and Growing Promotion of Cryptocurrencies (Nov. 9, 2017), https://www.centralbank.org.ls/images/Public_Awareness/Press_Release/Press_Release_-Bitcoin.pdf, https://perma.cc/ZK6H-JZQ3.

[545] *Id.*

[546] *Id.*

[547] Press Statement, Central Bank of Lesotho, The Emerging and Growing Promotion of Cryptocurrencies (Feb. 7, 2018), https://www.centralbank.org.ls/images/Public_Awareness/Article/CRYPTOCURRENCY_1st__2018_PRESS_RELEASE_HALF_PG.pdf, *archived at* https://perma.cc/9F7Y-7NYA.

[548] *Id.*

## Mozambique

On January 8, 2018, the Mozambican Federal Reserve Bank (Banco de Moçambique), issued a notice (Comunicado) in its role as supervisor of the financial system in the country informing citizens that a decentralized and convertible virtual currency called bitcoin is circulating in the national territory.[549]

The Bank clarified that it does not regulate or supervise any activity or transaction carried out through bitcoins and is not responsible for any impacts of transactions related to bitcoin, because this currency does not have legal support and is not issued by the national monetary authority, the Bank.

The notice further stated that companies that negotiate bitcoins are not regulated, authorized, or supervised by the Bank; that such virtual currency offers no security, being vulnerable to fraud and other crimes perpetrated using computer means; that its price is highly volatile; and that it allows for the execution of anonymous transactions, favoring criminal activities.[550]

## Namibia

In September 2017, the Bank of Namibia issued a position paper titled "Position on Distributed Ledger Technologies and Virtual Currencies in Namibia"[551] in which it noted that virtual currencies are not considered legal tender and are currently unregulated in the country.[552] The Bank outlined the risks associated with the use of virtual currencies, including credit risks, liquidity risks, operational risks, and legal risks.[553] It warned that individuals who hold or trade in virtual currencies do so "at their own risk and should exercise caution."[554] The Bank further stated that because the country's relevant laws do not envisage their existence, virtual currency exchanges cannot be established or operate in Namibia.[555]

---

[549] *Alerta Sobre os Riscos Decorrentes de Transações Relacionadas com Bitcoins*, Banco de Moçambique (Jan. 9, 2018), http://www.bancomoc.mz/Noticias.aspx?search=822 (click on the Word Document icon), *archived at* https://perma.cc/3AAZ-A73V.

[550] *Id.*

[551] Bank of Namibia, *Position on Distributed Ledger Technologies and Virtual Currencies in Namibia* (Position Paper, Sept. 2017), https://www.bon.com.na/CMSTemplates/Bon/Files/bon.com.na/cd/cd7ea698-3e85-4b79-b111-c97c7fae20fc.pdf, *archived at* https://perma.cc/ZUB4-XTGN.

[552] *Id.* § 3.10.

[553] *Id.* § 3.9.

[554] *Id.* § 3.10.

[555] *Id.* §§ 3.8 & 3.10.

Regulation of Cryptocurrency Around the World

## South Africa

At present, there are no specific laws or regulations governing the use or trading of virtual currencies (VCs) in South Africa.[556]  However, in December 2014 the South African Reserve Bank (SARB), the central banking institution whose responsibilities include formulating and implementing monetary policy and issuing banknotes and coins in the country, issued a position paper on virtual currencies.[557]

The position paper expressly stated that only the SARB may issue legal tender and that decentralized convertible virtual currencies (DCVCs), including bitcoin and litecoin, are not legal tender in South Africa.[558]  This means that "any merchant or beneficiary may refuse VCs as a means of payment."[559]

The SARB warned of various risks associated with the use of VCs, including issues relating to payment systems and payment service providers, price stability, money-laundering and terrorism financing, consumer risk, circumvention of exchange control regulations, and financial stability.[560] For instance, the position paper warns about risks that consumers are exposed to mainly due to the unregulated nature of VCs and the wild fluctuations in prices, which could result in heavy financial losses.[561]  This does not account for other risks such as losses incurred as the result of a security breach, fraud, and the absence of insurance mechanisms to cover losses, the SARB noted.[562]

Regarding the abovementioned risks, the SARB stated that "no legal protection or recourse is afforded to users, traders or intermediaries of VCs and such activities are performed at the end-users sole and independent risk."[563]

---

[556] *Virtual Currencies / Crypto-currencies*, SOUTH AFRICAN RESERVE BANK, https://www.resbank.co.za/RegulationAndSupervision/FinancialSurveillanceAndExchangeControl/FAQs/Pages/VirtualCurrenciesCryptocurrencies.aspx (last visited Mar. 20, 2018), *archived at* https://perma.cc/HH8P-H4BJ.

[557] SARB, *Position Paper on Virtual Currencies* (Dec. 3, 2014), https://www.golegal.co.za/wp-content/uploads/2018/01/Virtual-Currencies-Position-Paper-Final_02of2014.pdf, *archived at* https://perma.cc/A8L2-4MK6; *About Us*, SARB, https://www.resbank.co.za/AboutUs/Pages/About%20Us-Home.aspx (last visited Mar. 20, 2018), *archived at* https://perma.cc/TS79-2VFE.

[558] SARB, *Position Paper on Virtual Currencies*, *supra* note 557, §§ 2.1 & 3.2.

[559] *Virtual Currencies / Crypto-currencies*, SARB, *supra* note 556.

[560] SARB, *Position Paper on Virtual Currencies*, *supra* note 557, § 4.3.

[561] *Id.*

[562] *Id.*

[563] *Virtual Currencies / Crypto-currencies*, SARB, *supra* note 556.

Case 4:18-cv-04790/P5/2018-DD: 11069606 FbtFovn21118, Page 185 of 218
Case 4:18-cv-04790-PSF Document 17-1 Filed 09/21/18 Page 127 of 276

Regulation of Cryptocurrency Around the World

While the SARB's position paper warned individuals against involvement in trading or holding VCs, it also noted that it does not see VCs as posing any systemic threat at this time:

> Values ($6,25 billion) and volumes (60 000 daily average) currently traded in Bitcoin (the leading DCVC) remain insignificant when compared to the formal payment system and the larger economy. VCs are not considered legal tender in most jurisdictions. A multitude of independent variants of VCs exist and are being developed, all aimed at the same niche market. Based on the aforementioned, VCs (particularly DCs), at this stage of their development, are neither broad nor evasive enough to be classified as systemic.[564]

However, it emphasized the need for constant monitoring of DCVCs and said it "reserves the right to change its position should the landscape warrant regulatory intervention."[565]

On April 6, 2018, the South African Revenue Services (SARS) issued a clarification on the tax status of VCs.   SARS noted that it "will continue to apply normal income tax rules to cryptocurrencies and will expect affected taxpayers to declare cryptocurrency gains as part of their taxable income."[566]   Taxpayers must therefore declare all their cryptocurrency income and failure to do so could result in imposition of interest and penalties.[567]   SARS appears to have not made a determination whether gains made from trading cryptocurrency are subject to income tax or capital gains tax.[568]   It states that:

> Whilst not constituting cash, cryptocurrencies can be valued to ascertain an amount received or accrued as envisaged in the definition of "gross income" in the Act.  Following normal income tax rules, income received or accrued from cryptocurrency transactions can be taxed on revenue account under "gross income".

> Alternatively such gains may be regarded as capital in nature, as spelt out in the Eighth Schedule to the Act for taxation under the CGT paradigm.

> Determination of whether an accrual or receipt is revenue or capital in nature is tested under existing jurisprudence (of which there is no shortage).[569]

The amount of tax accrued to a person could differ a great deal depending on whether gains in VCs are taxed as income or capital gains.[570]

---

[564] SARB, *Position Paper on Virtual Currencies*, *supra* note 557, § 4.3.

[565] *Id*. §§ 4.3 & 5.3.

[566] Press Release, South Africa Revenue Services, SARS'S Stance on the Tax Treatment of Cryptocurrencies (Apr. 6, 2018), http://www.sars.gov.za/Media/MediaReleases/Pages/6-April-2018---SARS-stance-on-the-tax-treatment-of-cryptocurrencies-.aspx, *archived at* https://perma.cc/2ET9-V3KX.

[567] *Id*.

[568] *Id*.

[569] *Id*.

[570] *Capital Gains Tax (CGT)*, SOUTH AFRICAN REVENUE SERVICES, http://www.sars.gov.za/Tax-Rates/Income-Tax/Pages/Capital-Gains-Tax-(CGT).aspx, *archived at* https://perma.cc/7KRC-AKVT; *Rates of Tax for Individuals*, SOUTH AFRICAN REVENUE SERVICES, http://www.sars.gov.za/Tax-Rates/Income-Tax/Pages/Rates of Tax for Individuals.aspx, *archived at* https://perma.cc/2EVQ-GT94.

## Swaziland

In August 2017 the Central Bank of Swaziland issued a press release regarding virtual currencies.[571]   The Bank noted that cryptocurrency does not enjoy legal-tender status in Swaziland.[572]  The Bank also noted that bitcoin, a form of cryptocurrency currently being marketed and traded in Swaziland, is currently not regulated and this makes holding or trading the currency risky:

> [D]ue to its nature as a cryptocurrency, there are no restrictions, disclosures or regulatory compliance applicable to transactions executed using Bitcoin and yet, like any other currency, it can be used for illegal purposes or to facilitate fraudulent activity. In fact, the anonymity and speed of execution in transacting with cryptocurrency makes it more susceptible to abuse by unscrupulous persons.  This presents a risk to users of the currency because there is no protection or legal recourse available from any institution including the Central Bank in the event that the user suffers financial loss from the use of Bitcoin or any other cryptocurrency.[573]

## Uganda

In February 2017, the Bank of Uganda (BoU) issued a warning against the use of cryptocurrencies in general and the services of an unlicensed entity called One Coin Digital Money, citing the absence of investor protection schemes and relevant regulatory mechanisms.[574]  The Bank warned that "the entity 'ONE COIN DIGITAL MONEY' is not licensed by the BoU under the Financial Institutions Act, 2004 and is therefore conducting business outside the regulatory purview of the BoU," and that the "public is strongly encouraged to do business transactions with only licensed financial institutions."[575]

The Bank also warned that "whoever wishes to invest their hard earned savings in Cryptocurrency forms such as One-coin, Bitcoin, Ripple, Peercoin, Namecoin, Dogecoin, Litecoin, Bytecoin, Primecoin, Blackcoin or any other forms of Digital Currency is taking a risk in the financial space where there is neither investor protection nor regulatory purview."[576]

---

[571] Press Statement, Central Bank of Swaziland, Public Statement on Virtual Currencies ("Bitcoin") (Aug. 25, 2017), http://www.centralbank.org.sz/media/releases/cbsbitcoin.jpg, *archived at* https://perma.cc/GF5L-MYJ5.

[572] *Id.*

[573] *Id.*

[574] *Warning to the General Public about 'One Coin Digital Money' Operations in Uganda*, BANK OF UGANDA (Feb. 14, 2017), https://www.bou.or.ug/bou/bou-downloads/press_releases/2017/Feb/Bank-of-Uganda-warning-on-One-Coin-Digital-Money-in-Uganda.pdf, *archived at* https://perma.cc/LN6N-9HE6.

[575] *Id.*

[576] *Id.*

Case 4:18-cv-04790-P5H Document 27-1 Filed 09/21/18 Page 129 of 276
Case 4:18-cv-04790-P5H Document 27-1 Filed 09/21/18 Page 129 of 276

Regulation of Cryptocurrency Around the World

## Zambia

In February 2018, the Zambia Securities and Exchange Commission issued a notice on cryptocurrencies and other digital products.[577]  The Commission urged "any individuals or entities that are currently investing in or intend to invest in cryptocurrencies and related products/assets to exercise restraint and caution as they do so as the products/assets are largely unregulated and not subject to the jurisdiction of the Commission."[578]  While it did not ban their operation, the Commission cautioned platforms that facilitate cryptocurrency transactions "to ensure that they are not in any way abrogating any part of the [Securities] Act and that those that meet the description of securities in accordance with the Act are registered with the Commission."[579]

## Zimbabwe

In a December 2017 statement the Reserve Bank of Zimbabwe noted that virtual currencies are not legal tender in Zimbabwe and remain unregulated.[580]  It issued the following warning to the public regarding the risks presented with the use of cryptocurrencies:

> [T]he use of and trading in cryptocurrencies or virtual currencies is not regulated by the country's laws and presents risks such as money laundering, terrorism financing, tax evasion and fraud. Under the existing legal and regulatory dispensation, any person who invests in virtual currencies or participates in any transaction involving virtual currencies, does so at own risk and will not have legal protection from, or recourse against, any regulatory authority.[581]

---

[577] *Notice on Cryptocurrencies and Related Digital Products/Assets*, SECURITIES AND EXCHANGE COMMISSION (Feb. 13, 2018), http://www.seczambia.org.zm/notice-on-cryptocurrencies-and-related-digital-products-assets/, *archived at* https://perma.cc/KE69-J3KR.

[578] *Id.*

[579] *Id.*

[580] Press Statement, Reserve Bank of Zimbabwe, Use of Virtual Currencies in Zimbabwe (Dec. 20, 2017), http://www.rbz.co.zw/assets/press-statement---use-of-virtual-currencies-in-zimbabwe.pdf, *archived at* https://perma.cc/66FA-Q6MV.

[581] *Id.*

Case 4:18-cv-04790-PJH Document 17-6 Filed 09/21/18 Page 130 of 276
Case 4:18-cv-04790-PJH Document 17-6 Filed 09/21/18 Page 130 of 276
Regulation of Cryptocurrency Around the World

# Central Asia

## Kazakhstan

On March 30, 2018, the head of the Kazakhstan National Bank, Daniyar Akishev, stated that the National Bank had a very conservative position on the issue of cryptocurrencies and welcomed only strict restrictions because of multiple issues related to consumer protection, money laundering, and tax avoidance. He added that legislative amendments had already been prepared to prohibit the purchase and sale of cryptocurrencies for national currency, ban the activity of exchanges, and ban any type of mining.[582] No information was found indicating that the proposed amendments have been enacted.

## Uzbekistan

On February 19, 2018, President Shavkat Mirziyoyev signed a decree[583] instructing the Central Bank of Uzbekistan and several other agencies to develop a legislative framework for the use of digital money on the territory of Uzbekistan by September 1, 2018.[584] In September of 2017 the Central Bank expressed the opinion that it was not advisable to allow operations with cryptocurrencies because of the possibility of terrorism financing and other criminal activities.[585]

## Kyrgyzstan

On January 17, 2018, the head of Kyrgyzstan's National Bank, Tolkunbek Abdygulov, stated that the Bank did not plan to impede the development of the cryptocurrency market in Kyrgyzstan. He noted that it is very difficult to ban something that the Central Bank does not issue and that citizens of Kyrgyzstan investing in cryptocurrency do so at their own risk and peril.[586] In October of 2017 the Central Bank reportedly stated that it was not considering introducing any prohibitive or restrictive measures regarding the mining of cryptocurrency.[587]

---

[582] *Kazakhstan Mulls Complete Ban of Every Digital Currency Operation in Country*, SPUTNIKNEWS INTERNATIONAL (Mar. 30, 2018), https://sputniknews.com/asia/201803301063085023-kazakhstan-digital-currency-mining-ban/, *archived at* https://perma.cc/SNX2-KM7V.

[583] Decree of the President of the Republic of Uzbekistan No. PP-3549 of Feb. 19, 2018, NATIONAL LEGISLATIVE DATABASE No. 07/18/3549/0790 of Feb. 20, 2018, http://lex.uz/pages/getpage.aspx?lact_id=3564641 (in Russian), *archived at* https://perma.cc/X4N9-DXGR.

[584] Daniyar Karimov, *Uzbekistan Has Revised Its Views on Virtual Currency*, RG.RU (Feb. 21, 2018), https://rg.ru/2018/02/21/uzbekistan-peresmotrel-otnoshenie-k-virtualnoj-valiute.html (in Russian), *archived at* https://perma.cc/TFH9-QHCP.

[585] Press Release, Central Bank of the Republic of Uzbekistan, On Cryptocurrency (Sept. 16, 2017), http://cbu.uz/uzc/press-tsentr/press-relizy/2017/09/93262/ (in Uzbek), *archived at* https://perma.cc/K9CS-FB9G.

[586] Maksat Elebesov, *Will the Cryptocurrency Be Banned in Kyrgyzstan?*, SPUTNIK KYRGYZSTAN (Jan. 17, 2018), https://ru.sputnik.kg/economy/20180117/1037290672/zapretyat-li-kriptovalyutu-v-kyrgyzstane-otvet-glavy-nacbanka.html (in Russian), *archived at* https://perma.cc/XA83-4NJV.

[587] Artem Petrov, *Bitcoin and Others, Monetary Authorities of the Kyrgyz Republic Warn about the Risks of Using Cryptocurrency*, RG.RU (Oct. 4, 2017), https://rg.ru/2017/10/04/nacbank-kr-predupredil-o-riskah-ispolzovaniia-kriptovaliut.html (in Russian), *archived at* https://perma.cc/BN5S-K6QL.

**Tajikistan**

On January 15, 2018, the National Bank of Tajikistan issued a statement warning the citizens of the republic about the risks associated with the use of cryptocurrency. The Bank believes that, due to their anonymity, many cryptocurrency transactions can be used for conducting doubtful operations. According to the Bank, cryptocurrency can be exposed to cyberattacks or used for money laundering and terrorist financing. The Bank also clarified that in Tajikistan cryptocurrency cannot be considered an official means of exchange or savings, or a unit of account.[588]

---

[588] Abdullo Ashurov, *The National Bank of Tajikistan Explained Its Position on Cryptocurrencies*, Radio Ozodi (Jan. 15, 2018), https://rus.ozodi.org/a/28976882.html (in Russian), *archived at* https://perma.cc/553E-8JMN.

Regulation of Cryptocurrency Around the World

## South Asia

**Bangladesh**

On December 24, 2017, the Central Bank of Bangladesh issued a cautionary notice that cryptocurrencies are illegal in Bangladesh.[589] According to a news report, the notice states that "[t]ransaction [sic] with this currency may cause a violation of the existing money laundering and terrorist financing regulations."[590] The notice states that bitcoin transactions "are not authorized by the Bangladesh Bank or any regulatory agencies, and do not conform with the provisions under the Foreign Exchange Regulation Act, 1947; Anti-Terrorism Act, 2009; and the Money Laundering Prevention Act, 2012."[591] Also, according to the notice,

> [o]nline transaction [sic] of virtual currencies with any unnamed or pseudo named parties may cause a violation of the above-mentioned acts. . . . .[T]ransactions through online networks involving cryptocurrency are not approved by any central payment system and as such people can be financially harmed and may face legal consequences.
>
> Under the circumstances, the citizens have been asked to refrain from performing, assisting, and advertising all kind of transactions through virtual currencies like Bitcoin to avoid financial and legal damages.[592]

Law enforcement agencies, including the Foreign Exchange Police Department, Bangladesh Financial Intelligence Unit (BFIU), and Bangladesh Telecommunication Regulatory Commission (BTRC), have reportedly already held four meetings on "hunting down those using cryptocurrencies."[593]

---

[589] Central Bank of Bangladesh, Cautionary Notice on Bitcoin Transactions, https://www.bb.org.bd/mediaroom/noticeboard.php (in Bangladeshi), *archived at* https://perma.cc/7VEN-LYD7; *see also* Abdur Rahim Harmachi, *Bangladesh Bank Warns Against Transaction in 'Illegal' Bitcoin, Other Cryptocurrencies*, BDNEWS24.COM (Dec. 27, 2017), https://bdnews24.com/economy/2017/12/27/bangladesh-bank-warns-against-transaction-in-illegal-bitcoin-other-cryptocurrencies, *archived at* https://perma.cc/2APB-ZSZV.

[590] Golam Mowla, *Central Bank Issues Notice Banning Bitcoin in Bangladesh*, DHAKA TRIBUNE, (Dec. 27, 2017), http://www.dhakatribune.com/business/banks/2017/12/27/bangladesh-bank-ban-bitcoin/, *archived at* https://perma.cc/T6DH-Y9G5.

[591] Central Bank of Bangladesh, Cautionary Notice on Bitcoin Transactions, *supra* note 589 (English translation from the original Bengali provided by Law Library Reference Librarian Shameema Rahman).

[592] *Id.*

[593] Golam Mowla, *Police on the Hunt for Bitcoin Users in Bangladesh*, DHAKA TRIBUNE (Feb. 19, 2018), http://www.dhakatribune.com/bangladesh/crime/2018/02/19/police-hunt-bitcoin-users-bangladesh/, *archived at* https://perma.cc/M782-EKLR.

Regulation of Cryptocurrency Around the World

## India

The government of India stated in early 2018 that cryptocurrencies such as bitcoin are not legal tender in India.[594] While the government has not yet enacted a regulatory framework for cryptocurrencies,[595] the Reserve Bank of India (RBI) has advised caution on their use and has issued three notifications[596] that "cautioned users, holders and traders on the risk of these currencies and clarified that it has not given any licence or authorisation to any entity or company to operate such schemes or deals."[597]

Most recently, on April 6, 2018, the RBI issued a notification prohibiting banks, lenders and other regulated financial institutions from "dealing with virtual currencies," which stipulated that "[i]n view of the associated risks, it has been decided that, with immediate effect, entities regulated by the Reserve Bank shall not deal in VCs or provide services for facilitating any person or entity in dealing with or settling VCs. Such services include maintaining accounts, registering, trading, settling, clearing, giving loans against virtual tokens, accepting them as collateral, opening accounts of exchanges dealing with them and transfer / receipt of money in accounts relating to purchase/ sale of VCs."[598] Moreover, the RBI stated that "[r]egulated entities which already provide such services shall exit the relationship within three months from the date of this circular."[599] However, Deputy Governor B.P. Kanungo, in a policy press conference, did "recognize that the blockchain technology or the distributed ledger technology that lies beneath the virtual currencies has potential benefits for financial inclusion and enhancing the efficiency of the financial system" and stated that the RBI has "constituted an inter-departmental committee in Reserve Bank of India who will produce a report and they will explore the feasibility and desirability of issuing a digital currency by the central bank."[600]

---

[594] P. Suchetana Ray, *Govt Plans to Bring in Law to Regulate Cryptocurrency Trade, Forms Panel*, HINDUSTAN TIMES (Jan. 14, 2018), https://www.hindustantimes.com/india-news/government-plans-to-bring-in-law-to-regulate-cryptocurrency-trade/story-SpAO63DDfk6Gg7lo5yNKCJ.html, *archived at* https://perma.cc/6HLK-G9LD.

[595] Seema Jhingan et al., LexCounsel Law Offices, *India: Legal Status of Virtual Currencies/Cryptocurrencies in India*, MONDAQ (Apr. 6, 2017), http://www.mondaq.com/india/x/583670/fin+tech/Legal+Status+Of+Virtual+CurrenciesCryptocurrencies+In+India, *archived at* https://perma.cc/5H4T-Y3TT.

[596] Press Release, Reserve Bank of India, RBI Cautions Users of Virtual Currencies against Risks (Dec. 24, 2013), https://www.rbi.org.in/Scripts/BS_PressReleaseDisplay.aspx?prid=30247, *archived at* https://perma.cc/KFB8-JPZ7; Press Release, Reserve Bank of India, RBI Cautions Users of Virtual Currencies (Feb. 1, 2017), https://www.rbi.org.in/Scripts/BS_PressReleaseDisplay.aspx?prid=39435, *archived at* https://perma.cc/9VTJ-UEL2; Press Release, Reserve Bank of India, Reserve Bank Cautions Regarding Risk of Virtual Currencies including Bitcoins (Dec. 5, 2017), https://rbi.org.in/scripts/BS_PressReleaseDisplay.aspx?prid=42462, *archived at* https://perma.cc/B4TK-TL5U.

[597] Vivina Vishwanathan, *Bitcoin Regulations in India*, LIVEMINT (Dec. 21 2017), http://www.livemint.com/Money/uQIHZ7521LBgHClnuP66YM/Bitcoin-regulations-in-India.html, *archived at* https://perma.cc/527R-43SG.

[598] Press Release, Reserve Bank of India, Prohibition on Dealing in Virtual Currencies (VCs) (Apr. 6, 2018), https://www.rbi.org.in/Scripts/NotificationUser.aspx?Id=11243&Mode=0, *archived at* https://perma.cc/EFW3-HCXG.

[599] *Id.*

[600] Reserve Bank of India, Edited Transcript of Reserve Bank of India's First Bi-Monthly Policy Press Conference (Apr. 5, 2018), https://www.rbi.org.in/Scripts/bs_viewcontent.aspx?Id=3465, *archived at* https://perma.cc/ZD5A-STF7.

Reports in early 2018 indicated that the government is in the process of drafting a law to regulate trade of cryptocurrencies in India and "has formed a committee to fast track the process," according to the *Hindustani Times*.[601] The government has expressed two main concerns that the law will address: "the source of money being used to trade in [cryptocurrencies]; and regulation of exchanges of VC [virtual currency] to protect the common man," one government official was quoted as saying.[602]

An interdisciplinary committee, chaired by the Special Secretary (Economic Affairs), was established in April 2017 "to examine the existing framework with regard to Virtual Currencies."[603] The committee has nine members including representatives from the Department of Economic Affairs, Department of Financial Services, Department of Revenue (CBDT), Ministry of Home Affairs, Ministry of Electronics and Information Technology, Reserve Bank of India, National Institution for Transforming India (NITI Aayog), and State Bank of India. The role of the committee is to

> (i) take stock of the present status of Virtual Currencies both in India and globally; (ii) examine the existing global regulatory and legal structures governing Virtual Currencies; (iii) suggest measures for dealing with such Virtual Currencies including issues relating to consumer protection, money laundering, etc.; and (iv) examine any other matter related to Virtual Currencies which may be relevant.[604]

On August 7, 2017, *Business Line* reported that the committee had submitted its report, but details of the report had not been made available to the public.[605]

On December 29, 2017, India's Ministry of Finance released a press statement that cautioned investors about the "real and heightened" risks of trading in cryptocurrencies such as bitcoin, saying virtual currency investments are similar to "Ponzi schemes."[606] According to a February 1, 2018, news report, the Minister of Finance told lawmakers in Parliament that "[t]he government does not consider cryptocurrencies legal tender or coin and will take all measures to eliminate use of these crypto-assets in financing illegitimate activities or as part of the payment system," but

---

[601] Ray, *supra* note 594.

[602] *Id.*

[603] Press Release, Government of India, Ministry of Finance, Government Constitutes an Inter-Disciplinary Committee Chaired by Special Secretary (Economic Affairs) to Examine the Existing Framework with Regard to Virtual Currencies (Apr. 12, 2017), http://pib.nic.in/newsite/PrintRelease.aspx?relid=160923, *archived at* https://perma.cc/B952-YSLS.

[604] *Id.*

[605] *Panel on Crypto-currency Submits Report to Jaitley*, BUSINESS LINE (Aug. 7, 2017), https://www.thehindu businessline.com/economy/policy/panel-on-cryptocurrency-submits-report-to-jaitley/article9805978.ece, *archived at* https://perma.cc/3N3G-352Q.

[606] Press Release, Government of India, Ministry of Finance, Government Cautions People Against Risks in Investing in Virtual 'Currencies'; Says VCs are like Ponzi Schemes (Dec. 29, 2017), http://www.pib.nic.in/PressReleseDetail.aspx?PRID=1514568, *archived at* https://perma.cc/MN8M-BWQE.

Case 4:18-cv-04790-PSF Document 27-1 Filed 09/21/18 Page 135 of 276
Case 4:18-cv-04790-PSF Document 27-1 Filed 09/21/18 Page 123 of 218

Regulation of Cryptocurrency Around the World

"[t]he government will explore use of blockchain technology proactively for ushering in [the] digital economy."[607]

On November 13, 2017, the Supreme Court of India admitted under article 32 of the Constitution a Public Interest Litigation writ petition against the Union of India and issued a notice[608] to the Ministry of Finance, Minister of Law and Justice, Ministry of Electronics and Information Technology, Securities and Exchange Board of India, and Reserve Bank of India. The petition seeks "a regulatory framework to be laid down on Crypto Currency and wanted that the virtual currency be made accountable to the exchequer."[609]

The Supreme Court previously heard a petition in July 2017 that sought "a similar kind of regulatory framework":

> A Public Interest Litigation [PIL] was filed (Writ Petition (Civil) no. 406 of 2017) under Article 32 of the Constitution against Union of India, Ministry of Finance and the Reserve Bank of India over the use and business of Bitcoins, Litecoins, Ethereum etc. The Supreme Court on July 14, 2017, directed the RBI and the other concerned ministries to clarify their stance and enact a bill on the same before disposing off the PIL.[610]

## Nepal

On August 13, 2017, Nepal Rastra Bank issued a notice that "all transactions related to or regarding bitcoins are illegal."[611] In early October 2017, a police team from the Central Investigation Bureau (CIB) of the Nepal Police "for the first time arrested seven persons for allegedly running bitcoin exchange business from various parts of the country," the *Kathmandu Post* reported.[612]

---

[607] *India Turns Against Bitcoin but Embraces Blockchain*, BLOOMBERG (Feb. 1, 2018), https://www.bloomberg.com/news/articles/2018-02-01/india-to-curb-cryptocurrency-use-while-embracing-blockchain, *archived at* https://perma.cc/A5QP-YPBB.

[608] Dwaipayan Bhowmick v. Union of India & Ors., Writ Petition (Civ.) No. 1076/2017 (Nov. 13, 2017), http://supremecourtofindia.nic.in/supremecourt/2017/35252/35252_2017_Order_13-Nov-2017.pdf, *archived at* https://perma.cc/52JQ-8RAB.

[609] SS Rana & Co., *India: SC Asks Govt. to Regulate Crypto Currency*, LEXOLOGY (Nov. 21 2017), https://www.lexology.com/library/detail.aspx?g=4cc566a7-048b-449a-b535-9eb7b3626f78#_ftn1, *archived at* https://perma.cc/ED6V-EK8B.

[610] *Id.*

[611] Nepal Rastra Bank (NRB), Bitcoin Notice, https://nrb.org.np/fxm/notices/BitcoinNotice.pdf (in Bangladeshi), *archived at* https://perma.cc/856B-8JQ8; *see also* Atit Babu Rijal, Op-Ed., *The Future of Cryptocurrencies*, KATHMANDU POST (Dec 27, 2017), http://kathmandupost.ekantipur.com/news/2017-12-27/the-future-of-cryptocurrencies.html, *archived at* https://perma.cc/EQG6-HMT6.

[612] *7 Nabbed for Running Bitcoin Exchange Business*, KATHMANDU POST (Dec. 27, 2017), http://kathmandupost.ekantipur.com/news/2017-10-06/7-nabbed-for-running-bitcoin-exchange-business.html, *archived at* https://perma.cc/J4BY-4Q7E.

Regulation of Cryptocurrency Around the World

## Pakistan

Currently there does not appear to be any specific law that regulates cryptocurrencies or the trade in cryptocurrencies in Pakistan. In May 2017, the State Bank of Pakistan (SBP) stated that it does not recognize digital currencies.[613] On April 6, 2018, the SBP issued a press release cautioning the general public on the risk of virtual currencies:

> [The] General Public is advised that Virtual Currencies/Coins/Tokens (like Bitcoin, Litecoin, Pakcoin, OneCoin, DasCoin, Pay Diamond etc.) are neither recognized as a Legal Tender nor has SBP authorized or licensed any individual or entity for the issuance, sale, purchase, exchange or investment in any such Virtual Currencies/Coins/Tokens in Pakistan. Further, Banks/ DFIs/ Microfinance Banks and Payment System Operators (PSOs)/ Payment Service Providers (PSPs) have been advised not to facilitate their customers/account holders to transact in Virtual Currencies/ Initial Coin Offerings (ICOs) /Tokens vide BPRD's Circular No. 03 of 2018.[614]

The Federal Board of Revenue (FBR) "is currently investigating the traders of digital currencies for tax evasion and money laundering," according to news sources.[615] Moreover, the Federal Investigation Agency (FIA) has "launched operations against the people dealing in the cryptocurrencies," according to a February 10, 2018, news report.[616]

---

[613] Mubarak Zeb Khan, *FBR Goes After Bitcoin Trader*, DAWN (May 25, 2017), https://www.dawn.com/news/1335184, *archived at* https://perma.cc/7VBW-LL6C.

[614] Press Release, State Bank of Pakistan (SBP), Caution Regarding Risks of Virtual Currencies (Apr. 6 2018), http://www.sbp.org.pk/press/2018/Pr-VC-06-Apr-18.pdf, *archived at* https://perma.cc/L76H-PN8U.

[615] Mubarak Zeb Khan, *supra* note 613.

[616] Nozair Hanif Mirza, *FIA Springs Into Action Against Cryptocurrencies, One Held*, DAILY PAKISTAN (GLOBAL) (Feb. 10, 2018), https://en.dailypakistan.com.pk/pakistan/fia-swings-into-action-against-cryptocurrencies-one-held/, *archived at* https://perma.cc/P7KK-RK7G.

Case 4:18-cv-04790-PSR Document 27-1 Filed 09/21/18 Page 157 of 216
Case 4:18-cv-04790-PSR Document 97-1 Filed 09/21/18 Page 157 of 276
Regulation of Cryptocurrency Around the World

# East Asia and the Pacific

**Australia**

In August 2015, the Australian Parliament's Senate Economic References Committee published a report titled "Digital Currency – Game Changer or Bit Player,"[617] following the completion of an inquiry into "how to develop an effective regulatory system for digital currency, the potential impact of digital currency technology on the Australian economy, and how Australia can take advantage of digital currency technology."[618] The government responded to the Committee's recommendations in May 2016.[619] This included responses regarding the tax treatment of cryptocurrencies, which noted aspects of the following actions of the Australian Taxation Office (ATO).

The ATO has published a guidance document on the tax treatment of virtual currencies.[620] The general guidance follows the finalization, in December 2014, of various rulings relating to the application of tax laws to bitcoin and other cryptocurrencies.[621] According to the guidance, transacting with cryptocurrencies is "akin to a barter arrangement, with similar tax consequences."[622] This is because, in the view of the ATO, such currencies are "neither money nor

---

[617] SENATE ECONOMIC REFERENCES COMMITTEE, DIGITAL CURRENCY – GAME CHANGE OR BIT PLAYER (Aug. 2015), https://www.aph.gov.au/Parliamentary_Business/Committees/Senate/Economics/Digital_currency/~/media/Committees/economics_ctte/Digital_currency/report.pdf, *archived at* https://perma.cc/9C8Z-L76P.

[618] *Digital Currency*, PARLIAMENT OF AUSTRALIA, https://www.aph.gov.au/Parliamentary_Business/Committees/Senate/Economics/Digital_currency (last visited Mar. 1, 2018), *archived at* https://perma.cc/T5XB-BNY2.

[619] Australian Government Response to the Senate Economic References Committee Report: Digital Currency – Game Changer or Bit Player (May 2016), https://www.aph.gov.au/DocumentStore.ashx?id=4f9bcf03-5867-449c-85ad-b8dd01d7459c, *archived at* https://perma.cc/U6WP-VYKU.

[620] *Tax Treatment of Crypto-Currencies in Australia – Specifically Bitcoin*, AUSTRALIAN TAXATION OFFICE (ATO), https://www.ato.gov.au/General/Gen/Tax-treatment-of-crypto-currencies-in-Australia---specifically-bitcoin/ (last updated Dec. 21, 2017), *archived at* https://perma.cc/UFZ7-QSUG.

[621] ATO, Income Tax: Is Bitcoin a 'Foreign Currency' for the Purposes of Division 775 of the Income Tax Assessment Act 1997 (ITAA 1997)? (TD 2014/25), https://www.ato.gov.au/law/view/document?src=hs&pit=99991231235958&arc=false&start=1&pageSize=10&total=7&num=3&docid=TXD/TD201425/NAT/ATO/00001&dc=false&tm=and-basic-TD 2014/25 (last visited Mar. 1, 2018), *archived at* https://perma.cc/DS47-Y2JW; ATO, Income Tax: Is Bitcoin a 'CGT Asset' for the Purposes of Subsection 108-5(1) of the Income Tax Assessment Act 1997? (TD 2014/26), https://www.ato.gov.au/law/view/document?src=hs&pit=99991231235958&arc=false&start=1&pageSize=10&total=7&num=2&docid=TXD/TD201426/NAT/ATO/00001&dc=false&tm=phrase-basic-TD 2014/26 (last visited Mar. 1, 2018), *archived at* https://perma.cc/B9QN-N4FM; ATO, Income Tax: Is Bitcoin Trading Stock for the Purposes of Subsection 70-10(1) of the Income Tax Assessment Act 1997 (ITAA 1997)? (TD 2014/27), https://www.ato.gov.au/General/Gen/Tax-treatment-of-crypto-currencies-in-Australia---specifically-bitcoin/ (last visited Mar. 1, 2018), *archived at* https://perma.cc/BS2E-UZKW; ATO, Fringe Benefits Tax: Is the Provision of Bitcoin by an Employer to an Employee in Respect of their Employment a Property Fringe Benefit for the Purposes of Subsection 136(1) of the Fringe Benefits Tax Assessment Act 1986? (TD 2014/28), https://www.ato.gov.au/law/view/document?src=mm&pit=99991231235958&arc=false&start=1&pageSize=10&total=7&num=0&docid=TXD/TD201428/NAT/ATO/00001&dc=true&tm=and-basic-TD 2014/25 (last visited Mar. 1, 2018), *archived at* https://perma.cc/Y5FS-VYL3.

[622] *Tax Treatment of Crypto-Currencies in Australia – Specifically Bitcoin*, *supra* note 620.

---

a foreign currency."[623] Individuals who engage in cryptocurrency transactions are advised to keep records of the date of transactions; the amount in Australian dollars ("which can be taken from a reputable online exchange"); what the transaction was for; and who the other party was ("even if it's just their bitcoin address").[624]

Cryptocurrencies may be considered assets for capital gains tax purposes, with the guidance stating: "Where you use bitcoin to purchase goods or services for personal use or consumption, any capital gain or loss from disposal of the bitcoin will be disregarded (as a personal use asset) provided the cost of the bitcoin is $10,000 or less."[625]

With regard to business transactions, the ATO guidance states that the Australian dollar value of bitcoins (being the fair market value) received for goods and services must be recorded as part of ordinary income, in the same way as receiving non-cash consideration under a barter transaction.[626] A business that purchases items using bitcoin is "entitled to a deduction based on the arm's length value of the item acquired."[627] Goods and services tax (GST) is also payable and is calculated on the market value of the goods or services, which is "ordinarily equal to the fair market value of the bitcoin at the time of the transaction."[628] When a business disposes of bitcoin, there may be capital gains consequences. If a business gives bitcoin to an employee this may be considered either a fringe benefit (if there is a valid salary sacrifice arrangement in order to receive the bitcoin) or normal salary and wages. If an entity is in the business of mining bitcoin, or buying and selling bitcoin as an exchange service, any income derived must be included in its assessable income, and any expenses incurred may be deducted.[629]

The ATO has also published separate guidance on the application of the goods and services tax (GST) with respect to transactions involving digital currency.[630] A previous ruling regarding GST was withdrawn in December 2017 following the passage of amendments to A New Tax System (Goods and Service Tax) Act 1999 and associated regulations, which apply to transactions after July 1, 2017.[631] Under the amendments, sales and purchases of digital currency are not subject to GST. If a person is carrying on a business in relation to digital currency, or accepting digital

---

[623] *Id.*

[624] *Id.*

[625] *Id.*

[626] *Id.*

[627] *Id.*

[628] *Id.*

[629] *Id.*

[630] *GST and Digital Currency*, ATO, https://www.ato.gov.au/business/gst/in-detail/your-industry/financial-services-and-insurance/gst-and-digital-currency/ (last updated Dec. 8, 2017), *archived at* https://perma.cc/L2MT-WHHC.

[631] *Goods and Services Tax Ruling: GSTR 2014/W*, ATO, https://www.ato.gov.au/law/view/document?DocID=GST/GSTR20143/NAT/ATO/00001 (last visited Mar. 1, 2018), *archived at* https://perma.cc/6YAU-SYF3; Treasury Laws Amendment (2017 Measures No. 6) Act 2017 (Cth), https://www.legislation.gov.au/Details/C2017A00118, *archived at* https://perma.cc/6TB9-V9QU.

currency as a payment as part of a business, then there are GST consequences.[632] The changes were aimed at removing "double taxation" of digital currencies under the GST system.[633]

According to news reports from January 2018, the ATO is consulting with tax experts "to help it identify and track cryptocurrency transactions and ensure all taxes are being paid."[634]

The Australian Securities and Investments Commission's (ASIC's) MoneySmart website provides information on virtual currencies and sets out various risks associated with buying, trading, or investing in such currencies.[635] These include the fact that there are few safeguards because the exchange platforms are generally not regulated; large fluctuations in value; possible theft by hackers; and the popularity of virtual currencies with criminals. A separate page provides information about initial coin offerings, which ASIC calls a "high-risk speculative investment."[636]

In the area of anti-money laundering and counterterrorism financing (AML/CTF), the government introduced a bill in Parliament in August 2017 in order bring digital currency exchange providers under the AML/CTF regulatory regime, as recommended by the Senate committee referred to above.[637] The bill was enacted in December 2017 and the relevant provisions came into force on April 3, 2018.[638]

Under the amendments, digital currency exchanges will be required to enroll in a register maintained by AUSTRAC (Australian Transaction Reports and Analysis Centre) and implement an AML/CTF program "to mitigate the risks of money laundering as well as identify and verify the identity of their customers."[639] They will also be required to report suspicious transactions and maintain certain records.

---

[632] *GST and Digital Currency*, *supra* note 630.

[633] *GST – Removing the Double Taxation of Digital Currency*, ATO, https://www.ato.gov.au/General/New-legislation/In-detail/Indirect-taxes/GST/GST---removing-the-double-taxation-of-digital-currency/ (last updated Dec. 18, 2017), *archived at* https://perma.cc/L7KG-NWK2.

[634] Duncan Hughes, *ATO Creates Specialist Task Force to Tackle Cryptocurrency Tax Evasion,* FINANCIAL REVIEW (Jan. 10, 2018), http://www.afr.com/news/policy/tax/ato-creates-specialist-task-force-to-tackle-cryptocurrency-tax-evasion-20180109-h0fyaz, *archived at* https://perma.cc/VNY2-R6G3.

[635] *Virtual Currencies*, ASIC'S MONEYSMART, https://www.moneysmart.gov.au/investing/investment-warnings/virtual-currencies (last updated Dec. 1, 2017), *archived at* https://perma.cc/SCJ8-2WS3.

[636] *Initial Coin Offerings (ICOs)*, ASIC'S MONEYSMART, https://www.moneysmart.gov.au/investing/investment-warnings/initial-coin-offerings-icos (last updated Nov. 10, 2017), *archived at* https://perma.cc/YYW7-SZMS.

[637] *Anti-Money Laundering and Counter-Terrorism Financing Amendment Bill 2017*, PARLIAMENT OF AUSTRALIA, https://www.aph.gov.au/Parliamentary_Business/Bills_Legislation/Bills_Search_Results/Result?bId=r5952 (last visited Mar. 26, 2018), *archived at* https://perma.cc/3LS8-TZ5L; Anti-Money Laundering and Counter-Terrorism Financing Amendment Act 2017 (Cth) sch 1 pt 2, https://www.legislation.gov.au/Details/C2017A00130, *archived at* https://perma.cc/892P-DQ5W.

[638] *Digital Currency Exchange Providers*, AUSTRAC, http://www.austrac.gov.au/digital-currency-exchange-providers (last updated Mar. 13, 2018), *archived at* https://perma.cc/X4DK-SJ8X.

[639] Rohan Pearce, *Government Cracks Down on Bitcoin Money Laundering*, COMPUTERWORLD (Aug. 17, 2017), https://www.computerworld.com.au/article/626134/government-cracks-down-bitcoin-money-laundering/, *archived at* https://perma.cc/PW5D-U3SD.

## Brunei

On December 22, 2017, the Central Bank of Brunei, Autoriti Monetari Brunei Darussalam (AMBD), released a statement reminding the public that "cryptocurrencies are not legal tender in Brunei Darussalam and are not regulated by AMBD," and advising the public "to be vigilant and exercise extreme caution when dealing with such currencies that are privately issued."[640] The press statement also added that

> AMBD would like to remind the public to be careful when participating in any investment plans or financial transactions. The public is advised not to be easily enticed by any investment or financial activity advertisements, and to conduct due diligence and understand the financial products properly before participating.[641]

## China

China's central bank, the People's Bank of China (PBOC), has been conducting a study of digital currency for over three years, and has set up an Institute of Digital Money within the PBOC.[642] Zhou Xiaochuan, the then governor of the PBOC, addressed the current regulatory status of virtual currencies in a press conference held during the annual National People's Congress session in March 2018, when he was stepping down. According to Zhou, Chinese regulators are not recognizing virtual currencies such as bitcoin as a tool for retail payments like paper bills, coins, or credit cards. The banking system is not accepting any existing virtual currencies or providing relevant services, he said.[643]

Previously, on September 4, 2017, seven central government regulators—the PBOC, the Cyberspace Administration of China (CAC), the Ministry of Industry and Information Technology (MIIT), the State Administration for Industry and Commerce (SAIC), the China Banking Regulatory Commission (CBRC), the China Securities Regulatory Commission (CSRC), and the China Insurance Regulatory Commission (CIRC) —jointly issued the Announcement on Preventing Financial Risks from Initial Coin Offerings, which banned initial coin offerings (ICOs) in China.[644] According to the Announcement, ICO financing that raises "so-called 'virtual currencies' such as Bitcoin and Ethereum" through the irregular sale and circulation of tokens is essentially public financing without approval, which is illegal.[645] The Announcement warned that

---

[640] Press Release, Autoriti Monetari Brunei Darussalam, Public to Exercise High Caution with Cryptocurrencies (Dec. 22, 2017), http://www.ambd.gov.bn/SiteAssets/Lists/News/News/AMBD Press Release - Crypto currencies.pdf, *archived at* https://perma.cc/4N9M-AL26.

[641] *Id.*

[642] *Zhou Xiaochuan: Future Regulation on Virtual Currency Will Be Dynamic, Imprudent Products Shall Be Stopped for Now*, XINHUANET (Mar. 1, 2018), http://www.xinhuanet.com/finance/2018-03/10/c_129826604.htm (in Chinese), *archived at* https://perma.cc/2CW7-8F2T.

[643] *Id.*

[644] PBOC, CAC, MIIT, SAIC, CBRC, CSRC, and CIRC Announcement on Preventing Financial Risks from Initial Coin Offerings (Sept. 4, 2017), http://www.pbc.gov.cn/goutongjiaoliu/113456/113469/3374222/index.html (in Chinese), *archived at* https://perma.cc/N88N-5CV5.

[645] *Id.* (all translations by author).

tokens or virtual currencies involved in ICO financing are not issued by monetary authorities and therefore not mandatorily-accepted legal tender, and thus do not have equal legal status with fiat currencies and "cannot and should not be circulated and used in the market as currencies."[646]

As early as December 3, 2013, the PBOC, MIIT, CBRC, CSRC, and CIRC jointly issued a notice warning the public about the risks of bitcoin, the Notice on Precautions Against the Risks of Bitcoins.[647]  The circular defined bitcoin as "by nature a special virtual commodity," which "does not have equal legal status as currencies" and "cannot and should not be circulated in the market as a currency."[648]  According to the notice, banks and payment institutions in China are prohibited from dealing in bitcoins.  Financial and payment institutions are prohibited from using bitcoin pricing for products or services or buying or selling bitcoins, nor can they provide direct or indirect bitcoin-related services, including registering, trading, settling, clearing, or other services; accept bitcoins or use bitcoins as a clearing tool; or trade bitcoins with Chinese yuan or foreign currencies.[649]

**Cambodia**[650]

The status of cryptocurrencies in Cambodia is ambiguous.  The National Bank of Cambodia (NBC) "signed an agreement with a Japanese firm . . . to develop a blockchain-based project for its own internal use, which would track interbank lending and transactions" in April 2017.[651]  However, it only addresses interbank transactions.  The NBC has "asked banks in Cambodia not to allow people to conduct transactions with cryptocurrencies."[652]

At the Fourth Annual NBC Macroeconomic Conference on December 5, 2017, NBC Director General Chea Serey stated that activities of a handful of companies operating in Cambodia that tried to persuade people to use cryptocurrencies for everyday purchases and other financial transactions were "not legal as digital currencies are not issued or backed up by any government."[653]  However, she also stated that "digital currencies are not illegal in the Kingdom"

---

[646] *Id.*

[647] PBOC, MIIT, CBRC, CSRC, and CIRC Notice on Precautions Against the Risks of Bitcoins (Dec. 3, 2013), http://www.miit.gov.cn/n1146295/n1652858/n1652930/n3757016/c3762245/content.html (in Chinese), *archived at* https://perma.cc/S4DN-DXHD.

[648] *Id.*

[649] *Id.*

[650] At present there are no Law Library of Congress research staff members versed in Khmer.  This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[651] Robin Spiess, *Uncertainty over Future of Cryptocurrencies in Cambodia*, PHNOM PENH POST (Mar. 9, 2018), http://www.phnompenhpost.com/business/uncertainty-over-future-cryptocurrencies-cambodia, *archived at* https://perma.cc/6KFF-NQTA.

[652] Sok Chan, *Bitcoin a Risky Business*, *NBC Warns*, KHMER TIMES (Dec. 6, 2017), http://www.khmertimeskh.com/5094114/bitcoin-risky-business-nbc-warns/, *archived at* https://perma.cc/8UC3-4HFK.

[653] *Id.*

Case 4:18-cv-04790-PSF Document 27-1 Filed 09/21/18 Page 142 of 276
Case 4:18-cv-04790-PSF D. 11069606 Dkt Entry 1-18 Page 200 of 218

Regulation of Cryptocurrency Around the World

and "asked users to be wary of them and extremely careful when using them."[654]   In a December 29, 2017, press release the NBC reaffirmed that it "never allowed the purchase-sale and circulation of any form of cryptocurrencies."[655]

**Hong Kong**

On February 9, 2018, Hong Kong's Securities and Futures Commission (SFC) alerted investors to the potential risks of dealing with cryptocurrency exchanges and investing in initial coin offerings (ICOs).[656]   In the alert, the SFC said it has taken regulatory action against a number of cryptocurrency exchanges and issuers of ICOs.  The SFC has warned cryptocurrency exchanges in Hong Kong or with connections to Hong Kong that they should not trade cryptocurrencies, which it characterized as "securities" as defined in the Securities and Futures Ordinance, without a license.  The SFC also wrote to seven ICO issuers and most of them confirmed compliance with the SFC's regulatory regime or immediately ceased to offer tokens to Hong Kong investors. The SFC stated it would continue to police the market and engage in enforcement actions when necessary, and also urged market professionals to do proper gatekeeping to prevent fraud or dubious fundraising, and to assist the SFC in ensuring compliance with the law.[657]

The new alert follows a statement on ICOs issued by the SFC on September 5, 2017.[658]   That statement explained that, depending on the facts and circumstances of an ICO, digital tokens that are offered or sold may be "securities" as defined in the Securities and Futures Ordinance, and therefore subject to the securities laws of Hong Kong.[659]   According to the statement,

> [w]here the digital tokens involved in an ICO fall under the definition of "*securities*", dealing in or advising on the digital tokens, or managing or marketing a fund investing in such digital tokens, may constitute a "*regulated activity*". Parties engaging in a "*regulated activity*" are required to be licensed by or registered with the SFC irrespective of whether the parties involved are located in Hong Kong, so long as such business activities target the Hong Kong public.[660]

On January 8, 2014, in replying to a question raised at the meeting of the Legislative Council on the use of bitcoin, the Secretary for Financial Services and the Treasury said virtual currencies

---

[654] *Id*.

[655] Press Release, NBC, The National Bank of Cambodia Denies the False Information Stating that the NBC Has Cooperated with Chaintope Company (Dec. 29, 2017), https://www.nbc.org.kh/english/news_and_events/news_info.php?id=344, *archived at* https://perma.cc/QB84-FPAW.

[656] *SFC Warns of Cryptocurrency Risks*, SECURITIES AND FUTURES COMMISSION (Feb. 9, 2018), https://www.sfc.hk/edistributionWeb/gateway/EN/news-and-announcements/news/doc?refNo=18PR13, *archived at* https://perma.cc/K72W-NUTC.

[657] *Id*.

[658] Securities and Futures Commission, Statement on Initial Coin Offerings (Sept. 5, 2017), http://www.sfc.hk/web/EN/news-and-announcements/policy-statements-and-announcements/statement-on-initial-coin-offerings.html, *archived at* https://perma.cc/8VYV-W7D7.

[659] *Id.*

[660] *Id.*

such as bitcoin are not considered as legal tender but are virtual commodities in Hong Kong, and warned about the risks of using virtual currencies.[661]  According to the Secretary,

> [i]t would be quite risky to convert, trade or hold such virtual currencies as their value is not backed by any physical items, issuers or the real economy.  There are specified upper limits to the overall size of the issue of such virtual currencies, but no guarantee of their convertibility into a legal tender or commodities in the real economy.  Also, the price of virtual currencies may be susceptible to significant fluctuations due to individual speculative activities.[662]

On March 25, 2015, the Secretary responded to another question on the regulation of bitcoin trading activities raised at the meeting of the Legislative Council.[663]  In the statement, the Secretary reiterated there were no specific regulatory measures on virtual commodities such as bitcoin in Hong Kong, but existing laws provide for sanctions against unlawful acts such as money laundering, terrorist financing, fraud, pyramid schemes, and cybercrimes, with or without virtual commodities being involved.  The police will take enforcement action if they find criminal conduct involving virtual commodities by conducting patrols, including searching for relevant information via public platforms on the Internet, the Secretary said.  The Hong Kong Government and financial regulators will also keep a close watch on the development of bitcoin and other virtual commodities, he said.[664]

**Indonesia**

On January 13, 2018, Bank Indonesia (Indonesia's central bank) released a statement that warns against buying, selling, or otherwise trading in virtual currencies.[665] The statement includes the following:

> Bank Indonesia affirms that virtual currencies, including bitcoin, are not recognized as legitimate instrument of payment, therefore not allowed to be used for payment in Indonesia. This is in line with Act No. 7/2011 on The Currency,[666] which states that currency shall be money of which issued by the Republic of Indonesia and every transaction that has the purpose of payment, or other obligations which need to be fulfilled

---

[661] Press Release, Government of Hong Kong, LCQ1: Monitoring the Use of Bitcoins (Jan. 8, 2014), http://www.info.gov.hk/gia/general/201401/08/P201401080357.htm, *archived at* https://perma.cc/AY9N-B58F.

[662] *Id.*

[663] Press Release, Government of Hong Kong, LCQ4: Regulation of Trading Activities of Bitcoins (Mar. 25, 2015), http://www.info.gov.hk/gia/general/201503/25/P201503250463.htm, *archived at* https://perma.cc/WK74-B453.

[664] *Id.*

[665] Press Release, Bank Indonesia, Bank Indonesia Warns All Parties Not to Sell, Buy, or Trade Virtual Currency (Jan. 13, 2018), http://www.bi.go.id/en/ruang-media/siaran-pers/Pages/sp_200418.aspx, *archived at* https://perma.cc/ELQ5-PHTW.

[666] Undang-Undang Nomor 7 Tahun 2011 Tentang Mata Ung [Law Number 7 of 2011 Concerning Currency], http://www.bi.go.id/id/tentang-bi/uu-bi/Documents/UU 7 Tahun 2011.pdf (in Indonesian), *archived at* https://perma.cc/DNX8-FR6Z. An unofficial English translation of this law is available at http://www.flevin.com/id/lgso/translations/Laws/Law No. 7 of 2011 on Currency (MoF).pdf, *archived at* https://perma.cc/9NQL-SHYU.

with money, or other financial transactions conducted within the territory of the Republic of Indonesia, has to be fulfilled with Rupiah.[667]

The statement goes on to say that ownership of virtual currency is "highly risky," "vulnerable to bubble risks," and "susceptible to be used for money laundering and terrorism financing." Bank Indonesia therefore considers that such currencies "can potentially impact financial system stability and cause financial harm to society."[668] It also refers to Bank Indonesia Regulation No. 18/40/PBI/2016 on Implementation of Payment Transaction Processing[669] and Bank Indonesia Regulation No. 19/12/PBI/2017 on Implementation of Financial Technology[670] in affirming that, as the payment system authority, the Bank forbids all payment system operators and financial technology operators in Indonesia from processing transactions using virtual currencies.[671]

This statement was supported by the Minister of Finance who, in a press conference on January 23, 2018, warned that virtual currencies are a high-risk and speculative investment and said that "[w]e will also continue to function as a government that conveys the view that it is not in accordance with the Law to be used as a means of transaction."[672]

The Bank's statement follows an earlier press release in 2014, in which it encouraged caution with respect to virtual currencies and stated that "[i]n view of the Act No. 7 Year 2012 [sic] concerning Currency and Act No. 23 Year 1999[673] which has been amended several times, the latest with Act No. 6 Year 2009,[674] Bank Indonesia states that bitcoin and other virtual currency are not currency or legal payment instrument in Indonesia."[675]

---

[667] Press Release, Bank Indonesia, *supra* note 665.

[668] *Id.*

[669] Peraturan Bank Indonesia Nomor 18/40/PBI/2016 Tentang Penyelenggaraan Pemrosesan Transaksi Pembayaran, http://www.bi.go.id/id/peraturan/sistem-pembayaran/Documents/PBI_184016.pdf (in Indonesian), *archived at* https://perma.cc/JBX8-44U7.

[670] Peraturan Bank Indonesia Nomor 19/12/PBI/2017 Tentang Penyelenggaraan Teknologi Finansial, http://www.bi.go.id/id/peraturan/sistem-pembayaran/Documents/PBI_191217.pdf (in Indonesian), *archived at* https://perma.cc/6XTJ-ERCQ.

[671] Press Release, Bank Indonesia, *supra* note 665.

[672] *Minister of Finance: Bitcoin is Not in Line with the Law*, KEMENTERIAN KEUNANGAN [MINISTRY OF FINANCE], (Jan. 25, 2018), https://www.kemenkeu.go.id/en/publications/news/minister-of-finance-bitcoin-is-not-in-line-with-law/, *archived at* https://perma.cc/3MEJ-HHUP.

[673] Act No. 23 of 199 Concerning Bank Indonesia, http://www.bi.go.id/en/tentang-bi/uu-bi/Documents/act2399.pdf (unofficial English translation), *archived at* https://perma.cc/6S8P-FFZH.

[674] Act No. 6 of 2009 Concerning Stipulation of Government Regulation in Lieu of Act No. 2 of 2008 Concerning Second Amendment to the Act No. 23 of 1999 Concerning Bank Indonesia into Act, http://www.bi.go.id/en/tentang-bi/uu-bi/Documents/BIact_0609.pdf (unofficial English translation), *archived at* https://perma.cc/FRZ5-ZZG5.

[675] Press Release, Bank Indonesia, Statement of Bank Indonesia Related to Bitcoin and Other Virtual Currency (Feb. 6, 2014), http://www.bi.go.id/en/ruang-media/siaran-pers/Pages/SP_160614.aspx, *archived at* https://perma.cc/3MEJ-HHUP.

## Japan

In Japan, cryptocurrency exchange businesses are regulated.  The Payment Services Act was amended in June 2016 and the amendment took effect on April 1, 2017.[676]  The amended Payment Services Act defines "cryptocurrency"[677] as

- property value that can be used as payment for the purchase or rental of goods or provision of services by unspecified persons, that can be purchased from or sold to unspecified persons, and that is transferable via an electronic data processing system; or

- property value that can be mutually exchangeable for the above property value with unspecified persons and is transferable via an electronic data processing system.

The Act also states that cryptocurrency is limited to property values that are stored electronically on electronic devices; currency and currency-denominated assets are excluded.[678]

Under the Payment Services Act, only business operators registered with a competent local Finance Bureau are allowed to operate cryptocurrency exchange businesses.[679]  The operator must be a stock company or a "foreign cryptocurrency exchange business" that is a company, has a representative who is resident in Japan, and an office in Japan.[680]  A "foreign cryptocurrency exchange business" means a cryptocurrency exchange service provider that is registered with a foreign government in the foreign country under a law that provides an equivalent registration system to the system under the Japanese Payment Services Act.[681]

The Act requires cryptocurrency exchange businesses to separately manage customer's money or cryptocurrency apart from their own. The state of such management must be reviewed by certified public accountants or accounting firms.[682]  The exchange business must have a contract with a designated dispute resolution center with expertise in cryptocurrency exchanges.[683]  The exchange business must keep accounting records of its cryptocurrency transactions[684] and submit a report on the business to the Financial Services Agency (FSA) annually.[685]  The FSA is authorized to inspect

---

[676] 資金決済に関する法律 [Payment Services Act], Act No. 59 of 2009, *as amended by* Act No. 62 of 2016.

[677] In Japanese, the term 仮想通貨 ("virtual currency") is used.

[678] Payment Services Act art. 2, para. 5.

[679] *Id*. arts. 63-2 & 63-3.  *See also Details of Screening for New Registration Application as Virtual Currency Exchange Service Provider*, FSA, http://www.fsa.go.jp/en/news/2017/20170930-1/02.pdf, *archived at* https://perma.cc/M36D-7BU3.

[680] Payment Services Act art. 63-5, para. 1.

[681] *Id*. art. 2, para. 9.

[682] *Id*. art. 63-11.

[683] *Id*. art. 63-12.

[684] *Id*. art. 63-13.

[685] *Id*. art. 63-14.  Because the Cabinet delegates its authority over most of the matters under the Payment Services Act to the Financial Services Agency (FSA) (*id*. art. 104), the FSA is the regulatory agency of cryptocurrency transactions.

exchange businesses and issue orders to improve their practices.[686]  The FSA may rescind the registration of a cryptocurrency exchange business or suspend its business for up to six months in cases where

- the exchange business loses one of the requirements for registration;

- it turns out that the exchange business made the registration illegally; or

- the exchange business violates the Payment Services Act or orders based on the Act.[687]

On January 26, 2018, Coincheck, one of Japan's biggest cryptocurrency exchange businesses, lost about $400 million in NEM (cryptocurrency) tokens.  The local Finance Bureau ordered Coincheck to submit a report on the same day, examined it, and issued an order of business improvement on January 29, 2018.[688]  The following day the FSA requested all cryptocurrency exchange businesses to review their system-risk management plans and report the results to the FSA.[689]  On March 2, 2018, the FSA conducted an on-site inspection of Coincheck.  On March 8, 2018, the local Finance Bureaus issued business-improvement orders to seven exchange businesses,[690] again including Coincheck.[691]

A group of cryptocurrency exchange businesses publicized their decision to form a new self-regulating body on March 2, 2018, that all registered exchange businesses will join.[692]  The body aims to obtain authorization from the FSA under the Payment Services Act.[693]

---

[686] *Id.* arts. 63-15 & 63-16.

[687] *Id.* art. 63-17.

[688] コインチェック株式会社に対する行政処分について [*Regarding Administrative Disposition against Coincheck Company*], KANTO FINANCE BUREAU (Jan. 29, 2018), http://kantou.mof.go.jp/rizai/pagekthp 0130000001_00004.html, *archived at* https://perma.cc/6Q6W-K5XX.

[689] 仮想通貨交換業者に対するシステムリスク管理態勢の自己点検について [*Regarding Request to Cryptocurrency Service Providers to Self-check System Risk Management*], FSA (Jan. 30, 2018), http://www.fsa.go.jp/policy/virtual_currency/08.pdf, *archived at* https://perma.cc/LM5W-RC8K.

[690] Yuki Hagiwara et al., 金融庁：仮想通貨交換業者７社を行政処分、２社に業務停止命令 [*FSA: Administrative Disposition for 7 Cryptocurrency Exchange Businesses, Suspension of Business Order for 2*], BLOOMBERG (Mar. 8, 2018), https://www.bloomberg.co.jp/news/articles/2018-03-08/P58WVH6JIJUP01, *archived at* https://perma.cc/RGM9-DXCH.

[691] コインチェック株式会社に対する行政処分について [*Regarding Administrative Disposition against Coincheck Company*], KANTO FINANCE BUREAU (Mar. 8, 2018), http://kantou.mof.go.jp/rizai/pagekthp013 0000001_00013.html, *archived at* https://perma.cc/QBG7-JE6A.

[692] 仮想通貨の自主規制団体、「みなし業者も参加を」 [*Cryptocurrency Self-regulated Body, "Calling for Registration-pending Business, Too"*], NIKKEI (Mar. 5, 2018), https://www.nikkei.com/article/DGXMZO 27693400V00C18A3000000/, *archived at* https://perma.cc/Z8EQ-S4X2.

[693] Payment Services Act art. 87.

In addition, under the Act on Prevention of Transfer of Criminal Proceeds, cryptocurrency exchange businesses are obligated to check the identities of customers who open accounts, keep transaction records, and notify authorities when a suspicious transaction is recognized.[694]

According to the National Tax Agency (NTA), the profit earned by sales of cryptocurrency is, in principle, considered miscellaneous income,[695] rather than capital gains,[696] under the Income Tax Act. The NTA compiled questions and answers regarding the tax treatment of cryptocurrency and posted it online on December 1, 2017.[697] Miscellaneous income is added to the amount of other income, excluding specified capital gains,[698] when a person's taxable income is calculated and taxed.[699]

**Macau**

The Monetary Authority of Macau (AMCM) issued a statement on September 27, 2017, warning the financial industry and the public about the risks of virtual commodities and tokens.[700] "Any trading of these commodities involves considerable risks, including but not limited to those relating to money laundering and terrorism financing, against which all participants should remain vigilant," the statement said. According to the statement, the AMCM had issued a notice to banks and payment institutions in Macau to warn them not to participate in or provide, directly or indirectly, any relevant financial services, following a similar ban by Chinese authorities on the mainland on initial coin offerings (ICOs).[701]

Previously, on June 17, 2014, the AMCM issued a statement warning about the risks of bitcoin transactions.[702] According to that statement, bitcoin is a type of virtual commodity that is neither legal tender nor a financial instrument subject to the supervision of the AMCM. The AMCM

---

[694] 犯罪による収益の移転防止に関する法律 [Act on Prevention of Transfer of Criminal Proceeds], Act No. 22 of 2007, *amended by* Act No. 67 of 2017, art. 2 para. 2, art. 4 & arts. 7–8.

[695] 所得税法 [Income Tax Act], Act No. 33 of 1965, *amended by* Act No. 74 of 2017, art. 35.

[696] *Id.* art. 33.

[697] 仮想通貨に関する所得の計算方法等について（情報） [Regarding Calculation Method of Income Relating to Cryptocurrency (Information)], Individual Taxation Information, No. 4, NTA (Dec. 1, 2017), http://www.nta.go.jp/law/joho-zeikaishaku/shotoku/shinkoku/171127/01.pdf, *archived at* https://perma.cc/M22N-53MF.

[698] 租税特別措置法 [Act on Special Measures concerning Taxation], Act No. 26 of 1957, amended by Act No. 4 of 2017, arts. 8 through 8-5.

[699] Income Tax Act art. 89

[700] AMCM, Alert to Risks of Virtual Commodities and Tokens (Sept. 27, 2017), http://www.gcs.gov.mo/showNews.php?DataUcn=117182&PageLang=C (in Chinese), *archived at* https://perma.cc/28U9-WYPS, English translation *at* http://www.gcs.gov.mo/showNews.php?DataUcn=117184&PageLang=E, *archived at* https://perma.cc/SQD2-TW83.

[701] *Id.*

[702] AMCM, Caution Against Engagement in Bitcoin Transactions (June 17, 2014), http://www.gcs.gov.mo/showNews.php?DataUcn=79457&PageLang=C (in Chinese), *archived at* https://perma.cc/U5ET-8ZFW, English translation *at* http://www.gcs.gov.mo/showNews.php?DataUcn=79459&PageLang=E, *archived at* https://perma.cc/EWM6-GKK5.

warned the general public that trading in virtual commodities such as bitcoin "involves considerable risks, including but not limited to those relating to money laundering and terrorist financing."[703]

## Malaysia

On January 2, 2014, Bank Negara Malaysia (Malaysia's central bank) issued a statement saying that "[t]he Bitcoin is not recognised as legal tender in Malaysia. The Central Bank does not regulate the operations of Bitcoin. The public is therefore advised to be cautious of the risks associated with the usage of such digital currency."[704]

On December 14, 2017, the Bank released, for the purposes of public consultation, a proposed policy "on the invocation of reporting obligations on digital currency exchange business as reporting institutions under the Anti-Money Laundering, Anti-Terrorism Financing and Proceeds of Unlawful Activities Act 2001 (AMLA)."[705] According to the associated press release:

> [t]he proposed policy sets out the legal obligations, requirements and standards that digital currency exchangers, which will be defined under the First Schedule of the AMLA, must carry out as reporting institutions. This includes transparency obligations which are intended to provide relevant information for the public to better understand and evaluate risks associated with the use of digital currencies. Increased transparency will also serve to prevent the use of the digital currencies for criminal or unlawful activities. A digital currency exchanger must also declare its details to the Bank as a reporting institution.
>
> Failure to declare its details as reporting institutions or comply with the reporting obligations may subject the digital currency exchangers to the enforcement and non-compliance actions as provided under the AMLA as well as the potential termination or denial of use of financial services in Malaysia.[706]

The press release also affirms that digital currencies are not considered legal tender in Malaysia and digital currency businesses are not regulated by the Bank; the invocation of reporting obligations on digital currency exchange businesses does not connote any form of authorization or endorsement by the Bank.[707] The statement goes on to again advise the public to "carefully evaluate the risks associated with dealings in digital currencies."[708]

---

[703] *Id.*

[704] Press Release, Bank Negara Malaysia, Statement on Bitcoin (Jan. 2, 2014), http://www.bnm.gov.my/index.php?ch=en_announcement&pg=en_announcement&ac=49&lang=en, *archived at* https://perma.cc/6ZXJ-W2ZR.

[705] Press Release, Bank Negara Malaysia, Making Digital Currencies Transparent in Malaysia (Dec. 14, 2017), http://www.bnm.gov.my/index.php?ch=en_press&pg=en_press&ac=4575&lang=en, *archived at* https://perma.cc/W4P9-Z528; Anti-Money Laundering, Anti-Terrorism Financing and Proceeds of Unlawful Activities Act 2001 (Act 612), as at Dec. 1, 2015, http://www.agc.gov.my/agcportal/uploads/files/ACT 613 diluluskan TPPUU Dis 2015.pdf, *archived at* https://perma.cc/N3ZD-FKQ3.

[706] Press Release, Making Digital Currencies Transparent in Malaysia, *supra* note 705.

[707] *Id.*

[708] *Id.*

The policy would require digital currency exchanges (being businesses that exchange digital currency for money, exchange money for digital currency, or exchange one digital currency for another[709]), to comply with regulations relating to "the identification and verification of customers and beneficial owners, on-going monitoring of customers' transactions, sanction screening, suspicious transaction reporting and record keeping"; transparency obligations; and "requirements for the submission of data and statistics to the Bank" for the purpose of managing money laundering and terrorism financing risks.[710] Public comments on the draft policy were due by January 14, 2018; no date for its finalization was located.

In addition, a news report in February 2018 states that the Bank is going to release a concept paper on cryptocurrencies within the month, and this will neither recognize cryptocurrencies as money nor ban them altogether. The governor of the Bank stated, "[b]asically, we will let the cryptocurrency promoters including bitcoin, ethereum and ripple to be more transparent, the methods to be more transparent and people behind the scene are to be more transparent too. By doing so, the public can decide on its own if they want to invest in cryptocurrencies."[711]

A further news report says that the Bank will require exchanges to "publish prices and the methodology used to determine those prices in a bid to boost transparency."[712] The report also states that the Securities Commission of Malaysia (SC) "plans to issue a cryptocurrency exchange framework and has stepped up oversight of the sector, issuing a cease-and-desist letter to a crypto start-up on January 9th for failing to follow the country's securities regulations."[713] Previously, in September 2017, the Commission issued a statement in which it cautioned investors with respect to "the emergence of digital token based fundraising activities / investment schemes in Malaysia and elsewhere, which may be referred to as 'initial coin offerings' [ICOs], 'initial token offerings', 'token pre-sale', 'token crowd-sale.' "[714] Subsequently, in a speech in November 2017, the chairman of the Commission stated that

> we continue to stand by our statement that such schemes [ICOs], in its current form poses significant risks to investors. Therefore, SC strongly encourages investors to fully understand the features of an ICO scheme, and carefully weigh the risks before parting with their monies. We are also now part of the IOSCO [International Organization of

---

[709] Bank Negara Malaysia, Anti-Money Laundering and Counter Financing of Terrorism (AML/CFT) – Digital Currencies (Sector 6): Exposure Draft, at ¶ 4.1 (Dec. 2017), http://www.bnm.gov.my/index.php?ch=57&pg=538&ac=661&bb=file, *archived at* https://perma.cc/8ERA-F7QL.

[710] *Id.* at ¶ 2.1.

[711] *Bank Negara Malaysia to Let Public Decide Fate of Cryptocurrencies*, ECONOTIMES (Feb. 14, 2018), https://www.econotimes.com/Bank-Negara-Malaysia-to-let-public-decide-fate-of-cryptocurrencies-1149475, *archived at* https://perma.cc/W2MG-Q365.

[712] *Malaysia's Central Bank Issues Cryptocurrency Regulation*, THE ECONOMIST INTELLIGENCE UNIT (Feb. 5, 2018), http://www.eiu.com/industry/article/1426386726/malaysias-central-bank-issues-cryptocurrency-regulation/2018-02-05, *archived at* https://perma.cc/E986-K2GA.

[713] *Id.*

[714] Press Release, Securities Commission Malaysia, Media Statement on Initial Coin Offerings (Sept. 7, 2017), https://www.sc.com.my/post_archive/media-statement-on-initial-coin-offerings/, *archived at* https://perma.cc/GHM3-K6EJ.

Regulation of Cryptocurrency Around the World

> Securities Commissions] ICO Consultation Network where participating regulators are discussing the latest developments in this space.
>
> At the same time, we note the growing interest of Malaysian investors in trading cryptocurrencies and digital assets. To facilitate such activities in our market and put in place appropriate einvestor safeguards, SC is reviewing relevant regulations and guidelines to facilitate functional and effective use cases of digital assets in the capital market, including secondary market trading of established crypto currency and digital assets.[715]

With respect to tax treatment, in January 2018 Malaysia's Inland Revenue Board (IRB) froze the Malaysian bank account of a UK-based cryptocurrency trading platform, apparently for the purpose of conducting an audit to determine whether the company has complied with the Income Tax Act 1967, which requires tax to be paid on the income of any person accruing in or derived from Malaysia.[716] A request was made under section 81 of the Act as well as section 37 of AMLA for information on all of the company's Malaysian customers. According to the IRB's chief executive, "[a]ll traders should adhere to the Malaysian tax requirement by keeping proper records for audit purposes and disclose any transactions from the cryptocurrency trading when requested by IRB."[717]

## Marshall Islands

The Marshall Islands has enacted legislation authorizing the launching of its own national cryptocurrency to serve as legal tender for citizens and businesses on the island.[718] The currency will be known as the sovereign, or SOV, and will serve as "legal tender of the Marshall Islands for all debts, public charges, taxes, and dues."[719] It will circulate as legal tender in addition to the US dollar.[720] The SOV will be introduced in a forthcoming initial currency offering (ICO), after which residents of the Marshall Islands will be provided with the means to hold, save, and conduct transactions with the SOV, and merchants in the Marshall Islands will be given access to a computer application that will enable them to receive payments made with the SOV.[721] The

---

[715] Speech, Tan Sri Ranjit Ajit Singh, Opening Address at Synergistic Collaborations by SC (SCxSC) Digital Finance Conference 2017 (Kuala Lumpur, Nov. 6, 2017), https://www.sc.com.my/post_archive/opening-remarks-by-tan-sri-ranjit-ajit-singh-chairman-of-securities-commission-malaysia-at-synergistic-collaborations-by-sc-scxsc-digital-finance-conference-2017-in-kuala-lumpur-on-6-november-2/, *archived at* https://perma.cc/4NEN-4FJY.

[716] *IRB: Cryptocurrency Not Regulated but Traders Still Subject to Malaysian Income Tax Law*, THE STAR ONLINE (Jan. 19, 2018), https://www.thestar.com.my/tech/tech-news/2018/01/19/irb-cryptocurrency-not-regulated-but-traders-still-subject-to-malaysian-income-tax/, *archived at* https://perma.cc/YG9G-FQHL; Income Tax Act 1967 (Act 53), § 3, http://www.agc.gov.my/agcportal/uploads/files/Publications/LOM/EN/Pindaan Act 53 - 23 11 2017.pdf, *archived at* https://perma.cc/FZHX.

[717] *IRB: Cryptocurrency Not Regulated but Traders Still Subject to Malaysian Income Tax Law*, *supra* note 716.

[718] Declaration and Issuance of the Sovereign Currency Act, Pub. L. 2018-53 (2018), https://rmiparliament.org/cms/library/category/37-2018.html?download=410:p-l-2018-53-declaration-and-issuance-of-the-sovereign-currency-act,-2018, *archived at* https://perma.cc/53A9-B8S7.

[719] *Id*. §§ 103(a), 104(1).

[720] *Id*. § 104(2).

[721] *Id*. §§ 104(4), 105(5).

Minister of Finance will appoint a person or corporation to conduct the ICO.[722]  News reports indicate a financial technology company named Neema, which spearheaded the initiative, is likely to be awarded the contract to conduct the ICO.[723]

### New Zealand

In October 2017, the Financial Markets Authority (FMA) published information on cryptocurrencies, and the risks associated with them, as part of its guidance on investment options.[724] In particular, it highlights the following three points about cryptocurrencies:

- They're high risk and highly volatile – the price can go up and down very quickly
- They're not regulated in New Zealand
- Cryptocurrencies, crypto-exchanges and the people that use them are often the targets of online fraud and scams[725]

The FMA has also published commentary on initial coin offers (ICOs) and cryptocurrency services (including exchanges, wallets, and brokering).[726]  The information relates to the application of the existing regulatory framework for financial products and services. With regard to ICOs, the guidance states that

> The extent to which an ICO is regulated depends whether a 'financial product' is being offered to retail investors in New Zealand (ie a 'regulated offer' is being made). Whether a token offered via an ICO is a financial product, and if so, what type of product, depends on the token's specific characteristics and economic substance.[727]

The FMA then explains how a token may be considered one of the four types of financial products set out in the Financial Markets Conduct Act 2013 (being debt securities, equity securities, managed investment products, and derivatives),[728] and if so, what the obligations of the issuer are. It also notes that ICOs and tokens that are not financial products "will still be subject to general

---

[722] *Id*. § 109.

[723] Jonathan Keane, *Inside the Marshall Islands' Plans to Launch Its Own Legal Tender Cryptocurrency*, THE NEXT WEB (Apr. 23, 2018), https://thenextweb.com/hardfork/2018/04/23/marshall-islands-cryptocurrency/, *archived at* https://perma.cc/3N52-H4C9.

[724] *Cryptocurrencies*, FINANCIAL MARKETS AUTHORITY (FMA), https://fma.govt.nz/investors/ways-to-invest/cryptocurrencies/ (last visited Mar. 1, 2018), *archived at* https://perma.cc/L55V-K9Z6.

[725] *Id.*

[726] Press Release, FMA, FMA Commentary on ICOs and Cryptocurrencies (Oct. 25, 2017), https://fma.govt.nz/news-and-resources/media-releases/fma-commentary-on-icos-and-cryptocurrencies/, *archived at* https://perma.cc/WD49-H7Z9.

[727] *Initial Coin Offers*, FMA, https://fma.govt.nz/compliance/cryptocurrencies/initial-coin-offers/ (last visited Mar. 5, 2018), *archived at* https://perma.cc/JV7F-DCQK.

[728] Financial Markets Conduct Act 2013, http://www.legislation.govt.nz/act/public/2013/0069/latest/whole.html, *archived at* https://perma.cc/9FFL-PNYU.

consumer protection laws in New Zealand, for example prohibitions against misleading and deceptive conduct and fraud or other criminal conduct."[729]

With regard to cryptocurrency services, the FMA guidance states that businesses based in New Zealand that provide a "financial service" related to cryptocurrencies must comply with the Financial Service Providers (Registration and Dispute Resolution) Act 2008.[730] It then explains how different types of businesses might be considered to be providing a financial service and the obligations of such businesses.

The Inland Revenue Department (IRD) has not yet issued any guidance or rulings regarding the tax treatment of cryptocurrencies. Its public rulings work program for the 2017–2018 financial year includes "GST and Income tax – Tax treatment of crypto-currencies" as being an item currently in progress, as of February 9, 2018, with "[p]reparatory work on issuing public guidance" being underway.[731]

According to a news report in January 2018, the IRD indicated that people should "treat money made buying and selling cryptocurrencies in the same, or similar, way they would money made buying and selling gold. That is, pay tax on the profit made by selling a currency, only if that currency was bought with the intention of resale."[732] It directed the author to an information sheet on gold, which explains that amounts derived from its disposal will be income if the gold was acquired for the dominant purpose of disposal.[733]

In addition, a spokesman for the Reserve Bank of New Zealand (its central bank) was quoted in a December 2017 news article as stating that cryptocurrencies would be included in the bank's major review of its currency operating model and supporting infrastructure, which is currently underway. He explained that

> This project is focused on demand drivers, distribution models, and cash substitutes. It includes looking into crypto-currencies, blockchain technology and distributed ledgers.

---

[729] *Initial Coin Offers*, *supra* note 727.

[730] *Cryptocurrency Services*, FMA, https://fma.govt.nz/compliance/cryptocurrencies/cryptocurrency-services/ (last visited Mar. 5, 2018), *archived at* https://perma.cc/5SY4-GAUC; Financial Service Providers (Registration and Dispute Resolution) Act 2008, http://www.legislation.govt.nz/act/public/2008/0097/latest/whole.html, *archived at* https://perma.cc/7DBK-ULCJ.

[731] Inland Revenue Department (IRD), Public Rulings Work Programme 2017–18: Monthly Update – Position as at 9 February 2018, http://www.ird.govt.nz/resources/0/e/0ed9d869-4a08-46cd-a143-da492b1b9348/2018-02-09+Public+Rulings+Work+Programme.pdf, *archived at* https://perma.cc/7QP8-KCPR.

[732] Jenée Tibshraeny, *The IRD Says People Should Consider Money Made Selling Cryptocurrencies – Bought with the Intention of Resale – As Taxable, Until it Releases Specific Guidance on the Matter*, INTEREST.CO.NZ (Jan. 11, 2018), https://www.interest.co.nz/personal-finance/91564/ird-says-people-should-consider-money-made-selling-cryptocurrencies-bought, *archived at* https://perma.cc/Q68X-WXE4.

[733] IRD, Question We've Been Asked: Are Proceeds from the Sale of Gold Bullion Income? (QB 17/18) (Sept. 20, 2017), http://www.ird.govt.nz/resources/6/e/6ec89340-3f88-446f-90da-f50aaae363c9/QB17008.pdf, *archived at* https://perma.cc/3Q72-USAT.

The Reserve Bank doesn't regulate bitcoin. Whatever legal status bitcoin has is under ordinary law relating to contracts, tax obligations etc.[734]

An analytical note issued by the Reserve Bank in November 2017, which does not serve as an official policy position, discusses the technology involved in cryptocurrencies, their attributes and mechanics, and "the implications of cryptocurrencies for consumers, financial systems, monetary policy, and regulatory policy."[735]

## Philippines

Bangko Sentral ng Pilipinas (BSP, i.e., the Philippines Central Bank) has issued guidelines concerning virtual currencies (VCs).[736] Specifically, these Guidelines provide that since VCs are not backed by a central bank or a particular commodity and are not guaranteed by any country, they are not legal tender.[737] However, since they are used as a conduit to provide certain financial services, such as remittances and payment transactions, entities that provide such services using VCs must register with the BSP and adopt adequate measures to mitigate and manage risks associated with such currencies.[738] In addition, the Guidelines provide for penalties applicable to VC entities that conduct operations without the appropriate authorization from the BSP.[739]

## Samoa

On June 12, 2017, the Central Bank of Samoa issued a statement in which it warned the public to be "very cautious and diligent" in dealing with digital currency investments.[740] As part of a broader warning against get-rich schemes, it advised people to ensure that they fully understand how a venture works and the risks and benefits of investing, and to contact the Bank if they are uncertain.

No other government statements or regulatory actions were located.

---

[734] Jonathan Underhill, *IRD Sets its Sights on Bitcoin and Cryptocurrencies*, NEW ZEALAND HERALD (Dec. 22, 2017), http://www.nzherald.co.nz/business/news/article.cfm?c_id=3&objectid=11964722, *archived at* https://perma.cc/M8PB-J5R3.

[735] Aaron Kumar & Christie Smith, Crypto-currencies – An Introduction to Not-So-Funny Monies 2 (Reserve Bank of New Zealand Analytical Note Series, AN2017/07, Nov. 2017), https://www.rbnz.govt.nz/-/media/ReserveBank/Files/Publications/Analytical%20notes/2017/an2017-07.pdf, *archived at* https://perma.cc/TYQ7-75JQ.

[736] Bangko Sentral ng Pilipinas, Guidelines for Virtual Currency (VC) Exchanges, Circular No. 944, (Feb. 6, 2017), http://www.bsp.gov.ph/downloads/regulations/attachments/2017/c944.pdf, *archived at* https://perma.cc/Z9ZR-BYZV.

[737] *Id.*

[738] *Id.*

[739] *Id.*

[740] Press Release, Central Bank of Samoa, Beware of These Get Rich Quick Schemes and Digital Currency (June 12, 2017), https://cbs.gov.ws/index.php/media/latest-news/beware-of-getting-rick-at-these-new-article-page/, *archived at* https://perma.cc/5FC4-YCZU.

**Singapore**

In the wake of an increase in the number of initial coin offerings (ICOs) in Singapore as a means of raising funds, on August 1, 2017, the Monetary Authority of Singapore (MAS) issued a statement clarifying that the offer or issue of digital tokens in Singapore will be regulated by the MAS, if the digital tokens fall within the definition of "securities" regulated under the security laws.[741]  MAS's position is not to regulate virtual currencies.  "However, MAS has observed that the function of digital tokens has evolved beyond just being a virtual currency," the statement said.[742]

Following the August statement, the Deputy Prime Minister and Minister in Charge of MAS (DPM) responded to questions from the Parliament for its sitting on October 2, 2017, on the regulation of cryptocurrencies and ICOs.[743]  According to the DPM, although the MAS does not regulate virtual currencies per se, it regulates activities involving the use of virtual currencies that fall under MAS's regulatory ambit, such as money laundering and terrorism financing.  The MAS is working on a new regulatory framework for payments that will address the risks associated with virtual currencies, the DPM said.[744]  With respect to ICOs, the MAS has not issued specific legislation, but will continue to monitor developments and consider more targeted legislation when it becomes necessary, the DPM added.[745]

With respect to the new payment regulatory framework, the MAS issued a consultation paper proposing the Payment Services Bill in November 2017.[746]  The proposed Bill would expand the scope of regulated payment activities to include virtual currency services and other innovations.  Under the new framework, entities carrying out virtual currency services including buying or selling virtual currency would be required to be licensed.[747]

---

[741] Press Release, MAS Clarifies Regulatory Position on the Offer of Digital Tokens in Singapore (Aug. 1, 2017), http://www.mas.gov.sg/News-and-Publications/Media-Releases/2017/MAS-clarifies-regulatory-position-on-the-offer-of-digital-tokens-in-Singapore.aspx, *archived at* https://perma.cc/D8V5-3NST.

[742] *Id.*

[743] MAS, Reply to Parliamentary Question on the Prevalence Use of Cryptocurrency in Singapore and Measures to Regulate Cryptocurrency and Initial Coin Offerings (for Parliament Sitting Oct. 2, 2017), http://www.mas.gov.sg/News-and-Publications/Parliamentary-Replies/2017/Prevalence-use-of-cryptocurrency-in-Singapore.aspx, *archived at* https://perma.cc/WXF6-GDPD.

[744] *Id.*

[745] *Id.*

[746] Press Release, MAS Launches Second Consultation on New Regulatory Framework for Payments (Nov. 21, 2017), http://www.mas.gov.sg/News-and-Publications/Media-Releases/2017/MAS-Launches-Second-Consultation-on-New-Regulatory-Framework-for-Payments.aspx, *archived at* https://perma.cc/W5RF-D5GP.

[747] *Id.*

## South Korea[748]

The South Korean government implemented a rule that allows trades in cryptocurrencies only from real-name bank accounts ("real-name account system") beginning January 30, 2018. Cryptocurrency dealers must have contracts with banks concerning cryptocurrency trades. The banks examine dealers' management and cyber security systems before signing such contracts. In order to make a deposit into their e-wallet at a cryptocurrency dealer, a cryptocurrency trader must have an account at a bank where the cryptocurrency dealer also has an account. The bank checks the trader's (customer's) identity when it opens an account for the trader, and the trader reports his/her bank account to the dealer. The dealer also checks the identity of the trader and applies for registration of the trader's account with the bank.[749] Anonymous cryptocurrency traders may withdraw from their cryptocurrency accounts but cannot make a new deposit. Minors, as well as foreigners, regardless of their place of residence, are prohibited from trading in cryptocurrencies.[750]

Under the Act on Reporting and Using Specified Financial Transaction Information, financial institutions are required to report financial transactions that are suspected, based on reasonable grounds, to be illegal or to involve money laundering.[751] The Korea Financial Intelligence Unit (KFIU) issued guidelines on such reporting by banks to prevent money laundering via cryptocurrency transactions.[752] The guidelines list the following examples of suspicious situations:

- When a trader deposits or withdraws 10 million won (about US$9,400) or more a day or 20 million won or more a week

- When a trader makes financial (banking) transactions five times or more a day or seven times or more a week

- When a trader is a corporation or organization

---

[748] At present there are no Law Library of Congress research staff members versed in Korean. This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[749] Financial Services Commission (FSC), 가상통화 투기근절을 위한 특별대책, 금융부문 대책 시행 [Special Measures for the Elimination of Virtual Currency Speculation, Enforcement of Financial Sector Measures (Dec. 28, 2017)], at 3–4 (Jan. 23, 2018), http://www.korea.kr/common/download.do?tblKey=GMN&fileId=185832583, *archived at* https://perma.cc/Z9YH-7SDM.

[750] *Id*. at 2.

[751] Act on Reporting and Specified Financial Transaction Information, Act No. 6516, Sept. 27, 2001, *amended by* Act No. 14839, July 26, 2017, art. 4, http://elaw.klri.re.kr/kor_service/lawView.do?lang=ENG&hseq=44449, *archived at* https://perma.cc/7LSF-32ZN.

[752] KFIU, 가상통화 관련 자금세탁방지 가이드라인 [Guidelines for Anti-Money Laundering with Cryptocurrency] (Jan. 23, 2018), http://m.fsc.go.kr/common/mFileDown.do?BBS=BBS0030&FILENO=123190, *archived at* https://perma.cc/3WSL-BS82.

- When a trader who does not have a record of deposit for a cryptocurrency exchange account withdraws most of the funds sent from the cryptocurrency exchange account in cash

- When there are reasonable grounds for suspecting that a trader divides the amount of transaction money or the number of transactions to avoid reporting by financial institutions.[753]

The Act and the guidelines also mandate that cryptocurrency dealers and banks verify traders' identification and other information.[754]

On February 20, 2018, the chief of South Korea's Financial Supervisory Service, Choe Heung-sik, said that the government would support "normal" cryptocurrency trading and encouraged financial institutions to facilitate transactions with cryptocurrency exchanges.[755]

It was reported in March 2018 that the Ministry of Strategy and Finance is preparing a draft cryptocurrency taxation framework for release by the end of June 2018. The Ministry reportedly considers income from cryptocurrencies to be capital gains or miscellaneous income.[756]

**Taiwan**

On December 19, 2017, Taiwan's Financial Supervisory Commission (FSC) issued a statement warning the general public about the risks of investing in virtual commodities such as bitcoin.[757] In the statement, the FSC reiterated that in Taiwan, virtual currencies such as bitcoin are considered "highly speculative virtual commodities." According to the statement, whether tokens involved in initial coin offerings (ICOs) are securities under the Securities and Exchange Act will be examined case by case, and illegal fundraising will be sanctioned in accordance with financial laws.[758]

Previously, on December 30, 2013, Taiwan's Central Bank and the FSC jointly issued a statement warning the public about the risks inherent in dealing with bitcoin.[759] In the statement, the

---

[753] *Id*. at 5–6.

[754] Act on Reporting and Specified Financial Transaction Information art. 5-2.

[755] 최홍식 금감원장 "가상통화 정상적 거래 지원 [*Chief of Finance Supervisory Service Choe Heung-sik, "Support Normal Cryptocurrency Trading"*], YONHAP NEWS (Feb. 20, 2018), http://www.yonhapnews.co.kr/bulletin/2018/02/20/0200000000AKR20180220100700002.HTML, *archived at* https://perma.cc/5TUL-NSCY.

[756] Min-kwon Chang, 정부 6월 중 가상화폐 과세안 발표…7월 G20 회의에 규제 시계 맞출듯 [*Government Will Announce Cryptocurrency Taxation Plan in June ... Making It in Time for G20 Meeting in July*], FINANCIAL NEWS (Mar. 25, 2018), http://www.fnnews.com/news/201803251117095693, *archived at* https://perma.cc/Y6XD-KCBZ.

[757] Press Release, Financial Supervisory Commission Warns General Public Once Again about Risks of Investing in Virtual Commodities Such as Bitcoin (Dec. 19, 2017), https://www.fsc.gov.tw/ch/home.jsp?id=96&parent path=0,2&mcustomize=news_view.jsp&dataserno=201712190002&aplistdn=ou=news,ou=multisite,ou=chinese,ou=ap_root,o=fsc,c=tw&dtable=News (in Chinese), *archived at* https://perma.cc/R56Q-Z2KM.

[758] *Id.*

[759] Press Release, Central Bank and FSC, Bitcoin Is Not Real Currency; Accepters Please Look to the Risks (Dec. 30, 2013), http://www.cbc.gov.tw/ct.asp?xItem=43531&ctNode=302 (in Chinese), *archived at* https://perma.cc/4N82-R6GS.

regulators said bitcoin is not a real currency, but a "highly speculative virtual commodity." The general public was warned about the specific risks associated with accepting, trading, or holding bitcoin. The Central Bank and the FSC will take necessary regulatory actions at the appropriate time on the provision of bitcoin-related services by financial institutions, the statement said.[760]

Following the 2013 warning, the FSC issued a notice on January 6, 2014, that prohibited banks and financial institutions in Taiwan from accepting or exchanging bitcoin or providing bitcoin-related services at bank ATMs.[761]

## Thailand[762]

The Bank of Thailand issued a circular on February 12, 2018, asking financial institutions to refrain from doing any business involving cryptocurrencies.[763] Bangkok Bank halted transactions involving the trading of cryptocurrencies with a private Thai company, Thai Digital Asset Exchange (TDAX), on February 24, 2018.[764] On February 27, 2018, Krungthai Bank, a state-owned financial institution, halted transactions related to cryptocurrencies with TDAX through the bank's accounts.[765] According to a news article, the ban will continue even after a new regulation (discussed below) is issued.[766]

Though the government expects new laws regarding cryptocurrencies will be enacted in the future, it decided to implement temporary measures to protect cryptocurrency investors.[767] According to news articles, on March 13, 2018, the Cabinet approved the principles of the drafts of two Royal Decrees, one to regulate digital currencies, including cryptocurrencies, transactions, and initial coin offerings (ICOs), and the other to amend the Revenue Code to collect capital gains taxes on

---

[760] *Id.*

[761] Press Release, FSC, Financial Institutions Must Not Provide Bitcoin-Related Services at ATMs (Jan. 6, 2014), https://www.fsc.gov.tw/ch/home.jsp?id=96&parentpath=0,2&mcustomize=news_view.jsp&dataserno=201401060003&toolsflag=Y&dtable=News (in Chinese), *archived at* https://perma.cc/P7FK-YGVD.

[762] At present there are no Law Library of Congress research staff members versed in Thai. This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[763] Arnab Shome, *Thailand's Central Bank Bans Banks from Dealing with Cryptocurrencies*, FINANCE MAGNATES (Feb. 12, 2018), https://www.financemagnates.com/cryptocurrency/news/thailands-central-bank-bans-banks-deal-cryptocurrencies/, *archived at* https://perma.cc/XT6F-VKMA. The text of the circular is not available.

[764] Darana Chudasri & Somruedi Banchongduang, *Bangkok Bank Halts TDAX Activity*, BANGKOK POST (Feb. 24, 2018), https://www.bangkokpost.com/business/news/1417355/bangkok-bank-halts-tdax-activity, *archived at* https://perma.cc/FX7W-NNAQ.

[765] Wichit Chantanusornsiri & Darana Chudasri, *KTB Shuts Down Crypto Trade Accounts*, BANGKOK POST (Feb. 27, 2018), https://www.bangkokpost.com/news/general/1418935/ktb-shuts-down-crypto-trade-accounts, *archived at* https://perma.cc/5HQA-G6Q6.

[766] Frankie Crowhurst, *Thailand to Introduce New Cryptocurrency Laws*, CRYPTO DAILY (Mar. 18, 2018), https://cryptodaily.co.uk/2018/03/thailand-introduce-new-cryptocurrency-laws/, *archived at* https://perma.cc/BX79-JJ24.

[767] Wichit Chaitrong, *New Digital Currency Regulation on Horizon*, NATION (Mar. 4, 2018), http://www.nationmultimedia.com/detail/Economy/30340107, *archived at* https://perma.cc/QNN6-LJS7.

Regulation of Cryptocurrency Around the World

cryptocurrencies.[768]  The Decrees would require all digital asset transactions, including those of digital asset exchanges, brokers, and dealers, to be registered with the relevant authorities.[769]

## Vanuatu

In October 2017 a number of news media outlets reported that Vanuatu would allow people to use cryptocurrency to pay the fee to obtain Vanuatu citizenship as part of its citizenship investment program.[770] However, the Citizenship Office subsequently denied this, saying that there was no legal confirmation on the use of cryptocurrencies for this purpose and all payments were required to be in US dollars.[771]

No other government statements or regulatory actions were located.

## Vietnam[772]

The State Bank of Vietnam issued a decree on cryptocurrency on October 30, 2017.  According to news reports, the Bank

> effectively determined that Bitcoin and other virtual currencies are not legal means of payment.  That effectively also outlawed the issuance, supply and use of cryptocurrencies.  Those found in violation of the decree and other relevant legal principles face fines of up to 200 million dong (around US$9,000).[773]

Some news media also reported that the government is trying to establish a legal framework for cryptocurrencies.  It was reported that the Governor of the State Bank of Vietnam (SBV) Le Minh

---

[768] Wichit Chantanusornsiri, *Cabinet OKs Digital Asset Draft Decrees*, BANGKOK POST (Mar. 14, 2018), https://www.bangkokpost.com/business/news/1427642/cabinet-oks-digital-asset-draft-decrees, *archived at* https://perma.cc/N8EN-S3YZ.

[769] *Id.*

[770] *See, e.g.,* Echo Huang & Tripti Lahiri, *A Small Pacific Island Will Now Let You Pay for Citizenship with Bitcoin*, QUARTZ (Oct. 11, 2017), https://qz.com/1099475/a-small-pacific-island-will-now-let-you-buy-citizenship-with-bitcoin/, *archived at* https://perma.cc/9G89-BXVR; *Bitcoin Can Buy You Vanuatu Citizenship*, RADIO NEW ZEALAND (Oct. 10, 2017), http://www.radionz.co.nz/international/pacific-news/341258/bitcoin-can-buy-you-vanuatu-citizenship, *archived at* https://perma.cc/MLM2-KR47.

[771] *Vanuatu Govt Steps Away from Bitcoin Payments*, RADIO NEW ZEALAND (Oct. 19, 2017), https://www.radionz.co.nz/international/pacific-news/341894/vanuatu-govt-steps-away-from-bitcoin-payments, *archived at* https://perma.cc/9K9L-RG3M; Ben Moshinsky, *Vanuatu Denies it Will Accept Bitcoin for its $200,000 Citizenship Program*, BUSINESS INSIDER (Oct. 18, 2017), http://www.businessinsider.com/vanuatu-accepts-bitcoin-for-citizenship-payment-2017-10, *archived at* https://perma.cc/5MPC-RHWW.

[772] At present there are no Law Library of Congress research staff members versed in Vietnamese.  This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[773] Nate Fischler, *Vietnam Has a Cryptocurrency Dilemma*, ASIA TIMES (Feb. 1, 2018), http://www.atimes.com/article/vietnam-cryptocurrency-dilemma/, *archived at* https://perma.cc/5VF9-MSUE.

Hung said that " 'from the perspective of treating it as an investment asset', the SBV would co-operate with the justice ministry to 'study the legal framework for managing' Bitcoin."[774]

---

[774] Dani Gas, *Cryptocurrency Legal Framework in Vietnam: Will Be Ready by End of January*, INFOCOIN (Jan. 8, 2018), http://infocoin.net/en/2018/01/08/cryptocurrency-legal-framework-in-vietnam-will-be-ready-by-end-of-january/, *archived at* https://perma.cc/UX6R-U3E3.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this Petition with the Clerk of Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 25, 2018.

I further certify that copies of this Petition were served by email on the recipients listed below with the usual and customary manner of service in the underlying action and considering the "immediacy . . . , distance, and cost, . . ." *See* FRAP 25(c)(3).

| | |
|---|---|
| Thomas L. Laughlin, IV<br>Rhiana L. Swartz<br>SCOTT+SCOTT ATTORNEYS AT LAW LLP<br>The Helmsley Building<br>230 Park Avenue, 17th Floor<br>New York, NY 10169<br>Telephone: 212-223-6444<br>Facsimile: 212-223-6334<br>tlaughlin@scott-scott.com<br>rswartz@scott-scott.com<br><br>*Attorneys for Plaintiff Avner Greenwald* | John T. Jasnoch<br>SCOTT+SCOTT ATTORNEYS AT LAW LLP<br>600 W. Broadway, Suite 3300<br>San Diego, CA 92101<br>Telephone: 619-233-4565<br>Facsimile: 619-233-0508<br>jjasnoch@scott-scott.com<br><br>*Attorneys for Plaintiff Avner Greenwald* |

Dated: October 25, 2018            Respectfully submitted,

_____
            */s/ Peter B. Morrison*
            Peter B. Morrison
            Attorneys for Petitioners